1            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2

3    PROJECT VERITAS ACTION FUND,        )
                                         )
4              Plaintiff                 )
                                         )
5         -VS-                           )  CA No. 16-10462-PBS
                                         )  Pages 1 - 39
6    DANIEL F. CONLEY, In his            )
     Official Capacity as Suffolk        )
7    County District Attorney,           )
                                         )
8              Defendant                 )

9

10                      **MOTION HEARING**

11          BEFORE THE HONORABLE PATTI B. SARIS
             UNITED STATES CHIEF DISTRICT JUDGE
12

13

14

15

16                          United States District Court
                            1 Courthouse Way, Courtroom 19
17                          Boston, Massachusetts  02210
                            November 4, 2016, 2:42 p.m.
18

19

20

21

22

23                    LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
24              United States District Court
                1 Courthouse Way, Room 7200
25                   Boston, MA  02210
                      (617)345-6787

1   A P P E A R A N C E S:

2        GREGORY D. COTE, ESQ., McCarter & English, LLP,
   265 Franklin Street, Boston, Massachusetts, 02110,
3   for the Plaintiff.

4        STEPHEN KLEIN, ESQ., Pillar of Law Institute,
   500 Madison Street, #419, Alexandria, Virginia, 22314,
5   for the Plaintiff.

6        RYAN E. FERCH, ESQ., Attorney General's Office,
   18th Floor, One Ashburton Place, Boston, Massachusetts, 02108,
7   for the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  Court calls Civil Action 16-10462, Project

3    Veritas Action Fund v. Daniel Conley, et al.  Could counsel

4    please identify themselves.

5          MR. KLEIN:  Your Honor, Stephen Klein on behalf of

6    Project Veritas, joined by Greg Cote, local counsel.

7          THE COURT:  Thank you.

8          MR. FERCH:  Good afternoon, your Honor.  Ryan Ferch on

9    behalf of the defendant.

10          THE CLERK:  You can be seated.

11          THE COURT:  Okay.  I don't know who wants to go first.

12    We have a motion to dismiss and a motion for preliminary

13    injunction.  Sort of logically the standing issue goes first,

14    so I thought we would start there, but --

15          MR. FERCH:  Sure, happy to, your Honor.

16          THE COURT:  -- I'm not so wedded to it.  Does that

17    make sense from your point of view?

18          MR. KLEIN:  Your Honor, that's fine.

19          THE COURT:  Okay.

20          MR. FERCH:  Your Honor, as you point out, the crux of

21    our argument is a standing argument, just that the plaintiff

22    hasn't alleged sufficient harm or chilling impact, especially

23    for the drastic relief that they're seeking here.  There's no

24    allegations in the complaint that this out-of-state plaintiff

25    had any contacts with Massachusetts before filing this --

1          THE COURT:  Well, let me ask you, are you the First

2    Amendment guy?  I notice you're also the lawyer on the *Martin*

3    case?

4          MR. FERCH:  I am, your Honor.  I'm happy to take that

5    distinction, but I'm not sure how much I deserve it.

6          THE COURT:  So what we have here are allegations in a

7    complaint --

8          MR. FERCH:  Right.

9          THE COURT:  -- which I have to accept as true.  What

10   more do they need to do?  In other words, would an affidavit --

11   sometimes you have jurisdictional standing discovery.  I mean,

12   what more do you have to say other than, "I plan to use this

13   news story and I plan to use this technique, and I am afraid"?

14         MR. FERCH:  Well, it depends which prong we're talking

15   about.  I'll start with the chilling.  You have to, and the

16   Supreme Court has said in a couple of cases I'm happy to talk

17   about, you have to articulate two parts of the chilling:  one,

18   that you actually have been chilled, and, two, why that is.

19   And so here we don't have anything beyond just a --

20         THE COURT:  But suppose they had an affidavit.  I

21   mean, I'm sure they could come up with one, right, from the

22   organization?  I don't know, I don't think there's one in the

23   record, right?

24         MR. KLEIN:  Your Honor, no.  However, there is a

25   verified complaint was filed.

1          THE COURT:  All right, it's verified.  All right, that

2    may suffice.  Somebody swears under oath that "I plan to do an

3    article on slum landlords, and I'm afraid to do it because look

4    at the *Glik* case," why isn't that enough?  What else could you

5    say?

6          MR. FERCH:  Well, I mean, I'll take, for example, the

7    *Susan B. Anthony* case, which was a recent Supreme Court case.

8    That was a case where a plaintiff wanted to put up a billboard.

9    They articulated in their complaint, "This is what we want to

10   say.  This is the billboard."  They had gone to the committee

11   to have the billboard.  They had been rejected.  The committee

12   had decided there was probable cause that they would violate a

13   statute, and the Supreme Court said that's enough.  You have an

14   articulation of exactly what we're going to say.  It was

15   undisputed that the statute covered them.

16         THE COURT:  But in this context, I mean, their

17   business model or journalistic model -- that would be a better

18   way -- their journalistic model is to secretly record you, and

19   so they can't do that in advance, like the Susan B. Anthony

20   billboard, they can't do that because --

21         MR. FERCH:  Well, there's two points --

22         THE COURT:  -- they'd be violating the law.  They

23   would be under the Commonwealth's case law, so they can't do

24   it.

25         MR. FERCH:  Well, there's two points I'd like to make

1    on that.  The first one is that journalism doesn't give you a

2    right to do journalism in any way and in any manner that they

3    so choose.  They still have to comply --

4           THE COURT:  Absolutely.  But what you'd want them to

5    do, probably, is go in, interview a slum landlord, and then

6    say, "Oops, I would have done that"?  Is that what you want, "I

7    would have done that with a tape recording but I didn't because

8    of the law"?

9           MR. FERCH:  Something like that I think would get a

10   lot closer.  I mean, there needs to be something more.  Right

11   now we have -- and keep in mind that we still have the *Iqbal*

12   standard for pleadings.  You have to have something more than a

13   legal conclusion to --

14          THE COURT:  Have you seen these people?  I mean, they

15   do this.  I mean, this is not just some -- they're pretty

16   prominent in doing this.  I mean, I don't disbelieve that they

17   do it, do you?

