# In The Matter Of:

*Project Veritas Acton Fund  v.*
*Daniel F. Conley, et al.*

---

*Russell Joseph Verney*
*April 4, 2017*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Original File Russell Joseph Verney 4-4-18.txt
Min-U-Script® with Word Index

1               UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                    EASTERN DIVISION

4                         C.A. No. 1:16-cv-10462-PBS

5

6  PROJECT VERITAS ACTION FUND,

7                 Plaintiff,

8          vs.

9  DANIEL F. CONLEY, in his

10 official capacity as Suffolk

11 County District Attorney,

12                 Defendant.

13

14          DEPOSITION OF RUSSELL JOSEPH VERNEY,

15 individually and as corporate designee of Project

16 Veritas Action Fund, a witness called on behalf of

17 the Defendant, taken pursuant to the applicable

18 provisions of the Federal Rules of Civil Procedure

19 before Cynthia A. Powers, Professional Shorthand

20 Reporter and Notary Public in and for the

21 Commonwealth of Massachusetts, at the Office of the

22 Attorney General, One Ashburton Place, Boston,

23 Massachusetts, on Wednesday, April 4, 2017,

24 commencing at 9:00 a.m.

2

1    APPEARANCES:

2              Stephen Klein, Esquire

3              500 Madison Street, No. 419

4              Alexandria, Virginia 22314

5              (734) 233-1705

6              Representing the Plaintiff

7

8              Eric A. Haskell, Esquire

9              The Commonwealth of Massachusetts

10             Office of the Attorney General

11             One Ashburton Place, 19th Floor

12             Boston, Massachusetts 02108

13             (617) 963-2855

14             Representing the Defendant

15

16

17

18

19

20

21

22

23

24

17

1      Q.    And with respect to the Project Veritas

2  Action Fund since -- I think you said you created

3  Project Veritas Action Fund in September of '14?

4      A.    Correct.

5      Q.    Have you been its executive director

6  since that time?

7      A.    Yes.

8      Q.    Okay.  A couple of your former employers

9  you mentioned are 501(c)(4) organizations.

10      A.    Yes.

11      Q.    In your own words, what's a 501(c)(4)

12  organization?

13      A.    501(c)(4) is an IRS nonprofit category

14  for organizations that are issue advocacy related or

15  can be issue advocacy related.  It's non-taxed in

16  its primary mission by the IRS, but contributions

17  are not tax deductible.

18      Q.    How does 501(c)(4) compare to a

19  501(c)(3)?

20      A.    501(c)(3) charitable organization is not

21  taxed by the IRS in its primary mission and

22  contributions to the 501(c)(3) are tax deductible to

23  the extent permitted for the donor.  There are

24  restrictions on what a 501(c)(3) can do.  It cannot

Russell Joseph Verney - April 4, 2017

24

1    apportionment of your salary that you mentioned

2    earlier?

3         A.    Yes, but we have an agreement between

4    the companies on if there isn't an actual

5    designation of time then it's a -- I think it's a

6    65/35 split.

7         Q.    Sixty-five being apportioned to?

8         A.    Project Veritas.  Project Veritas Action

9    Fund is less active than Project Veritas.

10        Q.    And that arrangement of apportioning

11   salary 65 percent to Project Veritas and 35 percent

12   to Project Veritas Action Fund, is that common among

13   employees whose salaries are apportioned?

14        A.    Yes.

15        Q.    So, in your own words, what does Project

16   Veritas Action Fund do?

17        A.    We investigate incidents where we

18   suspect there might be abuse, fraud, lapses of

19   ethics; self-dealing within government, within

20   political organizations, within public agencies.

21        Q.    Does Project Veritas Action Fund do

22   anything besides that?

23        A.    Well, we -- obviously we've initiated

24   this litigation to break down some of the barriers

99

1      A.    Yes.

2      Q.    Same roles filled by the same people?

3      A.    Yes.

4      Q.    Doing the same things?

5      A.    Yes.

6      Q.    Okay.  Are there any states right now

7   where Project Veritas/PVA does not conduct field

8   operations?

9      A.    Yes.

10      Q.    What states are those?

11      A.    Massachusetts.

12      Q.    Are any others?

13      A.    Maryland.  There are others that are

14   heavily restricted in what we can do.  Those are the

15   two we absolutely stay away from right now.  States

16   like Pennsylvania are difficult, but under certain

17   circumstances we can record.

