# In The Matter Of:

*Project Veritas Acton Fund v.*
*Daniel F. Conley, et al.*

*James O' Keefe*
*April 9, 2018*

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Original File James E. O'Keefe 4-9-18.txt
Min-U-Script® with Word Index

**Exhibit B**

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3                    EASTERN DIVISION
 4                          C.A. No. 1:16-cv-10462-PBS
 5
 6  PROJECT VERITAS ACTION FUND,
 7           Plaintiff,
 8       vs.
 9  DANIEL F. CONLEY, in his
10  official capacity as Suffolk
11  County District Attorney,
12           Defendant.
13
14           DEPOSITION OF JAMES E. O'KEEFE, III,
15  individually and as corporate designee of Project
16  Veritas Action Fund, a witness called on behalf of
17  the Defendant, taken pursuant to the applicable
18  provisions of the Federal Rules of Civil Procedure
19  before Cynthia A. Powers, Professional Shorthand
20  Reporter and Notary Public in and for the
21  Commonwealth of Massachusetts, at the Office of the
22  Attorney General, One Ashburton Place, Boston,
23  Massachusetts, on Thursday, April 9, 2018,
24  commencing at 9:02 a.m.
```

Exhibit B

```
                                                               2
 1  APPEARANCES:
 2          Stephen Klein, Esquire
 3          500 Madison Street, No. 419
 4          Alexandria, Virginia 22314
 5          (734) 233-1705
 6          Representing the Plaintiff
 7
 8          Eric A. Haskell, Esquire
 9          Matthew Landry, Esquire
10          The Commonwealth of Massachusetts
11          Office of the Attorney General
12          One Ashburton Place, 19th Floor
13          Boston, Massachusetts 02108
14          (617) 963-2855
15          Representing the Defendant
16
17
18
19
20
21
22
23
24
```

**Exhibit B**

James O' Keefe - April 9, 2018

8

```
 1        A.    Yes.
 2        Q.    Sounds good.  You mentioned that you had
 3   given deposition testimony before.  What was the
 4   circumstance of that?
 5        A.    Undercover investigation in ACORN,
 6   specifically the office in San Diego California.
 7        Q.    I'm sorry, what was the undercover
 8   investigation into ACORN?
 9        A.    Going in to ACORN, posing as a pimp and
10   prostitute, saying we wanted to start housing for
11   our illegal business.
12        Q.    Who did that?
13        A.    Me and Hannah Giles.
14        Q.    Who did you speak with at the ACORN
15   office in San Diego?
16        A.    Juan Carlos Vera.
17        Q.    Anybody else?
18        A.    I don't believe so.
19        Q.    When did this happen?
20        A.    August 2009.
21        Q.    Okay.  Was Ms. Giles secretly recording
22   the conversation between you and she and Mr. Vera?
23        A.    I don't believe so.  I believe it was
24   just the camera was on my body and my cell phone.
```

James O' Keefe - April 9, 2018

27

```
 1        A.    Yes.
 2        Q.    And then I understand in 2014 Project
 3  Veritas Action -- can we call Project Veritas Action
 4  PVA?
 5        A.    Yes.
 6        Q.    In 2014 I understand PVA was created?
 7        A.    Yes.
 8        Q.    Did you play a role in creating PVA?
 9        A.    Yes.
10        Q.    What role was that?
11        A.    I should say oversight.  I authorized
12  Russ Verney, my executive director, to carry out
13  most of the responsibilities in its creation.
14        Q.    Since PVA was created in 2014, have you
15  had a role with that entity as well?
16        A.    Yes.
17        Q.    What's your title at PVA?
18        A.    Well, I'm the chairman of the board.
19        Q.    Any other titles?
20        A.    I have to check my board minutes just to
21  make sure I'm completely accurate here, but
22  president, CEO.
23        Q.    What are your responsibilities as board
24  chairman, president, and CEO of Project Veritas
```

James O' Keefe - April 9, 2018

33

