**In The Matter Of:**

*Project Veritas Acton Fund  v.*
*Daniel F. Conley, et al.*

---

*Robert Joel Halderman*
*April 6, 2017*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Original File Robert Joel Halderman 4-6-18.txt
Min-U-Script® with Word Index

Exhibit C

```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3                     EASTERN DIVISION

 4                         C.A. No. 1:16-cv-10462-PBS

 5

 6  PROJECT VERITAS ACTION FUND,

 7                     Plaintiff,

 8            vs.

 9  DANIEL F. CONLEY, in his

10  official capacity as Suffolk

11  County District Attorney,

12                     Defendant.

13

14            DEPOSITION OF ROBERT JOEL HALDERMAN,

15  individually and as corporate designee of Project

16  Veritas Action Fund, a witness called on behalf of

17  the Defendant, taken pursuant to the applicable

18  provisions of the Federal Rules of Civil Procedure

19  before Cynthia A. Powers, Professional Shorthand

20  Reporter and Notary Public in and for the

21  Commonwealth of Massachusetts, at the Office of the

22  Attorney General, One Ashburton Place, Boston,

23  Massachusetts, on Thursday, April 6, 2017,

24  commencing at 8:58 a.m.
```

Exhibit C

2

1   APPEARANCES:

2            Stephen Klein, Esquire

3            500 Madison Street, No. 419

4            Alexandria, Virginia 22314

5            (734) 233-1705

6            Representing the Plaintiff

7

8            Eric A. Haskell, Esquire

9            Matthew Landry, Esquire

10           The Commonwealth of Massachusetts

11           Office of the Attorney General

12           One Ashburton Place, 19th Floor

13           Boston, Massachusetts 02108

14           (617) 963-2855

15           Representing the Defendant

16

17

18

19

20

21

22

23

24

Exhibit C

126

1    of what we do is a little bit like fishing.  We

2    throw a line in the water.  If something bites and

3    we catch something, great.  If not, we don't.  We

4    don't know if we're going to catch a fish or not.

5              I believe that the process of journalism

6    is an ofttimes quite serendipitous process where you

7    have to be in the right place at the right time.

8    You will then find out something that the public

9    needs to know.

10         Q.    You sent an undercover journalist to

11   this event on Roosevelt Island?

12         A.    That's correct.

13         Q.    When did that event happen?

14         A.    Gosh, off the top of my head, I do not

15   know the date.  I know it was the formal

16   announcement of the campaign.  I guess it was the

17   spring, but I don't remember.  I really don't

18   remember the date.  It was early obviously in the

19   election.  It might have been -- gosh, was it 2015?

20   I don't know.  I would think you would have the

21   date, sir.

22         Q.    June 2015 sound right?

23         A.    That sounds exactly right.

24         Q.    We're going to up on the screen here

Exhibit C

149

1    that's not full.  In this case, I don't think we

2    specifically targeted the Sanders campaign per se.

3    I think we wanted to get into some campaigns to find

4    out what's going on.

5            We did not know -- we had no idea that

6    there was Australians working for a campaign.  We

7    had no idea they were being paid for by the

8    Australian Labor Party.

9        Q.    So the Bernie Sanders campaign, was that

10   the first campaign up to New Hampshire that an

11   undercover journalist went to and offered to help

12   with?

13       A.    I don't recall.  I think we were also in

14   the Clinton campaign.  To be very frank and also

15   kind of why she didn't get elected was she didn't

16   have a big ground game up there.  Sanders had a big

17   ground game.  When there's a big ground game,

18   there's more opportunity for us to be involved and

19   go there.  It was just an opportunity.

20       Q.    PVA's undercover journalist went to the

21   Bernie Sanders campaign and volunteered to help?

22       A.    Yes, I understand.

23       Q.    Was it one or more than one?

24       A.    There was a couple.

Exhibit C

163

1    where else other Australians were.

