UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PROJECT VERITAS ACTION FUND, )
)
Plaintiff, )     Civil Case No. 16-10462-PBS
)
v. )
)
DANIEL F. CONLEY, )     Affidavit of Russell Verney in Support
SUFFOLK COUNTY DISTRICT )     of Plaintiff's Motion for Summary
ATTORNEY )     Judgment
)
Defendant. )
)
)

## AFFIDAVIT OF RUSSELL JOSEPH VERNEY

I, Russell Joseph Verney, being duly sworn upon my oath do hereby state the following to be true and accurate:

1) I have served as the Executive Director of Project Veritas Action Fund ("PVA") since 2014.

2) I submit this affidavit in support of PVA's motion for summary judgment. I am familiar with the claims raised by PVA. I am authorized to make this affidavit on behalf of PVA and I make these statements based on my personal knowledge or upon review of the information kept in the course of normal business operations at PVA. The facts set forth in this affidavit are true to my knowledge.

3) PVA is a non-profit organization that engages almost exclusively in undercover journalism. This involves the primary use of secret audio and video recording to report to the public about instances of corruption, fraud, waste, and abuse.

4) PVA has a well-established history of exposing corruption, fraud, waste, and abuse since its inception in 2014. Some notable projects include:

   a. In 2017, the Federal Election Commission entered into a conciliation agreement with the Bernie Sanders 2016 campaign and the Australian Labor Party. This agreement arose out of an investigation carried out by PVA that exposed illegal, foreign, in-kind contributions being accepted by the Sanders campaign. After the FEC investigated, the parties each agreed to pay $14,500 as a penalty to the Commission.

   b. During the 2016 presidential election, PVA infiltrated an organization called "Democracy Partners" and uncovered evidence of collusion between non-profits and campaign committees that appeared to be illegal under federal election law. As a result, the head of Democracy Partners, Robert Creamer, resigned from his role in the Hillary Clinton campaign and the Federal Election Commission is still investigating the matter.

5) PVA had plans to investigate at least four items of public interest in Massachusetts, but was unable to do so due to Massachusetts' ban against secret audio recording.

   a. PVA planned to secretly record landlords in Boston offering unsafe or dilapidated apartments to college students and report its findings to the public. It could not do so due to the recording ban.

    b. PVA planned to secretly record police, legislators, and members of the Massachusetts Office for Refugees and Immigrants and their positions on sanctuary cities and then report its findings to the public. It could not do so due to the recording ban.

    c. On August 12, 2017, PVA sent undercover journalists to observe Antifa protests in Charlottesville, Virginia. On August 13, 2017, PVA sent undercover journalists to observe Antifa protests in Atlanta, Georgia. The results of this investigation remains pending. PVA planned to secretly record members of the protest group "Antifa" and any public officials connected with them in Boston on August 19, 2017 to learn more about their protest management tactics and report upon that to the public. It could not do so due to the recording ban.

    d. PVA planned to secretly record university officials at Harvard University to learn more about its endowment and use of federal funds then report upon that to the public. It could not do so due to the recording ban.

6) PVA has present and future plans to secretly record audio and video in Massachusetts to capture items of newsworthiness. It would still like to secretly record landlords in Boston, public officials about sanctuary cities, future Antifa events, and officials at Harvard University.

7) PVA would also like to deploy undercover agents with secret recording devices to Boston to learn more about potential leads about corruption and waste in the city related to government officials to be able to develop these stories and report about them to the public. It is impossible to know with specificity how these early investigations would develop due to the spontaneous nature of PVA's operations.

8) In my role as Executive Director, I take care to ensure that every undercover journalist deployed on a project complies with the law. Where legal requirements forbid a particular project or method of recording, PVA does not engage in the project or it alters its methods to comply with the law. For example, in states featuring "two-party" consent laws, I ensure that PVA only records where there is no reasonable expectation of privacy. PVA cannot operate in Massachusetts because the state bans the particular method of recording it uses for newsgathering.

9) PVA performs its newsgathering almost exclusively with secret audio and video recording. Because PVA focuses on capturing discussions about corruption, fraud, waste, and abuse, it is imperative that it be allowed to record secretly. It is also imperative that it be able to operate secret recording early in an investigation—before it may have concrete facts about what it will investigate—such that it may build a story that is verifiable to report to the public.

10) PVA complies with lawful requests from public officials and others. For example, if asked to leave a property, undercover journalists will promptly exit the area. If asked by police to stand a distance away from an investigation, undercover journalists will obey such instructions.

11) PVA maintains ongoing desires to operate in Massachusetts to secretly record and will do so if relief is granted by this Court.

Pursuant to 28 U.S.C. § 1746, I, Russell Joseph Verney, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 10, 2018.

By: _____
Russell Joseph Verney