# In The Matter Of:

*Project Veritas Acton Fund  v.*
*Daniel F. Conley, et al.*

---

*Robert Joel Halderman*
*April 6, 2017*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Original File Robert Joel Halderman 4-6-18.txt
**Min-U-Script® with Word Index**

1                  UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3                      EASTERN DIVISION

4                            C.A. No. 1:16-cv-10462-PBS

5

6    PROJECT VERITAS ACTION FUND,

7                    Plaintiff,

8            vs.

9    DANIEL F. CONLEY, in his

10   official capacity as Suffolk

11   County District Attorney,

12                    Defendant.

13

14           DEPOSITION OF ROBERT JOEL HALDERMAN,

15   individually and as corporate designee of Project

16   Veritas Action Fund, a witness called on behalf of

17   the Defendant, taken pursuant to the applicable

18   provisions of the Federal Rules of Civil Procedure

19   before Cynthia A. Powers, Professional Shorthand

20   Reporter and Notary Public in and for the

21   Commonwealth of Massachusetts, at the Office of the

22   Attorney General, One Ashburton Place, Boston,

23   Massachusetts, on Thursday, April 6, 2017,

24   commencing at 8:58 a.m.

2

1   APPEARANCES:

2           Stephen Klein, Esquire

3           500 Madison Street, No. 419

4           Alexandria, Virginia 22314

5           (734) 233-1705

6           Representing the Plaintiff

7

8           Eric A. Haskell, Esquire

9           Matthew Landry, Esquire

10          The Commonwealth of Massachusetts

11          Office of the Attorney General

12          One Ashburton Place, 19th Floor

13          Boston, Massachusetts 02108

14          (617) 963-2855

15          Representing the Defendant

16

17

18

19

20

21

22

23

24

3

1                          **I N D E X**

2                                                          Page

3     **Examination by Mr. Haskell**                        5

4     **Afternoon Session**                               146

5

6

7

8

9                        **E X H I B I T S**

10    **Number**                                          Page

11    **Exhibit 32      Screen Shot**                       41

12    **Exhibit 33      Screen Shot**                       42

13    **Exhibit 34      Screen Shot**                       53

14    **Exhibit 35      Screen Shot**                       63

15    **Exhibit 36      Screen Shot**                       66

16    **Exhibit 37      Screen Shot**                       83

17    **Exhibit 38      Screen Shot**                       83

18    **Exhibit 39      Flash Drive**                      111

19    **Exhibit 40      Screen Shot**                      117

20    **Exhibit 41      Screen Shot**                      121

21    **Exhibit 42      Screen Shot**                      129

22    **Exhibit 43      Screen Shot**                      132

23    **Exhibit 44      Screen Shot**                      133

24    **Exhibit 45      Screen Shot**                      177

4

1                    E X H I B I T S (Cont.)

2    Number                                          Page

3    Exhibit 46      Screen Shot                      177

4    Exhibit 47      Screen Shot                      198

5    Exhibit 48      Screen Shot                      253

6    Exhibit 49      Screen Shot                      263

7

8              (Exhibits retained by Mr. Haskell)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Robert Joel Halderman - April 6, 2017

5

1                    P R O C E E D I N G S

2                 ROBERT  JOEL  HALDERMAN,

3

4         having been satisfactorily identified

5           and duly sworn by the Notary Public,

6          was examined and testified as follows:

7

8                    DIRECT EXAMINATION

9    BY MR. HASKELL:

10         Q.    Good morning, Mr. Halderman.

11         A.    Good morning.

12         Q.    We met just a moment ago when you

13    arrived.  My name is Eric Haskell.  I'm an assistant

14    attorney general.  With me is assistant AG Matt

15    Landry.  Together we are representing the Defendant

16    in the case that Project Veritas Action Fund has

17    brought against the DA, Dan Conley and, in effect,

18    the Commonwealth of Massachusetts relating to

19    Massachusetts wiretapping statute.  So far so good?

20         A.    Yes.

21         Q.    Have you been deposed before?

22         A.    Yes.

23         Q.    And how many times?

24         A.    Twice.

Robert Joel Halderman - April 6, 2017

19

1      Q.    You mentioned a moment ago something
2   about being arrested, convicted --
3      A.    Yes.
4      Q.    -- and spending some time at Rikers
5   Island Jail in New York City.  Can we pull out of
6   your stack of exhibits there what was marked as
7   Exhibit 28?
8      A.    Yes.
9      Q.    Plaintiff's supplemental responses to a
10  set of request for admissions.  Let me ask you to
11  turn to page three, request for admission number 12.
12     A.    Yes.
13     Q.    And so that request for admission had
14  asked PVA to admit that the Robert J. Halderman whom
15  you identify in your initial disclosure as executive
16  producer is the same person who on or about March 9,
17  2010, pled guilty to and was convicted of attempted
18  grand larceny by extorsion in violation of the New
19  York Penal Code in People versus Halderman IND
20  number 4957/2009, Supreme Court of New York County
21  Criminal Term, and these responses admit that fact.
22     A.    Mm-hmm.
23     Q.    Is that Robert J. Halderman described in
24  number 12 you?

Robert Joel Halderman - April 6, 2017

20

1          A.     Yes, indeed.

2          Q.     Are those facts accurate?

3          A.     Indeed, they are.

4          Q.     Is it accurate to say that the

5     circumstances that led to that conviction were you

6     sought to obtain money from a person in exchange for

7     you not publicizing certain information you had

8     about that person?

9          A.     Well, you could interpret it that way.

10    I interpret it as jealous rage and an act of -- how

11    do I phrase it -- somewhat kind of ridiculousness to

12    the point of absurdity.  The charge was that, yes.

13         Q.     Is it fair to say that what you pled

14    guilty to was seeking to obtain money from a person

15    in exchange for you not publicizing information you

16    had about that person?

17         A.     Indeed.

18                    MR. HASKELL:  Off the record.

19                    (Discussion held off the record)

20    BY MR. HASKELL:

21         Q.     Can I ask you, Mr. Halderman, to look at

22    Exhibit 1 and Exhibit 2, which should be all the way

23    at the bottom of that stack in front of you.  Let's

24    actually look just at Exhibit 1 first.

Robert Joel Halderman - April 6, 2017

21

```
 1          A.     Okay, yep.

 2          Q.     Have you seen that document before?

 3          A.     Yes, I have.

 4          Q.     Let's flip to Exhibit 2.

 5          A.     Yes, and I have looked at this.

 6          Q.     So, Exhibit 2 designates you to speak on

 7   behalf of PVA in response to certain topics that my

 8   clients identified in this case; is that right?

 9          A.     Yes, sir.

10          Q.     Okay.  And what do you understand to

11   be -- let me rephrase that.  What is the obligation

12   to speak on behalf of PVA on those topics mean to

13   you in your own words?

14          A.     Well, as I understand it and based on

15   what I have read here, this actually is a definition

16   of what my expertise is and this is -- I'm the

17   executive producer of Project Veritas.  I'm

18   integrally involved in our investigations and have

19   been since I started four years ago.

20                 I also review most, if not all, of our

21   have videotape and recording, both video and audio

22   recording.  I also am responsible for producing our

23   product which we release on the Internet and through

24   our website.  So, my responsibilities are
```

Robert Joel Halderman - April 6, 2017

1   essentially the journalism, overseeing the

2   journalism.

3          James O'Keefe is integrally involved in

4   that process as well.  I'm sort of the nuts and

5   bolts guy.  When the tape comes in, I sit down and

6   watch it with one of my editors, and we talk about

7   it.  We'll send stuff out for transcription.  We'll

8   figure out the storyline.  We evolve the story to

9   sort of solidify what we have found.  That's what I

10  do.

11     Q.    And you spoke a moment ago about being

12  integrally involved in Project Veritas and PVA's

13  investigations.  Is that all of their

14  investigations?

15     A.    Pretty much.  I mean, I was thinking

16  about this the other day.  There are things -- there

17  are times when I have been on vacation or I've been

18  involved in one of the investigations where there's

19  other stuff going on that I'm not as -- I know

20  what's going on.

21          It's a small organization, and it's a

22  small team.  It's a very close knit team.  We

23  collaborate and certainly, you know, in the first

24  couple of years, '14, '15, you know, there was,

23

1   like, four or five of us.  So, it wasn't like we had

2   to send memos out.  You know what I mean?

3             I would yell, Russ, what's going on.

4   He'd say, oh, I don't know.  So, it was a small

5   office and we were -- we all are very likable

6   people.  In fact, we all get along exceedingly well.

7   There's open discussion about what's going on.

8        Q.    So, you're in the middle of everything?

9        A.    Try to be or at least know what's going

10  on.  That's part of what my responsibility is and

11  what I try to do.

12       Q.    That sounds good.  Looking at Exhibit 2,

13  the topics that you're listed as a designee for,

14  have you had a chance to look through those topics?

15       A.    Yep, I have.

16       Q.    And are you knowledgeable and prepared

17  to testify about each of those topics?

18       A.    Absolutely.

19       Q.    Let me ask, Mr. Halderman, what did you

20  do to prepare for this deposition today?

21       A.    Well, I kind of -- I went through --

22  Mr. Klein sent me a lot of these documents, and I

23  looked through them to make sure that I was aware

24  and recalled -- so, like, you know, you list the

Robert Joel Halderman - April 6, 2017

25

1        Q.    I see.  You said that you reviewed some
2    films as well.  When we talk about a film that you
3    produce and is finalized and released to the public,
4    is it fair if we call that a video report?
5        A.    Sure.
6        Q.    So, the films that you reviewed to get
7    ready for deposition today, were those the published
8    video reports?
9        A.    Yeah, and I only looked at that one
10   because I couldn't remember it.  I went to the
11   website and clicked on it.  So, that's the finished
12   report.
13       Q.    The term "raw video," does that mean
14   anything to you?
15       A.    Yes.
16       Q.    What's it mean?
17       A.    The unedited versions of our tapes.
18   When a journalist -- or in my old days, you would
19   shoot an hour.  You would go to a fire, and you
20   would shoot thirty minutes, and you would cut it
21   down to two minutes so you could sell it to the
22   local TV stations.
23       Q.    Raw video means full unedited video --
24       A.    Correct.

26

```
1         Q.    -- that underlies a video report or

2    whatever the produced version is?

3         A.    Correct.

4         Q.    Did you review any raw video --

5         A.    No.

6         Q.    -- to prepare to testify today?

7         A.    I reviewed all of the raw video in most

8    cases.  That's what I do.  That's my job.  In the

9    case of, let's say, take, for example, the Grimes

10   story, the Alison Grimes in Kentucky; right?

11   Tennessee.  Kentucky.  I remember when we did that

12   investigation.  I remember watching the tape when it

13   came in.

14            There was a number of undercover

15   journalists involved in that situation.  I remember

16   picking the sound bites, and I remember constructing

17   it in a certain way that tells the best story.

18            I'm proud of that story.  I thought it

19   was interesting that we were able to expose this

20   politician's hypocrisy in order to be elected.  She

21   was willing to lie to her potential voters to get

22   elected.

23        Q.    Let's talk about the Grimes

24   investigation.  So, how did that investigation
```

Robert Joel Halderman - April 6, 2017

1       Q.     What does that mean to you?

2       A.     Well, there's a guy named John Legend.

3   By the way, wasn't his name.  He change his name to

4   John Legend, which I think is real arrogant.  A

5   legend is someone or a story that has great import

6   or value to certain people.

7       Q.     Okay.  What about a journalist's cover,

8   what does that term mean to you, cover?

9       A.     In undercover reporting and

10  investigative undercover reporting, often

11  journalists who use that method have to come up with

12  an alias or a cover story.  This is also quite

13  typical in law enforcement in undercover

14  investigations by law enforcement.

15           By the way, it is a very common way, and

16  law enforcement is another argument for this; that,

17  you know, it's proven that without the ability of

18  law enforcement to go undercover they wouldn't be

19  able to expose certain criminal activity.  It

20  validates the idea of undercover work.

21           I think it both catches bad guys in the

22  criminal world and exposes wrongdoers in the public

23  world.  Yeah, so basically if we have a journalist

24  who is, let's say, investigating a -- let's say that

32

1    we were going to investigate the Flint water

2    situation where there's unbelievable lead levels in

3    the public water system in Michigan.  Perhaps we

4    would present ourselves as an industrial plumbing

5    expert and go up there and talk to the people about

6    the situation there in order to try to understand

7    how this occurred, how it happened.

8              If we've read much of the Flint case,

9    that was public officials who made some very, very

10   bad decisions that ended up creating a water

11   situation in Michigan that's extremely detrimental

12   to the health of its citizens.

13        Q.    The way the journalist presents

14   themselves in your example as industrial plumbing

15   expert, that's their cover?

16        A.    Yes, sir.

17        Q.    The journalist isn't an industrial

18   plumbing expert?

19        A.    Nope.  He might be.  You never know, but

20   rarely.

21        Q.    So, going back to the Grimes

22   investigation, what covers did the PVA journalists

23   use to approach those folks affiliated with the

24   Grimes campaign?

Robert Joel Halderman - April 6, 2017

33

```
1         A.     In that particular case, it was a
2    relatively simple and non-sophisticated cover.
3    Basically what we will do is basically go in and
4    volunteer to work for the campaign.  Our journalist
5    would say, I really like Alison Grimes.  I would
6    like to help the campaign.
7               Campaigns are pretty easy places to
8    infiltrate and investigate.  Certainly organizations
9    are much more challenging to get into.  Typically,
10   campaigns are pretty easy.  You don't have to be a
11   real sophisticated undercover journalist in order to
12   infiltrate a campaign.
13              I think in the case of Niko Elmaleh, I
14   don't think we had a cover.  We were in the bar and
15   he was yakking.  I don't think that the journalist
16   in that case even presented any kind of cover
17   whatsoever.  He was more than willing to spout out
18   his thesis without any real prompting even.
19        Q.     Did the journalist in that situation at
20   the bar introduce themselves?  Did they give a name?
21        A.     I don't recall.  I don't believe so.
22        Q.     Going back to what you were saying a
23   moment ago, is it fair to say that in the time
24   you've been with PVA, PVA has gone up a learning
```

Robert Joel Halderman - April 6, 2017

36

1   It's a federal statute.  It's a bad law.  It hinders

2   journalism in investigating the federal government.

3   Any time government makes a law that hinders the

4   freedom of the press, it's a bad law in my mind

5   because I think it violates the First Amendment.

6       Q.    Before we leave the Grimes

7   investigation, and we're going to be coming back to

8   the Democracy Partners investigation a little bit

9   later --

10      A.    One of my favorites.

11      Q.    There's a lot to talk about that.

12      A.    Indeed.

13      Q.    Before we leave the Grimes

14  investigation, the PVA journalists who approached

15  the campaign volunteering to work, they were the

16  ones who made those undercover recordings of the

17  Grimes campaign people --

18      A.    Correct.

19      Q.    -- and obtained these statements that

20  PVA then incorporated into the video report that it

21  had published?

22      A.    Correct.

23      Q.    Did those journalists keep on working

24  the Grimes campaign afterwards?

39

1    undercover journalism is always access.  That's the

2    biggest challenge.

3         Q.    What techniques does PVA and its

4    journalists use to obtain access?

5         A.    Well, the most important one is

6    likability, being a nice person, talking to people,

7    looking them in the eye, being friendly, being

8    congenial.  It's a lot of people skills.  It's

9    essentially people skills.

10             For the most part, most of our

11   investigations, you know, we're trying to get

12   someone to tell us the truth.  We don't want people

13   to lie to us.  We want people to tell us what's

14   really going on.  The process is to try to develop a

15   relationship, a bond, trust, mutual interest, mutual

16   concern, friendship maybe, at least on a superficial

17   level.

18             In the Democracy Partners case, one of

19   our journalists got an internship at Democracy

20   Partners headquarters in Washington, D.C., and was

21   there for quite some time going to work there on a

22   regular basis and became quite friendly with the

23   office staff and Robert Creamer, the man who was one

24   of the Democracy Partners and I think the founder of

Robert Joel Halderman - April 6, 2017

40

1   Democracy Partners.

2        Q.    How did she swing that, the journalist?

3        A.    It was a very -- that investigation was

4   a very complicated and tricky investigation.  We

5   created a -- we had a -- it kind of -- there was

6   actually a lit of serendipity to it on one level in

7   that in the first instance of what we heard was a

8   meeting that a political operative had with one of

9   our journalists in Wisconsin.  From that we were led

10  to Democracy Partners.

11            We then created -- because we knew this

12  was a political organization, this was a PVA

13  investigation, we knew these people were involved in

14  trying -- in the DNC campaign.  We created for these

15  folks the image -- we created a donor.  We suggested

16  that this donor wanted to donate to this effort.

17  The donor --

18        Q.    Suggested to whom?

19        A.    Suggested to our targets.  In this case,

20  it was Scott Foval who was the democratic operative

21  who was based in Wisconsin.  I can't remember the

22  organization off the top of my head.  I'm sure you

23  have it there somewhere, and I'm sure Steve would

24  know it if I asked him.

