# In The Matter Of:

*Project Veritas Acton Fund  v.*
*Daniel F. Conley, et al.*

---

*Russell Joseph Verney*
*April 4, 2017*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Original File Russell Joseph Verney 4-4-18.txt
Min-U-Script® with Word Index

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                   EASTERN DIVISION

4                        C.A. No. 1:16-cv-10462-PBS

5

6   PROJECT VERITAS ACTION FUND,

7                   Plaintiff,

8          vs.

9   DANIEL F. CONLEY, in his

10  official capacity as Suffolk

11  County District Attorney,

12                   Defendant.

13

14          DEPOSITION OF RUSSELL JOSEPH VERNEY,

15  individually and as corporate designee of Project

16  Veritas Action Fund, a witness called on behalf of

17  the Defendant, taken pursuant to the applicable

18  provisions of the Federal Rules of Civil Procedure

19  before Cynthia A. Powers, Professional Shorthand

20  Reporter and Notary Public in and for the

21  Commonwealth of Massachusetts, at the Office of the

22  Attorney General, One Ashburton Place, Boston,

23  Massachusetts, on Wednesday, April 4, 2017,

24  commencing at 9:00 a.m.

2

1   APPEARANCES:

2            Stephen Klein, Esquire

3            500 Madison Street, No. 419

4            Alexandria, Virginia 22314

5            (734) 233-1705

6            Representing the Plaintiff

7

8            Eric A. Haskell, Esquire

9            The Commonwealth of Massachusetts

10           Office of the Attorney General

11           One Ashburton Place, 19th Floor

12           Boston, Massachusetts 02108

13           (617) 963-2855

14           Representing the Defendant

15

16

17

18

19

20

21

22

23

24

3

1                    **I N D E X**

2                                              Page

3  Examination by Mr. Haskell              6, 205

4  Examination by Mr. Klein                   201

5  Afternoon Session                          146

6

7                  **E X H I B I T S**

8  Number                                     Page

9  Exhibit 1       Notice of Plaintiff Project    10

10                 Veritas Action Fund Pursuant

11                 to Federal Rules of Civil

12                 Procedure 30(b)(6)

13  Exhibit 2      Plaintiff's Designation for     10

14                 Defendant's Deposition Pursuant

15                 to Federal Rule of Civil

16                 Procedure 30(b)(6)

17  Exhibit 3      Project Veritas Action          32

18                 Organizational Chart

19  Exhibit 4      Project Veritas Action Fund     47

20                 Document Retention and

21                 Destruction Policy

22  Exhibit 5      Plaintiff's Responses to       102

23                 Defendant's First Set of

24                 Interrogatories

4

1               E X H I B I T S (Cont.)

2  Number                                              Page

3  Exhibit 6       DVD of "Non-30(b)(6)" Films        105

4  Exhibit 7       Screen Shot                         108

5  Exhibit 8       Screen Shot                         109

6  Exhibit 9       Screen Shot                         110

7  Exhibit 10      E-mail Chain, Verney to [name      124
8                  redacted], 4/14/15

9  Exhibit 11      Verified Complaint for             127
10                 Declaratory and Injunctive
11                 Relief

12 Exhibit 12      First Amended Verified             127
13                 Complaint for Declaratory and
14                 Injunctive Relief

15 Exhibit 13      Second Amended Complaint for        128
16                 Declaratory and Injunctive
17                 Relief

18 Exhibit 14      Screen Shot                         154

19 Exhibit 15      Screen Shot                         156

20 Exhibit 16      Screen Shot                         158

21 Exhibit 17      Screen Shot                         159

22 Exhibit 18      Screen Shot                         161

23 Exhibit 19      Screen Shot                         170

24 Exhibit 20      Screen Shot                         171

5

```
 1                    E X H I B I T S (Cont.)

 2   Number                                        Page

 3   Exhibit 21       Screen Shot                   172

 4   Exhibit 22       Screen Shot                   175

 5   Exhibit 23       Screen Shot                   177

 6   Exhibit 24       Report titled "Atlanta        184

 7                    Antifascist Deface Monument

 8                    and Threaten Police Officer"

 9   Exhibit 25       E-mail Chain, PVacationInfo    187

10                    to [name redacted], 2/1/17

11   Exhibit 26       E-mail Chain, O'Keefe to Barr, 190

12                    2/17/16

13   Exhibit 27       Plaintiff's Responses to      199

14                    Defendant's First Set of

15                    Requests for Admission

16   Exhibit 28       Plaintiff's Supplemental      199

17                    Responses to Defendant's First

18                    Set of Requests for Admission

19   Exhibit 29       Screen Shot                   201

20   Exhibit 30       E-mail Chain, Verney to [name  203

21                    redacted], 10/5/17

22   Exhibit 31       Conciliation Agreement        204

23             (Exhibits retained by Mr. Haskell)

24
```

Russell Joseph Verney - April 4, 2017

6

```
 1              P R O C E E D I N G S
 2              RUSSELL JOSEPH VERNEY,
 3
 4          having been satisfactorily identified
 5           and duly sworn by the Notary Public,
 6          was examined and testified as follows:
 7
 8                  DIRECT EXAMINATION
 9   BY MR. HASKELL:
10       Q.    Good morning, Mr. Verney.
11       A.    Good morning.
12       Q.    We got to meet a moment ago out in the
13   hallway.  I'm Eric Haskell, Assistant Attorney
14   General, and I represent the Defendant, in effect
15   the State of Massachusetts, in the case that Project
16   Veritas has brought challenging one of our criminal
17   statutes.  Have you been deposed before?
18       A.    Yes.
19       Q.    When did that happen?
20       A.    Let's see, many times throughout the mid
21   and late nineties, in the early 2000s.  I would say
22   I've probably been deposed over ten times.  Once
23   even by telephone.  They had a video camera on me.
24   Somebody in there watching, but --
```

Russell Joseph Verney - April 4, 2017

1    went to junior high and high school in Arlington,

2    Mass.  I went one year to Northeastern.

3         Q.    Did you get a degree from Northeastern?

4         A.    No.

5         Q.    Who what did you study while you were

6    there?

7         A.    It was an engineering course.

8         Q.    And when did you finish your time at

9    Northeastern?

10        A.    1966.

11        Q.    Did you go to any other school,

12   undergraduate, graduate programs after 1966?

13        A.    Not like college courses.  I've been to

14   Harvard School of Politics and lots of other places,

15   but not for any degree type of programs.

16        Q.    Okay.  What have you done for a living

17   since then?

18        A.    Well, since '66, three years in the

19   service including one year in Vietnam.  I was an air

20   traffic controller for approximately ten years eight

21   months and three days flying in the strike of '81.

22             I worked in the New Hampshire House of

23   Representatives on staff, became a consultant

24   managing political campaigns.  In 1991 I was the

Russell Joseph Verney - April 4, 2017

16

1    executive director of the Democratic Party in

2    New Hampshire during the first-in-the-nation

3    presidential primaries.

4             In '92 I was the only consultant on Ross

5    Perot's presidential campaign at the end.  I was the

6    executive director of the United We Stand of

7    America, a nationwide 501(c)(4) organization, in '93

8    through '95.  I was the manager of Ross Perot's 1996

9    presidential campaign.

10            I created the Reform Party in 1998.  I

11   worked for Judicial Watch, a 501(c)(4) in 2001 to

12   2005.  At all times I was still a political

13   consultant.  I've managed various campaigns.  I have

14   been with Project Veritas since.

15            I spent about a year with the North

16   Texas Crime Commission as executive director.  I've

17   been with Project Veritas Action Fund -- well, I've

18   been with Project Veritas since August of 2014, and

19   I created Project Veritas Action Fund in September

20   of 2014.

21        Q.    In the time you've been with Project

22   Veritas since August of '14, have you been the

23   executive director the whole time?

24        A.    Yes.

17

1      Q.    And with respect to the Project Veritas

2  Action Fund since -- I think you said you created

3  Project Veritas Action Fund in September of '14?

4      A.    Correct.

5      Q.    Have you been its executive director

6  since that time?

7      A.    Yes.

8      Q.    Okay.  A couple of your former employers

9  you mentioned are 501(c)(4) organizations.

10      A.    Yes.

11      Q.    In your own words, what's a 501(c)(4)

12  organization?

13      A.    501(c)(4) is an IRS nonprofit category

14  for organizations that are issue advocacy related or

15  can be issue advocacy related.  It's non-taxed in

16  its primary mission by the IRS, but contributions

17  are not tax deductible.

18      Q.    How does 501(c)(4) compare to a

19  501(c)(3)?

20      A.    501(c)(3) charitable organization is not

21  taxed by the IRS in its primary mission and

22  contributions to the 501(c)(3) are tax deductible to

23  the extent permitted for the donor.  There are

24  restrictions on what a 501(c)(3) can do.  It cannot

18

1    do issue advocacy.  It cannot do political -- it

2    cannot intervene in political campaigns.

