# In The Matter Of:

*Project Veritas Acton Fund  v.*
*Daniel F. Conley, et al.*

---

*James O' Keefe*
*April 9, 2018*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Original File James E. O'Keefe 4-9-18.txt
Min-U-Script® with Word Index

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                    EASTERN DIVISION

4                         C.A. No. 1:16-cv-10462-PBS

5

6    PROJECT VERITAS ACTION FUND,

7                    Plaintiff,

8            vs.

9    DANIEL F. CONLEY, in his

10   official capacity as Suffolk

11   County District Attorney,

12                    Defendant.

13

14           DEPOSITION OF JAMES E. O'KEEFE, III,

15   individually and as corporate designee of Project

16   Veritas Action Fund, a witness called on behalf of

17   the Defendant, taken pursuant to the applicable

18   provisions of the Federal Rules of Civil Procedure

19   before Cynthia A. Powers, Professional Shorthand

20   Reporter and Notary Public in and for the

21   Commonwealth of Massachusetts, at the Office of the

22   Attorney General, One Ashburton Place, Boston,

23   Massachusetts, on Thursday, April 9, 2018,

24   commencing at 9:02 a.m.

2

1   APPEARANCES:

2           Stephen Klein, Esquire

3           500 Madison Street, No. 419

4           Alexandria, Virginia 22314

5           (734) 233-1705

6           Representing the Plaintiff

7

8           Eric A. Haskell, Esquire

9           Matthew Landry, Esquire

10          The Commonwealth of Massachusetts

11          Office of the Attorney General

12          One Ashburton Place, 19th Floor

13          Boston, Massachusetts 02108

14          (617) 963-2855

15          Representing the Defendant

16

17

18

19

20

21

22

23

24

3

```
 1                    I N D E X

 2                                               Page

 3   Examination by Mr. Haskell                    5

 4   Afternoon Session

 5

 6                  E X H I B I T S

 7   Number                                      Page

 8   Exhibit 50     Transcript of the Videotaped  11

 9                  Deposition of James O'Keefe,

10                  III, 3/15/12

11   Exhibit 51     Transcript titled "San Diego" 14

12   Exhibit 52     DVD titled "Early Films"      16

13   Exhibit 53     Screen Shot                   18

14   Exhibit 54     Screen Shot                   20

15   Exhibit 55     Screen Shot                   43

16   Exhibit 56     Screen Shot                   49

17   Exhibit 57     Screen Shot                   52

18   Exhibit 58     Screen Shot                   53

19   Exhibit 59     Screen Shot                   55

20   Exhibit 60     Screen Shot                   56

21   Exhibit 61     Screen Shot                   59

22   Exhibit 62     Screen Shot                   60

23   Exhibit 63     Screen Shot                   63

24   Exhibit 64     Screen Shot                   65
```

4

1                    E X H I B I T S (Cont.)

2    Number                                        Page

3    Exhibit 65      Screen Shot                    71

4    Exhibit 66      Screen Shot                    74

5    Exhibit 67      Screen Shot                    75

6    Exhibit 68      Screen Shot                    80

7    Exhibit 69      Screen Shot                    80

8    Exhibit 70      Screen Shot                    80

9    Exhibit 71      Screen Shot                    81

10   Exhibit 72      Letter, Jordan to O'Keefe      92

11   Exhibit 73      Letter, Jordan to Project      93

12                   Veritas Action Fund

13   Exhibit 74      Federal Election Commission    95

14                   Documents

15   Exhibit 75      Complaint                      123

16   Exhibit 76      Excerpts from "American Pravda" 124

17

18            (Exhibits retained by Mr. Haskell)

19

20

21

22

23

24

James O' Keefe - April 9, 2018

5

1                 P R O C E E D I N G S

2                 JAMES E. O'KEEFE, III,

3

4           having been satisfactorily identified

5            and duly sworn by the Notary Public,

6          was examined and testified as follows:

7

8                    DIRECT EXAMINATION

9   BY MR. HASKELL:

10        Q.    Mr. O'Keefe, good morning.

11        A.    Good morning.

12        Q.    Thanks for coming up here today.  We met

13   in the hallway a moment ago.  My name is Eric

14   Haskell.  I'm assistant attorney general.  I

15   represent the Defendant in this case, so in effect

16   the state of Massachusetts, and I'm going to ask you

17   some questions today.

18        A.    Sounds good.

19        Q.    Can I ask you to just state your name

20   for the record?

21        A.    James O'Keefe.

22        Q.    Is that your full name?

23        A.    James Edward O'Keefe, III, is my full

24   name.

James O' Keefe - April 9, 2018

24

1        Q.    *So, that portion of in the transcript
2    you testified about earlier where Ms. Giles asked
3    Mr. Vera if he was recording the conversation, that
4    doesn't appear here in the published film, does it?
5        A.    Repeat your question.
6                (Record read)
7        A.    I don't believe it does.
8        Q.    Okay.  We will shut down the ACORN film
9    on the screen here.  Where is your office,
10   Mr. O'Keefe?
11       A.    It's in Mamaroneck, New York.
12       Q.    What's the address?
13       A.    135 Hoyt Avenue.
14       Q.    What's the difference between -- well,
15   excuse me.  Are Project Veritas's offices located at
16   135 Hoyt Avenue?
17       A.    Correct.
18       Q.    Are PVA's office located at 135 Hoyt
19   Avenue?
20       A.    Correct.
21       Q.    What's the relationship between the Hoyt
22   Avenue office and the office on, I think it was West
23   Boston Post Road?
24       A.    The Boston Post Road address is our P.O.

James O' Keefe - April 9, 2018

1   Box.

2        Q.    I see.  So, the physical office is at

3   135 Hoyt Avenue?

4        A.    Correct.

5        Q.    Does Project Veritas have any other

6   physical offices other than Hoyt Avenue?

7        A.    No.

8        Q.    Does Project Veritas Action have any

9   other physical offices?

10       A.    No.

11       Q.    Do you regularly come to Massachusetts

12  to do business in person?

13       A.    Define regular.

14       Q.    How often do you come to Massachusetts

15  to do business in person?