18          MR. FERCH:  No, but again --

19          THE COURT:  Did you look at their website?

20          MR. FERCH:  Yeah.  I mean, your Honor --

21          THE COURT:  I mean, they do it.  That's what they do.

22   So, I mean --

23          MR. FERCH:  But again, your Honor, we're talking about

24   an unarticulated story that may never come to pass.  There has

25   to be -- I mean, going back to the premise I started with,

1   there's no alleged contacts with Massachusetts at all.  They

2   admit in their opposition they haven't even sent somebody here,

3   and yet they're asking on the flip side this Court to strike

4   down the entire state statute, having never been to

5   Massachusetts, and articulating absolutely no steps that have

6   been taken on the statute other than a business model.  And

7   what we're saying is, that's simply not sufficient for --

8          THE COURT:  So if they had an affidavit with a game

9   plan for how they were planning on doing this investigative

10  reporting --

11         MR. FERCH:  We'd have to see that.  I mean, I think --

12         THE COURT:  I don't buy the argument that you actually

13  have to go in and violate the law before you have First

14  Amendment standing.

15         MR. FERCH:  No, and I think the case law is clear, and

16  I'm not arguing that you have to violate the law, but what you

17  have to do is articulate steps that you're covered by the law

18  and that you actually either -- and, again, the First Amendment

19  context -- either that you're going to face a certainly

20  impending prosecution or that you are actually chilled from

21  doing it, and they haven't done either of one of those here.

22  There's --

23         THE COURT:  So let's suppose he gives me an affidavit

24  from -- I don't know who's the lead guy now, lead or woman.

25  They come in.  They give me an affidavit.  They say, "We have

1   this game plan.  Here are the details for what we plan to do.

2   True, we don't have any reporters currently in the state, but

3   it's a small country.  They'll fly in and they'll --" I don't

4   know what you do -- "they'll go interview slum landlords."

5            MR. FERCH:  I mean, certainly they would have the

6   ability to attempt to amend the complaint or to bring an

7   affidavit in.  They could do that.  We could look at it at that

8   point.  I don't want to concede what's enough but --

9            THE COURT:  They sort of alleged that in the

10  complaint, in the verified complaint, I mean, close to that

11  anyway, so I don't know that I'd want to --

12           MR. FERCH:  I'm not sure how close to that they get.

13           THE COURT:  All right, well, you tell me.  What is it

14  you can tell me about the standing issue?  And if I think this

15  isn't enough, would you want to supplement it?

16           MR. KLEIN:  Your Honor, I don't believe -- I believe

17  Project Veritas Action Fund has adequately shown standing.

18  Again, we have the relaxed standards of the First Amendment

19  challenges.  Moreover, we still have *City of Chicago v.*

20  *Morales*.  Veritas Action comes into this court not just

21  representing itself, but this is one of the few areas where it

22  has third-party standing.  It is representing anyone within the

23  Commonwealth who seeks to record secretly.  As far as -- I

24  agree with your assessment.  I don't understand how an

25  affidavit would change the chill here.  This is already

1    established by Veritas.  We're talking about a misdemeanor

2    statute that prohibits even possession of secret recording

3    devices, and you're a member of this organization, whether an

4    independent contractor, whether an employee.  Evincing that

5    intent to use that to secretly record it seems --

6         THE COURT:  I suppose I could require more

7    particulars, and even if you did it ex parte because you didn't

8    want to tip off the slum landlords, you know, what is your

9    plan?  Who in particular were you planning on interviewing?

10   What's the practice that you were most -- I mean, you could get

11   more details.  Is that available?

12        MR. KLEIN:  Your Honor, I think PVA certainly could,

13   but the question is, then this continues to go in kind of a

14   fundamental misunderstanding of the news-gathering process, is

15   that PVA, a lot of what it gets it stumbles upon.  I mean,

16   we're coming into this case serendipitously after a few weeks

17   of PVA's most powerful reports yet, as in 10 million hits on

18   YouTube between two videos.  That all began with a happenstance

19   meeting in a bar in Wisconsin with a guy rambling to his

20   heart's content to the point where everybody around could hear

21   him, and the PVA reporter was wearing a hidden recording

22   device.  So this idea that PVA can lay out this game plan

23   strikes me as just asking far too much, and then --

24        THE COURT:  But it does require that since you haven't

25   done anything in Massachusetts, understandably because it would

1    be illegal here, still that you're not just making up out of

2    whole cloth, "Oh, I could, let's see, I could try and figure

3    out slum landlord problems."  I mean, I think that's what

4    they're saying, you made something up to essentially get the

5    hook to come in here.  So something a little more concrete than

6    that, I suppose that's what they're arguing you need.

7              MR. KLEIN:  Well, your Honor, I would disagree.  Given

8    the breadth of this statute, I just believe, particularly on

9    the compliance side with my clients, I have concerns about a

10   felony statute.  I have concerns about conspiracy.  I have

11   concerns about other inchoate defenses to come into

12   Massachusetts.  And particularly in the defendant's final reply

13   brief, there's a certain attitude of, "Go be real, journalists,

14   and then prove to us that doesn't work, and then maybe you'll

15   have standing to challenge this."  And I --

16             THE COURT:  Well, as you stand here as an attorney,

17   officer of the court, is there genuinely a game plan to come in

18   here and do an investigation of housing?

19             MR. KLEIN:  Your Honor, if this unequivocal ban was

20   not in place, yes.

21             THE COURT:  So if I were to -- I haven't had a First

22   Amendment standing case in a while.  The verification may make

23   this unnecessary, but if I wanted more details, more details

24   exist?