18          It's just very tricky because we're

19   dealing with an undercover journalist who can be

20   tripping a criminal line.  We definitely don't want

21   them getting anywhere near that.  We don't want to

22   put them in a situation where they could be held

23   criminally liable for something.  The company, we

24   can assume our own risks, but we can't assume that

119

1   but for the most part it's personal grievances that

2   people want investigated.

3         Q.   Sure.  But some of the tips you

4   mentioned that come through there have presented

5   opportunities to do secret recording in

6   Massachusetts?

7         A.   Yep.

8         Q.   How many such tips do you recall?

9         A.   Two or three having to do with voter

10   registration going over the border into

11   New Hampshire during the first presidential primary

12   where they don't have a residency requirement and

13   people registering to vote illegally in

14   New Hampshire.

15         Q.   I'm sorry, you're saying New Hampshire

16   doesn't have a residency requirement?

17         A.   Correct.

18         Q.   Okay.  And you said that there were two

19   or three tips involving that issue that presented an

20   opportunity to do secret recording in Massachusetts?

21         A.   Yeah, they were urging us to go to the

22   sources where people organized people to go to

23   New Hampshire and try to record them doing the

24   organization within the Commonwealth.

Russell Joseph Verney - April 4, 2017

120

1      Q.    Okay.  When did PVA receive those tips?

2      A.    It would have been in the fall, summer

3  or fall of 2016.

4      Q.    And did PVA do anything in response to

5  those tips?

6      A.    No.

7      Q.    Did those tips identify a specific place

8  in Massachusetts where this voter organization was

9  occurring?

10     A.    No.

11     Q.    Did those tips identify specific people

12 who PVA could talk to to learn more about these

13 events?

14     A.    No.

15     Q.    And so had PVA chosen to follow up on

16 these tips, what would it have done?

17     A.    Had we chosen to follow up on that,

18 because we were already in New Hampshire we would

19 have our journalist try to find indications of who

20 the organizers are.

21            At the same time, we would start sending

22 undercover journalists in to Democratic activists

23 organizations because these were Democrats we were

24 talking about for the first in the nation

121

```
 1   presidential primary.

 2           We would have our undercover journalists

 3   go into nonprofit or state party organizations or

 4   campaign organizations in the Commonwealth and see

 5   what they could find, see if they can identify where

 6   it's actually happening, if it was happening where

 7   it was happening.

 8       Q.    Outside of those, I think you said it

 9   was two or three tips that concerned activities in

10   Massachusetts or alleged activities in Massachusetts

11   related to the New Hampshire primary, has PVA

12   received other tips that would have presented an

13   opportunity to do secret recording in Massachusetts?

14       A.    Through that info line, I don't recall

15   any others, no.

16       Q.    Okay.  So, including the things learned

17   from media reports that PVA might have liked to have

18   followed up on and including the allegations

19   received through the tip line, the info line, does

20   PVA keep any documentation of these missed

21   opportunities to record in Massachusetts?

22       A.    No.

23       Q.    Wouldn't keep a copy of the e-mail

24   received through the tip line?
```

130

1  topic about landlords renting unsafe apartments to

2  college students?

3       A.    We had done a lot of college campus type

4  of investigations in the past.  This story came out,

5  we were aware of the story, and it was something

6  that our journalists would have been perfectly

7  suited to following up on as college students and

8  investigating it and getting candid comments from

9  the participants involved.  Obviously, we were

10 precluded from doing it by the state law, the

11 Commonwealth's law.

12      Q.    And so in what way would PVA's

13 journalists have followed up if not for the state

14 law?

15      A.    We would have sent undercover

16 journalists in posing in various roles; one as a

17 renter, one as an investor looking to buy property

18 and trying to get guidance from other owners.  We

19 would have, you know, done our research and gone

20 where we could to find exactly what was going on and

21 what the impact was to the unsuspecting students.

22      Q.    So, was a decision made by PVA to go

23 forward with this investigation if not for the

24 Massachusetts law?

133

1     A.    Yes.

2     Q.    And what was your involvement?

3     A.    Again, our conclusion was it was

4  something well worth investigating but for the law

5  that precluded us going in undercover.

6     Q.    Who participated in reaching that

7  conclusion?

8     A.    It would have been myself, Joe

9  Halderman, and Ken Constanza, I believe.

10     Q.    And similar to the last investigation we

11  discussed, was that a face-to-face conversation?