```
 1   work, more than five times since the beginning of
 2   2016?
 3        A.    I would have to go back and check to see
 4   if it happened more than five times.
 5        Q.    You aren't concern whether it has?
 6        A.    I'm not certain.  I would have to go
 7   back and look at the videos.
 8        Q.    Is it fair to say that the overwhelming
 9   majority of the journalistic work that PVA does is
10   undercover reporting?
11        A.    Yes.
12        Q.    Why the focus on undercover reporting?
13        A.    We believe that major media has become
14   systemically corrupt in so far that they have passed
15   along untrue information along to the masses that
16   sources have given to them, information that is
17   demonstrably untrue and information that these media
18   corporations pass along to the masses, thus
19   misinforming the masses.
20              So, the only way to accurately report
21   information and educate the people, we have to go
22   undercover to obtain the honest truths so we can
23   deliver them to the people.
24        Q.    And you say undercover work is the only
```

James O' Keefe - April 9, 2018

41

1   specific portions of the film that's listed in 10C,
2   which is the 2016 New Hampshire Primary film; right?
3        A.   Yes.
4        Q.   Have you recently have you reviewed the
5   published New Hampshire Primary film?
6        A.   Last night.
7        Q.   And how recently have you reviewed the
8   raw footage underlying the portion of the
9   New Hampshire Primary film for which you've been
10  designated to give testimony?
11       A.   I believe I reviewed the full raw
12  portion last night.
13       Q.   Exhibit 39 we marked last week is a jump
14  drive.  Do you see me inserting that into the
15  computer here?
16       A.   Yes.
17       Q.   Do you see projected on the screen on
18  the side of the conference room the file tree for
19  the computer?
20       A.   Yes.
21       Q.   On the screen do you see me going into
22  the jump drive that's been marked Exhibit 39?
23       A.   Yes.
24       Q.   Going into the sub-folder titled

James O' Keefe - April 9, 2018

45

```
 1        A.    I can't recall.
 2        Q.    Where did you encounter Ms. Topping?
 3        A.    It was on the street in, I believe it
 4   was Boulder, but I'm not sure.
 5        Q.    What was she doing at the time you
 6   encountered her?
 7        A.    I believe she was getting signatures on
 8   behalf of Greenpeace.
 9        Q.    Was she in front of a building or
10   anything?
11        A.    Yes.
12        Q.    What building was that?
13        A.    I don't remember.
14        Q.    How did -- you went up to Ms. Topping
15   and engaged her in conversation; right?
16        A.    Yes.
17        Q.    How did you decide to -- what made you
18   to decide to go up to her?
19        A.    We were doing an investigation in
20   Colorado where I had caught -- we were in the
21   process of catching at least one individual to tell
22   us that committing voter fraud is okay and that we
23   were looking to investigate and expose the
24   propensity to commit voting fraud given Colorado's
```

James O' Keefe - April 9, 2018

118

1  investigations labeled C and D on pages six and
2  seven of Exhibit 5?  You would also defer to
3  Mr. Halderman for those?
4     A.   Your original question, was there a
5  specific plan in place?
6     Q.   To record a particular person in a
7  particular place in Massachusetts relative to --
8  let's just take the potential investigation labeled
9  C --
10    A.   Right.
11    Q.   -- on page six, protest management
12 efforts for the Antifa protest in downtown Boston on
13 August 9, 2017.
14    A.   Is there a particular plan to film a
15 particular person in a particular place.  We
16 wouldn't know what the particular person is until we
17 actually started to do the investigative work.  We
18 wouldn't know who the person particular person is.
19 So, it's an idea.  It's a concept, something that we
20 have done elsewhere.  We can't do it here.
21    Q.   Would your answer be the same as to
22 PVA's plans to record a particular person in a
23 particular place in Massachusetts relative to the
24 fourth investigation listed in response to