2              One of the things that we really wanted

3    to find out was how many were here.  If it's one guy

4    or two guys, well, but we wanted to know how many

5    there were.  We wanted to know where they had

6    operated because that struck me as interesting.  We

7    wanted, if we could, go to those states to see them

8    operating and to talk to them.

9         Q.   What specifically was it that a PVA

10   journalist was told that caused you to think PVA had

11   an opportunity to conduct secret recordings in

12   Massachusetts?

13        A.   Again, as I recall, I believe the

14   Australians said that there were Australians working

15   for the campaign that were operating in

16   Massachusetts for the Sanders campaign.

17        Q.   Did PVA learn who those people were?

18        A.   No, I don't believe we did.

19        Q.   Did PVA learn where those people could

20   be found in Massachusetts?

21        A.   No, and one of the reasons why we were

22   unable to, I believe, is because we can't do our

23   journalism in the Commonwealth of Massachusetts

24   because of the laws forbidding undercover recording.

Exhibit C

**Robert Joel Halderman - April 6, 2017**

1        Whenever something pops up that we might

2   and would investigate in the state of Massachusetts,

3   we are hindered by the laws that puts limits on

4   journalism in the Commonwealth of Massachusetts.

5        I lived overseas for a number of years.

6   I lived in London and I covered the Soviet Union,

7   Gaddafi's Libya, and Saddam Hussein's Iraq.  I'm

8   very familiar with government control on

9   journalists.  It's a bad thing.

10        When it's here in the United States, I

11   think it's abominable as much as it was in working

12   in the Soviet Union or East Germany or

13   Czechoslovakia where we were as journalists severely

14   and totally restricted to the point where we

15   couldn't go certain places.  If we did go someplace,

16   we had to have somebody come with us.

17        That's kind of how I see the

18   one-party/two-party problem in this country.  I

19   think the two-party consent laws are a control, a

20   law, against the freedom of the press, which I think

21   is in direct violation of the First Amendment of the

22   United States Constitution.

23        Q.    In a way that's comparable to the old

24   USSR?

Exhibit C

Robert Joel Halderman - April 6, 2017

1   investigation or PVA investigation?

2         A.     I believe American Pravda was a Project

3   Veritas investigation.

4         Q.     But the personnel and the methods and

5   the techniques are the same between the two?

6         A.     Correct.   It's two organizations because

7   we have separate functions, but much of the

8   personnel, practices, and activities are similar.

9   They're basically two -- we basically wear two hats.

10  We wear one hat when we are doing certain kinds of

11  investigations, and we take that hat off and put on

12  another hat when we're doing another kind of

13  investigation.

14        Q.     In the interrogatory response we see on

15  page seven of Exhibit 5 here speaking about a desire

16  to use secret recording in Massachusetts, did that

17  relate to Dudich's mother?

18        A.     Yes.

19        Q.     Were there any other opportunities to

20  use secret recording in Massachusetts in the Dudich

21  investigation other than with respect to his mother?

22        A.     No, not with the Dudich investigation.

23  I think the obstacle, we wanted to confirm that

24  Comey was Dudich's -- or find out that it wasn't

Exhibit C

205

1    of business address.

2        Q.    What does Mrs. Dudich's home look like?

3        A.    I have no idea.  I've never been there

4    myself.

5        Q.    What was the plan for a PVA journalist

6    to engage with Mrs. Dudich at her home?

7        A.    I don't remember the exact ploy that we

8    were going to use.  Somehow we were going to say

9    that we knew Nick and that we were -- I don't

10   remember.  I don't remember what we were going to

11   do.  What ended up happening -- we're in the video

12   business.  When we come up against the Commonwealth

13   of Massachusetts, it's a real problem.

14            I think, as this says, we did send some

15   UCJs up here without camera equipment, and I think

16   they were doing a survey trying to see what they

17   could see.  I think what I was kind of -- I don't

18   remember my thought process per se.  I think these

19   the undercover journalists were not going to have a

20   conversation.  They were just coming up to look

21   around.