43

1          A.     I do.

2          Q.     Exhibit 33, where was that video taken?

3          A.      It was in a bar, I believe.  I don't

4     think it was in Madison.  I think it was in -- I'm

5     not sure.  It might have been in Madison, Wisconsin,

6     but it was somewhere in Wisconsin.  I don't remember

7     the location.

8          Q.     Is that a Brewers pendant in the ground?

9          A.     I believe so.

10          Q.     The encounter in Exhibit 33, was that

11     the first encounter between the journalist and

12     Mr. Foval?

13          A.     Yes, I believe it was.

14          Q.     And the journalist has a chat with

15     Mr. Foval at this bar?

16          A.     Yes.

17          Q.     Captures the video there?

18          A.     Yes.

19          Q.     What happened next?  Where did that take

20     the investigation next?

21          A.      So, interestingly, because you've chosen

22     that particular photo and that particular moment, so

23     I probably know your work is a little bit like me

24     saying, oh, Eric, I've read some of your decisions,

44

1    you know, they're great, you're such a great lawyer,

2    even though I haven't.  It's part of the techniques

3    that we use.

4              Scott Foval was boasting about his work

5    as a democratic operative in the campaign and

6    talking about this bird-dogging thing.  Our

7    journalist said, oh, I probably know your work.

8         Q.    And that comment was designed to build

9    trust with --

10        A.    To build trust and boost his ego.  Men

11   especially, much more so than woman, I think, men

12   love talking about themselves and love thinking

13   they're really smart and love thinking what they've

14   done is really important.  If you can tell that to

15   men, then they tend to like you more and tend to

16   then tell you more.

17        Q.    One way to do it is for journalists to

18   say, I probably know your work --

19        A.    Right.

20        Q.    -- even though the journalist may or may

21   not have actually known Mr. Foval's work?

22        A.    Correct.

23        Q.    So this interaction in Exhibit 33, the

24   reporter builds the relationship with Mr. Foval,

Robert Joel Halderman - April 6, 2017

45

1    kind of sets the hook so to speak?

2         A.    This was a pretty easy fish to catch.

3    Foval was a very boastful, very kind of

4    self-important man who was involved in, we believe,

5    some pretty serious shenanigans on behalf of the

6    Democratic National Committee.

7              He was proud of the dirty tricks work,

8    to use a Nixonian phrase, that he was doing on

9    behalf of the DNC.  He believed that the undercover

10   journalist that he was talking to was a sympathetic

11   listener; that he was also a pro-DNC person who

12   would be supportive of these kinds of actions.

13        Q.    Is that the impression that the

14   journalist worked to give Mr. Foval?

15        A.    Absolutely.

16        Q.    So, by the way, what was the

17   journalist's cover at this time, at the time of the

18   interaction in Exhibit 33?

19        A.    His cover was pretty loose at that

20   point.  It kind of got more sophisticated.  Once we

21   had the initial conversation with Foval and we

22   realized he had quite a lot to say and he was

23   connected by virtue of Democracy Partners all the

24   way to both the Obama White House and the Clinton

Robert Joel Halderman - April 6, 2017

47

1   journalist's name, although he probably does now

2   because they're suing us, ridiculously, not because

3   they say what we reported was wrong, but they're

4   suing us because what --

5                    MR. KLEIN:   Joe, just answer the

6             question.

7        A.    I'm fascinated by this.  We did not know

8   Foval's name, I don't believe, until the

9   conversation kind of evolved at the bar.

10       Q.    Okay.

11       A.    We meaning the undercover journalist.

12       Q.    And so at the time of the conversation

13  in the bar, Exhibit 33, the journalist has this kind

14  of loose, vague cover.  Does PVA develop a more

15  sophisticated cover after this conversation in the

16  bar?

17       A.    Yeah, and that's -- that's typical for

18  us.

19       Q.    Yeah.

20       A.    If we kind -- you know, so many times we

21  don't know.  We're journalists; right?  So, we don't

22  know what we're going to find.  We may have a tip.

23  We may have a suggestion from a friend or from a

24  source who says, hey, you should go investigate this

Robert Joel Halderman - April 6, 2017

48

1    corrupt politician in this state or you should take

2    a look at this company in this state or look at the

3    voter fraud issue in this place.  Then when we get

4    there, if we find what we -- a lot of times we find

5    something entirely different.  We respond to that.

6    We have to be flexible.

7              As a journalist you always have to

8    accept what you think may be the story may not be

9    the story, and you have to be open minded enough and

10   flexible enough to then adjust your approach in

11   order to get the story that you're being led toward.

12        Q.    Let me push on that a little bit.  When

13   PVA is doing an investigation, you know who the

14   target is; right?

15        A.    Well, absolutely not.  I just said in

16   this case, one of our biggest investigations that

17   we've ever done started with an encounter with

18   somebody who we didn't even know his name.

19        Q.    Do you have at least an idea where

20   you're going to encounter that person?

21        A.    I had no idea that when we sent an

22   undercover journalist to Wisconsin to kind of take a

23   look at what was going on with the primary that we

24   were going to expose the facts that the DNC and the

49

1    Clinton campaign was sending people to Trump rallies

2    to incite violence.

3         Q.    You can't say either then what your

4    journalist is going to wind up recording?

5         A.    Correct.

6         Q.    Take it as you find it?

7         A.    Yes.  I think like every journalist

8    throughout the history of journalism, we don't know

9    what the answer to the questions are going to be

10   until the questions are asked.

11             Now, we being undercover journalists, we

12   ask the questions without people knowing that we're

13   journalists, and I would suggest to you that that is

14   an incredibly powerful and successful way to elicit

15   the truth because we know very well that people

16   aren't always honest especially when they're in

17   front of a TV camera.

18        Q.    So, in what eventually became the

19   Democracy Partners investigation, what happened

20   after this conversation in Exhibit 33?

21        A.    So, that journalist called us.  I don't

22   remember if he called me specifically or James

23   O'Keefe or what, but essentially he said, told us

24   that he thought he had something that was pretty

57

1    years old, and as each day goes by, it's harder and

2    harder to remember names that I actually invented.

3    I came up with this man's name.  Charles.  Charles.

4    Oh, God, I can see him.

5          Q.    We can go with Charles.

6          A.    I got business cards for him.  I

7    created -- I invented him out of thin air.  It's

8    actually one of the fun parts of my job I would say.

9          Q.    Sounds creative.

10         A.    Yes, it is.  It requires both a degree

11   of imagination, but also it's got to be pointed.  It

12   has to be credible.  It has to work.

13         Q.    Let me ask, why did PVA choose to create

14   this donor?

15         A.    Because we know, like most people who

16   know anything about American politics, that American

17   politics is driven by money.  Money is the engine

18   that drives the political process in this country

19   for good or for evil.  I actually think it's

20   probably for evil, but that's neither here nor

21   there.

22               We knew that if we dangled the carrot of

23   a donation to this political organization they would

24   be very nice to us.  We knew based on, you know, our

1    experience that -- for example, one of the people

2    who works for our organization is a man named Russ

3    Verney.  Russ Verney is a sophisticated political

4    operative and has a great and strong history and

5    knowledge of the American political system.  He

6    knows how it works.  He's an integral member of our

7    leadership team.  He was one of the people who said,

8    yeah, offer them some money.

9         Q.    Creating a donor, first of all, it was

10   part of creating this more complex sophisticated

11   cover that you mentioned earlier, fair to say?

12        A.    Yeah, it was important for us.  We felt

13   that in order for us to be able to report the story

14   accurately and with a degree of confidence that I

15   like to have, the standard that I like to bring to

16   our journalism, I wanted confirmation of what Foval

17   said from numerous sources.  I wanted to be able to

18   on videotape, on audiotape, make the connection

19   between Democracy Partners and Robert Creamer back

20   to Scott Foval and forward to the Democratic

21   National Committee and the Hillary Clinton campaign.

22        Q.    And creating the donor gave you

23   additional access to do that?

24        A.    Yes, we created the donor because we

59

1    believed that by creating the donor we could get a

2    meeting with Mr. Creamer.

3         Q.    Did that come to pass?

4         A.    Yes, we had several meetings with

5    Mr. Creamer.

6         Q.    How was the first meeting between the

7    donor and Mr. Creamer set up?

8         A.    I was actually there.  It was in

9    Washington, D.C., at a hotel lobby.  I want to say

10   it was the Marriott Marquee.  I'm not 100 percent

11   sure which hotel it was.  It was in Washington,

12   D.C., which is a one-party consent area, unlike the

13   Commonwealth of Massachusetts.

14             We had the meeting in a hotel lobby.

15   Our undercover journalist was this Charles.  And the

16   meeting took place.  I was sitting across the way.

17   I will go to some of these kinds of events because,

18   A, I think our -- our journalists are not typically

19   terribly experienced journalists.

20             I have a lot of experience in

21   journalism.  Oftentimes if I don't accompany them, I

22   will oftentimes have a conversation with them right

23   prior to a meeting where I will talk about what I

24   believe we're trying -- the information that the

60

1    story -- what the story is.

2              I think that, as I said to you earlier,

3    I think that's one of my primarily responsibilities

4    is to help the organization determine and pursue a

5    story that is of journalistic value.

6         Q.    The PVA journalist who played the role

7    of the donor, Charles, I'm assuming that's a

8    different journalist than the one who encountered

9    Mr. Foval at the bar at the hotel; right?

10        A.    Correct, different journalist.

11        Q.    You had one of those pre-meeting

12   briefings with the Charles journalist before he met

13   with Mr. Creamer?

14        A.    Absolutely.

15        Q.    You were across the room while that

16   meeting took place?

17        A.    Correct.

18        Q.    Did Mr. Creamer know you were there?

19        A.    He didn't know.  He didn't know I was

20   connected to the person he was talking to.

21        Q.    Question is, were you monitoring the

22   conversation between the Charles journalist and

23   Mr. Creamer?

24        A.    Of course.

Robert Joel Halderman - April 6, 2017

63

1   with Foval, third meeting with Foval, third meeting

2   with Creamer, as I recall.

3        Q.    If we look at Exhibit 32 that we marked

4   a short time ago --

5        A.    Mm-hmm.

6        Q.    -- that's the third meeting with Foval

7   we're looking at there?

8        A.    Correct.

9                  MR. HASKELL:  Let's mark this,

10                please.

11                (Marked Exhibit 35, Screen Shot)

12   BY MR. HASKELL:

13       Q.    So, Exhibit 35 we just marked here,

14   which meeting is that?  Actually, I'm sorry, let me

15   first withdraw that last question and first ask, do

16   you recognize Exhibit 35 as a still from the

17   Democracy Partners video report that PVA published?

18       A.    Absolutely.

19       Q.    Which meeting are we looking at in

20   Exhibit 35?

21       A.    This is the first meeting with Robert

22   Creamer.

23       Q.    That's the one in the Marriott lobby in

24   D.C.?

Robert Joel Halderman - April 6, 2017

64

```
 1        A.    Don't hold me to that.  I think it was
 2   the Marriott.  I travel a lot, and I stay in a lot
 3   of hotel, and I have some for forty some years.
 4   They all kind of blend into each other.  I believe
 5   it was a Marriott Hotel in Washington, D.C.  It was
 6   a really nice hotel.  This is the first meeting with
 7   our undercover journalist and Mr. Robert Creamer in
 8   the lobby of that hotel.
 9        Q.    Now, you had mentioned earlier that one
10   of your undercover journalists eventually got an
11   internship.  Was it with Mr. Creamer's outfit here?
12        A.    Yes.
13        Q.    How did that come to happen?
14        A.    This was brilliant if I may say so
15   myself.  It may have been James O'Keefe's idea.
16   I'll give James O'Keefe the credit.  Once we
17   developed the cover of the donor, they were so
18   solicitous to us, they just fell in love with us.
19   They thought we were the best thing in the world.
20   We were going to give them some money, and they were
21   really happy about that.
22             We decided, let's leverage this a little
23   bit.  Let's push it.  In undercover journalism
24   generally you try push the envelope, try to ask for
```

65

 1     a little bit more and get a little bit more.  We

 2     suggested that our donor, we had him tell Creamer

 3     that he had a niece who was really interested in

 4     politics and was really interested in getting

 5     involved in the campaign.  Mr. Creamer said, well,

 6     that's great.  We got people all over the place.  We

 7     ended up sending our undercover journalist, a young

 8     woman journalist to Cleveland for the Republican

 9     primary.  I think it was in Cleveland that year.  It

10     was Cleveland; right?  Mm-hmm.

11                 Bob Creamer connected our journalist's

12     niece -- niece, I put that in quotes because she

13     wasn't actually his niece and he wasn't a donor, but

14     that was the cover story that he had a niece who was

15     interested in politics.  Mr. Creamer was able to

16     connect our undercover journalist who was posing as

17     the donor's niece to work for some people in

18     Cleveland during the -- and there was a woman by the

19     name of Zulema Rodriguez, I believe, who was part of

20     that.  Creamer corrected our niece undercover

21     journalist to Zulema Rodriguez.  Our undercover

22     journalist did some work at the campaign building a

23     fake brick wall to protest the Trump wall and some

24     little things at the Republican primary.

66

```
 1              During that part of the investigation,

 2   Ms. Rodriguez confirmed many of the initial

 3   statements that we had heard from Mr. Foval about

 4   the, quote-unquote, bird-dogging and otherwise

 5   staging of protests and demonstrations at Trump

 6   events.

 7              In fact, she talked about a Chicago

 8   demonstration that turned quite violent during that

 9   campaign year, and actually the law enforcement

10   authority closed down that event because it got too

11   violent in the streets.

12              Ms. Rodriguez said that she attended

13   that meeting and went there as a paid member of that

14   organization, which again we were led to believe due

15   to the public narrative that these protests were

16   spontaneous but, in fact, we kept finding evidence

17   and information that that was not so.

18              She also told us that she had done an

19   event in Arizona where they had partially blocked

20   the highway between Phoenix and Flagstaff, which is

21   a major interstate running north-south in Arizona.

22                   MR. HASKELL:  Let's mark this now.

23                   (Marked Exhibit 36, Screen Shot)

24   BY MR. HASKELL:
```

Robert Joel Halderman - April 6, 2017

67

1        Q.    Exhibit 36, do you recognize that as a
2   still from the video report on Democracy Partners
3   that PVA published?
4        A.    Absolutely.
5        Q.    And this was the Zulema Rodriguez you
6   were describing?
7        A.    Absolutely.
8        Q.    PVA's undercover journalist who was
9   posing as Charles's niece went out to Cleveland to
10  meet and work with Zulema Rodriguez?
11       A.    That is correct.
12       Q.    And let me ask, that undercover
13  journalist, is that the same woman who was at the
14  table for the second meeting with Mr. Foval in
15  Exhibit 34?
16       A.    No, it was a different journalist.
17       Q.    So, we're up to at least four
18  journalists at this point; the initial contact with
19  Mr. Foval, the woman who was at the second meeting
20  with Mr. Foval, the donor -- journalist who posed as
21  the donor, and the journalist who posed as the
22  niece?
23       A.    And myself who had a phone conversation
24  with Mr. Foval.  So, I would say five.  I like to

68

1   consider myself a journalist.

2        Q.    You got it.  Okay.  So, Exhibit 36,

3   where was this film taken?

4        A.    That was somewhere in Cleveland.

5   Cleveland.  They had an office space near the

6   convention center where they did their sign painting

7   and banners and sort of a workspace that they had

8   rented near the convention center.

9        Q.    And the PVA journalist posing as the

10  niece, did she tell Ms. Rodriguez something to the

11  effect of I'm here to work with you for the time?

12       A.    Yeah, as I recall, Robert Creamer

13  actually contacted Ms. Rodriguez and told

14  Ms. Rodriguez that our undercover journalist would

15  be coming to Cleveland and should be -- basically

16  vouched for our undercover journalist.

17            Again, in our line of work in

18  investigative journalism, having somebody like

19  Creamer vouch for our journalist to Zulema Rodriguez

20  is huge because it gives instant credibility to that

21  person.  There's not the necessity to create an

22  elaborate legend as you initially used that term.

23       Q.    Okay.  So, after the journalist posing

24  as the niece went to Cleveland and had these

Robert Joel Halderman - April 6, 2017

69

1    encounters with Ms. Rodriguez, what was the next

2    thing that happened in the -- let me ask this.  This

3    was the next thing that happened in the course that

4    led the niece to get the internship?

5         A.    Mm-hmm.  Basically, as I recall, we then

6    through the donor, the undercover journalist posing

7    as the donor, we wanted to get more information

8    about -- specifically, I was really interested in

9    the connection between Democracy Partners and the

10   Democratic National Committee.  I felt that if we

11   didn't solidify a true connection between those

12   organizations that our story really wasn't as

13   bulletproof as I wanted it to be.  James felt the

14   same way.

15             The idea was if we could have more

16   conversations with Mr. Creamer, we would learn more

17   information.  Our general belief and philosophy, if

18   you will, is that the more information we have the

19   better off we are.  The more solid our story is the

20   more reliable and comfortable I will be in the

21   production of and release of the story.