3         Q.    You mentioned a moment ago that a

4    501(c)(4) is authorized to do issue advocacy; is

5    that right?

6         A.    Correct.

7         Q.    Is a 501(c)(4) also authorized to

8    intervene in political campaigns?

9         A.    To an extent.  Less than 50 percent of

10   its spending can be done -- it cannot -- it cannot

11   do express advocacy like vote for or vote against,

12   but it can intervene in political campaigns up to

13   about 49 percent of its spending.

14        Q.    Are there any limitations on the

15   political activities a 501(c)(4) can engage in other

16   than vote for this person, don't vote for that

17   person?

18        A.    The two are financial, the amount of

19   your assets spent on it.

20        Q.    Sure.

21        A.    The other one is avoiding express

22   advocacy.

23        Q.    What's meant by express advocacy?

24        A.    That's vote for or vote against.  You'll

Russell Joseph Verney - April 4, 2017

19

1   see many commercial saying, Russ Verney is running

2   for Senate.  He voted against this bill.  He voted

3   for this terrible bill.  He's hurting all of us.

4   Please call him and tell him to oppose that bill.

5   There's no express advocacy there.  It's issue

6   advocacy.  Where if the tag line had been, He's

7   voted against this bill, vote against him on

8   election day, that's express advocacy.

9        Q.    Issue advocacy is something that a

10  501(c)(4) can do and a 501(c)(3) cannot do; is that

11  right?

12       A.    Correct.

13       Q.    What has Project Veritas been recognized

14  by the IRS -- excuse me, has Project Veritas been

15  recognized by the IRS as one of these types of

16  organizations?

17       A.    Yes, it has.

18       Q.    Which type?

19       A.    501(c)(3).

20       Q.    Has Project Veritas Action Fund been

21  recognized by the IRS as one of these two types of

22  organizations?

23       A.    No, it doesn't need to be.  It operates

24  as one until it decides to file for the designation.

Russell Joseph Verney - April 4, 2017

1        Q.      I'm sorry, I don't think I understood

2   you.

3        A.      The 501(c)(3) has to have a

4   determination from the IRS before it collects money

5   because the donor is taking a tax deduction.  A

6   501(c)(4) is a tax status.  You don't have to have a

7   designation from the IRS before you start operating

8   because the donor is not taking a deduction.

9   There's no penalty to the donor if you're denied

10   that tax status.  You have several years to apply

11   for it.  We've chosen not to apply for it yet.

12        Q.      And so under Project Veritas Action

13   Fund's current status, are there any limitations on

14   the kind of political advocacy that it can

15   participate in?

16                    MR. KLEIN:  Objection.  I think

17                    your first question was "in your

18                    opinion."  I've been running with that,

19                    but this is -- Russ can certainly answer

20                    here, but I will lodge the objection as

21                    far as legal conclusion.

22                    THE WITNESS:  Can you restate it?

23                    MR. HASKELL:  Sure.

24        Q.      Under Project Veritas Action Fund's

21

1  current status, are there any limitations on the

2  kinds of political advocacy that it can engage in?

3      A.    Yes, we operate as a 501(c)(4).

4  Therefore, we can't do express advocacy.  We can't

5  spend more than 49 percent of our money intervening

6  in federal elections.

7      Q.    And to operate as a 501(c)(4) without

8  having been recognized as one by the IRS, is that

9  something that Project Veritas Action Fund imposes

10  on itself voluntarily?

11      A.    Yes.

12      Q.    Okay.  So, let's take those one at a

13  time.  In your role as executive director of Project

14  Veritas Action Fund, what are your responsibilities?

15      A.    My responsibilities are administrative

16  in nature, overseeing the HR, overseeing compliance,

17  overseeing risk management, overseeing finances.

18      Q.    Anything else?

19      A.    I think that pretty much covers it.

20      Q.    And same question in your role as

21  executive director of Project Veritas, what are your

22  responsibilities there?

23      A.    Same functions; overseeing HR,

24  overseeing finance, overseeing compliance, whatever

22

1  else I said.

2      Q.    Now, I think you mentioned earlier that

3  you serve as the manager of litigation for one or

4  both organizations; is that right?

5      A.    Yes --

6      Q.    And --

7      A.    -- which falls under Compliance.

8      Q.    So, you perform that role with respect

9  to both organizations?

10      A.    Correct.

11      Q.    At Project Veritas Action Fund, who do

12  you report to?

13      A.    The president, James O'Keefe.

14      Q.    And at Project Veritas in your role as

15  executive director of that organization, who do you

16  report to?

17      A.    James O'Keefe, the president.

18      Q.    He's also the president of Project

19  Veritas?

20      A.    Both, mm-hmm.

21      Q.    Do you draw a salary from Project

22  Veritas Action Fund?

23      A.    I draw a salary through Project Veritas.

24  Some of it's apportioned to Project Veritas Action

Russell Joseph Verney - April 4, 2017

23

1    Fund.

2         Q.    Is that a common arrangement among

3    employees of Project Veritas Action Fund?

4         A.    Yes.

5         Q.    Are there any employees of Project

6    Veritas Action Fund that draw a salary directly from

7    Project Veritas Action Fund?

8         A.    No.

9         Q.    They're all apportioned through Project

10   Veritas?

11        A.    Correct.

12        Q.    How many hours a week would you say you

13   spend on work in your role as executive director of

14   Project Veritas Action Fund?

15        A.    Action Fund, probably -- probably about

16   twenty hours a week.

17        Q.    How many hours a week would you say that

18   you spend in your role as executive director of

19   Project Veritas?

20        A.    Somewhere around sixty hours a week.

21        Q.    So, you work eighty hours a week?

22        A.    Yep.

23        Q.    And that division of time between two

24   organizations, is that the basis for the

Russell Joseph Verney - April 4, 2017

24

1  apportionment of your salary that you mentioned

2  earlier?

3       A.   Yes, but we have an agreement between

4  the companies on if there isn't an actual

5  designation of time then it's a -- I think it's a

6  65/35 split.

7       Q.   Sixty-five being apportioned to?

8       A.   Project Veritas.  Project Veritas Action

9  Fund is less active than Project Veritas.

10      Q.   And that arrangement of apportioning

11 salary 65 percent to Project Veritas and 35 percent

12 to Project Veritas Action Fund, is that common among

13 employees whose salaries are apportioned?

14      A.   Yes.

15      Q.   So, in your own words, what does Project

16 Veritas Action Fund do?

17      A.   We investigate incidents where we

18 suspect there might be abuse, fraud, lapses of

19 ethics; self-dealing within government, within

20 political organizations, within public agencies.

21      Q.   Does Project Veritas Action Fund do

22 anything besides that?

23      A.   Well, we -- obviously we've initiated

24 this litigation to break down some of the barriers

25

1   to undercover recording and to assert our First

2   Amendment rights.

3           Q.    So, conduct investigations in the ways

4   you described and conduct litigation, does that

5   cover everything that Project Veritas Action Fund

6   does?

7           A.    Yes, I believe it does.

8           Q.    Okay.

9           A.    And we look at the litigation as a form

10  of advocacy of our First Amendment rights.

11          Q.    So, I'd like to speak about how an

12  investigation with Project Veritas Action Fund

13  works.  You mentioned a couple of areas in which

14  Project Veritas Action Fund is interested a few

15  moments ago.  Is that the extent of Project Veritas

16  Action Fund's focus?

17                  MR. KLEIN:  Objection, asked and

18              answered.

19          A.    I think they're all pretty broad.  We're

20  investigating fraud, abuse of power, lapses of

21  ethics.  There's no limit on how much work you can

22  do.

23          Q.    Where does the idea for a specific

24  investigation come from in Project Veritas Action

28

```
 1   they have to say on a subject.

 2              If that undercover journalist encounters

 3   any unique circumstances, they will withdraw from

 4   the situation, check with us for legal guidance as

 5   to how to conduct themselves.  For instance, if they

 6   were asked to sign an agreement of some sort, they

 7   would ask us for guidance on what to do with it

 8   because they use assumed names.

 9              When they have captured some

10   information, they will send it back to us.  We'll

11   review it to see if there are any opportunities for

12   a story, if there's any leads, if there's any

13   contacts we need to follow up.  It just develops

14   from there.  We apply the appropriate assets as it

15   goes along to develop the entire story.

16              Then when we have what we think is a

17   newsworthy story, our executive producer will

18   develop a script for what we would report, and we

19   run that by legal counsel for a review.  Then we

20   draft the video report.  We run that by legal

21   counsel.  Then we finalize the video report and

22   publish it through our website, news releases.

23        Q.   Just to make clear we're speaking the

24   same language here, when you speak about a video
```

29

1    report, that's the final version of the video that

2    PVA releases to the public?

3           A.    Correct.

4           Q.    And the component videos that comprise a

5    video report, fair to say there may be more than one

6    component video that are combined into the video

7    report?