16       A.    About twice a year maybe.

17       Q.    What kind of things were you up here?

18       A.    I would have to think.  I would have to

19  recollect recent years.  Fundraising activities,

20  events in New Hampshire, investigative work in

21  New Hampshire, at the very least.

22       Q.    Anything else?

23       A.    Yes, but I don't remember every activity

24  beyond that.

James O' Keefe - April 9, 2018

27

```
 1        A.    Yes.
 2        Q.    And then I understand in 2014 Project
 3   Veritas Action -- can we call Project Veritas Action
 4   PVA?
 5        A.    Yes.
 6        Q.    In 2014 I understand PVA was created?
 7        A.    Yes.
 8        Q.    Did you play a role in creating PVA?
 9        A.    Yes.
10        Q.    What role was that?
11        A.    I should say oversight.  I authorized
12   Russ Verney, my executive director, to carry out
13   most of the responsibilities in its creation.
14        Q.    Since PVA was created in 2014, have you
15   had a role with that entity as well?
16        A.    Yes.
17        Q.    What's your title at PVA?
18        A.    Well, I'm the chairman of the board.
19        Q.    Any other titles?
20        A.    I have to check my board minutes just to
21   make sure I'm completely accurate here, but
22   president, CEO.
23        Q.    What are your responsibilities as board
24   chairman, president, and CEO of Project Veritas
```

James O' Keefe - April 9, 2018

28

1   Action?

2        A.    Four primarily responsibilities.

3   Typically those include fundraising, external --

4   external, like, speeches; media appearances --

5   fundraising, external -- three, undercover

6   journalism and production.  That's three.  And the

7   fourth, let's see, fundraising, external, UCJ,

8   undercover journalism and production oversight.

9   There's one more.  It's escaping me, but it will

10  come to mind in a minute, I guess.

11       Q.    Let's talk through those.  Starting with

12  undercover journalism, what work do you do with

13  respect to PVA's undercover journalism activities?

14       A.    I would say I'm a creative director, and

15  I provide oversight and direction for the various

16  projects that we do.

17       Q.    Do you work with Mr. Halderman --

18       A.    Yes.

19       Q.    -- in that respect?

20       A.    Yes.

21       Q.    In your own words, what is

22  Mr. Halderman's role with respect to the UCJ work

23  that PVA does?

24       A.    He's an executive producer.  He's

James O' Keefe - April 9, 2018

29

1    responsible for carrying out projects, oversight

2    over certain projects, assembling the footage into

3    what we call a storyboard so that it's consumable to

4    the audiences that we produce the stories to.

5           Q.    Do you exercise the same level of

6    detailed oversight over the undercover journalism

7    operations as Mr. Halderman?

8           A.    Sometimes I do.  Sometimes I authorize

9    him completely to be responsible for the majority of

10   the work.  In some cases I get more involved

11   depending on what the video is.

12          Q.    With respect to, for instance, are you

13   familiar with the investigation that led to a video

14   report on Nicholas Dudich?

15          A.    Yes.

16          Q.    Is that one where you were involved in

17   the day-to-day details or where you more left it to

18   Mr. Halderman?

19          A.    It's not black or white.  It's not yes

20   or no.  It's a percentage degree involved in some of

21   those things.  Usually I'm involved at least a

22   little bit, but in some cases he's responsible for

23   the majority or the vast majority of oversight of

24   the project.

1        Q.     How would you characterize the level of

2   Mr. Halderman's level of oversight in the Dudich

3   project?

4        A.     He was very involved.

5        Q.     Is it fair to say that Mr. Halderman was

6   the day-to-day detail guy on the Dudich project?

7        A.     Yes.

8        Q.     What's your title at Project Veritas?

9        A.     President and CEO.

10       Q.     Are your responsibilities at Project

11  Veritas any different from your responsibilities at

12  PVA?

13       A.     Same scope of responsibilities.  The PVA

14  work is mostly centered around election related

15  investigative work whereas Project Veritas's work

16  usually focuses on nonelection subjects of

17  investigation.

18       Q.     Notwithstanding the difference in

19  subjects of investigation, how would you compare

20  Project Veritas's methods and techniques to those of

21  PVA?

22       A.     They're similar.

23       Q.     Are they different in any way?

24       A.     Not if you -- not -- notwithstanding the

James O' Keefe - April 9, 2018

1    subjects because PVA focuses mostly on campaigns,

2    politicians, whereas Project Veritas focuses on

3    broader educational issues.

4         Q.    But the methods and techniques that each

5    organizations uses is the same, just different

6    subject matter?

7         A.    Correct.

8         Q.    How many hours a week would you say you

9    spend doing work wearing your Project Veritas hat?

10        A.    It's never -- there's never a typical

11   week or a consistent number.

12        Q.    Let's look at it more broadly.  Say over

13   the course of the year, what portion of your time is

14   spent on Project Veritas work versus spent on PVA

15   work?

16        A.    It could be as wide of a margin as

17   80/20, or 80 percent on Project Veritas, 20 percent

18   on Project Veritas Action, or it could be something

19   to the effect of 65 percent on Project Veritas and

20   35 percent on Project Veritas Action over the course

21   of a year.

22        Q.    Is it fair to say the focus of both

23   Project Veritas and PVA's work is undercover

24   journalism?

James O' Keefe - April 9, 2018

32

1          A.     Correct.

2          Q.     How did PVA in particular go about

3    undercover journalism?

4          A.     We secretly record people because

5    sometimes that's when they are the most honest.

6          Q.     Do you commonly -- excuse me, does PVA

7    commonly openly record people?

8          A.     We sometimes openly record people.

9          Q.     How often?

10         A.     I don't want to give you a misleading

11   estimation, so I don't know the answer to that.

12         Q.     Would you say it's happened more than

13   one time --

14         A.     Yes.

15         Q.     -- this calendar year?

16         A.     This calendar year, 2018, probably not

17   since we haven't entered election season yet.

18         Q.     Would you say it's happened more than

19   one time going back to the beginning of 2016?

20         A.     The beginning of 2016?

21         Q.     Yes.

22         A.     I believe it has, yes.

23         Q.     Has it happened; that is, you openly

24   record somebody as part of the PVA's journalism

James O' Keefe - April 9, 2018

33

1    work, more than five times since the beginning of

2    2016?