25             MR. KLEIN:  Yes, your Honor.

```
 1            THE COURT:  All right, so let's move on now to the

 2    motion for a preliminary injunction.  So while you're on your

 3    feet --

 4            MR. KLEIN:  Thank you, your Honor, and may it please

 5    the Court, my name is Stephen Klein again.

 6            THE COURT:  Where are you from, which firm?

 7            MR. KLEIN:  I'm a solo practitioner in Virginia, your

 8    Honor.

 9            THE COURT:  Virginia?

10            MR. KLEIN:  Yes.

11            THE COURT:  Welcome --

12            MR. KLEIN:  Thank you.

13            THE COURT:  -- to our glorious fall weather.

14            MR. KLEIN:  This case is about the broadest censorship

15    of undercover news gathering and public accountability.  As I

16    mentioned during the standing discussion, Project Veritas is

17    coming off of some of its most successful reporting to date:

18    as far as distribution, 10 million hits on YouTube and

19    featuring some very, indeed, revealing comments; a political

20    operative well placed in a consulting firm that consults with a

21    Presidential campaign stating, "It doesn't matter what the

22    friggin' legal and ethics people say.  We need to win this

23    mother --" fill in the blank.  Suffice it to say, he was

24    speaking of the 2016 election.

25            Regarding certain protests and agitation that's been
```

1    going on throughout this Presidential campaign cycle, we have

2    another quote given in a crowded bar:  "We have mentally ill

3    people that we pay to do things --" the word was not

4    "things" -- "make no mistake."

5         We have yelling in an open room with others around,

6    not party to the conversation, someone taking credit for

7    organizing a protest in Chicago that shut down a rally for a

8    Presidential candidate.

9         The First Amendment concerns here are that in the

10   Commonwealth, as laid out by the defense, the requirement that

11   someone in PVA were to tell any of those people who were

12   recorded in any of those comments that, "By the way, I'm

13   recording this," or to openly display recording equipment, is

14   not merely to say that those comments would not have been made

15   it onto the record, it is the fact those comments never would

16   have been stated.  I think that those claims, had they been

17   written down, had they been recorded in any other form, would

18   simply have been plausibly deniable and in fact incredible.

19   There is a power to video, and audio in particular.  There is a

20   power to having truth; hence, the name Project Veritas.

21        Likelihood of success, the First Amendment interests

22   here -- and I think, to put this into perspective, your Honor,

23   the conflict here is that we've had the Commonwealth, the

24   interception statute has been on the books for a very long

25   time, and yet many, many, so many cases have happened.  And I

1  think to put it into the most perspective is, we have *Jean v.*

2  *Massachusetts State Police* from 2007, which adopted the Supreme

3  Court's *Bartnicki* precedent and ruled that if Project Veritas

4  were to do any kind of secret interception here in the

5  Commonwealth, it would be liable for a felony; but if it were

6  to take that document or that file and send it to the New York

7  Times, therein would be a wall of separation:  five-year felony

8  for Veritas, free speech for the New York Times.

9       THE COURT:  Well, while you're on *Jean*, a First

10  Circuit case, that seems to suggest that it's an intermediate

11  level of scrutiny.  So while you may want to preserve that for

12  a higher being, isn't that the standard I need to apply?

13       MR. KLEIN:  Your Honor, I stand by strict scrutiny for

14  a few reasons.

15       THE COURT:  But does *Jean* say intermediate?

16       MR. KLEIN:  *Jean* does.

17       THE COURT:  Okay.  And since the First Circuit, I

18  don't even go up like this; I just go down the hall like that.

19  That's where I am, okay?  And I do understand you want to

20  preserve it.  I can't change that, right?

21       MR. KLEIN:  Your Honor, I think --

22       THE COURT:  As much as I think I'm all powerful as a

23  DJ, I can't change the standard of the First Circuit.  Right,

24  that's the standard?

25       MR. KLEIN:  Your Honor, I believe in particular, to

1  consider a distinguishing factor, is the fact that the

2  government in this statute has preserved for itself the ability

3  to, under very narrow circumstances, but nevertheless under

4  certain circumstances, to go and get itself a warrant, and

5  thereby get itself single-party recording.  It's giving

6  government a power that it is denying the citizens.  And I

7  think for that, on that basis, there are content issues.  You

8  know, we could certainly bring an equal protection as well, but

9  I urge you to certainly not ignore that fact; that for a

10  statute that preserves privacy, it's doing it in such an

11  un-uniform way, that that may indeed trigger a strict scrutiny.

12        Having said that, even under intermediate scrutiny,

13  your Honor, particularly in light of the *McCullen v. Coakley*

14  decision, we now have Supreme Court precedent stating that,

15  well, we don't have to use the least restrictive means in

16  intermediate scrutiny, but we do have to consider means that

17  are less intrusive upon First Amendment conduct.

18        THE COURT:  Right, "a close fit" is often the way it's

19  described, right?

20        MR. KLEIN:  Yes, your Honor.  And in that sense, we

21  have many other states to compare to, whether under strict or

22  intermediate.  If the Commonwealth wants to protect private

23  conversations from intentional secret recording, then the

24  Commonwealth needs to protect private conversations from the

25  intentional secretive recording.  It should not be protecting

1    any conversation anywhere at any time from secret recording.  I

2    believe that the reasonable expectation of privacy standard,

3    which is used a lot in the Fourth Amendment context that has

4    been adopted in many other states, really shows the value of

5    this.  In most states that have even two-party consent, we have

6    an exception; that if somebody is speaking either in a

7    situation where they have no reasonable expectation of privacy

8    and are not exhibiting that expectation, then we understand

9    that that is free to record.

10        THE COURT:  One legal question that I had in reading

11   the cases was, in a close-fit kind of analysis, let's suppose

12   the statute -- and I'm going to ask you the same thing -- the

13   statute was not a close fit but that a judicial decision

14   narrowed it, by which of course I mean the First Circuit

15   opinion in *Glik*, so you had essentially a legal narrowing by a

16   court that took away what I would call the most compelling

17   cases you have for news gathering.

18        MR. KLEIN:  I'm not quite sure I understand, your

19   Honor.  In *Glik* it was a -- and I loop that back into the

20   standing argument to point out, in *Glik* we -- you know, as far

21   as the chill on Veritas is, people get arrested in Boston for

22   not violating this statute, as *Glik* showed, so there's

23   certainly concern about getting arrested for actually

24   violating --

25        THE COURT:  But suppose you just had a bright line:

1    If you're a public official acting in a public place, this

2    doesn't apply; this only applies in private settings.