12     A.    Yes.

13     Q.    With the three of you there; you,

14  Mr. Halderman, and Mr. Constanza?

15     A.    Yes.

16     Q.    Where did that --

17     A.    My belief is that Mr. Constanza was

18  there.

19     Q.    Where did that conversation take place?

20     A.    In our office in Mamaroneck, New York.

21     Q.    Was it just one conversation or more

22  than one?

23     A.    It was several.

24     Q.    When did they take place?

134

1           A.    I don't recall the exact date, but

2     sanctuary cities had become a national issue, and

3     there was reporting of certain incidents here in the

4     Commonwealth we felt required to open the door for

5     us to follow up on.

6           Q.    If these conversations that you had

7     within PVA took place after sanctuary cities

8     achieved national prominence as an issue, is it fair

9     to say that these conversations happened after the

10    2016 presidential election?

11          A.    It could have been before.  It was an

12    issue before.  Sanctuary cities have been an issue

13    for years with -- just haven't captured the national

14    attention that has been brought to them since the

15    2016 campaign.

16          Q.    Was Mr. O'Keefe briefed on this

17    potential investigation into sanctuary cities?

18          A.    My belief is yes.

19          Q.    In these discussions, I mean, I think

20    you just said sanctuary cities is a national issue;

21    right?

22          A.    Correct.

23          Q.    Why did you and Mr. Constanza and

24    Mr. Halderman choose to focus on Massachusetts for

135

1    an investigation?

2         A.    Based on some reports that had surfaced

3    associated with Massachusetts, we felt it was a very

4    opportune target for us at that time.

5         Q.    What reports were those?

6         A.    I don't recall them offhand, but there

7    was some reports that we received from various

8    sources.

9         Q.    Do you recall anything about what these

10   reports were about?

11        A.    No.

12        Q.    Do you recall from where they were

13   received by PVA?

14        A.    No.

15        Q.    And so this potential investigation

16   about sanctuary cities, how many meetings did you

17   say you had with Mr. Halderman and Mr. Constanza to

18   discuss these?

19        A.    It probably came up in two or three

20   different meetings.  Again, the door was closed

21   because we were prohibited from undercover reporting

22   in Massachusetts.

23        Q.    Did Mr. O'Keefe participate in those

24   meetings?

138

1   Commonwealth.

2        Q.    The next potential investigation that

3   the interrogatory mentions is protest management

4   efforts for the Antifa protest in downtown Boston on

5   August 19, 2017, that would focus on private

6   individuals and public officials.  Were you involved

7   in consideration of that potential investigation?

8        A.    Yes.

9        Q.    What did your involvement consist of?

10        A.    Whether or not we should try to embed

11   one or more journalists into the Massachusetts

12   office of Antifa that was involved in the planning

13   process of that event.  We were precluded because of

14   prohibition of undercover recording in

15   Massachusetts.

16        Q.    Where did that idea come from to embed a

17   journalist with this Antifa organization in

18   Massachusetts?

19        A.    It came from leads in other states of

20   Antifa or Antifa related organizations in other

21   states.

22        Q.    By the way, just so the record is clear,

23   what is Antifa?

24        A.    Antifa is -- I don't even --

Russell Joseph Verney - April 4, 2017

146

1           A F T E R N O O N   S E S S I O N

2              CONTINUED DIRECT EXAMINATION

3    BY MR. HASKELL:

4          Q.    So, Mr. Verney, I think before the break

5    we left off having discussed the first three

6    potential investigations listed in the first

7    paragraph in response interrogatory nine.

8              As to the fourth, the fourth potential

9    investigation mentions ongoing and future Antifa or

10   related protests occurring in Boston.  That's at the

11   top of page seven of the interrogatory responses.

12   That's Exhibit 5.

13         A.    All right, mm-hmm.

14         Q.    Do you see where I am there?

15         A.    Yes.

16         Q.    And so that potential investigation into

17   ongoing and future Antifa or related protests

18   occurring in Boston, what was your involvement with

19   that potential investigation?

20         A.    Pretty much to shut down the idea

21   because the Commonwealth prohibits the use of

22   undercover recording devices.  It was a great idea,

23   good leads, but can't do it because of the legal

24   prohibition.

147

1      Q.    So, how did that idea for an

2  investigation come to PVA?

3      A.    Again through one of our, one or more of

4  our undercover investigators who were reporting on

5  Antifa in other states.

6      Q.    Was it a separate lead from the

7  opportunity that we spoke about before the break?