22            What I was hoping was that maybe like a

23   lot of people in Massachusetts they go back and

24   forth to New Hampshire, Maine.  It was to come up,

Exhibit C

Robert Joel Halderman - April 6, 2017

1    take a look around and see what you could see.  We

2    had some people in New York, send them up.

3             Because we couldn't do Massachusetts, we

4    ended up finding Dudich's grandmother and aunt in

5    North Carolina and Dudich's father in Washington,

6    D.C., and we were able in those jurisdictions to do

7    undercover reporting in line with the First

8    Amendment of the United States Constitution, and we

9    were able to confirm that Dudich wasn't James

10   Comey's godson, which was --

11        Q.    The undercover journalists who traveled

12   to Massachusetts to look around, they never had a

13   specific plan to approach Mrs. Dudich in

14   Massachusetts?

15        A.    No, because we don't do -- we're video.

16   What we do is we shoot undercover video.  We record

17   undercover video and audio.  Our profession is

18   undercover video journalism.  I don't really have a

19   real big interest in one of my journalists talking

20   to somebody and finding out information unless they

21   can wear a hidden camera because that's not the

22   business that we're in.

23        Q.    Where did Mrs. Dudich work?

24        A.    I'm trying to recall.  I thought -- she

Exhibit C

213

1    going to do it.  In the state of Massachusetts, if

2    we're not going to do it, I don't write up a plan.

3    I don't plan parties that I'm not going to have.

4         Q.    Okay.  So, let's go through the list in

5    interrogatory number nine here.  This first

6    occurrence or potential investigation relating to

7    landlords renting unsafe apartments to college

8    students, what was your involvement in that idea?

9         A.    I saw that story.  I think it was a

10   Boston Globe story.  I saw that story, and I was

11   really intrigued by it because I think it was two

12   years ago or so.  I knew my son was going to be

13   moving here.  I knew he could fall victim to this

14   same thing.  I had a personal stake in it.

15            Plus, I think the landlord exploitation

16   of students and older people is really egregious.  I

17   think landlord abuse is just really horrific.  I

18   don't know why.  Maybe because I was a tenant for so

19   many years and I had a really lousy landlord when I

20   lived on the Lower East Side.

21            I remember reading this story, and I

22   remember reading these instances where kids were

23   being ripped off in rat infested houses and no heat,

24   and I thought, That's just abominable.  We could do

Exhibit C

214

1    that story.  That's the kind of story we can do

2    really well.  That's the kind of story that

3    undercover video is very powerful.

4              The Boston Globe can write about it, but

5    when you see the landlord and you see the apartments

6    and when you see the people who are being exploited,

7    it's so much more powerful.

8              I've been a video journalist, I've been

9    in television my whole career.  I think television

10   is the be all and end all.  I respect the print

11   press.  I think undercover video sometimes is a

12   unbelievably powerful voice in correcting wrongs.

13   Undercover video specifically is just unbelievable

14   because we get people to admit what they would never

15   say publicly.

16             I had an idea that we could actually be

17   like a landlord kind of guy and talk to the other

18   landlords and get them to tell us how they treated

19   these people, how they did it, why they did it, and

20   the fact that they reveled in it because that's what

21   I certainly believed was the case.

22       Q.    Did you set pen to paper and create an

23   op plan?

24       A.    No, no, I muse at what I might be able

Exhibit C

Robert Joel Halderman - April 6, 2017

1  government, that that's a problem.  That needs to be

2  exposed.

3           The problem that we have with the

4  sanctuary cities story is that many of the biggest

5  sanctuary cities in this country are in states that

6  have two-party consent laws like, for example,

7  Chicago, Illinois, and Seattle, Washington, and

8  Portland, Oregon, and Boston, Massachusetts, and I

9  could go on.

10          So, it's a problem.  It's a challenge.

11  It's a real challenge.  I would like to do some

12  stuff on it.  I think there's a story there.  I'm

13  not exactly sure what the story is.  I think there's

14  some hypocrisy going on.  I think there's some

15  shenanigans with playing politics with this issue.