22             We came up with basically the ploy, if

23   you will, the donor said to Mr. Creamer, well, my

24   niece isn't in school this summer, and she would

Robert Joel Halderman - April 6, 2017

70

1   love to do something in Washington to help the

2   campaign.  Is there anything that you can suggest.

3          I believe -- I'm not 100 percent sure,

4   but I'm pretty certain that Mr. Creamer suggested

5   that this niece, the undercover journalist, could

6   come to Washington, D.C., and be an intern at

7   Democracy Partners.

8       Q.   The journalist posing as Charles, the

9   donor, was that his intention when he asked

10  Mr. Creamer for opportunities for the niece was the

11  hope that Mr. Creamer would offer her an opportunity

12  at Democracy Partners?

13      A.   I don't think we -- I don't think we had

14  it all figured out.  You know, so much of this and

15  so much of journalism is one thing leads to another.

16  I don't think we ever have some grand master plan.

17  I'm a chess player, and sometimes I can get about

18  five or six moves ahead.  I'm never that in

19  journalism.

20          A lot of what we do is based on what

21  with learn.  We respond to what we learn and then we

22  develop our next move based on the knowledge that

23  we've accrued.

24      Q.   So, Mr. Creamer did offer the, quote,

Robert Joel Halderman - April 6, 2017

74

1   yeah, come on in.

2        Q.    And you spoke earlier about PVA creating

3   this donor, Charles.  When you say create the donor,

4   what did PVA do to create the donor?

5        A.    So, I thought of a name.  I talked to

6   the undercover journalist who was the person who met

7   with Foval.  We between us sort of created this

8   story of this person.  I got some business cards

9   made.  I got an e-mail.  I set up an e-mail account.

10  What else did I do?  I think that's about all I did.

11            Again, in this particular case, we

12  didn't feel like they were going to get seriously

13  vetted.  In some investigations we do legend

14  building because we believe or our concern is that

15  we're going to be vetted reasonably, you know, by

16  open source information.

17            So, we'll create a Facebook page, a

18  LinkedIn page.  We've even gone so far in the past

19  of creating LLCs, offshore bank accounts.  We do a

20  lot of things because undercover journalism is a

21  tricky, complicated business.

22       Q.    All of those things fall into the

23  category of legend building you just mentioned?

24       A.    Yeah, I guess, yes.

Robert Joel Halderman - April 6, 2017

75

```
 1          Q.    The e-mail account that you created for
 2    this donor, Charles, was that e-mail account used as
 3    part of the investigation?
 4          A.    Absolutely.
 5          Q.    And the business cards, were they used
 6    as part of the investigation?
 7          A.    Absolutely.
 8          Q.    The journalist posing as Charles gave
 9    out the business cards to who, Creamer?
10          A.    Creamer.  I think I had five hundred
11    printed.  I think we gave out one.
12                    MR. HASKELL:  Let's go off the
13                record.
14                    (Whereupon, a recess was taken)
15    BY MR. HASKELL:
16          Q.    So, we left off, I think, speaking about
17    the niece getting an internship with Democracy
18    Partners.  So, do you remember when she started to
19    work there?
20          A.    It was sometime in the summer of '17.  I
21    don't remember exact date.  She wasn't there that
22    long because it was after the convention and then we
23    pulled the plug in October.  I would have guessed
24    she started time in early August or September, but
```

76

1    I'm not exactly sure.  That's what I would -- as I

2    recollect, it was sometime around that time frame.

3         Q.    So would have stayed there for a month

4    or so?

5         A.    More or less.  I don't remember the

6    exact dates.

7         Q.    And her role as an intern at Democracy

8    Partners, how many days a week was she there?

9         A.    Well, we started off, we thought we

10   wanted her to be there a lot.  Then we had a funny

11   thing happen.  She was very successful.  At one

12   point she called me on the phone and said, Creamer

13   wants to take me to the White House, and I said --

14               Now, imagine we're Project Veritas.

15   We're doing an undercover investigation.  The target

16   of our investigation who we are trying to link to

17   the White House invites our undercover journalist to

18   go to the White House.

19               I said, You can't go to the White House.

20   And she said, I know, there's no way; right?  I

21   said, No, you are not who you say you are.  You

22   don't have ID.  You can't lie to the Secret Service.

23   You can't go anywhere near the White House.

24               It was one of the most bizarre problems

Robert Joel Halderman - April 6, 2017

1      Q.    What kind of work did Democracy Partners
2  have the undercover journalist doing for them?
3      A.    It was a lot of different things.  A lot
4  of it was typical internship stuff where she wasn't
5  doing that much, answering the phones and doing sort
6  of menial tasks around the office.
7            They took her around.  They wanted to
8  take her to the White House.  They took her to the
9  DNC headquarters.  We met a woman named Janet Price
10  from DNC who gave us some information.  You might
11  have a picture in there.
12            What was really remarkable about that
13  whole thing was the complete unfettered access they
14  gave her to what they were doing; their personnel,
15  their activities, their conversations with the DNC,
16  their conversations through the DNC and to the
17  Clinton campaign, their conversations with the White
18  House.
19            Again, these people were quite boastful,
20  and I think they were proud of their work.  That's
21  fine.  But they certainty did not think that they
22  were talking to an undercover journalist.  So, they
23  told her things that, you know, I'm sure they
24  wouldn't have told people if -- they wouldn't have

80

1   told that to a reporter who asked them the question.

2       Q.    Sure.  Now, the undercover reporter,

3   when she was doing this internship, did she have a

4   secret camera rolling the whole time that she was

5   there every day?

6       A.    Interestingly, the first day -- because

7   I've actually looked at this particular tape

8   relatively recently because of something else that

9   we're doing.  She was in the office for

10  approximately eight hours, and for that eight hours

11  she had her camera rolling the entire time, never

12  turned it off even when she went to the bathroom.

13          Part of what, you know, we don't tell

14  our journalists necessarily to do that because we

15  believe people should have privacy in those

16  situations, obviously.  But she is, as I say, a very

17  talented and hard working journalist, and she

18  understood that every minute in that place had the

19  potential to help us with the journalism in that

20  story.

21      Q.    When you said a moment ago you believe

22  people have privacy in those kinds of situations,

23  you mean when they're using the bathroom?

24      A.    When they're going to the bathroom.  I

Robert Joel Halderman - April 6, 2017

81

1    believe undercover reporting should be strictly

2    forbidden in private situations, especially

3    bathrooms.  I think that's throughout the world.

4    That should be an absolute line that should not be

5    crossed.

6          Q.    Fair enough.  So, she had the camera

7    going the full eight hours the first day she was

8    there.  Did that change as the summer went on?

9          A.    These cameras are tricky pieces of

10   technology that don't always work as well as we

11   would like them to.  This undercover journalist,

12   undercover reporter, is a conscientious and capable

13   person.  I think for the most part when she was in

14   that building she was rolling an undercover camera

15   and audio.

16         Q.    What kind of information did she have

17   access to at the internship?

18         A.    The biggest thing was conversations with

19   Robert Creamer about their activities.  That without

20   doubt was for us the most interesting.  I mean,

21   there were other things.  They spoke to a man by the

22   name of Aaron Black.  That is not his real name, we

23   don't believe, which is strange that they would hire

24   a guy they knew was not his real name.

83

1    it showed the connection between the original

2    conversation that we had with Scott Foval in that

3    bar in Milwaukee all the way to Hillary Clinton

4    herself, which I thought was fascinating.

5                      MR. HASKELL:  Let's mark a couple

6                of exhibits here.

7                      (Marked Exhibits 37 & 38, Screen

8                Shots)

9    BY MR. HASKELL:

10        Q.    Exhibit 37 that we've just marked, do

11   you recognize that as a still from the Democracy

12   Partners video report that PVA published?

13        A.    Absolutely.

14        Q.    And where was Exhibit 37 taken?

15        A.    That was in Bob Creamer's office, Robert

16   Creamer's office, at the Democracy Partners office

17   in Washington, D.C.

18        Q.    In his personal office?

19        A.    His designated office in the Democracy

20   Partners office space.

21        Q.    Thank you.  That's a better way to put

22   it.  So, this was captured by the undercover

23   journalist in her role as intern for Democracy

24   Partners having a conversation with Bob Creamer in

Robert Joel Halderman - April 6, 2017

84

1   his office?

2        A.    Correct.

3        Q.    Exhibit 38, where was that taken?

4        A.    That was in one of the common areas of

5   the Democracy Partners office in Washington, D.C.

6        Q.    Do you recognize Exhibit 37 as a still

7   from the published report that PVA put out on

8   Democracy Partners?

9        A.    Absolutely.

10       Q.    So, similar situation with Exhibit 38,

11  the intern or, excuse me, the undercover journalist

12  posing as the intern had a conversation with Bob

13  Creamer in this common area of the Democracy

14  Partners office and filmed it?

15       A.    Correct.

16       Q.    How often did the journalist posing as

17  the intern send back raw video for you to review?

18       A.    Not every day, but certainly on a very

19  regular basis.  The process of transmitting the

20  video remotely back to the headquarters is a

21  complicated and tricky process, and it requires

22  having real good Internet service.

23            This was also hours and hours and hours

24  of videotape, which those files are really large

Robert Joel Halderman - April 6, 2017

1   to find out about it and to see it.

2              What happened in the case of Democracy

3   Partners, almost immediately after the release of

4   our story, Scott Foval was fired and Bob Creamer

5   resigned from the campaign.  A lot of what PVA and

6   PV does is because we have impact.

7              In this case, these two man left the

8   campaign.  One was fired and one resigned from being

9   involved in the campaign.  That itself became the

10  story.  The story wasn't that we had these tapes.

11  The story was these guys were fired and resigned

12  because we had the tapes and that became

13  justification for a lot of mainstream media to

14  report the story.  These were principals in the

15  campaign.  They lost their jobs.  Why did they lose

16  their jobs.  Oh, because of the tapes that were

17  released.

18      Q.    The undercover journalist who was posing

19  as an intern with Democracy Partners, what kind of

20  camera did she use while she was there day in and

21  day out?

22      A.    Various.  We have all the kinds of

23  tricks and tools.  We've got necktie cameras, button

24  cameras, purse cameras.  We've got eyeglass cameras.

Robert Joel Halderman - April 6, 2017

1    You wouldn't -- you would be amazed at the

2    technology that we've acquired in order to do the

3    important work that we do.

4           Q.    Like James Bond stuff.

5           A.    You know, we take what we do very

6    seriously.  Some of the investigations we do are

7    potentially quite risky, physically risky to our

8    undercover journalists.  We want as sophisticated

9    equipment as we could possibly get that would be the

10   least likely to be discovered and the least likely

11   to put our journalists in any kind of risk.

12          Q.    How did the, quote, "niece" wrap up her

13   time at Democracy Partners?  She give two weeks'

14   notice or something?

15          A.    We actually had one, two, three -- I

16   think we had -- so, we actually -- I don't know if

17   you remember in the story, but I'm sure you do --

18   you're a smart guy and you looked at all the tapes.

19          We not only had a donor but we had an

20   undercover journalist, who was the donor's money

21   man, who was actually going to hand -- be the person

22   who wired the money to Americans United for Change.

23   He was an undercover journalist who is actually an

24   Englishman by birth.

Robert Joel Halderman - April 6, 2017

99

```
1    put all the pieces together yet.  It was kind of
2    amazing actually.
3         Q.    So, what you took from that is the niece
4    cover had been blown --
5         A.    Had been blown.
6         Q.    -- but not Charles Roth's?
7         A.    Which means had they hadn't put two and
8    two together.  If the, quote-unquote, "niece" wasn't
9    real, then that sort of puts in doubt the uncle,
10   doesn't it?  Took them a while.  They know now.
11        Q.    I think you mentioned before the break
12   earlier this morning that PVA made a donation.  Was
13   that part of this investigation?
14        A.    Yeah, yeah.
15        Q.    Who was that donation made to?
16        A.    It was made to Americans United for
17   Change.
18        Q.    Who made the donation?
19        A.    The donation actually came from an
20   offshore company.  I believe it was a company in
21   Belize.  I think it was one of our Belize offshore
22   companies.
23        Q.    Do you know the name of that company?
24        A.    I did.  If you are asking me if I
```

Robert Joel Halderman - April 6, 2017

1    remember it right now, I can't.  I made up most of

2    the names myself.  Mr. Verney and I came up with the

3    names.  Repulse Bay was one of them.  It may have

4    been Repulse Bay.  I don't remember.  It could have

5    been.  We had a bunch of them at the time.  That was

6    because we were -- we believed that if we actually

7    made a donation that it would enhance our

8    credibility even greater.  We went to our attorneys

9    and we said, how do we do this so we don't break any

10   laws.

11        Q.    Best not to testify about --

12        A.    I'm sorry, I found out that -- I learned

13   how we could do that without violating any laws.

14   Mr. Verney and I worked on that process.  We came up

15   with a mechanism and a process that we knew was --

16   that we knew was legal.

17             So, we ended up wiring from this

18   offshore bank $25,000 to a bank account that Creamer

19   gave us the information about, but it was actually

20   an Americans United for Change bank account, and I

21   believe it was in New York, and we made the wire

22   transfer to that bank account.

23        Q.    So, even though the donation was coming

24   from this company in Belize, the money was

101

1    controlled and directed by folks at PVA?

2          A.    Correct.

3          Q.    And had PVA created this company in

4    Belize?

5          A.    Yes.

6          Q.    And registered it, whatever the process

7    is?

8          A.    There's a business in this, believe it

9    or not.  I didn't know this beforehand.  People set

10   up these companies, and you can buy them.

11         Q.    I see.

12         A.    And they're not that expensive.  If

13   you'd like to buy one, I can help you out there.  I

14   know people who do this.

15         Q.    So, it's a legitimate Belizean entity,

16   but it's one for at least the purposes of this

17   donation its operations were controlled by you and

18   Mr. Verney and other folks at PVA?

19         A.    Correct.

20         Q.    Okay.  I think that covers us on

21   Democracy Partners.  Let's move on to the next

22   investigation I want to ask you about, investigation

23   involving the Clinton campaign in Nevada.

24         A.    Mm-hmm.

112

1        Q.    Going into the jump drive and going to a

2    folder, 30(b)(6) video and sub-folder RDP15, I'm

3    going to open a file titled 15-P27, Rigging The

4    Election.  It's an MP4 file.  Open the right

5    program.  You can see now that video file playing on

6    the screen here?

7        A.    Yes, I can.

8        Q.    I've paused that video file about

9    eighteen seconds in.  Do you recognize what we're

10   looking at here?

11       A.    I do.

12       Q.    What is it?

13       A.    It is the release that I produced and

14   Project Veritas Action produced in the Democracy

15   Partners investigation that we called Rigging The

16   Election.

17       Q.    And that's the same video release that

18   we've seen stills of in Exhibits 32 to 38?

19       A.    Exactly.

20       Q.    Going back to the jump drive and in that

21   same subfile, 30(b)(6) videos, RDP15, I'm going to

22   open a file, an MP4 file entitled 15-P25 Clinton

23   Campaign.  Do you see me doing that here?

24       A.    Indeed, I do.

Robert Joel Halderman - April 6, 2017

113

1       Q.    Do you see this video playing up on the
2   screen here?
3       A.    I do.
4       Q.    I've paused it about ten seconds in.  Do
5   you recognize this video?
6       A.    Yes, I do.
7       Q.    What is it?
8       A.    This is a recording that we made inside,
9   I believe, the Hillary for President campaign office
10  in Las Vegas, Nevada, and that figure on the
11  right-hand side of the screen is John Podesta, who
12  was the chairman of the campaign for Hillary Clinton
13  for President.  Robby Mook was the campaign manager,
14  but I believe the title that Podesta held was
15  chairman of the campaign.  He was giving a peptalk
16  to the workers at the campaign office in Nevada.
17      Q.    Was a PVA undercover journalist present
18  live for this is peptalk by Mr. Podesta?
19      A.    That's how we were able to make this
20  recording because our journalist was in the room and
21  was participating in this event.
22      Q.    Okay.  And let me ask just before we
23  move on, the MP4 file that I began to play here, do
24  you recognize that file that we're now playing?

114

1      A.    Yes.

2      Q.    What is it?

3      A.    It's one of our PVA releases that we

4    released during that campaign cycle.

5      Q.    Is it fair to characterize this one as

6    relating to the Clinton campaign in Nevada?

7      A.    That would be a correct

8    characterization.

9      Q.    Let's talk about how the PVA undercover

10   journalist got to be in the Clinton campaign office

11   in Nevada.  How did that happen?

12     A.    I think we literally walked in the door

13   and said, Can we help.  Campaigns do not tend, and I

14   understand why, to be high-security, high-vetting

15   organizations for people who want to contribute time

16   and effort to the campaigns.

17           In this particular case, as I recall, we

18   volunteered to work for the campaign, and we did.

19   We did phone banking.  We did GOTV stuff.  The

20   parties that we investigate, we actually help a

21   great deal as well.  I don't think they appreciate

22   that as much as they should, but it's true.

23     Q.    Who was "we" who got involved?

24     A.    I tend to think of every investigation

115

1   being we.  This is such a team process.  We don't

2   have -- I have lot of friends in the journalism

3   business.  I have a good friend who works for the

4   New Yorker.  He goes out and he doesn't go into the

5   office and works on a story for two or three months

6   and hands a Word document into the office, and they

7   edit it and print it.