8           A.    Correct.

9           Q.    For each of those component videos, fair

10   to say that there's more captured by your journalist

11   than is actually included in the video report?

12          A.    Correct.

13          Q.    So, the video that's captured by the

14   journalist, regardless of whether it's included in

15   the video report, can we today call that raw

16   footage?

17          A.    Yes.

18          Q.    Is that the term that you commonly use

19   for it?

20          A.    Well, because you no longer use tape, we

21   call it raw video.

22          Q.    Okay.  How about we use those

23   interchangeably, raw video and raw footage?

24          A.    Fine.

Russell Joseph Verney - April 4, 2017

1      Q.    I want to break down the process

2   step-by-step.  You have an idea for investigation.

3   You mentioned a moment ago that it goes to get an

4   initial approval from a group of staff before the

5   field director, and I think you said executive

6   director, set pen to paper and create a memo about

7   that investigation.  So.

8            The group of staff that makes the

9   decision to take the next step, who's included in

10  that group?

11     A.    Again, it's collaborative among staff.

12  It's not a fixed group.  It certainly involves the

13  president.  He's the final authority on everything,

14  James O'Keefe.  It would typically include the

15  executive producer, the field director, our media

16  communications director, could involve our

17  development director.  Also, we do have a chief

18  operating officer now.  He would be involved in it.

19            It's not -- it's a consensus building.

20  It's not democracy thing of yea or nay.  It's

21  consensus building of whether or not to do the

22  investigation and how or how much resources we

23  should put into it, and that leads to the field

24  director and executive producer creating the memo.

31

1        Q.    You mentioned that the president,

2   Mr. O'Keefe, is the final authority on whether the

3   investigation goes forward?

4        A.    Correct.

5        Q.    So, those last two questions, I should

6   have asked better questions.  Were you describing

7   the process for green lighting an investigation at

8   PVA?

9        A.    I'm sorry, I don't understand.  As

10  opposed to?

11       Q.    As opposed to Project Veritas.

12       A.    It's the same for both.

13       Q.    The process is the same for both?

14       A.    Yes.

15       Q.    And the members of the staff who

16  participate in the decision making, are they the

17  same for PVA and for Project Veritas?

18       A.    Assuming that it's not a fixed number of

19  staff, yes.  It's the senior staff.  It's the same

20  senior staff for PV.  Two different projects may be

21  two different arrangements of the staff.  Senior

22  staff deals with both of them, but it may not be the

23  very same people dealing with both of them.

24            In other words, I may not be involved in

32

1    one of the discussions, but I'm part of the senior

2    staff and have the opportunity to have input.

3          Q.    Well, let me break it down a bit.  Maybe

4    we can use the org chart to help us here.

5                        (Marked Exhibit 3, Project Veritas

6                        Action Organizational Chart)

7          A.    (Deponent viewing exhibit).

8                I'm familiar with this.

9          Q.    You've had a chance to look through

10   Exhibit 3?

11         A.    Yes.

12         Q.    What is that document?

13         A.    This was an organizational chart that

14   was created probably in 2015, I think, 2015 or 2016,

15   somewhere in there.

16         Q.    Has it been updated since then?

17         A.    No, it hasn't been kept current.

18         Q.    Okay.  Who created this document?

19         A.    I believe the gentleman's name was Ken

20   Constanza.  He was chief of staff at that time.

21         Q.    Did you have any involvement in creating

22   Exhibit 3?

23         A.    Yeah, I'm sure I reviewed it in its

24   development.

33

1        Q.    Do you use Exhibit 3 in your work as

2   executive director of PVA?

3        A.    I've never referred to it.  I know the

4   staff.  I know their functions.  I know their

5   responsibilities.  I hired them all.  It's not

6   something that I rely upon.

7        Q.    Do you have a comparable document for

8   Project Veritas?

9        A.    Yeah, it's essentially the same.

10       Q.    You were speaking a moment ago about the

11  senior staff in the context of making a decision to

12  pursue an investigation.  Looking at Exhibit 3, who

13  do you define as senior staff?

14       A.    I would -- the top row which is

15  president.  The second row is not senior staff with

16  respect to operations.  That's administrative.  The

17  next row of CFO, chief of staff, executive director,

18  senior staff.  The next down, development,

19  production, field operations, those are senior

20  staff, media communications.  I'm not sure IT

21  security is necessary in those types of things.

22  That's the senior staff.  That row of six and up

23  with the exception of the executive assistant,

24  office manager and aide.

34

```
 1          Q.    And so on the second page of Exhibit 3
 2     that we're looking at here, it's what we have been
 3     referring to, you have been referring to, this is an
 4     organizational chart for the PVA staff?
 5          A.    Mm-hmm.
 6          Q.    Do any of the folks who you just
 7     identified on Exhibit 3 have a different role with
 8     Project Veritas than they have with PVA?
 9          A.    No.
10          Q.    They all have the same role with both
11     organizations?
12          A.    Correct.
13          Q.    Okay.  And so when you spoke a moment
14     ago about the senior staff getting together and
15     deciding whether to go forward with investigation,
16     and it may be different groups of people for
17     different investigations, is that just a function of
18     what the investigation is and who has a role to play
19     in the decision?
20          A.    Yes, and who is available the day the
21     discussion occurs.
22          Q.    Sure, sure.  And so is the group who
23     makes the decision to pursue an investigation for
24     PVA different from the group who decides to pursue
```

Russell Joseph Verney - April 4, 2017

35

1    an investigation for Project Veritas?

2         A.    No.

3         Q.    Okay.  Had has PVA ever declined an idea

4    for an investigation because it's outside of it's

5    focus area?

6         A.    We have determined not to pursue some

7    investigations.  Now, there are tips that come in,

8    you know, like I just had a terrible time in my

9    divorce, will you go and investigate the judge.  We

10   don't do that.  I don't know if that's declining

11   them, but we do reach a point of do we or don't we

12   proceed with an investigation that we're discussing,

13   and there are some we don't proceed with and some we

14   do.

15        Q.    Let me ask a better question.  In your

16   experience on the PVA side, what factors go into

17   whether to pursue an investigation or not?

18        A.    The probability of success, the cost,

19   the time and newsworthiness of it.

20        Q.    Drilling down on that, what do you mean

21   by probability of success.

22        A.    Are we going to be able to get to the

23   people that can give us the candid information from

24   a high enough level, or are we simply going to be

36

1    dealing with peripheral staff that doesn't have

2    insight into what's going on.  Are we going to be

3    able to do it in a reasonable amount of time,

4    reasonable cost.  Those all go into it.

5         Q.    What did you mean a moment ago when you

6    spoke about the investigation's newsworthiness?

7    What does that mean?

8         A.    Our function is to educate the public on

9    what we find.  If it's not newsworthy to the

10   public -- like every airplane that lands safely

11   isn't newsworthy.  The one that crashes is

12   newsworthy.  We make those determinations in our

13   investigation.

14            We do report on some where the people

15   acted in an ethical way especially when it's in

16   contrast to how everyone else in the story acts just

17   to show there are good people who do it right.

18            Typically, a story isn't built around

19   good news.  It's built around violations of ethics

20   or abuse or something of that nature.

21        Q.    The probability of capturing such things

22   is something that PVA considers in deciding to go

23   forward with an investigation?

24        A.    Correct.

55

1    it and counsel reviews it, and at what stage is the

2    investigation assigned to a journalist?

3         A.    It would be after we got legal guidance

4    of how we're going to conduct it, then the field

5    director would determine what initial staff he's

6    going to assign to it and build off it from there.

7         Q.    And, again, am I understanding correctly

8    that Project Veritas's journalistic staff consists

9    of the same people at PVA's journalistic staff, and

10   it's just a question of how their time is

11   apportioned?

12        A.    Exactly, yes.

13        Q.    And so when this memo has been developed

14   and approved and a journalist is assigned to it,

15   what steps does the journalist typically need to

16   take at that point?

17        A.    The journalist first has to do the

18   research of this was the big picture of what we want

19   to do and where we want to do it.  Now, how do you

20   get started.  So, they do research on the target of

21   the investigation, start identifying their

22   opportunities to gain access and adopt a cover story

23   legend to go with who they are for that

24   investigation and any supporting information that

56

1   they need.

2        Q.    What do you mean when you say cover

3   story legend?

4        A.    They may be going to -- they may be

5   going to a campaign to volunteer and they're a

6   college student on spring break.  They may be going

7   to talk to sales representative for a publishing

8   company trying -- as a consultant for somebody

9   trying to acquire information to help with a

10  legislative process.  They adopt different names and

11  backgrounds to approach them, gaining their

12  confidence.

13       Q.    I'm sorry, gaining whose confidence?

14       A.    To gain the confidence of whoever

15  they're meeting with to build the targets for moving

16  on.  They may be meeting with somebody, a conference

17  out in the lobby and they tell them that they're a

18  consultant for some group and would like to meet

19  with somebody higher up in their organization and

20  get introduced.  So, that's the back story that they

21  have to get introductions.