3        A.    I would have to go back and check to see

4    if it happened more than five times.

5        Q.    You aren't concern whether it has?

6        A.    I'm not certain.  I would have to go

7    back and look at the videos.

8        Q.    Is it fair to say that the overwhelming

9    majority of the journalistic work that PVA does is

10   undercover reporting?

11       A.    Yes.

12       Q.    Why the focus on undercover reporting?

13       A.    We believe that major media has become

14   systemically corrupt in so far that they have passed

15   along untrue information along to the masses that

16   sources have given to them, information that is

17   demonstrably untrue and information that these media

18   corporations pass along to the masses, thus

19   misinforming the masses.

20           So, the only way to accurately report

21   information and educate the people, we have to go

22   undercover to obtain the honest truths so we can

23   deliver them to the people.

24       Q.    And you say undercover work is the only

34

1    way to do that.

2        A.    Yes.

3        Q.    What does, in PVA's work, the concept of

4    access mean to you?

5        A.    It means a lot of things, but one of the

6    things it means is getting in with a subject of an

7    investigation so that that subject can trust you

8    enough to be truthful.

9        Q.    How does a PVA journalist seek to gain

10   access to somebody they're looking to record?

11       A.    There's no specific one way.  There's a

12   variety of techniques that we use.

13       Q.    What are some of those techniques?

14       A.    Sometimes it involves creating an alias

15   such as many of the muckraking reporters have done

16   throughout the last hundred years, assuming an

17   identity in order to ingratiate yourself with the

18   subject so that they can trust you.

19       Q.    When you say creating an identity, what

20   do you mean by that?

21       A.    Posing as a donor, posing as a pimp,

22   just using a cover the same way law enforcement does

23   or the Chicago Sun Times used to do, or Nellie Bly

24   used to do or Upton Sinclair used to do, just the

James O' Keefe - April 9, 2018

35

1  idea of posing as something you are not in order to

2  capture candid conversations from the subject you

3  are talking to.

4        Q.    Is the effect of that to deceive the

5  person that PVA is seeking to record?

6        A.    Define deceive because we never deceive

7  our audience.

8        Q.    And I suppose my question is, is the

9  effect of these techniques to gain access to deceive

10  the person who PVA is looking to record?

11        A.    That person, that particular person,

12  yes.

13        Q.    Does Project Veritas when it releases a

14  video for publication -- actually, just so we're

15  clear, to release a video for publication, what does

16  that mean?

17        A.    Typically, it means putting the video on

18  our YouTube channel first.

19        Q.    So that it's publicly accessible?

20        A.    Yes.

21        Q.    And the public is desired and encouraged

22  to watch the video at that point; right?

23        A.    Yes.

24        Q.    So when Project Veritas releases a video

James O' Keefe - April 9, 2018

36

1    in that fashion, does it release the raw footage

2    underlying the published video?

3         A.    Typically, no.

4         Q.    Under what circumstances has it done so;

5    Project Veritas, that is?

6         A.    Project Veritas --

7         Q.    Yes.

8         A.    -- has released the raw video on

9    occasion.  I don't remember every single occasion.

10   I know we have released raw videos in the past.

11        Q.    What occasions, do you remember?

12        A.    A National Public Radio investigation,

13   we released the raw video.

14        Q.    Any others?

15        A.    Yes, I just don't remember every single

16   one.  I believe we released one in New Hampshire

17   with the voter fraud investigations we did in 2012.

18        Q.    Has Project Veritas publicly released

19   the raw video underlying one of its published videos

20   on any occasion since 2014?

21        A.    I don't believe so, but I would have to

22   go back and check.

23        Q.    For Project Veritas Action, does PVA

24   commonly release the raw footage underlying the

James O' Keefe - April 9, 2018

37

1    video it published?

2         A.    I don't believe so, but I would have to

3    go back and check.

4         Q.    Has PVA at all going back to 2014 to

5    your knowledge?

6         A.    No.

7         Q.    So, we have a stack of previously marked

8    exhibits in front of you and to your left, and

9    they're in reverse order that we marked them.  Can

10   you reach all the way down to the bottom and take

11   out Exhibits 1 and 2, please?

12        A.    Yes, I have them.

13        Q.    And Exhibit 1, have you seen that

14   document before?

15        A.    Yes.

16        Q.    Do you understand it to be a series of

17   topics on which my client sought deposition

18   testimony from PVA in this case?

19        A.    Yes.

20        Q.    Can I ask you to take a look at

21   Exhibit 2?

22        A.    Yes, I have it.

23        Q.    Have you seen that document before?

24        A.    Yes.

67

1    think this was something that we facilitated, as in

2    my undercover reporter.  It was an idea that she

3    came up with.  The answer could be easily verified

4    if I had a minute to look at the raw tape.  I'm

5    trying to recollect something I watched a year ago.

6         Q.    Is the raw tape something that you can

7    access from where you are right here right now?

8         A.    Yes, yes.

9                   MR. HASKELL:  Why don't we call a

10              break.

11                  (Whereupon, a recess was taken)

12   BY MR. HASKELL:

13        Q.    So, Mr. O'Keefe, I think earlier you

14   testified about a video involving NPR; right?

15        A.    Yes.

16        Q.    What was that one all about?

17        A.    That one was about the chief financial

18   officer, I believe it was, of NPR meeting with

19   someone he thought was an agent or member of the

20   Muslim Brotherhood organization, and we posed as a

21   group called MEAC, Muslim for Education Action

22   Reform, or something like that.  I can't recall

23   exactly what the name of group was.