3            MR. KLEIN:  That is one of the assertions we made in

4    our complaint, your Honor, and it's --

5            THE COURT:  So would that satisfy, I mean, since

6    essentially that is one way of thinking about what the *Glik*

7    court was signaling?

8            MR. KLEIN:  It certainly helps Veritas for a lot of

9    its reporting, your Honor, but it doesn't quite go far enough.

10   There are nonpublic officials who engage in a lot of public

11   conduct.  In fact --

12           THE COURT:  But for the private people, the balancing

13   starts tipping against you.  In other words, as I understand

14   it, you're taking the position you can record anywhere, even

15   with a private person, so long as there's one-person consent.

16   You're going to the other extreme.

17           MR. KLEIN:  Your Honor, we are not arguing -- as a

18   matter of public policy, we certainly support single-party

19   consent.  It certainly makes my job a lot easier on the

20   compliance side.  But for a constitutional standard, again, to

21   suggest we could incorporate it either through a reading of the

22   statute or even as a constitutional free speech standard is not

23   our assertion.  Again, this is an overbreadth or under

24   traditional tailoring.  The problem here is that in protecting

25   privacy, this statute just simply goes too far.  It simply

1   takes and allows citizens in any situation to walk around in

2   public with this bubble of protection that there is no

3   reasonable expectation of, and no reasonable objective person

4   would think they have privacy.

5         THE COURT:  I'm curious, did local counsel tell you

6   about the *Demoulas* case?

7         MR. KLEIN:  Your Honor, no.

8         THE COURT:  You're familiar with it, right?

9         MR. COTE:  It has been quite some time, your Honor,

10  but --

11        THE COURT:  Well, the *Demoulas* case is a local

12  scandal.  Are you familiar with it?

13        MR. FERCH:  Only --

14        THE COURT:  You're all too young, okay?  You're all

15  too young.

16        MR. COTE:  I remember the facts.  I don't remember the

17  particulars.

18        THE COURT:  All right.  So I had a piece of it, and

19  other judges had pieces of it.  It was litigated over a long

20  period of time.  The gist of it was and the relevant part of it

21  was is that the family was trying to undermine the credibility

22  of a judge and did so by having a false interview with the law

23  clerk, in which case they tape-recorded the law clerk talking

24  about the judge, and he thought it was a private interview, and

25  of course they used it to motion to recuse.  The piece I had

1    was, a prostitute tried to seduce somebody who was friendly

2    with the family to get information out of him in bed, and she

3    was tape-recorded.

4         Okay, now, so this was a big case here, so it's just

5    prominent in my mind.  I mean, at some point your position is

6    that both of those would have been okay.  Neither of them were

7    public people.  You know, it creates no protection or privacy

8    for people, right?

9         MR. KLEIN:  Your Honor, because we brought a facial

10   challenge, we stand by the *Hyde* ruling that calls this an

11   unequivocal ban.  I am certainly hesitant to encourage judicial

12   rewriting, particularly of a state statute, but that is not our

13   argument.  I mean, a facial invalidity would certainly send

14   this back to the Massachusetts General Court for some

15   rewriting, but there are ample options that would defend --

16        THE COURT:  Well, why wouldn't just as good an option

17   simply say "public people, public places," and then the rest of

18   it, the privacy outweighs the First Amendment?  Because that's

19   essentially what the First Circuit was doing.

20        MR. KLEIN:  I think it would head more in the right

21   direction as long as public places include places with no

22   reasonable expectation of privacy.  That's usually interpreted

23   as:  Someone else is around there who would have overheard the

24   conversation anyway.  That's at least how I've interpreted it

25   in practice in states like California and others.  So I really

1    think this two-prong analysis -- and there's many, many cases,

2    your Honor, and I'm certainly happy to provide supplemental

3    briefing on these litany of cases that show how this is played

4    out in practice.  And, you know, you have Florida.  You have a

5    case of a man in an apartment screaming into his telephone.

6    He's in a place, a place with a reasonable expectation of

7    privacy, but he's not objectively showing that expectation, and

8    thus his neighbor was able to record him through the wall just

9    by virtue of holding up a tape recorder.

10            THE COURT:  And that would be okay?

11            MR. KLEIN:  Yes, that is okay in Florida, and I think

12   it would be and should be okay because, again, the person is

13   not doing anything on their own part to secure that privacy

14   interest.

15            We have cases in California, a case in California

16   where someone was on a public street in public, but he was

17   speaking very quietly to somebody next to him.  He was really

18   exhibiting that "I'm trying to keep this quiet," and the only

19   reason he was picked up is because someone snuck up behind him

20   with a recording device and was able to --

21            THE COURT:  We could all come up with a parade of

22   examples that would make us squirm, but your view is,

23   essentially all private people in private places as long as one

24   person has consented to having it recorded?

25            MR. KLEIN:  From a matter of public policy, your

1    Honor, absolutely.  From a matter of constitutional law and

2    what we argue in this case, no.

3         THE COURT:  So let me go to you because, I mean, the

4    law -- and I want to make sure you're familiar with the *Martin*

5    case.  Are you?

6         MR. KLEIN:  I don't believe so, your Honor.

7         THE COURT:  There's a companion case.  "Companion" is

8    broadly put.

9         MR. KLEIN:  Oh, excuse me.  Yes, your Honor.

10        THE COURT:  I think -- is it *Martin*?

11        MR. FERCH:  Yes, it is.  ACLU, they're representing

12   *Martin*, you're correct.

13        THE COURT:  So I just read the brief you filed in that

14   case -- and I noticed you're the First Amendment guy -- in

15   which you urge me to certify the question to the SJC.  Just

16   filed it three weeks ago or something like that?

17        MR. FERCH:  Right, and I'm hesitant to argue that,

18   since --

19        THE COURT:  No, but why wouldn't -- in other words,

20   don't I have to decide these cases in tandem?  They're looking

21   for a carveout for public people, as I understand it, like

22   police officers.

23        MR. FERCH:  I don't -- there's sufficient distinction

24   between the cases that -- you're right, they raise a lot of the

25   same issues.