8      A.    I don't know if it involved the same

9  person, but it was a separate lead, yes.

10      Q.    And so with respect to future Antifa

11  demonstrations in Boston, this fourth potential

12  investigation, what did the lead consist of?

13      A.    That there was going to be an ongoing

14  organization in the Commonwealth and do we or don't

15  we want to try to infiltrate it and continue to

16  gather information over the coming months.

17      Q.    So, what had PVA learned about that

18  ongoing organization in Boston?

19      A.    All I know is that there was an ongoing

20  organization and we could assign somebody if it was

21  legal to undercover record them here in the state,

22  but because it was illegal we chose to pass on it.

23      Q.    Did that potential investigation get to

24  the point of identifying specific individuals that

166

1   they were going to do?

2        A.    It was a possibility, but by the time

3   they got to New Hampshire, they're spread out all

4   over the state.  We didn't have that many people

5   around the state.  You would have to find them on

6   the day they're registering or voting.  It's a huge

7   logistical problem at that end.  It's an easy

8   logistical problem if you can go to the organization

9   where they're preparing to go, planning to go.

10        Q.    Did this aspect, the Massachusetts

11   aspect of the PVA's work on the Bernie Sanders

12   campaign, did that result in any planning memo for

13   recording these Massachusetts related activities?

14        A.    No, it was precluded by the fact we

15   couldn't record in Massachusetts legally.

16        Q.    Who was involved in PVA's decision not

17   to pursue this lead?

18        A.    Joe and I for sure.  I don't know

19   anybody else.  We can't record in the state of

20   Massachusetts.  We'd love to do it, love to try to

21   find a way for you, but it's not going to happen.

22        Q.    Going back to Exhibit 5, the

23   interrogatory response.

24        A.    Yep.

1    Nicholas Dudich; right?

2         A.    Right, his function at New York Times.

3         Q.    Were you involved in the investigation

4    targeting Nicholas Dudich?

5         A.    Yes.

6         Q.    Where did that idea come from?

7         A.    Around New Year's Day, shortly after New

8    Year's of 2017, James O'Keefe announced that our

9    focus for 2017 would be on mainstream media; are

10   they presenting narratives that they choose or are

11   they presenting facts for us to decide.

12              Part of that goal for the year involved

13   sending somebody in to try and make contact within

14   the New York Times organization.  That led to

15   meeting with Mr. Dudich and hearing his stories and

16   recording them.

17        Q.    How was Mr. Dudich identified as a

18   potential point of access?

19        A.    I don't know.

20        Q.    Do you know who would?

21        A.    Joe Halderman would.

22        Q.    A PVA journalist was assigned to this

23   Nicholas Dudich investigation; right?

24        A.    PVA journalist was probably assigned to

Russell Joseph Verney - April 4, 2017

186

1    They want you to download things if you want to

2    watch a movie.  They don't have upload speeds.

3              We have to work around wherever the

4    journalist is and how the journalist can transmit it

5    to us.  It could be Federal Express to us.

6              Shortly after they recorded something,

7    we want them to get us the video as soon as possible

8    and give us an indication of what they did.  If

9    there is nothing in the video, tell us if there's no

10   content of any value to us.

11        Q.   Going back to the document retention

12   schedule that we spoke about earlier today, after

13   action reports of this type, are those subject to

14   the permanent retention or two-year retention or

15   somewhere in between?

16        A.   Typically two-year retention because

17   they typically come in in e-mails.

18        Q.   With respect to the events that are

19   described in Exhibit 24, how did the Project Veritas

20   journalist get to be there?

21        A.   Similar to the way we would have gotten

22   into the one in Boston.  We didn't face the

23   prohibition against recording in Massachusetts.  We

24   had a lead from some Antifa group around the country

Russell Joseph Verney - April 4, 2017

187

1    that this event was going to be going on in

2    Charlottesville, Virginia, and we had an

3    introduction with somebody in there, so we were able

4    to infiltrate and get some recording.

5         Q.    I'm sorry, Charlottesville or Atlanta?

6         A.    I'm sorry, Atlanta.

7         Q.    Exhibit 24 describes events in Atlanta.

8         A.    It's in Atlanta.  It was in reaction to

9    the Charlottesville rally.  My apologies.

10        Q.    Okay.  Are you aware that the Project

11   Veritas journalist in this Atlanta rally made a

12   series of videos while they were there?