16          I think that if I were to do an

17  investigation in, say, the state of Massachusetts

18  that we might theoretically potentially expose some

19  hypocrisy about the sanctuary cities issue.

20      Q.   When PVA wanted to do some investigation

21  but refrained because of Massachusetts's law, had

22  PVA identified specific people to secretly record?

23      A.   No, because again I only go -- so, again

24  the way it kind of works is I'll see something,

Exhibit C

221

1    somebody will tell me something, we get a tip or

2    James has an idea or Russ has an idea or somebody

3    has an idea, then we'll talk about it usually in the

4    office, and then if it's in a one-party consent

5    state, then we will sort of proceed from there.

6              If it's in a two-party consent state, we

7    do investigations in two-party consent states, but

8    we are so handcuffed.  It's virtually impossible,

9    it's incredible expensive, and it usually doesn't

10   even work.

11             We do it because in certain cases we

12   believe the story is so important that we need to

13   figure out a way to achieve the journalism, but it's

14   not easy and Massachusetts is a really tough state.

15   Your law is really difficult for us.

16             California is a two-party consent state.

17   We operate in California because there's an

18   opportunity in the law -- that's pretty reasonable,

19   I think -- when there is no expectation of privacy

20   that you can record a conversation without the

21   person knowing that you're recording it.

22             You're in a public restaurant and

23   somebody sitting at the next table and they can hear

24   everything that you're saying, then what they're

Exhibit C

Robert Joel Halderman - April 6, 2017

223

1      A.     That's correct.  We never got that far.

2      Q.     The third potential investigation that's

3   listed in response to interrogatory number nine

4   reads, Protest management efforts to the Antifa

5   protest in downtown Boston on August 19, 2017, that

6   would focus on private individuals and public

7   officials.  Do you see where I just read that?

8      A.     Yes, sir.

9      Q.     Were you involved in that idea for a

10  potential investigation?

11     A.     Yes, sir.

12     Q.     And who did PVA desire to secretly

13  record in Massachusetts for that one?

14     A.     The demonstrators at the event and any

15  public officials and anyone else that might be

16  involved in that event.

17     Q.     Where did that event take place?

18     A.     I think it was a park -- I thought it

19  was a park somewhere in Boston.  I don't think it

20  was the Common.  I don't know Boston that well.

21  Again, I hear about these things.  Somebody said to

22  me -- I mean, we believe the Antifa movement in this

23  country is a dangerous and scary thing.  So, we're

24  investigating it.  We keep an eye on it.

Exhibit C

225

1    prosecutions.

2              The Washington Post in that case said

3    that our investigation validates our practices

4    because it led to a crime not occurring that we

5    believe and law enforcement authorities believe

6    would have occurred or could have occurred.

7         Q.    Are you aware of any of these Antifa

8    type of events that occurred in Massachusetts since

9    August 19, 2017, that PVA tired to secretly record

10   but didn't?

11        A.    We know based on our reporting that

12   there are Antifa elements within the Commonwealth of

13   Massachusetts and we would love to investigate.

14        Q.    And so let's take a quick look at

15   Exhibit 5, the response to interrogatory number

16   nine, see that the fourth potential investigation

17   listed is ongoing and future Antifa or related

18   protests occurring in Boston.

19              At this point we're talking about both

20   the specific event on August 19, 2017, and ongoing

21   and future similar events.  Who would PVA record in

22   connection with those concepts?

23        A.    I don't know.  I will repeat myself.

24   Based on our reporting, our investigation, which has

Exhibit C

226

1    been going on for well over a year into Antifa and

2    their activities, we believe that there are Antifa

3    elements within the Commonwealth of Massachusetts,

4    and we would like to investigate them, and we

5    believe the only way to successfully investigate

6    them and to keep an eye on their activities is with

7    undercover investigative techniques.  That is who we

8    are.

9        Q.    Where would such undercover journalist

10   recordings have taken place?