8            We're an organization where we're

9   extremely collaborative.  People are conversing and

10  talking about what we do constantly.  We have to

11  figure out what the next move is.  We're very

12  reactive to information inputs and then we base our

13  next move on the latest information that we have.

14           In this case the journalist that was in

15  this particular investigation -- and there were a

16  number of journalists who were involved in our

17  Nevada investigation.  This particular journalist

18  who was at this particular event was somebody I

19  think I talked to the day of certainly after this

20  event because I remember the journalist calling me

21  after and saying, You won't believe who was here

22  today.  I said, I don't know who, John Podesta?  How

23  did you know?  Because I read it on the wires.

24           We're constantly -- James O'Keefe is

116

1    integrally involved in the decisions.  Russ Verney

2    in those years, he was still living in New York.  He

3    was integrally involved.  I say "we" because that's

4    how I see what we do.  We don't do things alone.  We

5    do things as an organization and as a team.

6         Q.    Let me skip ahead to a different segment

7    of the 15-P25 video that we have on the screen here.

8    I'm going to start playing at time stamp 4:15 and

9    play for just a -- excuse me.  I'm going to start at

10   4:23.

11                     (Video played)

12   BY MR. HASKELL:

13        Q.    So, that segment that we just listened

14   to, I've paused it at time stamp 5:13.  What are we

15   watching here?

16        A.    We're watching the undercover journalist

17   describe what she says occurred at, I believe it was

18   a polling place in Nevada.

19        Q.    Where is she when she's describing that?

20        A.    She's back at the Hillary for America

21   office in Las Vegas, Nevada, talking to that

22   campaign worker who worked for the Hillary for

23   President in Las Vegas, Nevada.

24        Q.    Do you know who was present in the

Robert Joel Halderman - April 6, 2017

122

1        A.    Yes.

2        Q.    Does that shed any light on what the

3   undercover journalist was doing?

4        A.    I think we were working for the

5   campaign.

6        Q.    To work on voter registration?

7        A.    Correct.

8        Q.    Okay.  The activity that we see in

9   Exhibit 41, did that occur before or after the

10  meeting at the campaign office that's depicted in

11  Exhibit 40?

12       A.    I believe it was before.

13       Q.    Same day?

14       A.    I don't recall.  No, I don't think so.

15  I don't think it was the same day.

16       Q.    Okay.

17       A.    I don't think so.

18       Q.    Going back up to the computer screen and

19  clicking on the jump drive that we marked as

20  Exhibit 39, I'm going to go into a different folder

21  titled Jump Drive Raw Videos.

22       A.    Okay.

23       Q.    I've gone into a sub-folder titled

24  RDP16-2 and another sub-folder titled "A," and I'm

123

1    going to open the one MP4 file we see there whose

2    title end '1746.MP4.

3                          (Video played)

4    BY MR. HASKELL:

5          Q.    Do you see that film being played?

6          A.    Yes.

7          Q.    Do you recognize that video?

8          A.    Yes.

9          Q.    What is it?

10         A.    Undercover recording inside Hillary

11   Clinton campaign office in Las Vegas, Nevada.

12         Q.    Is this the raw video that underlies a

13   portion of the published video report that we viewed

14   a moment ago?

15         A.    I believe so.

16         Q.    Specifically, is what we're looking at

17   on the screen the video underlying the scene we see

18   in Exhibit 40?

19         A.    I believe so.

20         Q.    I'm going play this through time stamp

21   2:00.

22                          (Video played)

23   BY MR. HASKELL:

24         Q.    So, I've paused the raw video at time

Robert Joel Halderman - April 6, 2017

124

1   stamp 2:00.  Did you get a chance to see and hear

2   that as we were playing it?

3        A.   Yes, I saw and heard it, sorry.

4        Q.   Thank you.  Fair to say that that

5   portion of the raw video depicted what appears to be

6   a staff meeting at the Clinton campaign

7   headquarters --

8        A.   Correct.

9        Q.   -- where they're discussing things like

10  scheduling and how this is a major week and other

11  similar things?

12       A.   Correct.

13       Q.   The undercover journalist is the louder

14  female voice that we heard; right?

15       A.   I believe so, yes.

16       Q.   She appeared to be actively

17  participating in that conversation?

18       A.   Correct.

19       Q.   In fact, at one point she made a comment

20  about what she could do so she could be as effective

21  as possible before she leaves.  Did you catch that?

22       A.   Yes, I did.

23       Q.   I'll move over to a different

24  investigation now and ask to speak about

Robert Joel Halderman - April 6, 2017

132

```
1                        (Video played)
2     BY MR. HASKELL:
3          Q.    So, the Canadian woman suggests can the
4     PV journalist make the purchase.  The campaign staff
5     says she could make a donation.  Is that right?
6          A.    Correct.
7          Q.    The Canadian woman says again, "Can you
8     buy it for me," and the PV journalist then says,
9     "Sure, I'll buy it."
10         A.    Correct.
11                        (Marked Exhibit 43, Screen Shot)
12    BY MR. HASKELL:
13         Q.    So, Exhibit 43, do you recognize that as
14    a screen shot from this video report that
15    corresponds to what we had up on the screen a moment
16    ago?
17         A.    Yes, I do.
18         Q.    I'm going to continue playing.
19                        (Video played)
20    BY MR. HASKELL:
21         Q.    So, I've paused it at time stamp 3:50.
22    The segment that we just listened to, the narrater
23    states that the Clinton campaign staff broke federal
24    election law by what we had seen happen earlier?
```

Robert Joel Halderman - April 6, 2017

133

1       A.    Our conclusion was that in fact based on

2   what we have on videotape, we believe that they

3   violated federal election law.

4       Q.    I'm going to keep playing couple more

5   seconds to time stamp 3:57.

6                   (Video played)

7                   (Marked Exhibit 44, Screen Shot)

8   BY MR. HASKELL:

9       Q.    Do you recognize Exhibit 44?

10      A.    Indeed I do.

11      Q.    What is it?

12      A.    It is a screen grab from the video we've

13  been watching that is about the Canadian woman via

14  our journalist purchasing campaign memorabilia which

15  is a campaign contribution to the Hillary campaign

16  which we believe is against federal election law.

17      Q.    Exhibit 44 corresponds to what we're

18  seeing on the screen in the conference room right

19  now?

20      A.    Yes, it did.

21      Q.    In the screen grab the PV journalist

22  saying, "yeah, it worked out because you're Canadian

23  and I'm American, and I did it for you"?

24      A.    Correct.

Robert Joel Halderman - April 6, 2017

137

1    improprieties by the Clinton campaign, who would

2    know about how that turned out?

3        A.    I believe Mr. Verney would know.

4        Q.    Anybody else?

5        A.    It's Mr. Verney's responsibility to know

6    those things.  It's not my responsibility per se to

7    know those things.  I know them sometimes because I

8    try to keep informed in all and everything that's

9    going on in the organization.  But past things like

10   that, unless it's going to be another story for us

11   that we're going to report on and do a release on, I

12   don't worry about a great deal.  I have a lot of

13   other things that I worry about.

14       Q.    Okay.  I'm going to go back into the

15   jump drive, Exhibit 39, go into the folder titled

16   Raw Videos and go into the sub-folder titled

17   RDP16-1.  What we have here is three separate MP4

18   files.  First one has titled ending '5504, second

19   one is title ending '5536, and the third one has a

20   title ending '5606.  I'm going to play all three of

21   them in that order.

22                    (Videos played)

23   BY MR. HASKELL:

24       Q.    Do you recognize those three videos I

Robert Joel Halderman - April 6, 2017

138

1    just played?

2           A.    I do indeed.

3           Q.    What are they?

4           A.    They are further conversation with our

5    PV journalist with the campaign workers at the

6    Hillary for President event at Roosevelt Island on

7    June 2015.

8           Q.    You were able to hear and see those okay

9    when I played them?

10          A.    I was.

11          Q.    Are those raw video of at least a

12   portion of the conversation that appeared in

13   Exhibit 44?

14          A.    That would be fair to say.

15          Q.    Okay.  And the three segments that I

16   just played also fair to say they're consecutive to

17   one another, one runs right into the next to the

18   next?

19          A.    I believe so.

20          Q.    Okay.

21          A.    As I said earlier, now that you play it,

22   I think this is why we were concerned that we may

23   have violated the law.

24          Q.    What did we see in --

139

```
 1        A.    We have the journalist who is giving a
 2   name and she mistakenly, erroneously, and wrongly
 3   gave an incorrect name to the campaign worker.  She
 4   said she was a student, and she actually was a
 5   student as well as an employee of ours.
 6   Irrespective of that, she gave an incorrect name.
 7        Q.    When you say incorrect name, what do you
 8   mean?
 9        A.    It was her cover name.  It was not her
10   actual legal name.
11        Q.    And the address that she gave to the
12   campaign staff when they asked for it, it's an
13   address in Tucson, Arizona.  Did the undercover
14   journalist live in Tucson at the time?
15        A.    I think her father did.  She's from
16   Arizona.  Again, my point was that I remember when
17   we saw this, I saw this and I remember thinking, you
18   know, we have an issue here that we need to concern
19   ourselves with because we may have broken the law,
20   and we don't like to do that.
21             I think the journalist made an error in
22   judgment there that was unfortunate, and that's why
23   we wanted to report it to the FEC.  It was one of
24   the reasons we went to the FEC.  We believed that
```

140

```
 1   the Clinton campaign violated the law, but we
 2   believe our journalist unfortunately did, in fact,
 3   give false information to a campaign worker, which
 4   we believe is perhaps a violation of federal
 5   campaign law.
 6        Q.    The three clips of raw video that we
 7   looked at, when did you first see those?
 8        A.    I probably saw them that day or the next
 9   day.  That was a New York event.  I'm pretty sure.
10   I know I was in the office that week.  I remember
11   getting a phone call from our undercover journalist
12   about that event.  So, I probably -- I probably saw
13   it that night.  When we have a story that we think
14   is a story, we tend to jump on it pretty quickly.
15        Q.    But in any event, you would have seen
16   those raw videos before the video report was
17   assembled and published, yes?
18        A.    I have to.  I have to look at the raw
19   video.  I can't look at the finished product before
20   the raw product.  I'm the cook.  It would be like
21   seeing the pancakes before you saw the eggs.  Can't
22   do that in my world.  You gotta see the eggs, you
23   gotta break them and mix them and add flour and make
24   pancakes.  That's what I do.  I break eggs.
```

Robert Joel Halderman - April 6, 2017

141

1      Q.    I think you testified a moment ago that

2   the undercover journalist in this scene was employed

3   as an undercover journalist by PVA.  Did she keep

4   her office in Mamaroneck with you?

5      A.    Our undercover journalists don't have

6   offices per se.  I think this particular undercover

7   journalist at the time was living in the New York

8   area.  She would often come to the office.  She may

9   have even had a desk designated to her, but I don't

10   recall that.

11           Our journalists typically are sort of

12   vagabonds.  They're on the road a great deal.  Our

13   office is not real big.  We don't have -- like this

14   attorney general's office, we don't have a whole

15   floor of a building.  We have a humble office.  We

16   don't have offices for all of our journalists.  I'm

17   the executive producer, and I share an office.  The

18   fact of the matter is I don't believe she had an

19   office, but, yes, she did work out of the office in

20   Mamaroneck.

21      Q.    You knew this woman, the undercover --

22      A.    I know all the undercover journalists.

23      Q.    You knew her name?

24      A.    Absolutely.

142

1          Q.     Her name wasn't Laura Baker, which is

2     the name that she gave to the campaign staff in this

3     video we just watched?

4          A.     Correct, which is why I said to you, I

5     was concerned when I heard that she had violated the

6     law and that's why we wanted to report it because we

7     were concerned that we had misspoken.

8          Q.     In terms of both the cover name and not

9     stating in response to the campaign staffer's

10    question that she was employed by PVA?

11         A.     Correct.

12                   MR. HASKELL:  Can we go off the

13              record for a moment.

14                   (Discussion held off the record)

15    BY MR. HASKELL:

16         Q.     Can I ask you to reach into the stack of

17    previously marked exhibits and pull out seven,

18    eight, and nine?

19         A.     I totally messed this up.  There's nine.

20    There's eight.  There's seven.  I don't even see

21    this one.  Yes, I have seven, eight, and nine.  I am

22    looking at them.

23         Q.     Exhibit 7, do you recognize that?

24         A.     I do, in fact.

151

1   bad things.

2        Q.    So, undercover PV journalists went to

3   the Bernie Sanders campaign, offered their services

4   as putative volunteers.  That was their cover story;

5   right?

6        A.    Correct.

7        Q.    And what kind of work do those

8   journalist wind up doing for the campaign?

9        A.    It's whatever they need them to do.  A

10  lot of times it's GOTV stuff, registration, it's

11  phone banking, and sometimes it's really menial

12  office work, envelope stuffing, door knocking,

13  canvassing, very basically grass-roots fundamental

14  on the ground campaign work.

15       Q.    That's what the PVA folks did there --

16       A.    I believe so.

17       Q.    -- for the Sanders campaign?

18       A.    Correct.

19       Q.    Got it.  Can I ask you take a look at

20  Exhibit 14?  It should be in that stack.

21       A.    Is it a picture?

22       Q.    Yeah, actually while you're there, why

23  don't you pull out 14, 15, 16, 17, and 18.

24  Exhibit 14, do you recognize what we're looking at

162

1    who spoke to whom to communicate that information?

2         A.    I think in that case it was one of the

3    Australians who mentioned something to that effect

4    to one of our undercover journalists.

5         Q.    Was that captured by the secret

6    recording that the journalist was making at the

7    time?

8         A.    Probably, but it wasn't at the time or

9    it wasn't necessarily part of the release because we

10   weren't able to substantiate the information, and it

11   wasn't particularly relevant.  When I finally --

12   James O'Keefe and I put together the final

13   production, we leave out a lot of stuff.

14        Q.    Sure, sure.

15        A.    We do.  I think in that particular case

16   where one of the Australians said they had been

17   wasn't particularly relevant to the story that we

18   produced.

19        Q.    I think that begins to answer my next

20   question which is what did that Australian

21   individual say to the PVA undercover journalist?

22        A.    As I recall -- because we wanted to know

23   that.  As I recall, the undercover journalist asked

24   a couple of Australians where else they had done and

Robert Joel Halderman - April 6, 2017

169

1    are 11 states where it's a two-party consent law,

2    and those 11 states make it very difficult for us to

3    operate.  Some states less difficult than others.

4            The Commonwealth of Massachusetts is a

5    particularly difficult state.  We just can't operate

6    here because your law is so remarkably difficult for

7    journalists to do undercover reporting, even though

8    there have been a lot of undercover reporting done

9    in this state before your law was passed that was

10   actually pretty good reporting.

11       Q.    Before we leave this topic, I want to be

12   clear on this.  Even though PVA hadn't received

13   information about the identities of these Australian

14   folks in Massachusetts or where they could be found

15   or how many there were or what they were doing, you

16   do have a memory that the Australian that the PVA

17   journalist spoke with in New Hampshire did say that

18   there were Australian folks working in

19   Massachusetts?

20       A.    I believe so, and had they been here and

21   had you had a one-party consent state, we would have

22   found them.

23       Q.    Okay.  Looking at Exhibit 5, the

24   interrogatory responses in that same paragraph that

Robert Joel Halderman - April 6, 2017

170

1    speaks about the Australian Labor Party

2    investigation, it also speaks about investigation

3    whose video report was titled American Pravda NYT,

4    Part One, is that the Dudich report that you began

5    to speak about before the lunch break?

6         A.    Correct.

7         Q.    How did that investigation come to be?

8         A.    We met Nicholas Dudich at a conference.

9    We sent some journalists out to a conference in

10   California.  I believe it was Southern California.

11   I believe it was Los Angeles or the Los Angeles

12   area.  One of our undercover journalists met

13   Nicholas Dudich who told us some outrageous things

14   including the fact that he claimed he was James

15   Comey's godson.  He also claimed that he worked

16   undercover for the FBI.

17             He claimed at one point -- he was pretty

18   wild out there.  He was pretty out there, but he

19   also said that he was a gatekeeper at the New York

20   Times and that, in fact, he was -- he used his power

21   to basically impact the New York Times coverage in a

22   way that he believed was the politically correct

23   message to send to the audience of the New York

24   Times.

Robert Joel Halderman - April 6, 2017

171

1     Q.    What was the conference that your

2  journalist attended?

3     A.    I do not remember the specific

4  conference, but I do remember, as I said to you

5  earlier, that when we registered for it we loved to

6  see this you give up the right of privacy when you

7  attend this conference because conversations will be

8  recorded and videos will be taken.

9     Q.    How many journalists did PVA send to

10  this conference?

11     A.    I believe it was three.

12     Q.    Were all three of them subsequently

13  involved in taking undercover reporting, undercover

14  recording of Mr. Dudich?