22       Q.    And that's intended to, as you said,

23  gain confidence of the person who the journalist

24  wants to record?

57

1        A.    Right.

2        Q.    The back story isn't necessarily true,

3    is it?

4        A.    Correct.

5        Q.    So, in a situation where the target of

6    an investigation is an organization and the approval

7    and memo process hasn't yet identified a method to

8    access individuals in that organization, is that

9    something that the journalist would do at this

10   stage?

11       A.    Yes.

12       Q.    I should take a step back and ask -- I

13   think we spoke about it earlier.  PV/PVA employs a

14   staff of journalists?

15       A.    Correct.

16       Q.    Does Project Veritas/PVA also use

17   journalists other than its own employees?

18       A.    We have contractors.  We have

19   independent contractors.  They're contracted for

20   that purpose as undercover journalists.  So, they

21   may be doing it for other people in other instances,

22   but we have both employees and independent

23   contractors.

24       Q.    And assigning an investigation to a

Russell Joseph Verney - April 4, 2017

63

```
 1        A.    Elicit that information, how do I elicit
 2   that information about how you operate, how you make
 3   those decisions.
 4        Q.    Is it fair to say that your training
 5   program covers some of the same law enforcement
 6   related techniques --
 7        A.    Yes.
 8        Q.    -- relative to getting access?
 9        A.    Correct.
10        Q.    Are Project Veritas and PVA's
11   journalists trained on any limitations to what they
12   can do in the way of a cover story or legend?
13        A.    Absolutely.
14        Q.    What are those?
15             MR. KLEIN:  I would object at this
16             point to privilege.  As far as the
17             involvement of attorneys, I would
18             instruct Russ not to discuss this
19             matter.
20             MR. HASKELL:  Can you read the
21             question back.
22                  (Record read)
23   BY MR. HASKELL:
24        Q.    And --
```

Russell Joseph Verney - April 4, 2017

64

1                MR. KLEIN:  As far as what are

2           those, I would say that's privileged and

3           I would instruct not to discuss that.

4    BY MR. HASKELL:

5         Q.    Mr. Verney, are you going to follow your

6    counsel's instructions not to tell me what

7    limitations Project Veritas and PVA place on its

8    journalists' cover stories that they can take?

9         A.    Yes.

10        Q.    Okay.  So, we were talking about

11   training.  Before that we were talking about the

12   process an investigation takes.  I think we left off

13   speaking about the research and legwork that a

14   journalist puts in before they actually go into the

15   field; is that right?

16        A.    Correct.

17        Q.    Okay.  At this stage has a budget been

18   set for the investigation?

19        A.    No, and at no point is an actual budget

20   set for -- we don't know when we start out if it's

21   going to require one undercover journalist, if it's

22   going to require five, if it's going to be one month

23   or ten months.

24                When we interviewed Foval, we had no

Russell Joseph Verney - April 4, 2017

1   That's the most important technique that they have,

2   to create access.

3       Q.    In what ways that you're familiar with

4   have Project Veritas and PVA's journalists built

5   access to a target?

6       A.    Sometimes it's as simple as a phone call

7   and setting an appointment.  Other times it's as

8   difficult as trying to casually met meet them in a

9   social setting you know they will be at.  Other

10  times it's having somebody who has given us a tip

11  introduce us to somebody.  It's unique.  Every

12  approach is unique.

13      Q.    Do all of these activities of building

14  access involve a cover story?

15      A.    Typically, yes.  There are occasionally

16  instances where the uncover journalist will use

17  their real name, real identity, but typically it's a

18  cover story.

19      Q.    How often does that happen that the

20  journalists use their actual identity?

21      A.    It's rare, but I can think of three

22  instances.

23      Q.    Three instances over the time you've

24  worked at Project Veritas and PVA?

71

1      A.    Right.

2      Q.    What are those three instances?

3      A.    One is a person who has a public

4  professional reputation in a field that we wanted to

5  use as access to opinion leaders in a community.

6  So, he used his name and his company, previous

7  company's reputation to gain that access.

8            Another one where we entered a federal

9  building, and we under Section 1001 we used real

10  names, identities.  In fact, both of those dealt

11  with Section 1001 issues.  These are three that I

12  can recall.

13      Q.    I'm sorry, what is Section 1001?

14      A.    That's Martha Stewart going to jail.

15      Q.    I'm sorry?

16      A.    That's Martha Stewart going to jail for

17  not telling the truth to a federal investigator as

18  opposed to what they were investigating, insider

19  trading.  That was never the crime she committed.

20  It was lying to a federal investigator.

21            You can't use a false name to enter a

22  federal building.  I can't enter this building --

23  well, the state.  I don't know what the state law

24  is.  Tip O'Neill's building I can't go in with a

72

1    false name.

2         Q.    Sure.   Okay.   So that's an occasion --

3    excuse me, there are two occasions in your time at

4    Project Veritas and PVA that the journalists have

5    used their real names for that purpose?

6         A.    Correct.

7         Q.    So, when a journalist meets with

8    somebody who they've identified as a target,

9    somebody they want to record, do they always have

10   the microphone rolling?

11        A.    Depending on the legal guidance for the

12   circumstances they're in, yes.

13        Q.    Okay.   But fair to say whenever

14   circumstances permit it to be done legally, the

15   reporter has a microphone rolling when they're

16   meeting with a target?

17        A.    Yes.

18              MR. KLEIN:   I want to ask Russ if

19        he's ready for a break or anything?

20              MR. HASKELL:   I have to say I

21        could use the men's room myself.

22              (Whereupon, a recess was taken)

23   BY MR. HASKELL:

24        Q.    So, we left off speaking about the

75

1    equipment you have with you.  Could be hidden in

2    your clothing.  It records typically to a DVR, which

3    records to a card, one of these little memory cards,

4    and then they have backup of their cell phone audio,

5    backup audio.

6         Q.    Do Project Veritas and PVA have their

7    own fleet of recording equipment?

8         A.    Shared.

9         Q.    And they are apportioned in some

10   fashion?

11        A.    They are apportioned.

12

13

14

15

16

17

18

19        Q.    The hidden camera, what is the smallest

20   that they come?

21        A.    It's a difficult question to answer.

22   The lens is the important thing, and that can be as

23   small as a button on your shirt or a rhinestone on

24   your pocketbook.  The other equipment is out of

76

1   site, the DVR and all.  So that's sort of irrelevant

2   what size that is, but it's probably about the size

3   of a package of cigarettes.

4        Q.    Okay.  And does Project Veritas and PVA

5   have hidden cameras that hide in the button of

6   somebody's clothing?

7        A.    Yes.

8        Q.    Do they have hidden cameras that hide in

9   a rhinestone on somebody's clothing?

10        A.    Yes.

11        Q.    So, the journalists are collecting raw

12   video on an ongoing basis when they're in the field;

13   is that right?  That's what they do?

14        A.    Correct.

15        Q.    Where does the raw video get sent by the

16   journalist after it's captured?

17        A.    Gets sent to our office.

18        Q.    How does that happen?

19        A.    Electronic transfer, upload it to our

20   service.

21        Q.    How frequently is the journalist

22   expected to upload the raw video?

23        A.    We prefer it every day.  Sometimes it's

24   every couple days.

83

```
 1    this.  We want that video in there.  Yeah, the

 2    script indicates what elements of the recorded

 3    content is going into it.

 4         Q.    And that draft script that the executive

 5    producer puts together, I think you said that's

 6    subject to review by Mr. O'Keefe and who else?

 7         A.    I think it's something that is reviewed

 8    by Mr. O'Keefe, but it's primarily reviewed by the

 9    attorneys to see if saying anything is troublesome.

10    We don't want to get into litigation.  We don't want

11    to overstate a case.  We want to be very factual in

12    what we're doing.

13         Q.    And assuming that the lawyers don't have

14    any issues, does Mr. O'Keefe have final review and

15    approval of the script?

16         A.    Ultimately, yeah, but again it's

17    collaborative between he and the executive producer

18    if we want to tweak it or change it a little bit.

19         Q.    So, when it comes to editing the raw

20    video and, I suppose, also raw audio for inclusion

21    in a video report, what kind of editing techniques

22    are available to the editing staff?

23         A.    They use Final Cut Pro X.  They may use

24    an audio editing program for getting rid of
```

84

1   background noises, I'm not sure, but the basic tool

2   that they use is Final Cut Pro X.

3          Q.    And that's a software tool?

4          A.    It's a software tool for Mac computers.

5          Q.    Where is the editing staff located?

6          A.    In our office.

7          Q.    Which I don't think I asked you about

8   this earlier.  Where is the office?

9          A.    It's in Mamaroneck, New York.

10         Q.    Is that office shared by Project Veritas

11  and PVA, I assume?