24                  We met with the two NPR executives at a

James O' Keefe - April 9, 2018

68

```
1    posh Georgetown eatery called Cafe Milano, talked to
2    them about their political views, about their views
3    of Jewish Americans, Republicans, Tea Party people,
4    and they were caught on tape ingratiating themselves
5    to these agents affiliated with the Muslim
6    Brotherhood.
7                        MR. KLEIN:  I'm going to object at
8                this point that we're beyond the
9                designations in the 30(b)(6) for Project
10               Veritas Action.  It is otherwise fine
11               for him to testify in his capacity.
12      A.    That's about it.  It goes on, but that's
13   the basic.
14      Q.    You mentioned two organizations, MEAC is
15   that M-E-A-C?
16      A.    I believe Muslim Education Action Center
17   was the alias utilized.
18      Q.    And Muslim Brotherhood --
19      A.    Mm-hmm.
20      Q.    -- were both of those organizations that
21   were created as aliases for Project Veritas
22   journalists?
23      A.    No, just the Muslim Education Action
24   Center.  A website was created.  The Muslim
```

James O' Keefe - April 9, 2018

69

```
1    Brotherhood was an existing organization that the

2    undercover journalists said that they were

3    affiliated with them in so many ways.

4          Q.    And the undercover journalists also said

5    that they were affiliated with MEAC?

6          A.    Correct.

7          Q.    How did they procure this meeting with

8    the staff at NPR?

9          A.    They had e-mailed with someone in Ron

10   Schiller's office, no relation to Vivian Schiller,

11   CEO of NPR, and had a series of phone calls and

12   meetings and eventually scheduled a date in February

13   of 2011.

14         Q.    And the PVA journalists, what did they

15   say --

16         A.    This is actually Project Veritas, not

17   Project Veritas Action.

18         Q.    Thank you.  Thank you.  I'm sorry, first

19   of all, Ron Schiller is one of the folks from NPR --

20         A.    Correct.

21         Q.    -- who ultimately met with the Project

22   Veritas journalists?

23         A.    Yes.

24         Q.    And what did Project Veritas or its
```

James O' Keefe - April 9, 2018

70

1    representatives say to Mr. Schiller's office that

2    led to this meeting coming about?

3         A.    In the communications prior to the

4    meeting?

5         Q.    Yes.

6         A.    Oh, this is another one where I would

7    have to go back and check the exact language used,

8    but speaking broadly it was an interest in making a

9    contribution to NPR.

10        Q.    Going into the CD that we previously

11   marked as Exhibit 52, I'm going to put that into the

12   computer, and I'm going to take a look at it up on

13   the screen.

14             So, do you see here on the screen in the

15   conference room we are now in that DVD in folder

16   titled Early Films, sub-folder titled Early Videos,

17   and I'm beginning to play a file whose title begins

18   17I NPR?  Do you see that?

19        A.    Yes.

20                   (Video played)

21   BY MR. HASKELL:

22        Q.    I've paused the film at time stamp 40

23   I'm going to move it back one second to time stamp

24   39.  Do you recognize what we're watching here?

James O' Keefe - April 9, 2018

71

1          A.     Yes.

2          Q.     What is it?

3          A.     It's the YouTube I produced about NPR.

4          Q.     When was this one made?

5          A.     It was released in March of 2011.

6          Q.     And this is the investigation video we

7    were speaking about a moment ago?

8          A.     Yes.

9          Q.     It involves the MEAC and Muslim

10   Brotherhood and the folks posing as potential donors

11   to NPR?

12         A.     Yes.

13         Q.     Those folks were Project Veritas

14   journalists?

15         A.     Yes.

16                       (Marked Exhibit 65, Screen Shot)

17   BY MR. HASKELL:

18         Q.     Do you recognize Exhibit 65 as a screen

19   shot from this video?

20         A.     Yes.

21         Q.     That corresponds to what we're looking

22   at on the screen in the conference room right now?

23         A.     Yes.

24         Q.     What is depicted in Exhibit 65?

James O' Keefe - April 9, 2018

72

1      A.    This is a screen shot of the YouTube

2  video that we produced.

3      Q.    This specific portion of the YouTube

4  video, what's the graphic we're looking at in

5  Exhibit 65?

6      A.    This is the website, so-called alias or

7  cover that was utilized.  This was the website that

8  we had created as the alias to reach out to the NPR

9  executives with.

10      Q.    Who created this website?

11      A.    My colleague.

12      Q.    Working for Project Veritas?

13      A.    Yes, I believe he was volunteering at

14  the time.

15      Q.    Sure.  And did you work with this

16  colleague to create this website?

17      A.    I don't remember exactly what I

18  contributed.  I think it was more of an oversight

19  role.

20      Q.    Were you involved in the creation of the

21  website we see here in Exhibit 65?

22      A.    Lightly, yes.

23      Q.    Did you say lightly or likely?

24      A.    Yes, lightly, a little bit.  I didn't

77

1          A.     Yes.

2          Q.     -- who just went by the name Amir Malik

3     for purposes of this investigation?

4          A.     Yes.

5          Q.     Once again, looking at the computer

6     screen and going into the jump drive that's been

7     marked as Exhibit 39, in the folder titled Jump

8     Drive 30(b)(6) Videos, the sub-folder RDP15, I'm

9     going to open an MP4 file whose title begins 15-P26

10    Out-of-State Voters.  Can you see that okay?

11         A.     Yes.

12         Q.     I'm going to play the first couple

13    seconds of this video.

14                      (Video played)

15    BY MR. HASKELL:

16         Q.     I've paused that video file.  Do you

17    recognize what we're watching here?

18         A.     Yes.

19         Q.     What is it?

20         A.     It's the video of the investigation we

21    did in the New Hampshire Primary in the presidential

22    election in 2016.

23         Q.     In this instance when you say "we," who

24    do you mean?

78

```
 1          A.    Project Veritas Action.
 2          Q.    Did you personally participate in
 3     creating the films that were incorporated into
 4     this --
 5          A.    Yes.
 6          Q.    -- published video?
 7          A.    Yes.
 8          Q.    I'm going to start playing this video at
 9     time stamp 11:09, and I'm going to play all the way
10     through stamp 12:19.
11                         (Video played)
12     BY MR. HASKELL:
13          Q.    So, I've paused it a little ahead at
14     12:05.  What did we just see in that segment?
15          A.    It was me walking into a voting precinct
16     in New Hampshire on primary day in the 2016 election
17     inquiring about how long a nonresident needs to be
18     in the state in order to vote in the state and
19     inquiring about if hypothetically I could vote and
20     then just leave the next day.
21          Q.    Fair to say the last couple things you
22     said in the conversation with the poll worker that
23     we just viewed were to the effect of you offering to
24     go out to the car and get a New York driver's
```

James O' Keefe - April 9, 2018

87

1              MR. HASKELL:  Certainly.

2              (Whereupon, a recess was taken)

3  BY MR. HASKELL:

4       Q.    So, Mr. O'Keefe, can I ask you to go

5  into the stack of exhibits and pull out Exhibit 12?