1          THE COURT:  I'd have to write these opinions together.

2          MR. FERCH:  In some ways, yes.  Before I go on to

3     that, I want to go back because it applies to both.  On the

4     standing issue, the First Amendment standard has been changed

5     in recent years with the *Clapper* and *Blum* case, *Blum* coming out

6     of the First Circuit in 2014.  So that case, you have noted

7     earlier that it might have been a few years, so I wanted to

8     highlight those cases because they apply to both.

9          The distinctions between the two, this case, again,

10    we're dealing with out-of-state plaintiffs seeking facial

11    invalidity of the entire statute.  *Martin* we're dealing with

12    two named plaintiffs in I believe Dorchester or Roxbury that

13    are making a specific allegation trying to extend the *Glik* case

14    in a narrow confine.  And it's important to understand that

15    *Glik* and the other First Circuit cases haven't addressed the

16    secretive nature.  So *Glik* was an open recording case, and the

17    First Circuit was clear in *Glik* to say that their rule or the

18    clearly established law for 1983 purposes was that you could

19    record public officials in public performing their duties; but

20    they made clear to say that it's not an unfettered or unlimited

21    ruling, and they specifically didn't address the secretive

22    nature of that.

23          THE COURT:  Right, because all they were addressing

24    was qualified immunity and as to what was clearly established,

25    but you don't have to read much if you read that and then you

1  read Justice Cordy's and Marshall's, both of whom are not on

2  the bench anymore, dissent in -- was it *Healy*?

3         MR. FERCH:  I believe it was *Hyde*.

4         THE COURT:  *Hyde,* I'm sorry, I got the name wrong.

5  You know, the way the law is moving on public people.

6         MR. FERCH:  Right, and we have an argument obviously

7  in the *Martin* case, and I don't want to argue it, that that

8  argument there is that it's better suited, given the evolving

9  technology, to certify that question back to the SJC so that

10  they can determine that narrow issue under state law, given the

11  evolving nature, and given -- I mean, it's just plain that

12  technology has changed so much.  *Hyde* was a 2001 case, and they

13  were talking about tape recorders then, I think.

14         THE COURT:  Well, and the way you were arguing it,

15  Project Veritas could just go in with phones that weren't part

16  of a common carrier and it wouldn't be covered.  Not that I'm

17  giving you ideas, but, I mean, that was the position that you

18  took, kind of thing.

19         MR. FERCH:  I tried to be very careful in that brief

20  to say that that's one potential argument that could be made,

21  and I do think that that's an argument that the state courts

22  and the state Supreme Judicial Court should be making or the

23  legislature should be making, not a plaintiff bringing an

24  out-of-state complaint.

25         THE COURT:  Well, you keep saying that, but the

1   <u>New York Times</u> is out of state.  They come in here all the

2   time.  I mean, with the Boston Marathon, you know, I had 500

3   media organizations here, 500.  So people come in from out of

4   state.  They're still journalists.

5           MR. FERCH:  They do, and, as you say, they come in all

6   the time, but, again, going back to the pleading, there's no

7   allegation that they've ever been here except for this

8   complaint.  That's the point that I'm making, that really

9   they're trying to strike down an entire state statute for a

10  state that they apparently have no contacts with --

11          THE COURT:  Right, but let's -- I get it.

12          MR. FERCH:  Right.

13          THE COURT:  I'll think about that one.

14          MR. FERCH:  I don't want to --

15          THE COURT:  But on the merits, on the merits, can I

16  consider, on an intermediate scrutiny, limiting principles by

17  the First Circuit, and the other courts, and basically narrow

18  it on my own, subject to the case law that is applicable?

19          MR. FERCH:  And I think I want to be careful here.

20          THE COURT:  I'm not sure of the doctrine, whether I

21  can do that.

22          MR. FERCH:  And this is where I want to be careful on.

23  The question under intermediate scrutiny, I don't think --

24  there's two parts.  The legitimate government interest, I don't

25  think there's any dispute on that; the privacy is a legitimate

1   government interest.

2           THE COURT:  Right.

3           MR. FERCH:  The second is the incidental impact that

4   is no greater than necessary, and I think, in determining that,

5   what you're looking at is the scope of the statute, its

6   relative impact on, arguably, First Amendment protected

7   communications versus its impact on non-First Amendment; and I

8   think, in considering that, you can look at how other cases

9   have construed this statute to determine exactly what the scope

10  of the statute is currently.

11          THE COURT:  In deciding whether it narrowly fits, I

12  can take into account existing case law?

13          MR. FERCH:  I certainly think you can because I think

14  that case law construes the statute and would be relevant to

15  how it is applied today.

16          THE COURT:  Now, could I do it myself?  Let's assume

17  that it's correct that *Glik* is not on all fours because it was

18  a qualified immunity as to what was clearly established.  On my

19  own, if I did it, especially with the companion case of *Martin*,

20  in your view, doctrinally, can I narrow myself?

21          MR. FERCH:  I'm hesitant --

22          THE COURT:  Or is it all or nothing?  I think Project

23  Veritas would say all or nothing, that I just can't do that.

24          MR. FERCH:  I'm hesitant to say "yes," but I think,

25  and we argue that in this case, that there is a doctrine, and

1    it's in my brief, and I can't remember, but there is a

2    constitutional avoidance or -- I'm messing up the words -- but

3    it's the doctrine that you read a statute to be as

4    constitutional as possible, read it in a way such that it will

5    make it constitutional.  And if you're going to do that, I

6    think the argument is, as opposed to striking down the entire

7    statute completely, it can be read, perhaps with a limiting

8    instruction, that would have made it constitutional.

9            But that gets to the point that -- and the other

10   distinction with *Martin* is, it's an as-applied challenge as

11   opposed to a facial challenge.  So in as-applied challenges,

12   and that's -- going back to *Jean*, that's similar; it's not on

13   all fours, but that's effectively what the First Circuit and

14   the Supreme Court were doing.  In *Jean* the First Circuit

15   conceded that the person that made the recording could have

16   been prosecuted but that the person who published the recording

17   could not.