13        A.    It's my understanding they did.

14        Q.    Have you watched those videos?

15        A.    No.

16        Q.    Do you know whether those videos were

17   recorded with a hidden camera or an open camera?

18        A.    My understanding, if they were done,

19   they were done with a hidden camera.

20        Q.    Okay.  With respect to the Atlanta rally

21   specifically -- no, that's okay.

22                    (Marked Exhibit 25; E-mail Chain,

23                     PVacationInfo to [name redacted],

24                     2/1/17)

Russell Joseph Verney - April 4, 2017

1    investigation consist of?  What's it all about?

2         A.    It consists of having somebody go meet

3    with the administrative staff of the university and

4    request that a certain percentage of a quarter of

5    one percent of the endowment being devoted to

6    specific activities affecting diversity or some

7    other silly idea, but trying to engage the

8    university into discussions about the use of their

9    endowment funds.  I believe we've done that at other

10   universities.

11        Q.    Where has Project Veritas done that?

12        A.    I don't recall where we've done

13   specifically the endowment, but I believe we've done

14   it at a couple of universities.

15        Q.    So, the journalist of this proposal

16   reflected in Exhibit 26 is to do something similar

17   at Harvard?

18        A.    Yes, it has the largest endowment of any

19   university.

20        Q.    And did this concept ever progress to

21   the point of deciding whether it was an

22   investigation that Project Veritas wanted to do into

23   Harvard?

24        A.    We were precluded from getting to that

193

1    further with it because of the prohibition of

2    undercover recording in the Commonwealth.

3         Q.    And did anybody at Project Veritas or

4    PVA to your knowledge prepare a plan or strategy to

5    access the appropriate folks at Harvard?

6         A.    No, it was precluded by the prohibition

7    of undercover recording in the Commonwealth.

8         Q.    Was a journalist assigned to this

9    potential investigation?

10        A.    Not to Harvard, no, because it was

11   precluded by the prohibition of undercover recording

12   in the Commonwealth.

13        Q.    And was it determined where in terms of

14   a location an approach might be made to folks at

15   Harvard to talk about their endowment?

16        A.    Beyond general that we would start with

17   an administrative office at the university, beyond

18   that, no, it was precluded by the prohibition of

19   undercover recording in the Commonwealth.

20        Q.    Who at Project Veritas or PVA --

21   actually I should ask, would an investigation of

22   this type have been classified as Project Veritas or

23   PVA investigation?

24        A.    Could have been either.

Russell Joseph Verney - April 4, 2017

194

1        Q.    Okay.  Did anybody at either Project
2    Veritas or PVA -- well, who was involved in
3    considering this potential idea for an
4    investigation?
5        A.    I don't recall specifically, but again a
6    consensus of senior staff with respect to
7    investigating endowments.  With respect to the
8    Harvard, it appears it was James and perhaps Joe and
9    then I get involved and say, sorry, we can't
10   investigate Massachusetts.  We're precluded because
11   of the state law.
12       Q.    Do you have memory of that conversation?
13       A.    No.
14       Q.    Do you have a memory of discussing this
15   proposal with anybody?
16       A.    The endowments, yes.  The Harvard in
17   particular, no.
18       Q.    On the interrogatory responses which you
19   have right in front of you, I ask you to go to pages
20   three and four, please.  Interrogatory number three
21   asks a lawyer question to state the basis for the
22   contention that our state statute is
23   unconstitutional.
24             In response you'll see the bottom half

Russell Joseph Verney - April 4, 2017

197

1    investigation?

2          A.    Right.

3          Q.    Are you aware that both Mr. Halderman

4    and Mr. O'Keefe have been designated to testify on

5    PVA's behalf about that investigation and video?

6          A.    I'm aware that I wasn't designated.

7          Q.    Well, have you spoken with either

8    Mr. Halderman or Mr. O'Keefe recently about that

9    operation to help them prepare to testify?

10         A.    No.

11         Q.    Are you aware of an investigation by PVA

12   in 2014 involving campaign workers of Alison Grimes?

13         A.    Yes.

14         Q.    And fair to say you were involved in

15   that investigation same way you were involved with

16   every investigation?

17         A.    Except that a fair portion of that was

18   accomplished before I arrived at Project Veritas in

19   2014.

20         Q.    Okay.

21         A.    The final report was done after I

22   arrived.  Some of the initial investigation had

23   already occurred.

24         Q.    And are you aware that both