11       A.    Well, in other areas such as New York

12   state, such as California, such as Atlanta, such as

13   Virginia where we have done reporting and even North

14   Carolina and the District of Columbia where we have

15   done investigations into Antifa, what we do is we

16   try to infiltrate the organization so we can find

17   out what they're doing and who they are.

18             We don't know who they are in

19   Massachusetts.  We have very good sources within the

20   Antifa organization -- Antifa is not like a -- it's

21   not like a football team.  It's more like a loose

22   association of independent groups that kind of fall

23   under same ideological banner.  They don't all know

24   each other.  They operate in a covert and secretive

Exhibit C

228

1    same idea that you were testifying a moment ago?

2         A.    No, I have no idea what he's talking

3    about, but, you know, he'll know.  You can ask him.

4         Q.    So, the idea that you were talking

5    about, if it's different from Exhibit 26, tell me

6    about your idea.

7         A.    I don't remember what specifically the

8    idea was.  I recall there was some story about

9    money -- what was it -- federal grants, the number

10   of grants, the amount of grants to Harvard.  It was

11   some story in -- I think it was the Times or the

12   Washington Post.

13              I felt it would be interesting to talk

14   to them about how much federal money they get when

15   they have this huge freaking endowment that they

16   have where they could basically buy the state of

17   Massachusetts or at least let everybody go to

18   college for free.

19              I think their greed and their avarice

20   and their kind of smugness is something that I would

21   love to talk to them about.  I think it would be

22   interesting, maybe even amusing.

23        Q.    Who's them?

24        A.    Administrators, the president of the

Exhibit C

229

1    university, deans, professors.  I would be curious

2    as to -- I have this thesis in my career or have had

3    this thesis in my career, you talk to people, you

4    find things out.

5            We might -- like I said, literally

6    dozens and dozens and dozens of time in my almost

7    four years at Project Veritas and Project Veritas

8    Action, we've launched investigations that have

9    turned out to be nothing where our premise or our

10   tip or our idea was, in fact, either incorrect or we

11   couldn't get it.  We couldn't get across that goal

12   line.  It's happened for my entire career.  That's

13   just the cost of doing business and the price of

14   doing business, but it doesn't mean that you

15   shouldn't do it.

16           You know, fisherman catch fish because

17   they throw their nets out every day.  It's not

18   because they know every time they throw their net

19   out it's going to get filled up with fish.  They do

20   it because they believe there's fish out there, and

21   if they throw the net in the right place, they might

22   catch some fish.  And that's what we do.

23           We go out, we have a tip or an idea or

24   we have a concept when we're operating in a

Exhibit C

230

1  one-party consent state, which is in line with the

2  Constitution of the United States, the American

3  Constitution and the First Amendment, and we cast

4  our net.

5            I would cast a net at Harvard.  We did

6  it at Columbia.  We did it at Princeton and Yale.

7  We did it at Yale.  Even though Connecticut is a

8  two-party consent state, there's no expectation of

9  privacy issue there.  So, we can bounce around that

10  law because it's not quite as stringent as the

11  Commonwealth's law.

12      Q.    Who did you record at -- who did you

13  record at Yale?

14      A.    At Yale it was a -- I think it was like

15  a -- it was, like, a student counselor/advisor that

16  colleges -- when I went to college there were

17  college professionals and there was a college

18  president and a dean.  Now there's a whole other

19  layer of bureaucracy at American colleges that deal

20  with such things as whether or not people feel like

21  they're being triggered.  I think that's crazy.

22            That was the story we were doing.

23  Basically we had an undercover journalist who

24  suggested that the constitution bothered her; that

Exhibit C

232

1   finest hour of journalism, but my point is that we

2   operate and do investigations in a lot of public

3   institutions across the country.  We can't do that

4   in states where we can't do undercover reporting, so

5   we don't.  What's going on at Harvard?  I don't

6   know.

7        Q.    Did you identify one or more

8   administrators at Harvard comparable to the ones you

9   found on the Yale and Columbia and Princeton at UNC

10  that you desired to record at Harvard?