15     A.    No, at that part of the Dudich

16  investigation in California only one journalist, as

17  I recall, female undercover journalist was the one

18  who recorded the conversations with Mr. Dudich.

19     Q.    Okay.  So, that female who PVA sent to

20  this conference in California, did she register for

21  the conference under her own name or under a cover

22  name?

23     A.    I don't recall.  A lot of times we

24  actually have to register under our own names in

Robert Joel Halderman - April 6, 2017

172

1   different conferences, and we do.  We can get around

2   that.  I don't recall the specifics of that one.

3   Sometimes we do.  Sometimes we don't.

4           We have a number of journalists who have

5   names like Tom Smith.  So, they actually sometimes

6   quite commonly use their actual name because they're

7   hiding in plain sight.  In that particular case I

8   don't recall.

9       Q.    Speaking about this one female

10  journalist who later had these interactions with

11  Mr. Dudich, was it PVA's intention sending her to

12  this conference that she was going to participate in

13  the conference as an attendee, or was it PVA's

14  intention that she was going to conduct an

15  investigation of somebody and generate some

16  material?

17      A.    We were fishing.  It was a big pond, and

18  we thought there was a lot of fish in it because it

19  was tech and media.  Those are two areas that we're

20  kind of interested in.  I think there's stuff there

21  that might be of interest.  It's a big pond full of

22  fish, and Dudich happened to bite.

23      Q.    How did this female undercover

24  journalist first meet Dudich, at the conference I

Robert Joel Halderman - April 6, 2017

173

1   assume?

2        A.    Yeah, I don't recall.  You know, I have

3   no idea, one of the least important facts that I

4   would ever want to know about something.  All I

5   wanted to know is who did you meet, what did they

6   say, not how did you meet them.

7        Q.    Did this undercover journalist give

8   Mr. Dudich her name when they met?

9        A.    I would assume so.

10       Q.    Did she give her actual name?

11       A.    I don't believe so.  Again, we commonly

12   don't give our true name.  We're undercover

13   journalists.  Undercover journalism is about not

14   necessarily exposing the fact -- it's absolutely not

15   exposing the fact you're a journalist when you're

16   talking to subjects.

17             Just like undercover state police in the

18   state of Massachusetts don't go into a drug ring and

19   say, hey, I'm Frank Johns.  I'm a lieutenant in the

20   state police.  They probably use a cover name and

21   don't tell people they're state cops.  And we do the

22   same thing.

23             The reason why the cops do it is because

24   those people won't talk to them if they're the cops.

174

1    The reason we do it is because people won't talk to

2    us because we're journalists.  That's why we do

3    undercover reporting.

4              I doubt that she gave her real name.  I

5    doubt it.  I don't like our journalists to give

6    their real names.  I think our journalists are under

7    at times, you know, very serious risk and pressures,

8    and I think that we actually have people who harass

9    our journalists.  So, I don't want to expose our

10   journalists to any more complications than they have

11   to.

12             So, I actually encourage our journalists

13   to not give their real name.  I don't like it when

14   our journalists give their real names because I

15   think it puts them at risk.

16        Q.   This female journalist, fair to say she

17   did not disclose her employment by PVA?

18        A.   Of course not.  She would not do that.

19   Like I said, the state cop doesn't tell the drug

20   dealer she's a state cop.

21        Q.   How long did this conference in

22   Los Angeles last?

23        A.   I think it was a Thursday-Friday-

24   Saturday conference, but -- I'm not 100 percent sure

175

1   of that, but it was about that, typical.

2        Q.    At what point in the conference did the

3   female undercover journalist first meet Mr. Dudich?

4        A.    I think it was the second day.

5        Q.    And did the journalist secretly record

6   her interactions with Mr. Dudich on that second day

7   of the conference, first day she met?

8        A.    Yes, I believe that conversation took

9   place on a rooftop smoking area at the conference as

10  I recall.

11       Q.    Can we look at from your stack Exhibits

12  19 all the way through 23?  Can you specifically

13  look at Exhibit 20?  Do you recognize Exhibit 20?

14       A.    Yes, I do.

15       Q.    Is that the rooftop?  Is the background

16  of Exhibit 20 the rooftop smoking area that you were

17  describing?

18       A.    Yes, I believe it is.

19       Q.    Do you know from looking at Exhibit 20

20  whether that was taken the first day that your

21  journalist had met Mr. Dudich?

22       A.    I believe it was.  Yeah, I believe it

23  was.  I believe it was the first day that she

24  actually engaged him in any kind of real

Robert Joel Halderman - April 6, 2017

176

1   conversation of any substance.

2       Q.    Did you attend this conference yourself?

3       A.    I did not.

4       Q.    Did the journalist who was engaging

5   Mr. Dudich upload her raw video or send it to you

6   back in Mamaroneck while the conference was going

7   on?

8       A.    Yes.

9       Q.    Did you and she then speak about what

10  she ought to do next --

11      A.    Yes.

12      Q.    -- with respect to Mr. Dudich?

13      A.    Mm-hmm.

14      Q.    What was said in that conversation?

15      A.    So, generally again we don't know -- I

16  didn't know that we were going to be talking to a

17  guy at the New York Times.  We were able to find

18  Dudich on social media and other Internet searches.

19  I think we found a bunch of his videos that he had

20  edited on the Times website.  So, I was kind of

21  curious.

22           You know, a lot of what we do is just

23  kind of have a conversation with people and see

24  where it goes.  You know, I don't necessarily say,

177

1    get him to say this.  In fact, I never say that.  I

2    say, ask him about this, ask him about that, ask him

3    about how it works at New York Times, how much

4    control does he have, how much oversight is there of

5    his work, how many people agree with his point of

6    view, how many people -- what's the mood of the

7    place, what do people say about, you know, X, Y, Z.

8              Basically what I try to do with our

9    journalists and, again, part of our, you know, part

10   of the reason why I work there, I believe why

11   Mr. O'Keefe employs me, because I can help the

12   journalist understand what's important.  I've been a

13   journalist for a long time, and I have a pretty good

14   news sense.  I can say, I don't care what he says

15   about the Washington Post.  He doesn't work for the

16   Washington Post.  I do want to know about the inner

17   workings of the New York Times and how their

18   editorial decision process works, whether they have

19   an extreme bias one way or the other and how it

20   goes.

21              MR. HASKELL:  Let's mark two

22         exhibits.

23              (Marked Exhibits 45 & 46, Screen

24         Shots)

Robert Joel Halderman - April 6, 2017

178

```
1   BY MR. HASKELL:

2        Q.    Exhibit 46, do you recognize that?

3        A.    I do.  It is a photograph of one of

4   our -- a still frame, freeze frame, a grab, frame

5   grab of one of our videos, the release that we did

6   on American Pravda.

7        Q.    That's the Dudich investigation?

8        A.    That is correct.

9        Q.    And the --

10       A.    The American Pravda was more than just

11  the Dudich investigation.

12       Q.    I guess what I mean, it's the

13  investigation that we're talking about that involves

14  Mr. Dudich?

15       A.    Correct.

16       Q.    Got it.  Exhibit 46, was that taken as

17  part of the same interaction between the undercover

18  journalist and Mr. Dudich as Exhibit 20?

19       A.    As Exhibit 20, yeah, because he's got

20  the same shirt on and it looks like the same roof

21  and -- yes.

22       Q.    You can see that it looks maybe like a

23  heat lamp in the back?

24       A.    Yes, I'll bet it's a satellite dish.
```

Robert Joel Halderman - April 6, 2017

179

1      Q.    That works too.  Exhibit 45, was that

2   taken in the same place as Exhibits 20 and 46?

3      A.    Oh, it is a heat lamp, yeah, but on a

4   different day because he's wearing a different

5   shirt.  As I recall, Dudich was smoker.  That was

6   kind of what they did or -- and I don't think our

7   undercover journalist, that particular journalist

8   was a smoker.  Sometimes our journalists will smoke

9   when they need to if they have to in order to have a

10  conversation with people that smoke, but as I

11  recall, Dudich was if not a smoker he was one of

12  those wacko vapors.  I think it was the next day.

13  The black shirt, so the next day, because that's

14  when he told us the story about the -- that his

15  godfather was James Comey.

16     Q.    That was the second day --

17     A.    I believe so.

18     Q.    -- that your journalist had interacted

19  with Mr. Dudich?

20     A.    Correct.

21     Q.    Third --

22     A.    And I think it was the third day of the

23  conference.  I'm not 100 percent sure of that.

24  Those facts are not real important to me.

Robert Joel Halderman - April 6, 2017

180

1          Q.    And Exhibit 19, which we had pulled out
2    of the stack a moment ago --
3          A.    Yes.
4          Q.    -- that's also a screen grab from the
5    same video report?
6          A.    Yes.
7          Q.    And it appears that Exhibit 19 was taken
8    the same day as Exhibit 45; right?
9          A.    Yep, black shirt but inside.
10         Q.    The background of Exhibit 19, was that
11   the conference your journalist was attending?
12         A.    I believe so.  I think it was in one of
13   the public hallways that you ingress and egress from
14   the conference.
15         Q.    Looks like there's some sort of poster
16   board in the background.
17         A.    Yep, movie nights.
18         Q.    So, after the conference was finished,
19   did your journalist then return to Mamaroneck or
20   that area?
21         A.    No, that journalist doesn't live in
22   Mamaroneck, that journalist, but Mr. Dudich returned
23   to New York because Mr. Dudich lived in New Jersey
24   and worked for the New York Times at the New York

181

1    Times headquarters in New York City in Times Square.

2              We wanted to finish the conversation

3    with Mr. Dudich because we thought we were on to

4    something.  We wanted to get more.  We wanted more

5    information.  We wanted more conversations with him.

6    We wanted to continue the dialogue.

7         Q.    PVA's undercover journalist, the same

8    female, had at least two more meetings with

9    Mr. Dudich; right?

10        A.    That is correct.

11        Q.    Can I ask you to look at Exhibits 21 and

12   22?

13        A.    Yep, looking at them now.

14        Q.    Exhibit 21, where was that taken?

15        A.    Number 21 was taken at Yankee Stadium

16   like in one of those hospitality kind of suite

17   things that they have in the stadiums for people who

18   have more money than I do and fewer ex-wives and

19   that was a meeting that Mr. Dudich -- we actually

20   took Mr. Dudich to the game, as I recall, as part of

21   our investigation.

22        Q.    Does PVA have tickets or access to one

23   of those hospitality suites at Yankee Stadium, or

24   did PVA get that for Mr. Dudich?

Robert Joel Halderman - April 6, 2017

182

1          A.     We got that specifically for Mr. Dudich.

2     We do not have box seats at Yankee Stadium, and I

3     would be opposed to that because I'm a Mets fan.

4          Q.     Exhibit 22, where was that taken?

5          A.     That was that a restaurant that's

6     downstairs in the New York Times building.  It's not

7     actually like your cafeteria.  It's not part of the

8     New York Times.  I think it's an independent

9     contractor.  What do you call it?  You know, what's

10    that word I'm looking for when you have, you know --

11    it's a guy who's got a business in the New York

12    Times building and it's a diner/restaurant.

13         Q.     The meeting that we see in Exhibit 22,

14    when did that happen in relation to the Yankee

15    Stadium outing in Exhibit 21?

16         A.     As I recall, Exhibit 22 is our sort of

17    final meeting with Mr. Dudich at the diner.

18    Penultimate meeting with Mr. Dudich was at Yankee

19    Stadium.

20         Q.     Were there any more meetings between the

21    PVA journalist and Mr. Dudich other than the

22    conference in Los Angeles, the Yankee Stadium, and

23    the diner?

24         A.     I had a cameraman stake out his

Robert Joel Halderman - April 6, 2017

183

```
1   apartment in New Jersey so I could get video of him.
2   I wanted more video of him to help tell the story.
3   We also had considered having Mr. O'Keefe meet
4   Mr. Dudich to ask him some questions.  We decided to
5   not do that.  We decided it was more appropriate for
6   us to have a conversation with Mr. Dudich's bosses
7   including Mr. Dean Baquet who is the executive
8   editor of the New York Times.
9         Q.    Those other occasions that you just
10  mentioned where you had a camera outside of
11  Mr. Dudich's home and you considered an encounter
12  between Mr. O'Keefe and Mr. Dudich, did either of
13  those occasions involve the female PVA journalist
14  meeting with Mr. Dudich?
15        A.    No, they did not.
16        Q.    So, those two people met at the
17  conference in LA, at Yankee Stadium, and at this
18  diner?
19        A.    Yes.
20        Q.    And the PVA journalist was recording
21  each of those encounters?
22        A.    Yes.
23        Q.    Okay.  The conference, you said, was a
24  Thursday, Friday, Saturday?
```

Robert Joel Halderman - April 6, 2017

184

1        A.    I believe so, but I'm not 100 percent

2    certain of that.  I could be wrong about that.

3        Q.    How long after the end of the conference

4    did the Yankee Stadium date occur?

5        A.    I think it was a couple weeks.  I want

6    to say about three, two to three weeks more or less.

7    There were some conversations -- we had to figure

8    out how the journalist could be in New York

9    plausibly so that she could then have another

10   meeting with Dudich.  We had to figure that out.  We

11   had some other issues we needed to sort out.

12              I want to say that it was a few weeks,

13   but it might have been a little longer than that.  I

14   remember there was one period where we had -- our

15   undercover journalist had trouble contacting Dudich.

16   He kind of went off the radar, which happens to us a

17   lot.  When it happens we have to deal with it and

18   wait until they come back on grid.

19       Q.    And how long after Yankee Stadium did

20   the diner date in Exhibit 22 occur?

21       A.    I think it was about a week or so.  It

22   might have been a little longer than that.  Time is

23   really one of my great weaknesses in life.  I tend

24   to compress it and expand it for no logical reason.

185

```
 1    I'm not a big calendar guy.  I tend to see my life
 2    and these investigations as kind of almost like
 3    they're one event.  I have tendency to compress
 4    things.  So, when you ask me those questions, I
 5    would beg your forgiveness if I'm not as accurate as
 6    I would like to be.
 7         Q.    But in any event, several weeks between
 8    the one date and the other?
 9         A.    That's what I believe.
10         Q.    Okay.  Do you remember who the Yankees
11    were playing that day?
12         A.    No, but what I remember, which was so
13    crazy, they were in there having this meeting when
14    like, in, like, the ninth inning and it was, like,
15    2-2 and the bases were loaded.  I remember in one of
16    our video shots, you could see the monitor.  Bases
17    were loaded, two outs in the ninth, and they're
18    sitting there talking.  I thought, Jesus, these
19    people are such nerds.  Dudich was the biggest one
20    of them all.  I remember seeing that.  It was a
21    great game.  I don't remember who they were playing.
22         Q.    It sounds like Dudich wasn't there for
23    the baseball game.
24         A.    No, no, Mr. Dudich was intrigued by our
```

Robert Joel Halderman - April 6, 2017

186

1   undercover journalist.

2        Q.    In what way?

3        A.    I think he was attracted to her.

4        Q.    So, well, during the conference in

5   Los Angeles, did the undercover journalist tell

6   Mr. Dudich anything about who she worked for, where

7   she lived, her background?

8        A.    Well, I don't think she told him

9   anything that was necessarily true, although I

10  instruct our journalists who are building a cover

11  story and an alias to create an alias that is as

12  similar to your own story as reasonable.  This is

13  because when you create a story that is completely

14  beyond your understanding or experience, you often

15  get caught out.

16             For example, if you were one of my

17  undercover journalists, I would say you should not

18  say that you were a professional football player and

19  went to Georgia State.  You never know.  You might

20  meet a guy who actually played at Georgia State and

21  say, "I don't remember you."

22             I try to tell our journalists to have as

23  similar to their own story as possible but still not

24  revealing their true identity.

Robert Joel Halderman - April 6, 2017

187

```
 1          Q.    Okay.  And so you said that this
 2   particular female journalist didn't live in the New
 3   York area; right?
 4          A.    Correct.
 5          Q.    What part of the country did she live
 6   in?
 7          A.    In the Northeast generally.
 8          Q.    But not in New York City?
 9          A.    Correct.
10          Q.    Or around New York City?
11          A.    Correct.
12          Q.    And so at the end of conference, had she
13   given Mr. Dudich reason to believe that she was
14   going to her true home area, wherever that was?
15          A.    Yeah, as I recall when I first -- the
16   Dudich story, I was a little skeptical of the Comey
17   thing.  James Comey was in the news.  James Comey
18   got fired by the president of the United States.
19   James Comey is a integral part of this Russia
20   investigation.  I was like, okay, if he's freaking
21   Comey's godson, that's interesting.  Maybe there's
22   something we can learn about this.  Who knows.  I
23   didn't know where it was going to go.  I was
24   intrigued.
```

188

```
 1                 I wasn't sure I believed him.  He was
 2     kind of a little bit of a bullshitter.  You never
 3     know.  That's why it's important for us to be able
 4     to follow up on these things because I don't want to
 5     report something that's not true.  I really don't.
 6     It's in my bones.  You know, I really believe that
 7     it's really important for us to report the truth.
 8     So, I wanted to verify that he was Comey's godson.
 9     I also wanted to talk to him a bunch more times, if
10     he was Comey's godson, what Comey was up to, what he
11     knew.
12                 I think the story we came up with was
13     that the undercover journalist said that she had --
14     her father was wealthy and that she traveled around.
15     I think she even said that her father lived in New
16     York.  I think her original story just because it
17     was what we came up with was she actually was living
18     in California and was attending the conference
19     because it was, like, you know, in the neighborhood
20     kind of thing.  We don't -- we couldn't create the
21     kind of job to make sense for her to be there if she
22     traveled from New York, for example.
23                 I think what we came up with was she
24     said her father was wealthy, to Dudich, and that he
```

189

1    lived in New York and that she visits him often, and

2    when she visits him next she would love to see him

3    when she came to New York.