12         A.    Yes.

13         Q.    Is the Final Cut Pro X software that's

14  used to edit the videos also shared among Project

15  Veritas and PVA?

16         A.    Yes.

17         Q.    With the costs apportioned in some

18  fashion?

19         A.    Correct.

20         Q.    So, just speaking a bit more about the

21  office in Mamaroneck, is that where you keep your

22  office?

23         A.    No.  I was there, but I left there in

24  February of '17 and went to Indianapolis, a suburb

Russell Joseph Verney - April 4, 2017

86

1   that do not office in Mamaroneck.

2          Q.    So, the video is produced and edited

3   into a video report.  I assume somebody sees the

4   video report and approves it before it's finalized

5   for release?

6          A.    Yes.

7          Q.    Who is involved in that decision?

8          A.    Well, the executive producer is

9   primarily responsible for it.  He'll work in

10  collaboration with James O'Keefe and possibly the

11  undercover journalist who worked on the story.  Once

12  they're satisfied with it, with the draft, then I'll

13  run it by legal counsel.

14          Our communications director may review

15  it at that point too to see if he's got any

16  recommendations.  I think legal counsel is the main

17  outside set of eyes at that point other than those

18  who have been working and developing the story.

19         Q.    Then once the video report has been

20  approved for publication, how does Project Veritas

21  and PVA go about publishing it?

22         A.    Let's assume we decided that we wanted

23  to release a story today.  We prepare the story.  We

24  prepare a press release that announces the story.

Russell Joseph Verney - April 4, 2017

87

 1    We prepare e-mail messages to go out to our blast

 2    lists, our e-mail list, announcing the story.  We'll

 3    have a link back to our website or to our YouTube

 4    channel for the story.

 5            If we have time we'll talk with media

 6    outlets that might have a special interest in the

 7    story.  There are some that like to get an exclusive

 8    and make big story out of it.  They will get --

 9    we'll give them a story a half hour, an hour, before

10    we put out the press release to the entire media.

11            It's then sent out to the media.  It's

12    on our website.  Sent out to the media, sent out to

13    our supporters, and then we start posting notices of

14    it on social media, Facebook and Twitter and I think

15    Instagram.  Then our media staff will try and

16    arrange interviews depending on the story with local

17    or national media affected by or interested in the

18    story.

19        Q.    In order to call attention to the video

20    report?

21        A.    Yeah, the whole purpose is to educate

22    the public.  We don't advocate a solution.  Let's

23    say that we found out that the Massachusetts

24    Attorney General's Office does favors for friends

89

1  get the analytics.  We prefer that they come to our

2  site.

3          We've spent a lot of effort making our

4  site something that can sustain the onslaught.  When

5  it gets noticed on a form like Drudge, that can

6  generate tense of thousands of hits almost

7  instantly.

8      Q.    Does Project Veritas have a policy as to

9  releasing raw video underlying a video report?

10     A.    Yes.

11     Q.    What is that policy?

12     A.    We don't release it.

13     Q.    Does PVA have a policy?

14     A.    Same.  We don't release it.

15     Q.    I'm sorry?

16     A.    We don't release.  Project Veritas or

17  Project Veritas Action Fund does not release the

18  underlying raw video.  There are occasions where we

19  will provide it to somebody under a confidentiality

20  agreement.

21          For instance, we provided it to a joint

22  task force down in Washington, D.C., when we

23  discovered some planned illegal activity, what we

24  thought would be illegal activities that could harm

Russell Joseph Verney - April 4, 2017

1   people, and they used it as a basis for prosecution

2   in several criminal trials.

3       Q.    How long has that been the policy of

4   Project Veritas?

5       A.    Been the policy since I joined them in

6   the fall of 2014.

7       Q.    And likewise with Project Veritas Action

8   Fund, it's been this way as long as you've been

9   there?

10      A.    Yes.

11      Q.    That neither organization will release

12  raw video?

13      A.    Right.

14      Q.    Can we go back to Exhibit 3, the

15  organizational chart?

16      A.    Mm-hmm.

17      Q.    I want to make sure that I'm putting

18  pieces together correctly from what we've talked

19  about earlier this morning.  We spoke -- looking at

20  the second page, the organizational chart there, we

21  spoke pretty extensively about the president and CEO

22  and his responsibilities.  It looks like he has the

23  additional title of COO.

24      A.    Chief content officer.

98

1    for a recruiting and training staff role.  Is that

2    now filled by the gentleman who used to fill the

3    field director role?

4         A.    Correct.

5         Q.    And the recruiting and training role,

6    what does that involve?

7         A.    We have -- when I started there in 2014,

8    there were five of us and a couple remote

9    journalists.  There's now forty of us.  Somebody has

10   to recruit all those people.  They have to go

11   through various forms of advertising and attracting

12   applicants, weeding through the applications,

13   setting up the interviews, the interview process,

14   and if they're hired they have to go through the

15   on-boarding process with them.

16        Q.    Does that person have responsibility for

17   the journalist training program we spoke about

18   earlier, the one-week program?

19        A.    No, that's the field director and the

20   executive producer deal with that.

21        Q.    Before we go off the second page of

22   Exhibit 4, what we have in front of us is a PVA

23   organizational chart.  Fair to say that the Project

24   Veritas organizational chart is identical?

Russell Joseph Verney - April 4, 2017

99

```
1        A.    Yes.

2        Q.    Same roles filled by the same people?

3        A.    Yes.

4        Q.    Doing the same things?

5        A.    Yes.

6        Q.    Okay.  Are there any states right now

7   where Project Veritas/PVA does not conduct field

8   operations?

9        A.    Yes.

10       Q.    What states are those?

11       A.    Massachusetts.

12       Q.    Are any others?

13       A.    Maryland.  There are others that are

14  heavily restricted in what we can do.  Those are the

15  two we absolutely stay away from right now.  States

16  like Pennsylvania are difficult, but under certain

17  circumstances we can record.

18            It's just very tricky because we're

19  dealing with an undercover journalist who can be

20  tripping a criminal line.  We definitely don't want

21  them getting anywhere near that.  We don't want to

22  put them in a situation where they could be held

23  criminally liable for something.  The company, we

24  can assume our own risks, but we can't assume that
```

102

1        Q.    He was arrested for something else?

2        A.    Right.  And O'Keefe was not arrested for

3    surreptitious recording.  He was arrested for

4    entering a building under -- ultimately for entering

5    a building under false name.

6        Q.    I just want to wrap up what we've spoken

7    about.  I think we've covered a lot of this in our

8    conversation.  So, is it fair to say that Project

9    Veritas's operations are essentially interchangeable

10   with PVA's?

11       A.    Correct.

12       Q.    And fair to say that they're both --

13   Project Veritas and PVA are both putting a very

14   similar product out in the field in the form of

15   video report?

16       A.    Correct.

17                  (Marked Exhibit 5, Plaintiff's

18                  Responses to Defendant's First Set

19                  of Interrogatories)

20       A.    (Deponent viewing exhibit).

21             Okay.

22       Q.    So Exhibit 5 is a document entitled

23   "Plaintiff's Responses to Defendant's First Set of

24   Interrogatories."  Mr. Verney, have you had a chance

Russell Joseph Verney - April 4, 2017

1      Q.    I'm going to shut down the film that we

2  had up on the screen.  So, going back to Exhibit 5,

3  which was the interrogatory responses, can I ask you

4  to flip the page to page seven, please.

5            Interrogatory number 11 asks PVA to

6  identify each step they had taken in furtherance of

7  making any future recording in Massachusetts.  PVA's

8  response -- well, PVA's response is Plaintiff has

9  been aware of the unequivocal ban in GL Chapter 272,

10  Section 99, since 2015.  Because of this unequivocal

11  ban, its steps have been limited to monitoring

12  instances in Massachusetts, largely reports from

13  other news outlets, that it would investigate with

14  secret recording but for the ban.  Since March 2016

15  Plaintiff has engaged in a constitutional challenge

16  in an effort to overturn the unequivocal ban on

17  secret recording.  Have I read that correctly?

18      A.    Yes.

19      Q.    So setting aside the litigation

20  challenge, is it correct that PVA's steps in

21  furtherance of making future recordings in

22  Massachusetts have been limited to monitoring

23  instances in Massachusetts that it would investigate

24  with secret recording but for the ban?