6       A.    Okay.

7       Q.    Let me ask you to read through

8  Exhibit 12 and pay particular attention to page

9  number 13.  It's the second-to-last page.

10      A.    I've read it.

11      Q.    Do you recognize Exhibit 12?

12      A.    Yes.

13      Q.    What is it?

14      A.    It's the complaint in this case.

15      Q.    And Exhibit 12 is a verified complaint

16  that -- let me ask, page 13 of Exhibit 12, do you

17  recognize the signature on that?

18      A.    Yes.

19      Q.    Whose signature is it?

20      A.    It's mine.

21      Q.    So, you signed this verified complaint?

22      A.    Yes.

23      Q.    And in your own words, what did your

24  signature on the complaint mean?

James O' Keefe - April 9, 2018

88

1        A.    That I declare the information on the

2   page to be accurate.

3        Q.    And when you say "on the page," do you

4   mean the information contained in the verified

5   complaint?

6        A.    Yes.

7        Q.    Specifically looking at page 13,

8   paragraph three, it reads, I have personal knowledge

9   of PVA's activities including those set out in this

10  verified complaint, and if called upon to testify, I

11  would competently testify as to the matters stated

12  herein.  Is that true?

13       A.    Yes.

14       Q.    And it was true at the time you signed

15  it?

16       A.    Yes.

17       Q.    Paragraph 4 of page 13, reads, I verify

18  under penalty of perjury under the laws of the

19  United States of America that the factual statements

20  contained in this First Amended Verified Complaint

21  concerning PVA's existing and proposed activities

22  are true and accurate, and that's what you were

23  signing for?

24       A.    Yes.

89

1          Q.    It's your testimony that the factual

2     statements in Exhibit 13 concerning PVA's existing

3     and proposed activities indeed are true and correct?

4          A.    Yes.

5          Q.    Can I ask you to look at page six of

6     Exhibit 12?

7          A.    Yes.

8          Q.    In particular look at paragraph 24 which

9     reads, In September 2015 PVA exposed campaign

10    finance violations in New York using undercover

11    techniques --

12         A.    Yes.

13         Q.    -- and then has a citation to a video

14    titled Hidden Cam Hillary's National Marketing

15    Director Illegal Accepting Foreign Contribution.  Do

16    you see that?

17         A.    Yes.

18         Q.    Is that one of those factual statements

19    concerning PVA's existing and proposed activities

20    that you verified to be true and correct in this

21    document?

22                   MR. KLEIN:  Objection, calls for a

23                   legal conclusion.

24    BY MR. HASKELL:

90

1          Q.     You can answer.

2          A.     Yes.

3          Q.     Going into the jump drive that we've

4    labeled as Exhibit 39 in the folder titled 30(b)(6)

5    Videos, sub-folder titled RDP15, there's an MP4

6    document whose title begins 15-P24 Hidden Cam

7    Hillary's National Marketing Director Illegally

8    Accepting Foreign Contribution.  Do you see that

9    file on the screen in the conference room?

10         A.     Yes.

11         Q.     I'm going to open that up.

12                      (Video played)

13   BY MR. HASKELL:

14         Q.     I've paused the film one minute in.  Do

15   you recognize this?

16         A.     Yes.

17         Q.     Is the film we're watching the same one

18   that's described in paragraph 24 of Exhibit 12?

19         A.     Yes.

20         Q.     And do you have a memory of the

21   investigation underlying the film that we're

22   watching?

23         A.     Yes.

24         Q.     And just in your own words, what

James O' Keefe - April 9, 2018

91

1   happened there?

2          A.    One of our -- one of PVA's employees was

3   going to a Hillary event and happened to expose a

4   campaign violation from the Hillary Clinton

5   campaign.

6          Q.    When you say campaign violation, what

7   you mean?

8          A.    Accepting money, a foreign contribution.

9          Q.    What does that violate?

10                MR. KLEIN:  Objection, calling for

11                a legal conclusion.  You may answer.

12         A.    It violates part of the FEC's

13   regulations concerning taking money from foreign

14   countries.

15         Q.    Did the incident that the PVA journalist

16   recorded that day at the Hillary Clinton campaign

17   event result in any complaints before the FEC?

18         A.    I believe so, yes.

19         Q.    I'm sorry, when I say "FEC," we mean

20   Federal Election Commission?

21         A.    Yes.

22         Q.    Who made that complaint?

23         A.    Benjamin Barr.

24         Q.    Who's Benjamin Barr?

James O' Keefe - April 9, 2018

100

1        Q.    Not while the question is pending,

2   Mr. O'Keefe.

3        A.    Okay.

4        Q.    How do you know that woman?

5        A.    Well, I have a policy at Project Veritas

6   not to identify the current names of our undercover

7   journalists since it would violate my code of

8   conduct internally to release the names of current

9   Project Veritas undercover journalists.

10       Q.    You're aware, aren't you --

11             MR. KLEIN:  Can we go off the

12             record.

13             MR. HASKELL:  Yes.

14             (Discussion held off the record)

15   BY MR. HASKELL:

16       Q.    So, how do you know the woman who goes

17   by the name is Marissa Jorge?

18       A.    She works with me at Project Veritas.

19       Q.    Does she also do work for PVA?

20       A.    Yes, she does, yes.

21       Q.    Is Marissa Jorge the only name you know

22   her by?  You can answer yes or no.