18           THE COURT:  Could not.

19           MR. FERCH:  Even though the First Circuit recognized,

20   arguably, the way the statute is written that person could be

21   prosecuted under the statute, there was a limiting construction

22   there.

23           THE COURT:  So when I read -- you know, it's funny, I

24   read *Citizens United* back in the day, but I sort of had never

25   read it with this in mind.  I mean, essentially the Supreme

1    Court, they started off with in an earlier case trying to

2    construe it as applied to make it constitutional, and then,

3    finally, in *Citizens United* they sort of gave up, and they

4    said, "Look, we can't be the legislative body here.  Thumbs

5    down.  Rewrite it, Congress."

6         I mean, I'm trying to think whether I -- let's assume

7    I think it's narrowly tailored with respect to private people.

8    I can't come up with every hypothetical.  I challenge myself

9    sometimes:  "Well, what if this?  What if that?"  But let's

10   assume, just broad brush, the privacy concerns of private

11   people, but what about public like the, you know, policemen?

12        MR. FERCH:  I think on that point, I think we're a

13   long ways away from *Citizens United* or even the recent *Johnson*

14   opinion where the Court basically is throwing its hands up and

15   saying you can't do it.  I --

16        THE COURT:  *Johnson*, the criminal case?

17        MR. FERCH:  The criminal case, right.

18        THE COURT:  Oh, I do know that one.

19        MR. FERCH:  Yeah, I figured you did.  I think we're a

20   long ways from that, and I think the reason for that is -- and

21   this overlaps a little bit with the standing -- there simply

22   aren't that many prosecutions under this under state law.  It

23   just does not come up that frequently.

24        THE COURT:  Let me tell you, that *Demoulas* case was

25   not a prosecution.  It was a civil suit for damages.  So, I

1    mean, it comes up.  That counts, doesn't it?

2           MR. FERCH:  It comes up in that context, but there's a

3    separate provision that's not at issue here which allows for

4    torts of the individual person.  I mean, again, it's important

5    to remember that only one defendant has been named here, and

6    that's the Suffolk DA.  And the argument has to be that the

7    Suffolk DA as the defendant is the one that will actually

8    prosecute this case, and they've only really been able to and

9    I'm only really aware of two alleged prosecutions, one which

10   was *Glik*, which was dropped in the District Court, and then the

11   other one is the *Manzelli* case, which I believe was over ten

12   years ago, and so those are really the only two times that this

13   has been prosecuted.

14          THE COURT:  I don't know, wouldn't you be worried?  I

15   mean --

16          MR. FERCH:  Again, I think that gets into the

17   question -- I don't want to argue the *Martin* case -- it gets

18   into the question of modern technology and in what context

19   we're talking.  And I think it's important to remember here

20   that there is no constitutional right to secretly record.  And

21   I think it's also important, I think one-party consent --

22          THE COURT:  I get that, and I first thought that, but

23   it does say and the Supreme Court has said that news-gathering

24   is protected by the First Amendment, and you can't -- I took

25   down the word that he used -- yes, that audio taping has a

1  different power, I think was the word used, rather than just

2  taking notes or trying to remember and then going back and

3  taking notes, because, I mean, the way they do it is, they

4  essentially don't notify anyone.  They're in casual

5  conversations or they're on the street or wherever.  So it

6  doesn't carry the punch to just say, "Well, I was in this

7  conversation with someone and this is what he said," and he

8  said, "No, I didn't."  So the news-gathering is protected.

9        MR. FERCH:  The news-gathering, but it's not an

10  absolute privilege, and the Supreme Court has said that as

11  well.  You can't news-gather in any way and in any manner, and

12  that's the point that I --

13        THE COURT:  Well, that's their point too:  "Yeah, and

14  we're not going to violate the law, so we need this declared

15  unconstitutional."  I mean, that's their big point:  "We're not

16  permitted to do it this way."

17        MR. FERCH:  But the other point is that states also

18  have the right within their sovereign powers to make decisions

19  for their constituents.  The Massachusetts legislature made the

20  decision that two individuals having a conversation, one should

21  not have to fear that they're going to be secretly recorded by

22  that second person.

23        Now, I want to make clear that one-party consent is

24  really a misnomer.  What one-party consent means is that I can

25  choose to consent and secretly record somebody else.  So that's

1     what the legislature here has said --

2              THE COURT:  Sure.

3              MR. FERCH:  -- that you're not allowed --

4              THE COURT:  It's basically, I hate to say it, federal

5     law.  I mean, I deal with that day in and day out in the drug-

6     trafficking context.  You know, you get one trafficker.  He's

7     wired.  He goes in with another drug trafficker.  You don't

8     need a warrant.  I mean, the federal law is exactly what

9     they're asking for.

10             Now, I do take it that the state legislatures have the

11    power to protect privacy, and so then the question is, is this

12    narrowly tailored to do that?  Really, that's the issue.

13             MR. FERCH:  And our argument is "yes" because, as we

14    point out in the brief and as you pointed out here, there's a

15    large host of areas, any conversation between two individuals,

16    and we point out some of the examples in our brief that aren't

17    protected by First Amendment.  And, as you pointed out, the few

18    instances of news-gathering of public information, again, with

19    the *Martin* case, it's a little bit unclear, given current

20    technology, but you're certainly allowed to openly record that.

21    And it is narrowly tailored in that sense because it isn't --

22    the incidental -- again, intermediate scrutiny allows for some

23    infringement on First Amendment rights.  It's not an absolute

24    bar.  It's just a question of, how do you compare that

25    infringement versus the scope of the statute?  And our argument

 1   here is, any infringement is minor compared to the scope of the

 2   statute for unprotected --

 3          THE COURT:  Well, what if I carved off public

 4   officials acting in the scope of their public responsibilities

 5   or in a public arena?  You know, like someone giving a speech

 6   is what I'd be thinking of.  Am I allowed to do that?  In other

 7   words, if I think that that's constitutionally impermissible,

 8   that the public interest outweighs the privacy interest at that

 9   point, is that something I'm allowed to do is rewrite it

10   constitutionally?