11       A.    No, we just show up and we talk to

12  whoever is there.  We try to get as high on the food

13  chain as we can get.  Sometimes we will specifically

14  identify a specific subject we want to talk to when

15  there's a specific investigation.

16            Going back to Democracy Parters, Foval

17  gave us Robert Creamer's name.  Once Foval said Bob

18  Creamer, okay, we specifically targeted Robert

19  Creamer.  Again, in that investigation we didn't

20  know we were going to meet Zulema Rodriguez until

21  our undercover journalist had met Zulema Rodriguez.

22  We didn't target her.

23            What we tend to do most of the time, we

24  tend to target an institution or an organization.

Exhibit C

234

1              What we target for the most part is

2    organizations, institutions, and then we

3    determine -- once we get into the door, then we can

4    become more refined and focus as to whom we want to

5    talk to, who's pulling the strings and who's the

6    power.

7              In the Democracy Partners investigation,

8    that is a perfect example of this.  Scott Foval was

9    a pure serendipitous event.  We sort of knew who he

10   was.  We certainly didn't know what he was going to

11   say.  He led us to Bob Creamer.  From there we were

12   able to lock down this incredible story.

13             We don't -- most of our

14   investigations -- most is not a great word, but I

15   would say a large percentage of our investigations

16   we don't necessarily have a specific person who

17   we're targeting because we don't know who that is

18   yet.

19             We're journalists.  We don't know the

20   end of the investigation at the beginning just like

21   law enforcement doesn't know who they're ultimately

22   going to charge and prosecute when they're doing an

23   investigation of a drug gang or a crime syndicate.

24        Q.    So, by the same token, you can't really

Exhibit C

Robert Joel Halderman - April 6, 2017

239

1        Q.     The overall video that we have begun to
2   play is PVA's video report relating to Alison
3   Grimes' campaign?
4        A.     Yes.
5               Correct.
6        Q.     We spoke about that toward the beginning
7   of your testimony; correct?
8        A.     Correct.
9        Q.     I'm going to back up one level in the
10  file three here still on Exhibit 39 looking in the
11  folder titled Jump Drive 30(b)(6) Videos.  I'm going
12  to go into the sub-folder RDP17, and I'm going to
13  begin to play the file titled 17L, Part One,
14  Undercover.  Do you see where I'm doing that?
15       A.     Yes, I do.
16                    (Video played)
17  BY MR. HASKELL:
18       Q.     I've paused that film twenty seconds
19  into it.  Do you recognize the film that we've begun
20  to watch?
21       A.     I do.
22       Q.     What is it?
23       A.     This is our investigation into the
24  protestors at the DJ20 in Washington, D.C., prior to

Exhibit C

Robert Joel Halderman - April 6, 2017

240

1    the inauguration and the -- it was January of 2017

2    and these guys were -- we had infiltrated this group

3    DJ20, Disrupt J20, Disrupt January 20th, which was

4    the inauguration for Donald Trump.  They were a

5    loose group of people who were trying to protest the

6    inauguration of President Donald Trump.

7              These particular guys were not

8    interested in peaceful and legal protests.  They

9    seemed to be plotting to take a criminal act in

10   order to disrupt the inauguration events.

11             When we recorded this using a hidden

12   camera, which we would have never been able to get

13   if we weren't able to use a hidden camera, we then

14   turned this information over to law enforcement, and

15   law enforcement arrested these guys, and their plots

16   or plans did not happen.

17             Whether they would have done it anyways

18   if we hadn't been there, I can't answer that.  I do

19   know that law enforcement took what we were able to

20   record on that undercover hidden camera recording.

21   They took it very seriously.  These guys were

22   prosecuted.