4         Q.    Had the PVA journalist said that to

5    Mr. Dudich before she left at the end of this

6    conference in Los Angeles?

7         A.    Yes, I believe so.  By the way, it was

8    the undercover journalist's father that bought the

9    Yankee tickets.  Not really.

10        Q.    That was the story, yes?

11        A.    Yes, that was the story.

12        Q.    Got it.

13        A.    That's how it works.

14        Q.    You said you had the sense that

15   Mr. Dudich was attracted to your reporter.  What

16   gave you that sense?

17        A.    Well, she's a young, attractive female.

18   He is young, reasonably attractive male.  Usually,

19   at least in my experience, young males are attracted

20   to young females.

21        Q.    Perhaps when they meet at far flung

22   conferences?

23        A.    When they meet anywhere they tend to be

24   attracted to them and each other.  And, in fact,

Robert Joel Halderman - April 6, 2017

190

1   that is not -- for us that's not something that we

2   necessarily avoid.  Our objective, our journalists'

3   objective is to have conversations and encounters

4   and relationships with the people that we're

5   investigating.  So, if that person thinks that this

6   person is attractive and wants to spend time with

7   that person because they're attracted, great, that's

8   all good for us.

9        Q.    So, they leave the conference in

10  Los Angeles, go to their respective homes, more or

11  less.  Who reaches out to whom next?

12       A.    As I recall, our journalist reached out

13  to Dudich, I think through an e-mail or text.  I

14  think they were texting a lot.  These young folks,

15  they text all the time.  I think that conversation

16  and that sort of back and forth was primarily over

17  text.

18       Q.    Fair to say at that point Mr. Dudich was

19  eager to see the journalist again?

20       A.    You know, he was funny.  I think he was

21  intrigued by her and he was attracted to her, but he

22  was a -- he's a weird duck.  He kind of went off the

23  grid for a while.  He wasn't like, you know,

24  charging up the gangplank to get on the boat, no pun

Robert Joel Halderman - April 6, 2017

197

1      Q.     Did Journalist B succeed in developing
2  an independent relationship with Mr. Dudich?
3      A.     Limited.  It was not as successful as I
4  had hoped.
5      Q.     You said a couple weeks went by between
6  the Yankee Stadium date Exhibit 21 and the diner
7  date in Exhibit 22; right?
8      A.     That is correct.
9      Q.     And were Journalist A, the young woman,
10 and Mr. Dudich in touch between those two times?
11     A.     I believe they were texting and
12 communicating at some level.
13     Q.     Pretty frequently?
14     A.     There was communication.  There was
15 communication.
16     Q.     Okay.  And how did the date in
17 Exhibit 22 at the diner come to happen?
18     A.     So, I really wanted to lock down the
19 Comey thing.  I had real serious reservations about
20 it.  As I said, I had doubt about Dudich's
21 credibility, but I thought if he could give us more
22 information, it might help us lock it down one way
23 or the other.  We wanted to -- basically, the
24 purpose of that meeting was to get Dudich to talk

1    about Comey more, which he did, but all of it was

2    BS.

3                      (Marked Exhibit 47, Screen Shot)

4    BY MR. HASKELL:

5         Q.    Do you recognize Exhibit 47?

6         A.    Yeah, it's a photograph of the video

7    release that is the same meeting that is in

8    Exhibit 22.  It's the same diner in the New York

9    Times building in New York City.

10        Q.    Is it taken from a different camera?

11        A.    Yes.

12        Q.    The camera in Exhibit 47, where was that

13   camera located?

14        A.    I believe that was in a bag.  I think

15   that's a bag cam.

16        Q.    Exhibit 47?

17        A.    I believe so, yes.

18        Q.    Okay.  What about Exhibit 22?

19        A.    Twenty-two was a bag cam by one of our

20   production people.

21        Q.    And was that production -- it looks like

22   the camera angle in Exhibit 22 is from a table

23   adjacent to where Mr. Dudich and Journalist A are

24   sitting; correct?

Robert Joel Halderman - April 6, 2017

199

1       A.      Correct.

2       Q.      Was the production person sitting at

3  that adjacent table?

4       A.      Yes.

5       Q.      Unbeknownst to Mr. Dudich?

6       A.      I'm sure he saw him, but he didn't know

7  that he worked for Project Veritas, but he didn't

8  know that Journalist A worked for Project Veritas

9  either.

10      Q.      True identity unknown to Mr. Dudich?

11      A.      Correct.

12      Q.      Can I ask you to pick up Exhibit 23,

13  please?

14      A.      Yes.

15      Q.      So, this is also a screen shot from that

16  same published video report?

17      A.      Correct.

18      Q.      This screen shot, I'm correct that the

19  screen shot is correlated with an audio recording --

20      A.      I'm sorry.

21      Q.      Go ahead.

22      A.      This actually is a phone conversation

23  that Journalist A had with Mr. Dudich after the

24  meeting that's in Exhibits 47 and 22.

Robert Joel Halderman - April 6, 2017

201

1        A.    In fact --

2        Q.    -- she wasn't there?

3        A.    -- she didn't know who Nicholas Dudich

4    was and was not, in fact, his mother.

5        Q.    Okay.

6        A.    Then with further OSINT we proceeded

7    to -- OSINT is open-source intelligence meaning

8    basically the Internet.  We discovered that what we

9    were able to pretty, I think, seriously confirm that

10   Mr. Dudich's mother lived in the Commonwealth of

11   Massachusetts.

12       Q.    Where did you learn that she lived?

13       A.    As I recall, it was just OSINT stuff.

14   We knew that they had lived in Ohio and that the

15   father and mother divorced at a certain point.  I

16   think we knew where the mother went to school

17   because I think Dudich told Journalist A some of

18   that background information.  We were able to pretty

19   much lock down almost 100 percent -- I was very

20   confident that the woman we believed was Nicholas

21   Dudich's mother lived in Boston, Massachusetts, or

22   in the area.  I don't think she lived right in

23   Boston.  I think it was like Needham or something

24   like that.  I don't remember the exact town.  I

202

1    would have -- I wouldn't have bet the farm on it,

2    but I would have bet a few cows.

3         Q.   Did you identify a particular

4    residential address for Dudich's mom?

5         A.   We had a workplace, and we had a

6    residence.

7         Q.   Okay.  What was the workplace, do you

8    recall?

9         A.   No, I don't.

10        Q.   Do you know where it was?

11        A.   I want to say it was in Boston.  I think

12   she worked in Boston and lived in one of the

13   suburbs.

14        Q.   So, looking at Exhibit 5 again, the

15   interrogatory responses we had a while ago, and

16   turning to page seven, in that paragraph that got us

17   talking about Mr. Dudich, there's a note there that

18   Project Veritas desired to use secret recording in

19   Massachusetts in the process of investing claims by

20   New York Times reporter relating to former FBI

21   Director James Comey in the fall of '17 but avoided

22   doing so because of the law.

23             First of all, was the investigation

24   involving Mr. Dudich classified as a Project Veritas

203

1    investigation or PVA investigation?

2         A.    I believe American Pravda was a Project

3    Veritas investigation.

4         Q.    But the personnel and the methods and

5    the techniques are the same between the two?

6         A.    Correct.  It's two organizations because

7    we have separate functions, but much of the

8    personnel, practices, and activities are similar.

9    They're basically two -- we basically wear two hats.

10   We wear one hat when we are doing certain kinds of

11   investigations, and we take that hat off and put on

12   another hat when we're doing another kind of

13   investigation.

14        Q.    In the interrogatory response we see on

15   page seven of Exhibit 5 here speaking about a desire

16   to use secret recording in Massachusetts, did that

17   relate to Dudich's mother?

18        A.    Yes.

19        Q.    Were there any other opportunities to

20   use secret recording in Massachusetts in the Dudich

21   investigation other than with respect to his mother?

22        A.    No, not with the Dudich investigation.

23   I think the obstacle, we wanted to confirm that

24   Comey was Dudich's -- or find out that it wasn't

204

1   true.  We wanted confirmation one way or the other

2   of Dudich's relationship with James Comey.  We

3   believed by talking to a close family member of

4   Mr. Dudich we would be able to determine whether or

5   not that was, in fact, true.

6          Q.    Could I ask you to pull Exhibit 30 out

7   of the stack, please?  Exhibit 30 is an e-mail

8   tread.  You see your name and e-mail address appear

9   in Exhibit 30?

10         A.    Mm-hmm.

11         Q.    Do you remember this e-mail tread?

12         A.    Vaguely.

13         Q.    Does this relate to an effort to

14  secretly record Mr. Dudich's mother in

15  Massachusetts?

16         A.    Yes.

17         Q.    Okay.  At the time that this e-mail

18  thread was sent, had PVA identified a location at

19  which it would have or desired to secretly record

20  Mrs. Dudich?

21         A.    I believe we had the home address, and I

22  think we had a work address or some kind of work --

23  some -- as I recall, as I said before, I believe we

24  had a home address, and I believe we had some kind

Robert Joel Halderman - April 6, 2017

205

```
 1   of business address.
 2        Q.    What does Mrs. Dudich's home look like?
 3        A.    I have no idea.  I've never been there
 4   myself.
 5        Q.    What was the plan for a PVA journalist
 6   to engage with Mrs. Dudich at her home?
 7        A.    I don't remember the exact ploy that we
 8   were going to use.  Somehow we were going to say
 9   that we knew Nick and that we were -- I don't
10   remember.  I don't remember what we were going to
11   do.  What ended up happening -- we're in the video
12   business.  When we come up against the Commonwealth
13   of Massachusetts, it's a real problem.
14              I think, as this says, we did send some
15   UCJs up here without camera equipment, and I think
16   they were doing a survey trying to see what they
17   could see.  I think what I was kind of -- I don't
18   remember my thought process per se.  I think these
19   the undercover journalists were not going to have a
20   conversation.  They were just coming up to look
21   around.
22              What I was hoping was that maybe like a
23   lot of people in Massachusetts they go back and
24   forth to New Hampshire, Maine.  It was to come up,
```

206

1   take a look around and see what you could see.  We

2   had some people in New York, send them up.

3           Because we couldn't do Massachusetts, we

4   ended up finding Dudich's grandmother and aunt in

5   North Carolina and Dudich's father in Washington,

6   D.C., and we were able in those jurisdictions to do

7   undercover reporting in line with the First

8   Amendment of the United States Constitution, and we

9   were able to confirm that Dudich wasn't James

10  Comey's godson, which was --

11      Q.   The undercover journalists who traveled

12  to Massachusetts to look around, they never had a

13  specific plan to approach Mrs. Dudich in

14  Massachusetts?

15      A.   No, because we don't do -- we're video.

16  What we do is we shoot undercover video.  We record

17  undercover video and audio.  Our profession is

18  undercover video journalism.  I don't really have a

19  real big interest in one of my journalists talking

20  to somebody and finding out information unless they

21  can wear a hidden camera because that's not the

22  business that we're in.

23      Q.   Where did Mrs. Dudich work?

24      A.   I'm trying to recall.  I thought -- she

207

1    was either a lawyer or some kind of health care

2    worker.  It may have been a combination thereof

3    where she was like a lawyer who did health care,

4    something like that.  I thought she had an office

5    again in Boston or in the Boston area and a home in

6    a suburb of Boston.

7         Q.    But you don't remember where the office

8    in Boston was?

9         A.    No.  I wasn't that interested because

10   the problem is we can't do our job in the state of

11   Massachusetts.  So, it wasn't real important to me.

12   I spend a great deal of time and effort and

13   attention to investigations that are legal and where

14   we can operate and do our journalism.  I don't spend

15   a whole lot of time worrying about places that

16   forbid freedom of the press.

17        Q.    So, I take it you wouldn't be able to

18   say whether the location where your journalists

19   desired to encounter Mrs. Dudich would come with an

20   reasonable expectation of privacy?  I mean, it

21   sounds like you just don't know?

22        A.    I don't really know, but I know she was

23   in the state of Massachusetts, and the state of

24   Massachusetts expressly forbids undercover

208

1    recording.  So, therefore it didn't matter where she

2    was in the state of Massachusetts.  No matter where

3    she was, middle of the Red Sox stadium on a

4    megaphone, I couldn't undercover record her

5    according to your law as I understand it.

6                        MR. HASKELL:  Let's call a break.

7                        (Whereupon, a recess was taken)

8    BY MR. HASKELL:

9         Q.    Turning back to Exhibit 5, response to

10   interrogatory number nine.

11        A.    Yes.

12        Q.    We've been focusing so far on the last

13   paragraph of that response saying that PVA had

14   desired to conduct secret recording in Massachusetts

15   related to the Australian Labor Party and Dudich

16   investigations.  I'd like to talk now about the four

17   examples listed in the first paragraph.  Could I ask

18   you to take a moment and reread the first paragraph,

19   please.

20        A.    (Deponent viewing exhibit).

21              Yes, I'm familiar with all of those.

22        Q.    Again, those are instances that PVA has

23   identified that it desired to secretly record a

24   person in Massachusetts but refrained from doing so.

Robert Joel Halderman - April 6, 2017

211

1          Q.    The second category that I'm going to

2     ask you about are PVA's plans and intentions to

3     conduct secret recordings in Massachusetts in the

4     future.  Can we keep those two as separate

5     categories?

6          A.    I'll do the best I absolutely can.

7          Q.    And the two may overlap at some point.

8     We can work with each other on that.

9                Historical in the past occurrences where

10    PVA wanted to do some secret recording in

11    Massachusetts but chose not to, we have the four

12    examples listed in the first paragraph in response

13    to interrogatory nine.  We have the Australian Labor

14    Party and Dudich investigations that we already

15    spoke about.  Then you also mentioned an

16    investigation related to Harvard.  I think we spoke

17    about that with Mr. Verney earlier this week.  We're

18    going to include that on the list as well.

19                Are you aware of any other occurrences

20    when PVA wanted to secretly record in Massachusetts

21    in the past and chose not to?

22         A.    Not specifically, but I'm always looking

23    for stories.  I read at least two to three

24    newspapers almost every single day.  Except the Wall

Robert Joel Halderman - April 6, 2017

213

1    going to do it.  In the state of Massachusetts, if

2    we're not going to do it, I don't write up a plan.

3    I don't plan parties that I'm not going to have.

4          Q.    Okay.  So, let's go through the list in

5    interrogatory number nine here.  This first

6    occurrence or potential investigation relating to

7    landlords renting unsafe apartments to college

8    students, what was your involvement in that idea?

9          A.    I saw that story.  I think it was a

10   Boston Globe story.  I saw that story, and I was

11   really intrigued by it because I think it was two

12   years ago or so.  I knew my son was going to be

13   moving here.  I knew he could fall victim to this

14   same thing.  I had a personal stake in it.

15              Plus, I think the landlord exploitation

16   of students and older people is really egregious.  I

17   think landlord abuse is just really horrific.  I

18   don't know why.  Maybe because I was a tenant for so

19   many years and I had a really lousy landlord when I

20   lived on the Lower East Side.

21              I remember reading this story, and I

22   remember reading these instances where kids were

23   being ripped off in rat infested houses and no heat,

24   and I thought, That's just abominable.  We could do

214

1    that story.  That's the kind of story we can do

2    really well.  That's the kind of story that

3    undercover video is very powerful.

4              The Boston Globe can write about it, but

5    when you see the landlord and you see the apartments

6    and when you see the people who are being exploited,

7    it's so much more powerful.

8              I've been a video journalist, I've been

9    in television my whole career.  I think television

10   is the be all and end all.  I respect the print

11   press.  I think undercover video sometimes is a

12   unbelievably powerful voice in correcting wrongs.

13   Undercover video specifically is just unbelievable

14   because we get people to admit what they would never

15   say publicly.

16             I had an idea that we could actually be

17   like a landlord kind of guy and talk to the other

18   landlords and get them to tell us how they treated

19   these people, how they did it, why they did it, and

20   the fact that they reveled in it because that's what

21   I certainly believed was the case.

22        Q.   Did you set pen to paper and create an

23   op plan?

24        A.   No, no, I muse at what I might be able

215

1    to do if I had the opportunity and the freedom to do

2    so.  I just --

3         Q.    Go ahead.

4         A.    I think stories like that, that kind of

5    story in particular, is so much in our wheelhouse.

6    It's so important and is what undercover journalism

7    is about.