117

```
 1          A.     Correct.
 2          Q.     And interrogatory number 12 asks for the
 3     identity of people with knowledge of those steps.
 4     Response to interrogatory 12 lists Mr. O'Keefe,
 5     Mr. Halderman, and yourself; right?
 6          A.     Yes.
 7          Q.     So, let me ask to your knowledge what
 8     has been Mr. O'Keefe's involvement with these steps
 9     of monitoring instances in Massachusetts where PVA
10     would use secret recording if not for this law?
11          A.     He's certainly aware of news reports.
12     He keeps current of all news reports that affect
13     things we might want to investigate.  He's aware of
14     investigations that are going around the country
15     that might have tentacles that come into the
16     Commonwealth.  He gets tips from people and
17     suggestions of things to investigate.  He's aware of
18     what we might be able to do but for the restriction
19     against secret recordings.
20          Q.     And for Mr. Halderman, are you aware of
21     what involvement Mr. Halderman has had in terms of
22     monitoring instances in Massachusetts where PVA
23     would record if not for this law?
24          A.     Similar to what James O'Keefe had that
```

Russell Joseph Verney - April 4, 2017

118

1    he receives tips, he monitors news reports and from

2    other investigations we have ongoing that would lead

3    to an opportunity to investigate within

4    Massachusetts but for the law.

5         Q.    I suppose I should ask the same

6    question.  What do you know about instances in which

7    PVA would have recorded or would record in

8    Massachusetts if not for this law?

9         A.    My sources would be the same, general

10   news reports that I monitor, and I have a little

11   infinity for the Commonwealth having been born and

12   brought up here.  The leads from other

13   investigations and tips that we receive, I see them

14   come into our information e-mail box on the website

15   about potential investigations that should be run in

16   Massachusetts.

17        Q.    I'm sorry, let me back up on that last

18   part a bit.  You mentioned a tips mailbox.

19        A.    Mm-hmm.

20        Q.    What is that?

21        A.    It's Info@ProjectVeritas.  People send

22   in all kinds of things like my divorce went wild and

23   it was the judge's fault, please investigate him.

24   Occasionally there's decent story leads in there,

119

1    but for the most part it's personal grievances that

2    people want investigated.

3         Q.    Sure.  But some of the tips you

4    mentioned that come through there have presented

5    opportunities to do secret recording in

6    Massachusetts?

7         A.    Yep.

8         Q.    How many such tips do you recall?

9         A.    Two or three having to do with voter

10   registration going over the border into

11   New Hampshire during the first presidential primary

12   where they don't have a residency requirement and

13   people registering to vote illegally in

14   New Hampshire.

15        Q.    I'm sorry, you're saying New Hampshire

16   doesn't have a residency requirement?

17        A.    Correct.

18        Q.    Okay.  And you said that there were two

19   or three tips involving that issue that presented an

20   opportunity to do secret recording in Massachusetts?

21        A.    Yeah, they were urging us to go to the

22   sources where people organized people to go to

23   New Hampshire and try to record them doing the

24   organization within the Commonwealth.

120

1       Q.    Okay.  When did PVA receive those tips?

2       A.    It would have been in the fall, summer

3   or fall of 2016.

4       Q.    And did PVA do anything in response to

5   those tips?

6       A.    No.

7       Q.    Did those tips identify a specific place

8   in Massachusetts where this voter organization was

9   occurring?

10      A.    No.

11      Q.    Did those tips identify specific people

12  who PVA could talk to to learn more about these

13  events?

14      A.    No.

15      Q.    And so had PVA chosen to follow up on

16  these tips, what would it have done?

17      A.    Had we chosen to follow up on that,

18  because we were already in New Hampshire we would

19  have our journalist try to find indications of who

20  the organizers are.

21            At the same time, we would start sending

22  undercover journalists in to Democratic activists

23  organizations because these were Democrats we were

24  talking about for the first in the nation

121

1    presidential primary.

2              We would have our undercover journalists

3    go into nonprofit or state party organizations or

4    campaign organizations in the Commonwealth and see

5    what they could find, see if they can identify where

6    it's actually happening, if it was happening where

7    it was happening.

8         Q.    Outside of those, I think you said it

9    was two or three tips that concerned activities in

10   Massachusetts or alleged activities in Massachusetts

11   related to the New Hampshire primary, has PVA

12   received other tips that would have presented an

13   opportunity to do secret recording in Massachusetts?

14        A.    Through that info line, I don't recall

15   any others, no.

16        Q.    Okay.  So, including the things learned

17   from media reports that PVA might have liked to have

18   followed up on and including the allegations

19   received through the tip line, the info line, does

20   PVA keep any documentation of these missed

21   opportunities to record in Massachusetts?

22        A.    No.

23        Q.    Wouldn't keep a copy of the e-mail

24   received through the tip line?

122

1          A.     No, if we didn't pursue it, no.

2          Q.     Now, the interrogatory, this is on page

3    seven of Exhibit 5, the first sentence of the

4    response to interrogatory number 11 says that PVA

5    became aware of Chapter 272, Section 99, in 2015; is

6    that right?

7          A.     Correct.

8          Q.     And that sentence also characterizes

9    272, Section 99, as an unequivocal ban on secret

10   recording.  Is that how you would characterize that

11   statute?

12         A.     Yes.

13         Q.     Do you recall when in 2015 you became

14   aware of 272, Section 99?

15         A.     No.

16         Q.     But in your role as executive director

17   with responsibility for compliance, you would have

18   been -- if anybody at PVA knew about it, you would

19   have; right?

20         A.     Yes.  As we were planning our 2016

21   Project Veritas Action activities, we would have

22   been aware of it then.

23         Q.     And when you speak about 2016 PVA

24   activities, is one of those planned activities

132

1       A.    No, we did not get to the phase where we

2   would decide whether it would be a long-term or

3   short-term investigation, and again we don't set

4   specific budgets for them.

5       Q.    And so did Mr. O'Keefe approve this

6   investigation as something that PVA would do if not

7   for the Massachusetts law?

8       A.    He wanted me to find if there was any

9   way permissible under Massachusetts law that we

10  could launch this investigation.  The answer was no,

11  but for the law we would have done it.  But for the

12  law we would have initiated the investigation.

13      Q.    And besides these discussions with

14  Mr. Halderman and Mr. Constanza you mentioned and

15  Mr. O'Keefe, did PVA make any other preparations for

16  this investigation?

17      A.    I'm not aware of any.

18      Q.    So, moving on to the second

19  investigation that's mentioned by interrogatory,

20  government officials including police officers,

21  legislators, or members of the Massachusetts Office

22  for Refugees and Immigrants and their positions on

23  sanctuary cities, were you involved in that

24  potential investigation?

133

1       A.    Yes.

2       Q.    And what was your involvement?

3       A.    Again, our conclusion was it was

4    something well worth investigating but for the law

5    that precluded us going in undercover.

6       Q.    Who participated in reaching that

7    conclusion?

8       A.    It would have been myself, Joe

9    Halderman, and Ken Constanza, I believe.

10      Q.    And similar to the last investigation we

11   discussed, was that a face-to-face conversation?

12      A.    Yes.

13      Q.    With the three of you there; you,

14   Mr. Halderman, and Mr. Constanza?

15      A.    Yes.

16      Q.    Where did that --

17      A.    My belief is that Mr. Constanza was

18   there.

19      Q.    Where did that conversation take place?

20      A.    In our office in Mamaroneck, New York.

21      Q.    Was it just one conversation or more

22   than one?

23      A.    It was several.

24      Q.    When did they take place?

134

1        A.    I don't recall the exact date, but

2   sanctuary cities had become a national issue, and

3   there was reporting of certain incidents here in the

4   Commonwealth we felt required to open the door for

5   us to follow up on.

6        Q.    If these conversations that you had

7   within PVA took place after sanctuary cities

8   achieved national prominence as an issue, is it fair

9   to say that these conversations happened after the

10  2016 presidential election?

11       A.    It could have been before.  It was an

12  issue before.  Sanctuary cities have been an issue

13  for years with -- just haven't captured the national

14  attention that has been brought to them since the

15  2016 campaign.

16       Q.    Was Mr. O'Keefe briefed on this

17  potential investigation into sanctuary cities?

18       A.    My belief is yes.

19       Q.    In these discussions, I mean, I think

20  you just said sanctuary cities is a national issue;

21  right?

22       A.    Correct.

23       Q.    Why did you and Mr. Constanza and

24  Mr. Halderman choose to focus on Massachusetts for

135

1    an investigation?

2        A.    Based on some reports that had surfaced

3    associated with Massachusetts, we felt it was a very

4    opportune target for us at that time.

5        Q.    What reports were those?

6        A.    I don't recall them offhand, but there

7    was some reports that we received from various

8    sources.

9        Q.    Do you recall anything about what these

10   reports were about?

11       A.    No.

12       Q.    Do you recall from where they were

13   received by PVA?

14       A.    No.

15       Q.    And so this potential investigation

16   about sanctuary cities, how many meetings did you

17   say you had with Mr. Halderman and Mr. Constanza to

18   discuss these?

19       A.    It probably came up in two or three

20   different meetings.  Again, the door was closed

21   because we were prohibited from undercover reporting

22   in Massachusetts.

23       Q.    Did Mr. O'Keefe participate in those

24   meetings?

Russell Joseph Verney - April 4, 2017

136

1        A.     To the best of my knowledge, no.

2        Q.     Do you know whether he was briefed on

3   this potential investigation?