23       A.    No, since she uses undercover aliases.

24       Q.    Is Marissa Jorge her true name?

101

```
 1        A.    Yes.

 2        Q.    Was Ms. Jorge involved in an

 3  investigation into the AFT Michigan?

 4        A.    Yes.

 5        Q.    What did Ms. Jorge do as part of that

 6  investigation?

 7        A.    That investigation is not released yet.

 8  So, I have an obligation to talk about my notebooks

 9  that haven't been released yet apparently.  Is

10  that -- I guess I have to answer his question.  He

11  wants me to answer a question that --

12                    MR. KLEIN:  Can we go off the

13            record?

14        A.    -- concerns materials I haven't

15  released.

16                    MR. HASKELL:  Question is pending,

17            Steve.

18                    MR. KLEIN:  I understand that.

19        A.    As a journalist I can't in good

20  conscience answer a question about what's in my

21  unedited reporter notebooks since The New York Times

22  and CBS in good conscience wouldn't answer that

23  question either.

24                    MR. HASKELL:  Do you want to take
```

James O' Keefe - April 9, 2018

1                   a moment, or should we continue?

2                        MR. KLEIN:  Yes, let's go.

3                        (Counsel conferred with witness)

4    BY MR. HASKELL:

5         Q.    So, I think we left off talking about

6    the AFT Michigan investigation.  My question,

7    Mr. O'Keefe, is how did Ms. Jorge obtain access to

8    AFT Michigan?

9         A.    Ms. Jorge obtained access by

10   volunteering with the office.

11        Q.    Did she approach the office without

12   prior introduction?  Was it a cold call?

13        A.    I'm trying to remember exactly the

14   approach itself.  I believe it was an e-mail.

15        Q.    That she e-mailed somebody at the AFT

16   Michigan?

17        A.    Correct.

18        Q.    In that e-mail did she describe her

19   background or why working at AFT Michigan might be a

20   good fit for her or for them?

21        A.    I believe she did, yes.

22        Q.    Do you know what she said?

23        A.    I don't have it in front of me, but I

24   could find out.

James O' Keefe - April 9, 2018

103

1    Q.    In general, did she represent herself as
2  a student?
3    A.    It was either a student or a recent
4  graduate.
5    Q.    And was she at that time a student?
6    A.    No.
7    Q.    Was she a recent graduate?
8    A.    No.
9    Q.    Did she submit a resume to AFT Michigan
10  in order to obtain this opportunity?
11    A.    I don't recall.
12    Q.    Did she submit any other credentials?
13    A.    I don't recall.
14    Q.    Did she give AFT Michigan a name?
15    A.    Yes.
16    Q.    And it wasn't her actual name?
17    A.    Correct.
18    Q.    Okay.  Can we pull Exhibit 5 out of the
19  big stack, please.  I think that's it right there.
20    A.    Okay.
21    Q.    Exhibit 5 is a document titled
22  Plaintiff's Responses to Defendant's First Set of
23  Interrogatories.  Have you ever seen that document
24  before?

James O' Keefe - April 9, 2018

104

1      A.    I see so many documents.  I may have

2  glanced at it in an e-mail once.

3      Q.    Okay.  If we go to page seven of

4  Exhibit 5, I'd ask you to follow with me as I read

5  interrogatory 11 which asks PVA to please identify

6  each step you have taken in furtherance of making

7  any future recording in Massachusetts.

8           PVA's response is that it has been aware

9  of the unequivocal ban in General Laws Chapter 272,

10  Section 99, since 2015.  Because of this unequivocal

11  ban, its steps have been limited to monitoring

12  instances in Massachusetts, largely reports from

13  other news outlets, that it would investigate with

14  secret recording but for the ban.  Since March 2016

15  Plaintiff has engaged in an Constitutional challenge

16  in an effort to overturn the unequivocal ban on

17  secret recording.

18           Have I read interrogatory number 11 and

19  response accurately?

20      A.    Yes.

21      Q.    Follow with me as I read interrogatory

22  number 12 which asks PVA to please identify each

23  person with knowledge of any steps identified in

24  response to the preceding interrogatory.  PVA's

105

1    response identifies Russell Verney, Robert

2    Halderman, and yourself.  Have I read that

3    correctly?

4           A.    Yes.

5           Q.    And so looking at the list of steps PVA

6    has taken in furtherance of making future recordings

7    in Massachusetts that PVA laid out in response to

8    interrogatory 11, is that response a complete

9    statement of the steps you're aware of that PVA has

10   taken in furtherance of making future recordings in

11   Massachusetts?

12          A.    That seems to be a complete and accurate

13   statement, yes.

14          Q.    Thank you.  Still working with

15   Exhibit 5, if you flip one page back to page six,

16   and I'd ask you to please read to yourself

17   interrogatory number nine and PVA's response as well

18   as interrogatory number ten and PVA's response.

19          A.    (Deponent viewing exhibit).

20                Okay, I've read it.

21          Q.    To your knowledge is the listing of

22   occurrences in which PVA desired to secretly record

23   a person in Massachusetts but refrained from doing

24   so; that is, the list provided in the response to

James O' Keefe - April 9, 2018

106

1   interrogatory number nine, is that list in response

2   to interrogatory nine complete?

3        A.    Since this document was drafted in

4   January, the only other issue I suppose I would add

5   is education.  Otherwise, yes, it's complete.

6        Q.    Can I ask you -- we'll be speaking more

7   about this in a moment.  From the stack of exhibits

8   to pull out Exhibit 26.

9        A.    Sure.  Twenty-six, okay.

10        Q.    Take a moment to read Exhibit 26,

11   please.

12        A.    (Deponent viewing exhibit).

13             Okay.

14        Q.    When you say education, does Exhibit 26

15   describe the education related investigation that

16   you had in mind?

17        A.    No.

18        Q.    Okay.  Let's talk about that now then.

19   So, when you say an education related opportunity

20   that's cropped up in the past, what, three months,

21   what is that opportunity?

22        A.    Education, state education officials

23   covering up sexual abuse, a la what the Boston Globe

24   reported on with the Catholic Church that won the

```
 1   Pulitzer Prize.
 2        Q.    What is the nature of -- well, these
 3   education officials you're describing, who are they?
 4        A.    A lot of them work with education
 5   associations or federations of teachers.  Their
 6   charter describes that they want to protect
 7   children.  Oftentimes they do the exact opposite of
 8   that.
 9        Q.    Does PVA have information about specific
10   individuals in Massachusetts engaging in that kind
11   of conduct?
12        A.    I have access to information like that,
13   yes.
14        Q.    When you say "information like that,"
15   what information do you have access to?
16        A.    Sources, tipsters, locations, addresses,
17   suspicions based upon things that sources tell me.
18        Q.    Have your sources and tipsters,
19   et cetera, identified specific people in
20   Massachusetts who PVA would be interested to record
21   as part of such investigation?
22        A.    Not a specific individual, no.
23        Q.    And have they identified specific places
24   where PVA would be interested to make such
```

James O' Keefe - April 9, 2018

108

1    recordings?