11          MR. FERCH:  I don't think so because I don't think

12   there's any -- again, we'd be having to talk about the -- we're

13   talking about the secretive nature.  The First Circuit has

14   already carved out that without the secretive part, so what you

15   would be including is the secretive nature, and you'd have

16   to -- and it's not raised in this case.  Again, we argue it

17   shouldn't be raised in the *Martin* case because it should go

18   back to the state to determine that issue, but effectively what

19   you'd be having to do is say that the secretive nature is

20   allowed in that context.  And I point back to the *Hyde* case in

21   the SJC.  They made the point, the majority in that case I

22   thought made the point very well that how do you define public

23   employee?  Is it teachers?  Is it parent/teacher conferences?

24   Is it the meter takers?  Is it a parking attendant?  Is it

25   you --

1          THE COURT:  Yes, it's difficult.  I read that, both

2     the majority and the dissent, with great interest because it

3     does point out the difficulties.

4          MR. FERCH:  And, again, I think that especially raises

5     the point that this is important for the state legislature.

6          THE COURT:  On the other hand, that example of that

7     young woman whose husband was shot who had the cell phone

8     recording --

9          MR. FERCH:  Oh, the one in Chicago, I believe?

10         THE COURT:  I don't remember where it was, but, in any

11    event, it was sort of one of those sad situations the nation

12    was riveted by.  You know, she was tape recording the whole

13    thing, so she could have been prosecuted.

14         MR. FERCH:  No, not in Massachusetts.  My

15    understanding is, she was tape recording in the open and the

16    cell phone was openly --

17         THE COURT:  Is that right?  But what if she weren't?

18    You would say she could be prosecuted.  What if it was in her

19    pocketbook or something and she turned it on?

20         MR. FERCH:  And, again, that's the *Martin* case where

21    we say that really the SJC should be determining that.  But if

22    it's in her pocket, if it's intentional, there's a lot of

23    hurdles that you would have to get over to get to that, but --

24         THE COURT:  Because at some point, if it's too hard

25    for me, if I think that the public interest, say, in that

1    situation outweighed the privacy interest of the police

2    officer, there are interests here, but you say, "Oh, you can't

3    do that.  What about the schoolteachers, and what about the tax

4    assessors?"  I can't remember.  They came out with a parade of

5    horribles which I couldn't answer.

6              MR. FERCH:  Right.

7              THE COURT:  But then in a way that feeds right into

8    Project Veritas' point, which is, "This is too hard.  Throw it

9    out and let a legislature look at what other states have done."

10   I mean, essentially that's their point:  "You don't do it,

11   Judge," and that's what I'm sort of struggling with in my own

12   mind.

13             MR. FERCH:  Well, I mean, again, the easiest way we

14   say is to throw it out on standing so you don't have to do

15   that, but --

16             THE COURT:  I got it.  It's tempting, but I do worry,

17   in the First Amendment context, it's just, he's correct, a more

18   relaxed standard.

19             MR. FERCH:  It is, but that's where I point to the

20   *Blum* case because it's not as relaxed as it used to be, or as

21   this court -- or, sorry, I keep saying "this court" -- the

22   First Circuit --

23             THE COURT:  The standard is not blooming, huh?

24             MR. FERCH:  Yeah, it is more difficult.  The standard

25   under *Clapper* from the U.S. Supreme Court is "certainly

1    impending," not reasonable, so it is a much higher standard

2    than it used to be in the First Amendment context.

3         We understand the concerns.  There certainly are

4    competing interests here and it's difficult, but the question

5    again is secret recording.  That's really what we're talking

6    about, and is that -- there's no First Amendment right, no

7    court has recognized a First Amendment right to secretly

8    record; and in fact it could be a reasonable time, place, or

9    manner restriction.  As the First Circuit said in *Glik*, it said

10   in the *Gericke* case -- I could be mispronouncing it -- the

11   First Circuit has punted on that issue.

12        THE COURT:  Which one?  In what case?

13        MR. FERCH:  I believe it was *Gericke*.  It was the

14   New Hampshire case that came after *Glik*.  It was a traffic stop

15   with the New Hampshire statute in which the -- again, it was an

16   open recording case where the woman told the police officer,

17   "I'm planning to record this."  The First Circuit extended the

18   *Glik* holding to traffic stops saying that the police officers

19   were performing their duties in public when it's a traffic stop

20   at night just between the police officer and the person in the

21   car, but they dropped a footnote saying, because this is open,

22   we don't have to address whether or not this is a reasonable

23   time, place, or manner restriction.  So there certainly is

24   areas in the law in which secret recording or a ban on secret

25   recording arguably is allowable.  You don't have to strike out

1    the secret recording entirely.

2         THE COURT:  So it's clear that the First Amendment

3    protects the right to gather and disseminate news, but you

4    would say, but there's no right to do it through audio

5    recordings?

6         MR. FERCH:  Let me --

7         THE COURT:  Secretly do it.

8         MR. FERCH:  There's no right to do it with intentional

9    secret recordings.

10        THE COURT:  Thank you.  And have I set a hearing

11   yet -- I should ask Maryellen -- on the other case, the *Martin*

12   case?  So we need to set that.  Is the op coming in?

13        MR. FERCH:  My understanding on that case, and I don't

14   remember the date, the other side has asked for an extension to

15   file an opposition to both us and the police department.  I

16   suspect we may file for leave to file a reply brief in that

17   case, depending on what comes in.  I'm guessing probably

18   January or February would be --

19        THE COURT:  February.

20        MR. FERCH:  Well, I don't know.  I don't know what the

21   timing on it is.

22        THE COURT:  I just can't imagine writing these two

23   separately without thinking about them.

24        Have you been coordinating with the lawyers there,

25   Mr. Klein?

1        MR. KLEIN:  No, your Honor.  I've been in touch with

2   Jesse Rothman, I believe is their counsel.  We've spoken via

3   email, but we have not coordinated these cases in any way.

4        THE COURT:  Well, I'm not saying that would be a bad

5   thing or a good thing.  Just timingwise, I just can't imagine

6   not having one in mind with the other, particularly on the

7   common issues.

8        So did you want to respond at all before I let you go

9   home on this beautiful weekend.