23             This particular investigation is

24   probably one of the very best arguments for

Exhibit C

246

```
1    when he was in the conference in Florida or whether
2    it was in Kansas.  It might have been in Florida.
3              There was a teachers union conference in
4    Florida that we attended.  This was a throw the net
5    out, see what you can find.  I think we met this guy
6    at the bar.  I wish I could remember more.  That's
7    what I think.
8         Q.   I will skip ahead to a different section
9    of the 17K film that we have up on the screen here.
10   I'm going play from time stamp 5:04.
11                    (Video played)
12   BY MR. HASKELL:
13        Q.   I've paused the video at 5:36, and we
14   just watched that thirty odd second clip.  Does that
15   help you understand --
16        A.   Yeah.
17        Q.   -- which piece of video was taken where?
18        A.   The bar, I believe, was in Florida at
19   this conference.  This conversation took place at
20   a -- what's that restaurant called?  I used to have
21   one around the corner from my house.  One of those
22   bread places in Wichita, Kansas, and so we had --
23   there were -- there was a different journalist.
24   This was a male journalist.  We wanted to talk with
```

Exhibit C

248

1  don't think she actually attended the conference.  I
2  think what she did as she's one of our better -- was
3  one of our better journalists, I think what I told
4  her to do was hang out at the bar.  I said, I've
5  been to conferences in my life and people go to bars
6  and especially men go to bars and they like to brag.
7  It's a good place to get conversations and content.
8  If you sit at the bar and you dress nice and you
9  look nice and you talk to people and you're alone,
10 men will talk to you.  This conference was primarily
11 teachers union officials.  I figured some teachers
12 union officials would go to the bar and talk about
13 what they do.
14       Q.    How old was this young woman at the
15 time?
16       A.    She's in her twenties.
17       Q.    Okay.  So, did she specifically seek out
18 Mr. Wentz?
19       A.    Absolutely not.  This was another
20 situation which again as you have seen, as we've
21 gone through, this happens to us so many times and
22 that's why, you know, when we talk about things we
23 would do in Massachusetts, we don't know who we
24 would investigate.  We don't know who the corrupt

Exhibit C

Robert Joel Halderman - April 6, 2017

1   people are.  We don't know who the lawbreakers are.

2   We don't know who the bad guys are.  The only way we

3   find that out is to go out there and put ourselves

4   in situations where we can encounter and converse

5   with those people.

6           It's a very imprecise profession,

7   journalism.  Like I said, I've been doing this a

8   long time.  I spent three and a half years covering

9   the war in Bosnia and in and out of Sarajevo.  I

10  never knew what was going to happen.  I knew we

11  wanted to talk to people who were victims of the war

12  or prosecutors of the war.  I sort of knew where

13  some of them were.

14          One day we drove down a road and came

15  across one of the infamous rape camps where there

16  were young women literally tied to buildings, and

17  these Serb guards didn't like us and told us to go

18  away.  We were actually able to film it.  It was a

19  big story at the time.  We don't know whom we're

20  going to investigate.

21          In this case, Steve Wentz went to the

22  bar where our journalist was and started telling

23  this story.  I don't think our journalist knew that

24  he was a teachers union person until he told us

Exhibit C

251

1    have lawyers who ask me this question, were there

2    other people at the bar.  There was somebody our

3    undercover journalist didn't know who was sitting

4    next to her.  It was good.  Bars are really good for

5    us.

6                When we are handcuffed by the state and

7    we cannot do our job, we cannot be journalists.

8    When we are fettered unconstitutionally, I believe,

9    by state laws, we have to figure out a way that we

10   can still do our job.  In some states we can do

11   that.  Florida is one them.  California is one of

12   them.  Massachusetts is not one of them.

13        Q.    In the way of a bar being a suitable

14   place to record also in vino veritas; right?

15        A.    I'm not a huge fan and neither is

16   Mr. O'Keefe of when we get content from people who

17   are inebriated.  I don't like it.  I think there's

18   veracity issues.  There's also people -- when people

19   get drunk they say really stupid things.  I think

20   alcohol tends to create liars or big liars out of

21   people who are dishonest to begin with.  I'm not

22   crazy about it.  But a bar is a good place because

23   people are there, they're comfortable, they're

24   relaxed, they're talkative.

**Exhibit C**