8              It's about Nellie Bly going into the

9    insane asylum and exploring how cruel and horrific

10   those conditions were.  It's Lincoln Steffens.  It's

11   people who put themselves in circumstances and

12   situations that they cannot get into publicly but

13   they have to get into covertly and expose the truth

14   that they are able to uncover.

15             Undercover journalism is an incredibly

16   important and powerful tool for democracy and

17   freedom.  When you limit that freedom, you damage

18   democracies.

19        Q.    This idea to investigate landlords with

20   respect to out-of-code apartments, unsafe

21   apartments, did you discuss that idea within PVA?

22        A.    I believe I talked to Russ about it.  I

23   might have mentioned it to James too.  I don't

24   recall specifically talking to James about it.  In

216

1    those days -- it's only been in the last year that

2    we've really grown into a much larger organization.

3              In the first two, two and a half years,

4    almost the first three years that I worked at the

5    organization, it was a pretty small group of people,

6    pretty tight, myself, Russell, James, couple of

7    other people who came in and out during that time

8    period.  So, we talked about everything.

9              Russ is from Boston and Massachusetts.

10   He grew up here.  So, he's really into what goes on

11   here.  He knows about where Deval Patrick's bodies

12   are buried.  He knows everything, and he is really

13   into it.  I don't really know Boston particularly

14   well.  Russ was from here, and Russ and I are good

15   colleagues and friends.

16             When a Boston or Massachusetts story

17   comes up, we would often talk about it.  He's a Red

18   Sox fan.  We talked about it a lot.  Boston and

19   Massachusetts and New England generally is Russ's

20   backyard.  He grew up right outside of here.

21             Yeah, I remember talking specifically

22   about that story, and I know a bunch of people who

23   went to college here.  I mean, I thought it was a

24   good story.  I still think it's a good story.  I

217

1   think it's probably still going on.

2        Q.    Is this an idea that PVA still intends

3   to pursue?

4        A.    I would love to.  I would do it

5   tomorrow.

6        Q.    Remembering that you're designated to

7   testify on behalf of PVA with respect to its plans

8   and intentions vis-a-vis Massachusetts, my question

9   is does PVA have a present intention to do an

10  investigation of this type in Massachusetts?

11       A.    No, because it's against the law.

12       Q.    Is it fair to say that your

13  consideration of this idea never resulted in any

14  individual targets being identified for recording?

15       A.    No.  I mean, I think I saved the

16  newspaper story.  I think I probably did.  I tend to

17  save everything.  Recently I've been trying to empty

18  my office because I've got stacks everywhere.  I

19  remember that story specifically.  I think it's a

20  important story.  It's a great story.  If the law in

21  Massachusetts gets overturned, as I hope it will,

22  then I believe we probably will do that

23  investigation.  I would like to.

24                 I'm not the final decider.  Mr. O'Keefe

218

```
 1    is really the final decider.  I'm a party to the
 2    conversation about what investigations we do and
 3    don't do.  I like to think that I have a pretty
 4    prominent role.  It's not my decision alone.
 5         Q.    Okay.  And the way that this idea has
 6    been developed by PVA so far, have you identified
 7    locations at which you would do secret recordings
 8    relating to landlords renting unsafe apartments?
 9         A.    No.  I mean, I know how I would do it
10    just because I know how to do this kind of stuff.
11    I've been doing it for long time.  I don't know that
12    I talked to anybody about it because I don't plan
13    parties that I'm not going to have.
14         Q.    You haven't identified a particular
15    property that you would look into?
16         A.    I have not.
17         Q.    You haven't identified particular
18    landlord who you would seek to record?
19         A.    I have not and when we initially -- like
20    I said, when I initially saw this story, it was a
21    couple of years ago.  As I said, I would bet that
22    it's still going on to some degree because I don't
23    know that the problem has been solved.  I haven't
24    heard that.  I might -- if the law were changed or
```

219

1    overturned tomorrow, I might come up here and start

2    to do the investigation and find, in fact, it's no

3    longer a problem.  If that's the case, then great,

4    terrific, that would be a wonderful thing.

5         Q.    It's not your present intention to do

6    that?

7         A.    It's not my present intention to do

8    anything in the state of Massachusetts because it's

9    against the law for me to do the kind of journalism

10   that I do.

11        Q.    With respect to the second investigation

12   that's mentioned in response to the interrogatory

13   nine, government officials including police

14   officers, legislatures, or members of Massachusetts

15   Office for Refugees and Immigrants and their

16   position on sanctuary cities, is that an idea for

17   potential investigation that you were involved with?

18        A.    Yes, the sanctuary cities story is an

19   interesting story.  I think it's an important story.

20   Politically I'm not sure I necessarily agree with

21   all -- some of the story, but that's irrespective.

22   I think that when people are violating the law and

23   doing -- and doing so by being paid by the

24   government, whether it be state, local, or federal

Robert Joel Halderman - April 6, 2017

220

1    government, that that's a problem.  That needs to be

2    exposed.

3                The problem that we have with the

4    sanctuary cities story is that many of the biggest

5    sanctuary cities in this country are in states that

6    have two-party consent laws like, for example,

7    Chicago, Illinois, and Seattle, Washington, and

8    Portland, Oregon, and Boston, Massachusetts, and I

9    could go on.

10               So, it's a problem.  It's a challenge.

11   It's a real challenge.  I would like to do some

12   stuff on it.  I think there's a story there.  I'm

13   not exactly sure what the story is.  I think there's

14   some hypocrisy going on.  I think there's some

15   shenanigans with playing politics with this issue.

16               I think that if I were to do an

17   investigation in, say, the state of Massachusetts

18   that we might theoretically potentially expose some

19   hypocrisy about the sanctuary cities issue.

20        Q.    When PVA wanted to do some investigation

21   but refrained because of Massachusetts's law, had

22   PVA identified specific people to secretly record?

23        A.    No, because again I only go -- so, again

24   the way it kind of works is I'll see something,

221

1   somebody will tell me something, we get a tip or

2   James has an idea or Russ has an idea or somebody

3   has an idea, then we'll talk about it usually in the

4   office, and then if it's in a one-party consent

5   state, then we will sort of proceed from there.

6           If it's in a two-party consent state, we

7   do investigations in two-party consent states, but

8   we are so handcuffed.  It's virtually impossible,

9   it's incredible expensive, and it usually doesn't

10  even work.

11          We do it because in certain cases we

12  believe the story is so important that we need to

13  figure out a way to achieve the journalism, but it's

14  not easy and Massachusetts is a really tough state.

15  Your law is really difficult for us.

16          California is a two-party consent state.

17  We operate in California because there's an

18  opportunity in the law -- that's pretty reasonable,

19  I think -- when there is no expectation of privacy

20  that you can record a conversation without the

21  person knowing that you're recording it.

22          You're in a public restaurant and

23  somebody sitting at the next table and they can hear

24  everything that you're saying, then what they're

222

1    saying to you isn't private in my humble opinion.

2    I'm not very humble.

3        Q.    But this concept for an investigation

4    into public officials with respect to the sanctuary

5    cities, is it your testimony that it never got to

6    the point of identifying specific folks you wanted

7    to set out to record?

8        A.    That's correct.  We never really got to

9    the point at least in the state of Massachusetts

10   where we had specific individuals targeted.  What I

11   would have done had we had the opportunity is I

12   would have looked around, see who the great

13   advocates for it.  Those probably would have

14   potentially be our targets whether they be

15   legislatures, governors, mayors, school teachers,

16   deputy attorney generals, or whomever would be

17   people I would consider talking to.

18       Q.    That hasn't yet happened?

19       A.    That is correct.

20       Q.    Also with respect to this idea of an

21   investigation involving sanctuary cities, is it also

22   your testimony that never got to the point of

23   identifying specific locations to secretly record

24   those folks?

Robert Joel Halderman - April 6, 2017

```
 1        A.     That's correct.  We never got that far.
 2        Q.     The third potential investigation that's
 3   listed in response to interrogatory number nine
 4   reads, Protest management efforts to the Antifa
 5   protest in downtown Boston on August 19, 2017, that
 6   would focus on private individuals and public
 7   officials.  Do you see where I just read that?
 8        A.     Yes, sir.
 9        Q.     Were you involved in that idea for a
10   potential investigation?
11        A.     Yes, sir.
12        Q.     And who did PVA desire to secretly
13   record in Massachusetts for that one?
14        A.     The demonstrators at the event and any
15   public officials and anyone else that might be
16   involved in that event.
17        Q.     Where did that event take place?
18        A.     I think it was a park -- I thought it
19   was a park somewhere in Boston.  I don't think it
20   was the Common.  I don't know Boston that well.
21   Again, I hear about these things.  Somebody said to
22   me -- I mean, we believe the Antifa movement in this
23   country is a dangerous and scary thing.  So, we're
24   investigating it.  We keep an eye on it.
```

224

1                We had an undercover journalist in

2    Charlottesville.  We wanted to see what happened at

3    that event.  That was a horrific event that an

4    innocent person lost their life because of crazy

5    people.

6                We're interested in exposing anybody and

7    everybody who in a situation like that do something

8    that we believe is improper, illegal, or, you know,

9    not in the best interest of our country.  So, I try

10   to make sure that when there's an Antifa or other

11   kind of event like that going on that we send

12   undercover journalists to see what's going on.

13               Now, sometimes it's all good, they're

14   all nice people, and they have signs and sing

15   Kumbaya.  That's a beautiful thing.

16               We did an investigation of the DJ20

17   events surrounding the Trump inauguration.  They

18   were planning to set off butyric acid smoke bombs at

19   an inaugural event, which could have been very

20   dangerous and was certainly criminal.

21               When we exposed that, and we had

22   undercover recording of them planning that

23   operation, we took it to D.C. Metro Police, the FBI,

24   Secret Service, and that led to arrests and

225

1   prosecutions.

2           The Washington Post in that case said

3   that our investigation validates our practices

4   because it led to a crime not occurring that we

5   believe and law enforcement authorities believe

6   would have occurred or could have occurred.

7       Q.    Are you aware of any of these Antifa

8   type of events that occurred in Massachusetts since

9   August 19, 2017, that PVA tired to secretly record

10  but didn't?

11      A.    We know based on our reporting that

12  there are Antifa elements within the Commonwealth of

13  Massachusetts and we would love to investigate.

14      Q.    And so let's take a quick look at

15  Exhibit 5, the response to interrogatory number

16  nine, see that the fourth potential investigation

17  listed is ongoing and future Antifa or related

18  protests occurring in Boston.

19          At this point we're talking about both

20  the specific event on August 19, 2017, and ongoing

21  and future similar events.  Who would PVA record in

22  connection with those concepts?

23      A.    I don't know.  I will repeat myself.

24  Based on our reporting, our investigation, which has

226

```
 1    been going on for well over a year into Antifa and

 2    their activities, we believe that there are Antifa

 3    elements within the Commonwealth of Massachusetts,

 4    and we would like to investigate them, and we

 5    believe the only way to successfully investigate

 6    them and to keep an eye on their activities is with

 7    undercover investigative techniques.  That is who we

 8    are.

 9         Q.    Where would such undercover journalist

10    recordings have taken place?

11         A.    Well, in other areas such as New York

12    state, such as California, such as Atlanta, such as

13    Virginia where we have done reporting and even North

14    Carolina and the District of Columbia where we have

15    done investigations into Antifa, what we do is we

16    try to infiltrate the organization so we can find

17    out what they're doing and who they are.

18              We don't know who they are in

19    Massachusetts.  We have very good sources within the

20    Antifa organization -- Antifa is not like a -- it's

21    not like a football team.  It's more like a loose

22    association of independent groups that kind of fall

23    under same ideological banner.  They don't all know

24    each other.  They operate in a covert and secretive
```

Robert Joel Halderman - April 6, 2017

227

1    manner.

2              We've been able to -- we've had some

3    success in investigating them in the past and we

4    hope in the future.  Based on our reporting, we

5    believe that there are active Antifa elements in the

6    Commonwealth of Massachusetts.

7         Q.    Do you know where those folks are?

8         A.    No.

9         Q.    Can I ask you to pull Exhibit 26 out of

10   the stack there?

11        A.    Yes, I am looking at Exhibit 26.

12        Q.    Have you seen that e-mail thread before?

13        A.    You know, I'm not sure that I -- I don't

14   see my name on it.  So, if I wasn't cc'd, then I

15   probably didn't see it.  I don't read other people's

16   e-mail.  I think that's impolite, so I don't.  If

17   I'm sent an e-mail, I try to read it.  I don't see

18   my name on here.  I think that is the first time

19   I've ever seen this.

20        Q.    I guess then my question is you had

21   earlier mentioned that PVA at one time desired to

22   make secret recordings with respect to Harvard

23   University in Massachusetts.  The proposal that's

24   described by Mr. O'Keefe in Exhibit 26, is that that

228

1   same idea that you were testifying a moment ago?

2         A.    No, I have no idea what he's talking

3   about, but, you know, he'll know.  You can ask him.

4         Q.    So, the idea that you were talking

5   about, if it's different from Exhibit 26, tell me

6   about your idea.

7         A.    I don't remember what specifically the

8   idea was.  I recall there was some story about

9   money -- what was it -- federal grants, the number

10  of grants, the amount of grants to Harvard.  It was

11  some story in -- I think it was the Times or the

12  Washington Post.

13            I felt it would be interesting to talk

14  to them about how much federal money they get when

15  they have this huge freaking endowment that they

16  have where they could basically buy the state of

17  Massachusetts or at least let everybody go to

18  college for free.

19            I think their greed and their avarice

20  and their kind of smugness is something that I would

21  love to talk to them about.  I think it would be

22  interesting, maybe even amusing.

23        Q.    Who's them?

24        A.    Administrators, the president of the

229

1  university, deans, professors.  I would be curious

2  as to -- I have this thesis in my career or have had

3  this thesis in my career, you talk to people, you

4  find things out.

5          We might -- like I said, literally

6  dozens and dozens and dozens of time in my almost

7  four years at Project Veritas and Project Veritas

8  Action, we've launched investigations that have

9  turned out to be nothing where our premise or our

10  tip or our idea was, in fact, either incorrect or we

11  couldn't get it.  We couldn't get across that goal

12  line.  It's happened for my entire career.  That's

13  just the cost of doing business and the price of

14  doing business, but it doesn't mean that you

15  shouldn't do it.

16          You know, fisherman catch fish because

17  they throw their nets out every day.  It's not

18  because they know every time they throw their net

19  out it's going to get filled up with fish.  They do

20  it because they believe there's fish out there, and

21  if they throw the net in the right place, they might

22  catch some fish.  And that's what we do.

23          We go out, we have a tip or an idea or

24  we have a concept when we're operating in a

230

1   one-party consent state, which is in line with the

2   Constitution of the United States, the American

3   Constitution and the First Amendment, and we cast

4   our net.

5              I would cast a net at Harvard.  We did

6   it at Columbia.  We did it at Princeton and Yale.

7   We did it at Yale.  Even though Connecticut is a

8   two-party consent state, there's no expectation of

9   privacy issue there.  So, we can bounce around that

10  law because it's not quite as stringent as the

11  Commonwealth's law.

12       Q.    Who did you record at -- who did you

13  record at Yale?

14       A.    At Yale it was a -- I think it was like

15  a -- it was, like, a student counselor/advisor that

16  colleges -- when I went to college there were

17  college professionals and there was a college

18  president and a dean.  Now there's a whole other

19  layer of bureaucracy at American colleges that deal

20  with such things as whether or not people feel like

21  they're being triggered.  I think that's crazy.

22              That was the story we were doing.

23  Basically we had an undercover journalist who

24  suggested that the constitution bothered her; that

231

1    she didn't like the constitution and that it

2    triggered her.  There is this new word on college

3    campuses about triggering.

4                The administrators in several cases

5    actually helped our undercover journalist destroy a

6    copy of the constitution, and we thought it was

7    amusing.  It wasn't a big story, wasn't important,

8    but it was amusing.

9                What was really interesting was when we

10   continued to do this kind of investigation, we went

11   to the University of North Carolina and we went to

12   this college administrator, same story, whole thing,

13   and the college administrator looked at our

14   undercover journalist and said, you know what, you

15   need to get a grip.  I'm not going to help you

16   destroy the constitution.  You need to talk to a

17   psychiatrist or a psychologist because you've got a

18   problem.

19               What's so interesting about that is

20   that's what all the rest of them should have said

21   too.  It was ridiculous.  It was literally this

22   undercover journalist suggested that when she saw

23   the constitution it created this great anxiety.

24               Look, that investigation wasn't our

232

1  finest hour of journalism, but my point is that we

2  operate and do investigations in a lot of public

3  institutions across the country.  We can't do that

4  in states where we can't do undercover reporting, so

5  we don't.  What's going on at Harvard?  I don't

6  know.

7       Q.    Did you identify one or more

8  administrators at Harvard comparable to the ones you

9  found on the Yale and Columbia and Princeton at UNC

10  that you desired to record at Harvard?

11       A.    No, we just show up and we talk to

12  whoever is there.  We try to get as high on the food

13  chain as we can get.  Sometimes we will specifically

14  identify a specific subject we want to talk to when

15  there's a specific investigation.