4        A.     Yes.

5        Q.     Did this potential investigation get to

6   the point that the field director and executive

7   producer wrote one of those planning memos for the

8   potential investigation?

9        A.     No, never got to that stage.  It was

10  precluded by the prohibition of undercover recording

11  in the Commonwealth.

12       Q.     Did it get to the point that a member of

13  PVA's journalistic staff was assigned to it?

14       A.     No, it was precluded to that level

15  because of the prohibition of undercover recording

16  in the Commonwealth.

17       Q.     Were specific targets identified within

18  Massachusetts?

19       A.     There were starting areas that were

20  discussed, but no individuals.

21       Q.     What were those starting areas?

22       A.     As I recall, it was an immigration

23  organization, an immigrant advocacy organization or

24  resettlement organization.  I don't really recall

Russell Joseph Verney - April 4, 2017

137

1    the specifics of it.  That would be the first step

2    to getting in, learning what is going on and where

3    it's going on.

4         Q.    But no individuals were identified as

5    targets?

6         A.    I don't recall any.

7         Q.    Was there any planning about how to gain

8    access to this advocacy organization you mentioned a

9    moment ago?

10        A.    No, because it was precluded by the

11   prohibition of undercover recording in the

12   Commonwealth.

13        Q.    Were any specific locations identified

14   as places that you might otherwise want to do secret

15   recording?

16        A.    No, it was precluded by the prohibition

17   of undercover recording in the Commonwealth.

18        Q.    With respect to this potential

19   investigation into sanctuary cities, were any

20   preparations made for such an investigation other

21   than the conversations between you and Mr. Halderman

22   and Mr. Constanza you described?

23        A.    No, they were precluded because of

24   prohibition of undercover recording in the

138

1    Commonwealth.

2         Q.    The next potential investigation that

3    the interrogatory mentions is protest management

4    efforts for the Antifa protest in downtown Boston on

5    August 19, 2017, that would focus on private

6    individuals and public officials.  Were you involved

7    in consideration of that potential investigation?

8         A.    Yes.

9         Q.    What did your involvement consist of?

10        A.    Whether or not we should try to embed

11   one or more journalists into the Massachusetts

12   office of Antifa that was involved in the planning

13   process of that event.  We were precluded because of

14   prohibition of undercover recording in

15   Massachusetts.

16        Q.    Where did that idea come from to embed a

17   journalist with this Antifa organization in

18   Massachusetts?

19        A.    It came from leads in other states of

20   Antifa or Antifa related organizations in other

21   states.

22        Q.    By the way, just so the record is clear,

23   what is Antifa?

24        A.    Antifa is -- I don't even --

Russell Joseph Verney - April 4, 2017

1    journalists were working in New Hampshire, see e.g.

2    Australian Labor Party Assisting Democratic U.S.

3    Campaigns in Violation of Campaign Finance Laws.  It

4    includes a link to a Project Veritas Action video

5    report.

6          A.    Mm-hmm.

7          Q.    Were you involved in that investigation?

8          A.    Yes.  I'm sorry, which is that

9    investigation?

10         Q.    Well, that's a good question.  First of

11   all, where the interrogatory response speaks about

12   using secret recording to investigate political

13   campaigns in Suffolk County, was that opportunity to

14   use secret recording in Suffolk County part of the

15   investigation for this video report that's mentioned

16   right afterwards?

17         A.    I believe I mentioned earlier that we

18   had suggestions that people were coming, being

19   brought in from out of state and potentially going

20   to be registering to vote in New Hampshire.  That

21   was all part of the investigation that led to the

22   report of the Australian Labor Party people working

23   for the Bernie Sanders campaign.  It was a separate

24   idea from what was finally reported, but it all came

152

1  out of the same universe.  That did not happen

2  because of the prohibition of undercover recording.

3       Q.    Let's talk more broadly about the

4  investigation that resulted in this video report

5  about the Australian Labor Party.  Have you reviewed

6  that video report recently?

7       A.    Yeah.

8       Q.    And I'm going to put it up on the screen

9  here.  If you've reviewed it recently, I won't play

10  the whole thing, but just skip to specific parts of

11  that.  Is that okay?

12       A.    That's fine with me.

13       Q.    And so we're looking at Exhibit 6, which

14  is the CD that we marked earlier today.  Can you see

15  up on the screen in the conference room here I have

16  the file directory for that CD that's been marked as

17  Exhibit 6?

18       A.    I see it.

19       Q.    Okay.  And the file folder title

20  interrogatory nine?

21       A.    Yes.

22       Q.    And I'm going to click to open an MP4

23  file whose title begins Australian Labor Party.

24       A.    Okay.

153

1           MR. KLEIN:  Eric, if it's choppy

2           again, I don't object to you dragging

3           the file onto the hard drive and playing

4           it directly.  We had some trouble with

5           choppiness last time.  This is going to

6           have audio, I assume.  Maybe this will

7           be better.

8           MR. HASKELL:  Sure, let's do that

9           then.

10     Q.    So we have up on the screen here ready

11  to play the video file titled, "Australian Labor

12  Party Assisting Democratic U.S. Campaigns in

13  Violation of Campaign Finance Laws."  Do you

14  recognize this video report?

15     A.    Yes.

16     Q.    This was a video report that was

17  published by Project Veritas Action?

18     A.    Yes.

19     Q.    Just to set the table, is it fair to say

20  that the video report consists in large part of

21  secret recordings taken by a PVA journalist of her

22  interactions with other people?

23     A.    Correct.

24     Q.    Okay.  I'm going to bring the movie

154

1    forward and pause it at 2:20.  There we go.  So can

2    you see up on the screen we have the video paused at

3    time stamp 2:20?

4         A.    Yes.

5                    (Marked Exhibit 14, Screen Shot)

6    BY MR. HASKELL:

7         Q.    What we've marked as Exhibit 14,

8    Mr. Verney, fair to say that's a screen shot from

9    the Australian Labor Party video?

10        A.    Yes.

11        Q.    And it's, I think, a couple frames off,

12   but more or less what we're looking at on the screen

13   in the conference room here?

14        A.    Yes.

15        Q.    Okay.  So, the scene that's depicted up

16   on the screen in the conference room and also in

17   Exhibit 14, where is that?

18        A.    That's an office in Manchester,

19   New Hampshire, I believe.

20        Q.    Office of whose?

21        A.    I believe it's Bernie Sanders for

22   President or Bernie for President.  I don't recall

23   the official name.

24        Q.    Is it fair to say that a PVA journalist

155

1    in an undercover capacity had obtained access to

2    this office of Bernie Sanders to make this video?

3         A.    Correct.

4         Q.    And that PVA journalist, it was a woman;

5    right?

6         A.    Yes.

7         Q.    How did she get access to the Bernie

8    Sanders campaign headquarters?

9         A.    She offered to volunteer.

10        Q.    Had she been volunteering for the Bernie

11   Sanders campaign before she took this assignment on

12   behalf of PVA?

13        A.    No.

14        Q.    And so I take it the campaign accepted

15   her offer to volunteer?

16        A.    Yes.

17        Q.    How long did she work with them?

18        A.    I don't recall how long it was.  Off and

19   on for a day here a day there for over a couple

20   weeks.  It wasn't forty hours a week.  It was

21   sporadic.

22        Q.    Do you know what kind of work she was

23   asked to do for the campaign?

24        A.    She was asked to do some canvassing, I

156

1    believe, and some office work.

2         Q.    She did so?

3         A.    Yes.

4         Q.    I think we spoke before the break about

5    a reporter or a journalist's legend, their kind of

6    cover.  What did this journalist use in the way of a

7    legend or cover to get access to the Sanders

8    campaign?

9         A.    I don't recall specifically.  It would

10   have been an alias name and probably a student on

11   break from a college looking to get involved.  I

12   don't recall specifically.

13        Q.    The journalist who made this video that

14   we're looking at, was she a college student at the

15   time?

16        A.    Not at the time, no.

17        Q.    I'm going to skip ahead in the same

18   video file entitled "Australian Labor Party" on

19   Exhibit 6.  I'm going to skip ahead to time stamp

20   4:59.  I'll play the last couple seconds leading up

21   to that, okay.

22                    (Video played)

23                    (Marked Exhibit 15, Screen Shot)

24   BY MR. HASKELL:

157

1          Q.    So, Mr. Verney, what's been marked as

2     Exhibit 15, do you recognize that as a still of the

3     portion of the video file that we have up on the

4     conference room display here?

5          A.    Yes.

6          Q.    And it more or less depicts what we see

7     in the film at this portion; right?

8          A.    Yes.

9          Q.    And fair to say that this segment of the

10    video report depicts a conversation between an

11    undercover PVA journalist and a woman named Rebecca

12    Doyle?

13         A.    Correct.

14         Q.    At least Rebecca Doyle says is a

15    volunteer from Australia?