2          A.    Yes.

3          Q.    What places are those?

4          A.    I don't have them in front of me, but

5    addresses of locations where these events might

6    occur.

7          Q.    What events are you referring to?

8          A.    Activities of those sorts of cover-ups

9    that are taking place.

10         Q.    Where in Massachusetts do you have

11   information that such coverup activities may be

12   occurring?

13         A.    Well, Boston is one place.

14         Q.    Where in Boston?

15         A.    I don't have the address in front of me.

16   I could check.

17         Q.    What is the organization or person who

18   PVA would seek to secretly record in connection with

19   that allegation?

20         A.    I would have to check.  I would have to

21   check and get back with you.  I don't have that in

22   front of me.

23         Q.    Do you remember?

24         A.    I don't recall.

James O' Keefe - April 9, 2018

109

```
 1          Q.    So, if -- but you said there's no
 2    specific person associated with that allegation of
 3    coverup; right?
 4          A.    That's correct.
 5          Q.    Is there a specific organization or
 6    company or association or chapter or group
 7    associated with that allegation?
 8          A.    One of them is the education
 9    association.
10          Q.    I'm sorry, which education association
11    is that?
12          A.    Massachusetts Education Association.
13          Q.    What is the Mass. Education Association?
14          A.    It's a union that represents teachers in
15    the state.
16          Q.    And you have information that that
17    organization is engaged in covering up some sort of
18    misdeeds against children?
19          A.    Yes.
20          Q.    What information do you have as to that
21    allegation?
22          A.    Sources that I speak with.
23          Q.    What have they told you?
24          A.    They've talked to me about the behavior
```

James O' Keefe - April 9, 2018

110

1    of the officials in these organizations.

2          Q.    What have they said?

3          A.    How they behave and what they do.  I

4    have reason to believe that these organizations are

5    engaged in wrongdoing that needs to be exposed.

6          Q.    And so what did your sources tell you

7    specifically that leads you to believe that this

8    organization, the Mass. Education Association, is

9    engaged in wrongdoing?

10         A.    The manner in which they conduct

11   themselves inside of the offices.

12         Q.    What about it?

13         A.    That it needs to be exposed; that it

14   needs to be filmed; that it needs to be uncovered

15   and distributed to the masses, to the audience I

16   mean.

17         Q.    What is it that happens at the office of

18   the Mass. Education Association that you want to

19   record?

20         A.    I'd have to speculate about exactly what

21   they would say.  Do you want me to do that?

22         Q.    Speculate about what who would say?

23         A.    The officials inside of the office.

24         Q.    Well, let me try asking it a different

James O' Keefe - April 9, 2018

111

1    way.   Why would PVA seek to record people at the

2    office of the Mass. Education Association?

3         A.    If they were doing something that was

4    hurting the interests of children and violating

5    their mission statement, if they are an organization

6    that receives directly or indirectly public monies,

7    they should be exposed and the people of

8    Massachusetts should be educated about it in

9    furtherance of the mission statement of our

10   organization to expose and educate people what

11   happens.

12        Q.    You're aware that there is some such

13   wrongdoing at the Mass. Education Association?

14        A.    I have reason to believe, yes.

15        Q.    What is that reason?

16        A.    The sources that I speak with, the

17   investigative work that I have done in other states

18   at similar organizations, the information I have

19   available to me through sources and tipsters.

20        Q.    I feel like we're going around in

21   circles here, but let me ask it this way.  Are you

22   aware of any present opportunity that PVA has to

23   record a particular person in a particular place

24   relative to this potential investigation into

James O' Keefe - April 9, 2018

112

1   education related issues?

2       A.   Yes, I am aware -- I don't have a

3   particular name of a person, but I have particular

4   locations.

5       Q.   Tell me those locations, please.

6       A.   I don't have them memorized.

7       Q.   What do you remember?

8       A.   The locations of the offices in the

9   state of Massachusetts where this behavior might

10  occur.

11      Q.   So you said one was the Mass. Education

12  Association.

13      A.   Correct.

14      Q.   Are you aware of any others?

15      A.   I would have to look at my notes.  I

16  don't recall off the top of my head the others.

17      Q.   Do you remember whether there were

18  others?

19      A.   I believe there are others, yes.

20      Q.   Do you have a memory that there were

21  other locations besides the Mass. Education

22  Association?

23      A.   I do.

24      Q.   Do you remember what those are?

113

1        A.    I don't.

2        Q.    The Mass. Education Association, where

3   is its office?

4        A.    I don't know off the top of my head.

5        Q.    Has PVA developed an operational plan to

6   pursue this education related investigation that

7   you're describing?

8        A.    Not in Massachusetts.

9        Q.    And you said this opportunity just came

10  up within the past several months?

11       A.    Yes, we have -- we get sent thousands of

12  tips and sources and people that come to us that

13  offer ideas, tips, about what to investigate.

14       Q.    Who provided this tip to PVA?

15       A.    It's more than one person.  It could be

16  a tip that comes through our tip line.  It could be

17  a person that speaks to me who is an expert on the

18  subject matter.  In this case it was a little bit of

19  both.

20       Q.    So, is it your testimony that PVA has

21  received tips from its tip line about this education

22  related investigation in Massachusetts?

23       A.    I'd have to check to see if it came

24  through the PVA tip line, but I get tipped off

James O' Keefe - April 9, 2018

114

1     through Facebook.  I get tipped off in my

2     conversations at conferences with people, I give

3     speeches at.  I get tipped off by sources who work

4     in the education reform movement.  I get sent

5     information a lot of different ways.  So, I don't

6     know if it was specifically through the PVA tip

7     line.