10        MR. KLEIN:  Thank you very much, your Honor.  The *Blum*

11   case which has been cited a few times -- and I hesitate, I

12   don't have it in front of me -- but this is not a case, and I

13   think *Blum* was pretty clear that the law in question was not

14   actually going to apply to the people challenging it; and that

15   was a, you know, you can't have a subjective chill when that's

16   the case.  Here we have an unequivocal ban on PVA's activities.

17   And I think, again, the few cases, as much as there are not

18   that many of them, they show that having a five-year felony in

19   effect for intentional secret recording has done a pretty good

20   job at prohibiting this kind of conduct.  But we have enough

21   really bad cases already, and I'm not here to relitigate

22   *Commonwealth v. Hyde,* but there's a certain Kafkaesque angle to

23   somebody recording their own conversation with a police officer

24   secretly, taking that tape to the police department to

25   illustrate, you know, "I didn't like how I was treated," and

1  then being charged with a crime, and that's certainly --

2        THE COURT:  That is troubling.

3        MR. KLEIN:  -- the breadth of that.

4        I want to just mention that the *Gericke* case was

5  brought up, *Gericke*.  That was fascinating because in the

6  intermediate scrutiny context, we have that the safety of

7  police officers cannot be so broad as to prohibit all

8  recording, but we can have these reasonable restrictions that

9  as long as that, you know, police officer is not being, you

10 know, threatened by somebody, you can record them at a

11 distance.  That same kind of reasoning I think applies here and

12 shows that you can't just have a bubble that you can walk

13 around in public with, and belt out whatever you'd like at the

14 top of your lungs, and if someone secretly records that, it can

15 be a felony in Massachusetts.

16       THE COURT:  How about somebody talking in a restaurant

17 booth that you can sort of, you know, a little glass of wine, a

18 little too loud, you're standing there with the recorder on the

19 other side of the booth?  I mean, for every parade of horrible

20 you can talk about their position, it flips.  So that's what

21 makes this so difficult.  And with some sort of humanity about

22 I'm not a lawmaker, I don't know the extent to which I should

23 just carve out things that privacy rights clearly don't

24 outbalance the rights of the public, or whether I just say, "I

25 can't do this, Legislature.  Go back to the drawing boards."  I

1    have to think about that.

2         MR. KLEIN:  And, your Honor, I would only add as far

3    as -- I think that is a proper remedy.  This is a facial

4    challenge, and that's what we've put forward, and for that very

5    reason in part.  And, you know, I practice campaign finance law

6    primarily, so your mention of *Citizens United*, I have to move

7    and I have to --

8         THE COURT:  Were you the lawyer in that case?

9         MR. KLEIN:  I was not, no, your Honor, but I --

10        THE COURT:  I was going to say.

11        MR. KLEIN:  -- must go way back in campaign finance

12   and I must channel a way better lawyer than me, Paul Clement.

13   When he closed the *NFIB v. Sebelius* case, he compared the

14   Affordable Care Act to the Federal Election Campaign Act, and

15   he urged then the Supreme Court to say, this is not a case,

16   when they were talking about severability, this is not

17   something we should pull something out of and hope that the

18   rest of the statute functions.

19        We have some very bad precedent here.  We have good

20   precedent in the First Circuit, bad precedent from the

21   Massachusetts Supreme Judicial Court, and I think it's

22   certainly time.  The statute's time has come, and given the

23   constitutional implications at play here and given the

24   difficult --

25        THE COURT:  The thing that was interesting about both

1   *Citizens United* and *Johnson*, now that you mention it, is

2   actually the Supreme Court tried several times first to narrow,

3   and it was only when they finally just threw up their hands and

4   said "We can't do it" that they said, you know, "facially

5   invalid."  *Johnson* I think there must have been three or four

6   cases where they struggled with it.

7          MR. FERCH:  I think they cited at least three or four

8   cases in that order.

9          THE COURT:  In *Citizens United* they cited one.  I

10  didn't spend so much time with it, so I'm not sure if there

11  were more, but, still, very interesting.  It's a great case.

12  Thank you for bringing it, very interesting.  And I usually,

13  you know, get the big patent case, so it's nice to have a First

14  Amendment issue, and I'll have a second one coming down.  I

15  don't think we have a date yet, but I'm unlikely -- while I'm

16  going to get going on this, clearly, important issues that

17  overlap, I'm unlikely to rule till I've got them both side by

18  side to make sure I'm not being inconsistent on what to do.

19         MR. FERCH:  And that position, as I said earlier, is

20  fine with us.  And I think it's important, when you do get them

21  side by side -- and I can talk again at that hearing, and

22  certainly, Steve, I'm sure you're welcome to come to that

23  one -- about the distinctions between the two and what our

24  remedy is in that case because I think it assuages some of your

25  concerns.

1          THE COURT:  Are there any other of these cases

2    floating around in Federal Court somewhere?

3          MR. FERCH:  Not in Massachusetts that I'm aware of.

4          THE COURT:  No, but I'm just talking about anywhere.

5          MR. KLEIN:  No, your Honor, but, again, it speaks of

6    the uniqueness of the Commonwealth's interception statute.

7          THE COURT:  Is this the only state that goes this far?

8          MR. KLEIN:  I believe so, your Honor.  Some other

9    states, Maryland has a possession of recording devices

10   prohibition that is comparable.  It's a felony I believe there

11   to possess secret recording devices, so there's the litany, but

12   as far as most states are single-party consent or two-party

13   with the reasonable expectation of privacy exception.

14         THE COURT:  I see.  So, okay.  Well, thank you very

15   much.  It was very well briefed.  I enjoyed it, and to be

16   continued, *Martin*.  Okay, thank you.

17         THE CLERK:  All rise.

18         (Adjourned, 3:31 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 39 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 16-10462-PBS,

11 Project Veritas Action Fund v. Daniel F. Conley, In his

12 Official Capacity as Suffolk County District Attorney, and

13 thereafter by me reduced to typewriting and is a true and

14 accurate record of the proceedings.

15          Dated this 7th day of December, 2016.

16

17

18

19

20          /s/ Lee A. Marzilli
            _____
21          LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
22

23

24

25