16            Going back to Democracy Parters, Foval

17  gave us Robert Creamer's name.  Once Foval said Bob

18  Creamer, okay, we specifically targeted Robert

19  Creamer.  Again, in that investigation we didn't

20  know we were going to meet Zulema Rodriguez until

21  our undercover journalist had met Zulema Rodriguez.

22  We didn't target her.

23            What we tend to do most of the time, we

24  tend to target an institution or an organization.

233

1    We can do -- by the way, it's really snowing out

2    there, not dressed for this.

3         Q.    I mean, it sounds like the approach

4    you're describing makes it very difficult to know in

5    advance who PVA might be recording, where PVA might

6    be recording that person, and what PVA might capture

7    them saying?

8         A.    Just like an undercover cop --

9         Q.    Is that right?

10        A.    You're absolutely right.  Just like an

11   undercover cop who wants to investigate a drug

12   organization.  Because you guys can wire tap people

13   and lots of other things that you guys can do, which

14   I'm in favor of as long as a judge approves it, that

15   undercover investigator or undercover cop,

16   undercover state police, doesn't know who is going

17   to give him states evidence, doesn't know where the

18   investigation leads.

19             What you do commonly in those kinds of

20   investigations is you say to the undercover cop,

21   this gang is selling a lot of drugs on the south

22   side.  Let's get you involved in that gang and find

23   out who is in charge and how that works.  That's how

24   it works.  We operate in somewhat a similar way.

Robert Joel Halderman - April 6, 2017

234

1           What we target for the most part is
2    organizations, institutions, and then we
3    determine -- once we get into the door, then we can
4    become more refined and focus as to whom we want to
5    talk to, who's pulling the strings and who's the
6    power.
7           In the Democracy Partners investigation,
8    that is a perfect example of this.  Scott Foval was
9    a pure serendipitous event.  We sort of knew who he
10   was.  We certainly didn't know what he was going to
11   say.  He led us to Bob Creamer.  From there we were
12   able to lock down this incredible story.
13          We don't -- most of our
14   investigations -- most is not a great word, but I
15   would say a large percentage of our investigations
16   we don't necessarily have a specific person who
17   we're targeting because we don't know who that is
18   yet.
19          We're journalists.  We don't know the
20   end of the investigation at the beginning just like
21   law enforcement doesn't know who they're ultimately
22   going to charge and prosecute when they're doing an
23   investigation of a drug gang or a crime syndicate.
24       Q.   So, by the same token, you can't really

235

1    predict where these recordings will take place?

2         A.    I can tell if you we were doing a

3    Harvard investigation, it would happen most likely

4    on a Harvard campus.

5         Q.    That's a big place.

6         A.    Indeed, but it's not insurmountable.

7         Q.    Sitting in the dean's office versus in

8    the library versus Widener Hall versus, you know,

9    park bench out on the yard versus walking down Mount

10   Auburn Street, you just can't say what location

11   these secret recordings would be taken, can you?

12        A.    No, I can't, but I would tell you

13   without any doubt that it would be within the

14   Commonwealth of Massachusetts, and those secret

15   recordings in the Commonwealth of Massachusetts at

16   this moment in time are illegal.

17        Q.    On the interrogatory responses,

18   Exhibit 5, let me ask you to --

19        A.    I'm sorry, Exhibit 5?

20        Q.    Exhibit 5.

21        A.    Yep, I got it.

22        Q.    Let me ask you to flip to page seven.

23   Follow with me as interrogatory number 11 asks PVA

24   to identify each step it's taken in furtherance of

237

1    would say why don't we go try to have conversations

2    with police officers attached to the Beverly Police

3    Department and find out if we can get them to talk

4    about this practice of soliciting bribes from

5    businesses.

6        Q.    Are you aware of any such particular

7    opportunities for PVA as you sit here today?

8        A.    No, not specifically.  I think that my

9    experience is that, sadly, there are innumerable

10   opportunities for the kind of reporting and

11   investigations that we do in every state of the

12   union and the District of Columbia and probably

13   Puerto Rico and Guam.

14       Q.    Does PVA have any present intention to

15   record a particular person in secret in a particular

16   place in a particular way doing a particular thing

17   or saying a particular thing?

18       A.    Outside of Massachusetts?

19       Q.    In Massachusetts.

20       A.    Not in Massachusetts, no, that would be

21   against the law.  We can't do that.  I would love to

22   probably secretly record a whole bunch of people

23   because that's what I do.  I think it is a very

24   important and valuable kind of journalism.  We don't

238

1    have any plans to because we can't.  It's against

2    the law, and we don't break the law.

3         Q.    I'm going to pull the computer screen

4    back up again.  Looking at the jump drive that

5    earlier today we marked as Exhibit 39, I'm going to

6    take a look at a couple of files.

7               First, going down into the folder on

8    that jump drive titled Jump Drive 30(b)(6) Videos

9    and sub-folder RDP15, I'm going to play the first

10   file there titled 15-P23, Grimes Campaign Workers,

11   and that's an MP4 file.  Do you see that where I'm

12   opening it?

13        A.    Yes, sir, I do.

14                   (Video played)

15   BY MR. HASKELL:

16        Q.    I've paused that film fifteen seconds

17   into it.  Do you recognize this file that we're

18   beginning to view here?

19        A.    Yes, I produced this story, and I was

20   very happy when I found this TV ad that was produced

21   by the Alison Grimes campaign.  It made me very

22   happy.

23        Q.    The one that's up on the screen?

24        A.    Correct.

Robert Joel Halderman - April 6, 2017

242

```
 1        A.    You know, I don't -- I think it's
 2   New Hampshire.
 3                  MR. KLEIN:  Can we play more?
 4                  THE WITNESS:  I've been in a lot
 5             of cars in a lot of places.  I'm sixty
 6             years old.  I've been in lots of cars.
 7                  MR. KLEIN:  Take your time.
 8                  (Video played)
 9   BY MR. HASKELL:
10        Q.    I'm going to pause here at one minute
11   and fifteen seconds into it.  Do you recognize this
12   movie at this point?
13        A.    I don't, I'm sorry.  I really don't.
14   I've been to a lot of places.  I think that's James
15   O'Keefe.  I just don't remember exactly where that
16   was.  We've been to a lot of places.
17        Q.    Once more drilling down into Exhibit 39,
18   Jump Drive Raw Videos, opening sub-folder titled
19   RDP18-2 and the sub-folder underneath that titled
20   "A," there's one MP4 file in there whose name ends
21   '2900.  Do you see me opening that on the screen on
22   the side of the conference room?
23        A.    Yes, I do.
24                  (Video played)
```

243

1   BY MR. HASKELL:

2       Q.    I've paused this video twenty seconds

3   into it.  Do you recognize this video that we're

4   watching?

5       A.    I do I recognize this one.

6       Q.    What is it?

7       A.    This is a recording with a union

8   official in -- I don't remember the city, but I

9   believe it's Kansas.  His name is Steve Wentz, and

10  he's talking about hitting kids and seeming to brag

11  about it.

12      Q.    And this file that we've begun to watch

13  here, is this the raw video underlying a video

14  report that Project Veritas later published?

15      A.    I believe it is.

16      Q.    Let me ask, the person recording this

17  scene here is a Project Veritas undercover reporter;

18  right?

19      A.    Correct.

20      Q.    A male or female?  Would it help to play

21  some more of the video?

22      A.    It would.

23      Q.    Let's do it.

24                  (Video played)

Robert Joel Halderman - April 6, 2017

247

1    Mr. Wentz to see if we could get him to elaborate on

2    the story.

3            Q.    Let's take a step back.  The video at

4    the bar in Florida at the teachers union conference

5    was captured before the video of this meeting at the

6    restaurant in Wichita?

7            A.    Absolutely.

8            Q.    Okay.  And it was the video at the bar

9    in Florida that was taken by the female PVA

10   undercover; right?

11           A.    Correct.

12           Q.    How did they get to be at the teachers

13   union conference, you said?

14           A.    Yes.

15           Q.    How did she get to be there?

16           A.    I think she flew.

17           Q.    Was she sent there as part of a Project

18   Veritas investigation?

19           A.    Indeed she was.

20           Q.    Were you involved in planning that

21   investigation?

22           A.    Yes, I was.

23           Q.    Did she attend the entire conference?

24           A.    No, I don't even think -- as I recall, I

Robert Joel Halderman - April 6, 2017

248

1   don't think she actually attended the conference.  I

2   think what she did as she's one of our better -- was

3   one of our better journalists, I think what I told

4   her to do was hang out at the bar.  I said, I've

5   been to conferences in my life and people go to bars

6   and especially men go to bars and they like to brag.

7   It's a good place to get conversations and content.

8   If you sit at the bar and you dress nice and you

9   look nice and you talk to people and you're alone,

10  men will talk to you.  This conference was primarily

11  teachers union officials.  I figured some teachers

12  union officials would go to the bar and talk about

13  what they do.

14          Q.    How old was this young woman at the

15  time?

16          A.    She's in her twenties.

17          Q.    Okay.  So, did she specifically seek out

18  Mr. Wentz?

19          A.    Absolutely not.  This was another

20  situation which again as you have seen, as we've

21  gone through, this happens to us so many times and

22  that's why, you know, when we talk about things we

23  would do in Massachusetts, we don't know who we

24  would investigate.  We don't know who the corrupt

Robert Joel Halderman - April 6, 2017

249

```
1   people are.  We don't know who the lawbreakers are.
2   We don't know who the bad guys are.  The only way we
3   find that out is to go out there and put ourselves
4   in situations where we can encounter and converse
5   with those people.
6              It's a very imprecise profession,
7   journalism.  Like I said, I've been doing this a
8   long time.  I spent three and a half years covering
9   the war in Bosnia and in and out of Sarajevo.  I
10  never knew what was going to happen.  I knew we
11  wanted to talk to people who were victims of the war
12  or prosecutors of the war.  I sort of knew where
13  some of them were.
14             One day we drove down a road and came
15  across one of the infamous rape camps where there
16  were young women literally tied to buildings, and
17  these Serb guards didn't like us and told us to go
18  away.  We were actually able to film it.  It was a
19  big story at the time.  We don't know whom we're
20  going to investigate.
21             In this case, Steve Wentz went to the
22  bar where our journalist was and started telling
23  this story.  I don't think our journalist knew that
24  he was a teachers union person until he told us
```

Robert Joel Halderman - April 6, 2017

250

1    that.  Her job was to go to these kinds of events

2    and basically talk to people and see what she could

3    find out.  The business of undercover journalism to

4    a large extent is being at the right place at the

5    right time and listening.

6         Q.    In your experience a bar is a pretty

7    good odds place to do that?

8         A.    It's just logical.  People in bars are

9    killing time.  They are -- it tends to be a really

10   relaxed conversational place.  In this particular

11   case it was important for us to be in a bar.

12   Florida is a two-party consent state, but if there

13   is no expectation privacy, we can do our job, we can

14   be journalists and we can -- the law in Florida

15   allows for undercover recording of people who don't

16   know you're recording them if it's in a public place

17   and there's no expectation of privacy.

18               Bar in Florida is really good for us

19   because there's a bartender, there's other

20   customers, and there was a guy sitting next to him

21   who was kind of involved in the conversation, sort

22   of half in and half out.  There were people walking

23   by, people sitting in other areas of the bar.

24               We always ask this question because I

252

1              When you sit at a bar -- the social

2      paradigm in this culture is when you're at a bar it

3      is not at all strange to talk to somebody you don't

4      know.  If you're sitting at a table in a restaurant,

5      that's very strange to do that.  When you're in a

6      elevator, it's pretty strange to talk to people.  I

7      talk to people all the time.

8              Bars are one of the unique social

9      environments where you can talk to strangers and

10     strangers are willing to talk to you.  It's one of

11     the unique areas of our social and political life

12     where you can talk to a stranger and they will talk

13     to you and everybody thinks it's perfectly normal.

14             In undercover journalism where we are

15     trying to talk to people who otherwise we may not be

16     able to talk to, bars serve a very valuable purpose

17     because of that social phenomenon.

18         Q.   I'm going to play a segment of the

19     video, the 17K Teachers Union President to Kid video

20     beginning at time stamp 2:19.  We're going to play

21     through 3:09.

22                   (Video played)

23     BY MR. HASKELL:

24         Q.   So, in your own words, what did we just

253

1    see there?

2         A.    Mr. Wentz saying that he has threatened

3    physical violence on several of his students in the

4    past.

5                      (Marked Exhibit 48, Screen Shot)

6    BY MR. HASKELL:

7         Q.    Do you recognize Exhibit 48?

8         A.    It's a screen grab of the video that I

9    produced that Project Veritas did on Steve Wentz.

10        Q.    From the segment that we just watched?

11        A.    Correct.

12        Q.    Okay.  What was the PVA undercover

13   journalist, the female in the bar in Florida here,

14   what was her cover story to Mr. Wentz?

15        A.    You know, I don't think there was much

16   of one.  Wentz was the kind of guy who liked to hear

17   his own voice.  He didn't ask a lot of questions.

18   He's like a lot like a man.  He's a braggart and a

19   loud mouth.  I don't think he asked her.  Usually,

20   typically we would say in a situation like that,

21   keep your cover story real simple.  Don't over

22   complicate it.

23              Some undercover journalists have a

24   tendency if you give them a complex cover story

254

1   there's tendency to blather it out, which is not

2   normal.  In fact, I try to tell our undercover

3   journalists to answer a question if it's asked.  You

4   don't have to tell people where you went to school,

5   what your mother's name was, how many brothers or

6   sisters you have and how many of them are divorced

7   unless somebody asks you.

8        Q.   Did the undercover journalist in this

9   video suggests to Mr. Wentz that she was a young

10  teacher or an education student or interested in

11  getting involved in teaching?

12       A.   She might have.  She might have in order

13  to get him talking about it.  Yeah, you know what,

14  now that you mention that, that sounds familiar.  I

15  mean, it was an education conference.  It would have

16  made sense for us to come up with something like

17  that.  This again was one of our finest journalists.

18  This young woman was so remarkably talented and

19  smart and quick on her feet that she may have come

20  up with that at the moment.  She's a remarkable

21  young woman and I miss her dearly, but we're still

22  friends.

23       Q.   I'm going to shut down the published

24  video report.  Back to raw video RDP15-2 sub-folder

255

1   "A" to the '2900.MP4 file, and I'm going to open

2   that now.  Do you see me doing that?

3       A.    Yes, I do.

4       Q.    I think we discussed earlier that this

5   is the raw video underneath the segment of the

6   published video with Mr. Wentz that we just viewed?

7       A.    That's correct.  You can tell it's the

8   raw video because in the produced released video the

9   man you see on the screen now who was not a

10  participant of the conversation, other than sort of

11  just being there, we blurred his face in the

12  published video.  We have no desire to expose

13  anyone.  We don't want to embarrass this guy or make

14  him feel bad.  I'm not interested in hurting people,

15  especially people who are totally innocent who

16  happen to be sitting next to bar next to this guy.

17      Q.    I'm going to play a portion of the raw

18  video.  I'm looking at starting at time

19  stamp 8:42 and continuing through 9:35.  I'm going

20  to ask you to watch that, please, as I play it.

21                  (Video played)

22  BY MR. HASKELL:

23      Q.    So, I paused it at 9:36 actually.  Is it

24  fair to say that the segments that we just viewed in

256

1    the raw video corresponds to the same footage that

2    we viewed together a moment ago in the published

3    video?

4         A.    Yes, it is.

5         Q.    Where we've paused the video at

6    9:36 here, it looks like Mr. Wentz has raised his

7    right hand and forefinger and began to say "now."

8    Did you catch that?

9         A.    Yes.

10        Q.    I'm going to keep playing from 9:36.

11                    (Video played)

12   BY MR. HASKELL:

13        Q.    Mr. Wentz just said, "Now, here's the

14   caveat to that.  If you work hard in here, I will

15   walk through fire for you."  Is that correct?

16        A.    Yes.

17        Q.    And was that portion that we just saw in

18   the raw video, did that make it into the published

19   video?

20        A.    I don't believe it did.

21        Q.    Let's continue playing from 9:42 where

22   I've paused it forward.

23                    (Video played)

24   BY MR. HASKELL:

257

1          Q.     The last thing I've paused it at 9:56,

2     Mr. Wentz just told the PVA journalist, "That's not

3     something you can share in a college of education

4     class and that's obviously not a tool that you could

5     use"; is that right?

6          A.     I believe so.

7                      (Video played)

8     BY MR. HASKELL:

9          Q.     And I've just played and paused it at

10    time stamp 10:00.  Did you catch Mr. Wentz say, "The

11    point is to be real with some of these kids"?

12         A.     Mm-hmm.  Yes, I'm sorry.  I did hear

13    that, indeed.

14         Q.     Thank you.

15         A.     Forgive me.

16                     (Video played)

17    BY MR. HASKELL:

18         Q.     I've paused it at 10:39.  That 39-second

19    clip that we just listened to, fair to say Mr. Wentz

20    was describing an encounter he had some twenty years

21    on with a student with whom he had had one of these

22    come-to-Jesus type encounters?

23         A.     Correct.

24         Q.     And Mr. Wentz also just said a moment