16         A.    Correct.

17         Q.    Was this raw video made by the same

18    journalist who recorded the segment that we looked

19    at in Exhibit 14?

20         A.    I don't know.

21         Q.    Do you know how many undercover

22    journalists PVA had with the Bernie Sanders campaign

23    in New Hampshire at this time?

24         A.    I don't know.  More than one.

158

1          Q.     Do you know, the segments that we have

2     up on the screen and also in Exhibit 15, do you know

3     where that video was made?

4          A.     I believe it's the same office in

5     Manchester, New Hampshire, for both videos.

6          Q.     And is it your understanding that this

7     woman who was recorded, Rebecca Doyle, was a fellow

8     volunteer for the Bernie Sanders campaign?

9          A.     Yes.

10          Q.     Did she know that she was being

11     recorded?

12          A.     No.  Let me rephrase that.  As far as I

13     know she did not.  She was not supposed to know.

14          Q.     Sure.  Turning back to the Australian

15     Labor Party video, we're going to skip ahead to time

16     stamp 7:05.  Keep going.  One frame too far.

17                         (Video played)

18                         (Marked Exhibit 16, Screen Shot)

19     BY MR. HASKELL:

20          Q.     So, Mr. Verney, what's been marked

21     Exhibit 16, do you recognize that as a screen shot

22     from the Australian Labor Party video that we have

23     up on the screen in the conference room here?

24          A.     Yes.

Russell Joseph Verney - April 4, 2017

163

1     that conversation with Mr. Pelletier?

2          A.     No.

3          Q.     Do you know where Mr. O'Keefe was when

4     he had that conversation?

5          A.     He was in New York at that time.

6          Q.     In Project Veritas --

7          A.     In his office.

8          Q.     PVA?

9          A.     In his office in Mamaroneck, New York.

10         Q.     Do you know how Mr. O'Keefe introduced

11    himself to Mr. Pelletier at the beginning of the

12    call?

13         A.     I do not.

14         Q.     Do you know whether Mr. O'Keefe

15    introduced himself as James O'Keefe of Project

16    Veritas Action?

17         A.     I do not.

18         Q.     I'm going to shut down the video now.

19    We're through looking at that one.

20                Going back to the interrogatory response

21    that got us talking about that particular

22    investigation, how did this investigation offer PVA

23    an opportunity to conduct secret recording in

24    Massachusetts?

164

1        A.    When they were working in the

2   Manchester, New Hampshire, area, there was a lot of

3   talk about the support that they were receiving out

4   of Massachusetts and plans for future report.  We

5   wanted to follow up.  There were people from

6   New Hampshire that believed that there was support

7   coming from Massachusetts.

8              What we picked up from the campaign is

9   that they coordinate with them.  They bring

10  volunteers.  How far do the volunteers go is

11  something we would have liked to investigate.  We

12  were unable to get into the organization of it down

13  here because of the prohibition of undercover

14  recording.

15       Q.    So, in their undercover capacity posing

16  as a volunteer for the Bernie Sanders campaign, the

17  PVA journalist learned that some other volunteers

18  for the Bernie Sanders campaign were coming from

19  Massachusetts?

20       A.    Correct.

21       Q.    Did you learn anything else about these

22  Sanders volunteers from Massachusetts?

23       A.    We did not learn anything specific about

24  them.  We had reports from people in New Hampshire

165

1   that nefarious things might go on, but we were never

2   able to document it.

3         Q.    And nefarious things, was that

4   allegation of nefarious things connected to the

5   volunteers in Massachusetts?

6         A.    Yes, connected to voter registration and

7   voting.

8         Q.    What was that allegation?

9         A.    People were being bussed in from out of

10  the state to register to vote and to vote in the

11  presidential primary in New Hampshire.

12        Q.    I see.  Based on the information that

13  PVA received that you just described, was PVA able

14  to identify specific individuals in Massachusetts

15  who it would otherwise have gone to record?

16        A.    No, we did not invest any resources into

17  it because we could not record in Massachusetts.

18        Q.    Did PVA identify specific places that it

19  might have conducted recording if not for the

20  Massachusetts statute?

21        A.    I don't know that.

22        Q.    Okay.  Did PVA consider the possibility

23  of secretly recording these folks from Massachusetts

24  after they had come in to New Hampshire to do what

166

1    they were going to do?

2         A.    It was a possibility, but by the time

3    they got to New Hampshire, they're spread out all

4    over the state.  We didn't have that many people

5    around the state.  You would have to find them on

6    the day they're registering or voting.  It's a huge

7    logistical problem at that end.  It's an easy

8    logistical problem if you can go to the organization

9    where they're preparing to go, planning to go.

10        Q.    Did this aspect, the Massachusetts

11   aspect of the PVA's work on the Bernie Sanders

12   campaign, did that result in any planning memo for

13   recording these Massachusetts related activities?

14        A.    No, it was precluded by the fact we

15   couldn't record in Massachusetts legally.

16        Q.    Who was involved in PVA's decision not

17   to pursue this lead?

18        A.    Joe and I for sure.  I don't know

19   anybody else.  We can't record in the state of

20   Massachusetts.  We'd love to do it, love to try to

21   find a way for you, but it's not going to happen.

22        Q.    Going back to Exhibit 5, the

23   interrogatory response.

24        A.    Yep.

Russell Joseph Verney - April 4, 2017

180

1      Q.    The relative, what was her relation to
2  Mr. Dudich?
3      A.    My memory of is not that clear.  Joe
4  Halderman will be able to answer those questions
5  better for you.
6      Q.    Okay.  Do you know where the relative
7  was located?
8      A.    In the greater Boston area, but I don't
9  know specifically where.
10     Q.    Okay.  But the journalist -- was it one
11  or more than one Project Veritas journalist?
12     A.    I don't -- there was at least one.
13  There may have been more.  Joe Halderman would be
14  somebody that could answer that for you.
15     Q.    Okay.  Do you know where the journalist
16  or journalists made contact with this relative of
17  Mr. Dudich?
18     A.    No, I don't.
19     Q.    Mr. Halderman would?
20     A.    Yes.
21     Q.    Are you familiar with an investigation
22  that Project Veritas or PVA -- I'm not sure who --
23  conducted into the AFT Michigan?
24     A.    Yes.

181

1     Q.    AFT Michigan is the local chapter of the

2  American Federation of Teachers?

3     A.    Yes.

4     Q.    Was that a Project Veritas or PVA

5  investigation?

6     A.    We have not admitted in litigation that

7  we did an investigation out there.  If we had done

8  an investigation, it would have been done by PV, not

9  PVA.

10     Q.    So, you mentioned a moment ago that you

11  are familiar with that investigation.  What was your

12  involvement with it?

13     A.    Same with all investigations, once we

14  start looking into some subject, I do the review of

15  it with the attorneys and make sure that our

16  undercover agents are familiar with what their

17  procedures should be so that they don't violate any

18  laws within the state they're operating in, same as

19  with all those videos we just saw.

20     Q.    Did a Project Veritas journalist succeed

21  in gaining access to folks at AFT Michigan?

22     A.    AFT Michigan has claimed, I believe,

23  that somebody who was associated with Project

24  Veritas at one time had access and they believe that

182

1    because she had jewelry on that she did undercover

2    recording.  No story has ever been released and

3    we've never admitted to any of that.

4         Q.    I guess that's what I'm asking you now.

5    Did the PV journalist succeed in gaining access to

6    folks at AFT Michigan?

7         A.    Yes.

8         Q.    What was that person's cover?  How did

9    she do so?

10        A.    She got invited in as an intern.

11        Q.    Did she seek an internship at AFT

12   Michigan?

13        A.    I think it was offered to her by

14   somebody in AFT not in that -- in that statewide

15   office.  Somebody in Michigan AFT recommended her to

16   the state organization as an intern.

17        Q.    Did this person have to provide

18   credentials in order to begin working that

19   internship --

20        A.    No.

21        Q.    -- at AFT Michigan?

22        A.    No.

23        Q.    Did she have to provide a name?

24        A.    Yes.

183

1          Q.    And did she give her true name?

2          A.    No.

3          Q.    Did she have to provide any information

4     about her background?

5          A.    May have.  I don't know.

6          Q.    Do you know who would know?

7          A.    Joe might know what she had for a

8     legend.  Joe Halderman might know what she had for a

9     legend and whether or not she was required to

10    provide any information to them, whether it was

11    verbal or written.  I don't think she ever provided

12    written information to them.

13         Q.    This Project Veritas reporter in the

14    course of acting the part of an intern at AFT

15    Michigan, did she then make surreptitious recording

16    of folks she encountered at the office of AFT

17    Michigan?

18         A.    We've never admitted that she has, but,

19    yes, she did.

20                   THE WITNESS:  Excuse me a minute.

21            Can I consult with Steve?

22                   MR. HASKELL:  Absolutely.  Why

23            don't we call a quick break, and you can

24            step into the break room.