8          Q.    Well, you testified a moment ago that

9     your source of information about this education

10    related potential investigation, I think you said it

11    came from a little bit of both relating to tipsters

12    and subject matter experts.

13         A.    Yes.

14         Q.    How did the tipster information get to

15    PVA?

16         A.    I don't recall exactly.  It could have

17    been in conference, for example, where I gave a

18    speech and I spoke to someone after the speech.  We

19    also have a source that we're working with in New

20    Jersey that we speak with.  I would rather not give

21    his name.  We have a lot of informants around the

22    United States.

23         Q.    Did that person in New Jersey provide

24    information about an opportunity to secretly record

James O' Keefe - April 9, 2018

115

1    a specific person in a specific place in

2    Massachusetts?

3        A.    Not a specific person, no, but we have

4    discussed recording in various states.

5        Q.    You also mentioned the part of PVA's

6    information on this came from a subject matter

7    expert.  What do you mean when you testify subject

8    matter expert?

9        A.    Someone who knows about education reform

10   and the issues inherent in that topic, areas to look

11   for, what we might expose.

12       Q.    And has PVA received information from a

13   subject matter expert about an opportunity to record

14   a particular person in a particular place in

15   Massachusetts?

16       A.    Not a particular person, no.

17       Q.    And so is it your testimony that while

18   PVA has identified the Mass. Education Association

19   as an organization that it would be interested to

20   record, it hasn't identified any particular

21   individuals it would like to record, it hasn't

22   identified a particular place it would like to

23   recording short of MEA's offices?

24       A.    That's correct.

120

1          A.    No.

2          Q.    No, you're not aware or, no, it did not

3    result in such a plan?

4          A.    It did not result in any plan.

5          Q.    Have you ever visited the office of the

6    Mass. Education Association?

7          A.    No.

8          Q.    Do you know what controls, if any, are

9    in place at that office to obtain access to it?

10         A.    I'd have to check.  I don't know off the

11   top of my head.

12         Q.    Do you know whether somebody entering

13   that office needs to swipe a card?

14         A.    I don't, no.

15         Q.    Do you know whether somebody entering

16   that office has to go through a locked door?

17         A.    I don't.

18         Q.    Do you know whether somebody entering

19   that office has to pass by a reception desk?

20         A.    I don't.

21         Q.    Do you know whether some or all of that

22   office is open to the public?

23         A.    I don't off the top of my head, no.

24         Q.    Of all these potential investigations

121

1    we've just discussed as to interrogatory number

2    nine -- by the way, as to all of these potential

3    investigations we've just discussed on Exhibit 9,

4    when we were talking about opportunities to conduct

5    recording in Massachusetts, those were all secret

6    recording opportunities; right?

7         A.    Yes.

8         Q.    And as to all these investigations,

9    would you characterize any of them as election

10   related?

11        A.    That depends.

12        Q.    What does it depend on?

13        A.    If the Antifa people are coordinating

14   with and working with people running for office.

15        Q.    Do you have any present reason to

16   believe that they are so coordinating?

17        A.    I have a tough time defining reason to

18   believe, but I suspect in some cases they might be,

19   yes.

20        Q.    Does that suspicion relate specifically

21   to the Antifa activities and events occurring in

22   Massachusetts?

23        A.    No, because I'm not working in

24   Massachusetts.

James O' Keefe - April 9, 2018

122

1      Q.    So, you don't have any present reason to
2  believe that the Antifa organizations in
3  Massachusetts are coordinating with any election
4  campaign?
5      A.    No.
6      Q.    Can I ask you to take Exhibit 28 out of
7  the stack we previously marked.  Exhibit 28 is the
8  document titled Plaintiff's Supplemental Responses
9  to Defendant's First Set of Requests for Admission.
10 Have you seen that document before?
11     A.    I may have.
12     Q.    Let me turn your attention to page three
13 and ask you to please read to yourself request for
14 admission number 13 and PVA's response.
15     A.    (Deponent viewing exhibit).
16           Okay.
17     Q.    Are you the James O'Keefe who on or
18 about May 26, 2010, pled guilty to and was convicted
19 of entry by false appearances on real property of
20 the United States in violation of the United States
21 Code in the case of United States versus O'Keefe,
22 Criminal Action No. 10CR-81SRDDEK in the U.S.
23 District Court for the Eastern District of
24 Louisiana?

123

1        A.    Yes.

2                    (Marked Exhibit 75, Complaint)

3        A.    I'm ready.

4        Q.    Do you recognize Exhibit 75?

5        A.    Yes.

6        Q.    And in particular, if you look at the

7   final page of Exhibit 75, there are a series of

8   signatures.

9        A.    Yep, yes.

10        Q.    Do you recognize your signature on that

11   page?

12        A.    Yep, I wrote a whole book about it.

13        Q.    Of those signatures, yours is the one

14   that appears just above the typed "James O'Keefe,

15   Defendant"?

16        A.    Yes.

17        Q.    And you signed Exhibit 75 on March 24,

18   2010?

19        A.    Yes.

20        Q.    In your own words, what do you

21   understand it to mean when you signed Exhibit 75?

22        A.    Pleading guilty to a misdemeanor crime.

23        Q.    And looking at the final page of

24   Exhibit 75, above the signatures there's a paragraph

124

1    that states, Both the government and the Defendants

2    Joseph Basil, Stan Dye, Robert Flanagan, and James

3    O'Keefe do hereby stipulate and agree that the above

4    facts are true and that they set forth a sufficient

5    factual basis for the crime to which the Defendants

6    are pleading guilty.  Do you see that?

7            A.    Yes.

8            Q.    Was it your understanding in signing

9    this document that you were stipulating and agreeing

10   that the above facts are true and that they set

11   forth a sufficient basis for your guilty plea?

12           A.    Yes.

13                       (Marked Exhibit 76, Excerpts from

14                       "American Pravda")

15   BY MR. HASKELL:

16           Q.    Did you have a chance to look at

17   Exhibit 76?

18           A.    Yes.

19           Q.    Do you recognize it?

20           A.    Yes.

21           Q.    What is it?

22           A.    It's a various excerpts of my second

23   book, American Pravda.

24           Q.    And specifically is it fair to say that