**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

————————————————————————————— )
K. ERIC MARTIN and RENÉ PÉREZ,      )
                                    )
                    Plaintiffs,     )
                                    )         Civil Action
          v.                        )       No. 16-11362-PBS
                                    )
WILLIAM GROSS, in his Official      )
Capacity as Police Commissioner     )
for the City of Boston, and         )
DANIEL F. CONLEY, in his Official   )
Capacity as District Attorney for   )
Suffolk County,                     )
                                    )
                    Defendants.     )
—————————————————————————————)
————————————————————————————— )
PROJECT VERITAS ACTION FUND,        )
                                    )
                    Plaintiff,      )
                                    )         Civil Action
          v.                        )       No. 16-10462-PBS
                                    )
DANIEL F. CONLEY, in his Official   )
Capacity as Suffolk County          )
District Attorney,                  )
                                    )
                    Defendant.      )
—————————————————————————————)

**MEMORANDUM AND ORDER**

December 10, 2018

Saris, C.J.

**INTRODUCTION**

These two cases challenge the application of Mass. Gen.

Laws ch. 272, § 99 ("Section 99") to secret audio recordings in

Massachusetts.[1] Section 99, in relevant part, criminalizes the willful "interception" of any "communication." Mass. Gen. Laws ch. 272, § 99(C)(1). An "interception" occurs when one is able "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device" without the consent of "all parties to such communication." Mass. Gen. Laws ch. 272, § 99(B)(4). Thus, the statute does not apply to open (or non-secret) recording or to video recording (without audio). See id.; Commonwealth v. Hyde, 750 N.E.2d 963, 964 (Mass. 2001) (holding that Section 99 "strictly prohibits the secret electronic recording . . . of any oral communication").

The plaintiffs in Martin argue that Section 99 violates the First Amendment insofar as it prohibits the secret audio recording of police officers performing their duties in public. The plaintiff in Project Veritas makes a similar, though broader, argument: that Section 99 violates the First Amendment insofar as it prohibits the secret audio recording of government officials performing their duties in public. The parties in each

---

[1]    The Court assumes familiarity with its earlier opinions in both cases. See Project Veritas Action Fund v. Conley, 270 F. Supp. 3d 337 (D. Mass. 2017); Project Veritas Action Fund v. Conley, 244 F. Supp. 3d 256 (D. Mass. 2017); Martin v. Evans, 241 F. Supp. 3d 276 (D. Mass. 2017).

case also clash over certain ancillary issues that are discussed in more detail below.

On the core constitutional issue, the Court holds that secret audio recording of government officials, including law enforcement officials, performing their duties in public is protected by the First Amendment, subject only to reasonable time, place, and manner restrictions. Because Section 99 fails intermediate scrutiny when applied to such conduct, it is unconstitutional in those circumstances.

**FACTUAL BACKGROUND**

The following facts, drawn from the summary judgment record in each case, are not subject to genuine dispute.

## I. *Martin v. Gross*

### A.   The Parties

The plaintiffs K. Eric Martin and René Pérez are two private citizens who live in Jamaica Plain, Massachusetts. The defendants are Suffolk County District Attorney Daniel Conley and City of Boston Police Commissioner William Gross.[2]

### B.   The Plaintiffs' Secret Recordings

Since 2011, Martin has openly recorded police officers performing their duties in public at least 26 times; Pérez has

---

[2]      In <u>Martin</u>, Commissioner Gross was automatically substituted for former Commissioner William Evans pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. In both cases, because Conley is no longer the district attorney, his replacement shall also be substituted upon notice.

done so 18 times, often live-streaming his recordings. The plaintiffs' recordings of police have included one-on-one interactions, traffic and pedestrian stops of others, and protests.[3] Between the two of them, the plaintiffs have wanted to secretly record police officers performing their duties in public on at least 19 occasions since 2011, but have refrained from doing so. Both have stated that their desire to record secretly stems from a fear that doing so openly will endanger their safety and provoke hostility from officers.

The plaintiffs have not advanced any specific plans or intentions to surreptitiously record police officers in the course of this litigation. But Pérez stated that he would not rule out secretly recording police officers in various sensitive situations and that he intended to live-stream any secret recordings he is permitted to make. Neither Martin nor Pérez has ever been arrested for violating Section 99.

C.  **Enforcement of Section 99**

Since 2011, the Suffolk County District Attorney's Office ("SCDAO") has opened at least 11 case files that involve a felony charge under Section 99. These have included Section 99

---

[3]     Two specific subsets of Martin's recordings are the subject of a motion to draw adverse inferences. These recordings depict interactions between police officers and citizens (1) in the vicinity of the Boston Common and (2) inside the Arizona BBQ restaurant in Roxbury. In his deposition, Martin refused to testify about these recordings, invoking the Fifth Amendment.

charges where the person recorded was a police officer performing her duties in public. During the same period, the Boston Police Department ("BPD") has applied for a criminal complaint on a Section 99 violation against at least nine individuals for secretly recording police officers performing their duties in public.[4]

When asked what governmental interest Section 99 advances, the district attorney asserted that it protects individuals' privacy rights -- specifically, the right of citizens and public officials alike to be on notice of when they are being recorded. Asked the same question, the police commissioner referred generally to Section 99, its legislative history, and judicial decisions interpreting the statute.

### D.  Police Training on Section 99

Section 99 is one of several topics on which BPD officers receive training. The methods of training include training bulletins, training videos, and in-service training. In all, BPD recruits receive 50 to 60 hours of criminal law instruction at the police academy. The instructor teaches from his own textbook, which touches on many, but not all, crimes under Massachusetts law. The text includes a segment on Section 99 -- one of over 150 sections discussing various criminal law topics.

---

[4]     It is unclear on this record whether, or to what extent, the SCDAO and BPD Section 99 cases overlap.

BPD officers are also instructed using at least two other criminal law manuals that similarly include segments on Section 99 among 150 to 200 other criminal laws.

Furthermore, BPD has created a training video and a training bulletin related to Section 99. Since 2009, BPD has published 28 training videos; one of them related to Section 99. In recent years, BPD has disseminated 22 training bulletins. One of them is related to Section 99, and it has been circulated three times.

The video tells officers that Section 99 prohibits only secret recording. It depicts two scenarios of citizens recording police -- one openly and one in secret -- and instructs officers that the first is not a violation of Section 99, but the second is. The video became mandatory viewing for current officers. New recruits watch it as well.

The bulletin describes two court cases where defendants were convicted for secretly recording police officers performing their duties in public, instructing officers that they have a "right of arrest" whenever they have probable cause to believe an individual has secretly recorded a conversation. It was first circulated in November 2010, then again in October 2011, and most recently in May 2015. The 2011 and 2015 circulations are the only bulletins since 2011 that have required police commanders to read the bulletin aloud to their officers at roll

call. A memo accompanying the 2011 recirculation explicitly references the First Circuit decision in Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011), discussed in more detail below.

### E.    Procedural History

The Martin plaintiffs' claim, brought under 42 U.S.C. § 1983, alleged that Section 99 violates the First and Fourteenth Amendments as applied to the secret recording of police officers engaged in their duties in public places. Resolving a motion to dismiss, the Court held that the plaintiffs had adequately stated a claim that Section 99 violates the First Amendment. The Court also rejected a challenge to the plaintiffs' standing, held that the complaint adequately stated a claim for municipal liability, and held that Pullman abstention was unwarranted.

The defendants now challenge the claim on the grounds of standing, ripeness, and municipal liability. The district attorney also asks the Court to draw adverse inferences against Martin. The parties have filed cross-motions for summary judgment on the constitutional claim.

## II.   *Project Veritas Action Fund v. Conley*

### A.    The Parties

The plaintiff, Project Veritas Action Fund ("PVA"), is a nonprofit organization that engages in undercover journalism. The defendant is the Suffolk County District Attorney.

## B.    PVA's Secret Recording Practices

PVA has a history of investigating government officials, candidates for public office, and others through the use of secret recording. The organization also investigates suspected fraud, abuse, and corruption. PVA would like to secretly record government officials in Massachusetts, including when they make statements in public places while performing their public duties. PVA has refrained from doing so due to Section 99.

In general, PVA decides to investigate a story based on considerations like cost, time, level of public interest or newsworthiness, and the likelihood that it will obtain "candid information" from sufficiently high-level individuals. Once an investigation is assigned to a PVA reporter, he or she develops a "cover story" designed to develop trust with the source. The "cover story" is "rarely" true, but PVA enhances its verisimilitude by, for instance, creating fake email or social media accounts, printing false business cards, or creating a new business entity. Often the "cover story" involves volunteering or interning at a target organization, or donating to it. In other cases, PVA reporters use flattery, sex appeal, or romantic overtures to appeal to target sources.

PVA reporters use "sophisticated" recording equipment, including hidden necktie cameras, purse cameras, eyeglass cameras, and cameras whose lenses are small enough to fit into a

button or rhinestone. They have made recordings during campaign staff meetings, within a target's offices, and while meeting with representatives of a target organization. They have also recorded pretextual "dates" with target individuals and conversations at bars.

PVA's ultimate product is an edited "video report" that is released to the public via its website and/or YouTube channel. The final report leaves out portions of the raw footage. The record includes several examples of PVA's final reports and the raw footage used to create them.

In this case, PVA identifies four specific projects that it has refrained from conducting on account of Section 99. The projects involve secretly recording: (1) landlords renting unsafe apartments to college students; (2) government officials, including police officers, legislators, or members of the Massachusetts Office for Refugees and Immigrants, to ascertain their positions on "sanctuary cities"; (3) "protest management" activities by both government officials and private individuals related to Antifa protests; and (4) interactions with Harvard University officials to research its endowment and use of federal funds. PVA would like to send its journalists into Massachusetts to develop leads on these and other stories that may emerge.

### C.    Procedural History

PVA's original complaint challenged the constitutionality of Section 99 facially and as applied to it, targeting the statute's prohibition on secret recording in a public place (Count I) and secret recording of oral communications of individuals having no reasonable expectation of privacy (Count II). In March 2017, the Court dismissed PVA's claims insofar as they challenged the application of Section 99 to the secret recording of private conversations, and insofar as they presented facial and overbreadth challenges to Section 99. See Project Veritas Action Fund, 244 F. Supp. 3d at 264-66.

Having preserved its appellate rights as to those rulings, PVA has filed an amended complaint and has narrowed its claim to challenge only Section 99's application to the secret recording of government officials engaged in their duties in public spaces. The district attorney has moved to dismiss on ripeness grounds. Both parties seek summary judgment on the constitutional claim.

### LEGAL BACKGROUND

### I.    Summary Judgment Standard

A party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual

10

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphases in original). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248. A fact is material if it "might affect the outcome of the suit under the governing law." <u>Id.</u>

II.   **Setting the Scene: *Glik* and *Gericke***

The discussion that follows requires an understanding of two First Circuit decisions: <u>Glik v. Cunniffe</u>, 655 F.3d 78 (1st Cir. 2011), and <u>Gericke v. Begin</u>, 753 F.3d 1 (1st Cir. 2014).

In <u>Glik</u>, the plaintiff was arrested for using his cell phone's digital video camera to openly film several police officers arresting someone on the Boston Common. 655 F.3d at 79, 87. He was recording audio as well as video on the cell phone. <u>Id.</u> at 80. The plaintiff was charged with violating Section 99 and two other state-law offenses. <u>Id.</u> at 79. These charges were later dismissed. <u>Id.</u> The plaintiff sued the police under 42 U.S.C. § 1983, claiming that his arrest for audio and video recording of the officers constituted a violation of his rights under the First and Fourth Amendments. <u>Id.</u> The police officers raised a qualified immunity defense. <u>Id.</u> A central issue on appeal was whether the arrest violated the plaintiff's First

11

Amendment rights -- in other words, "is there a constitutionally protected right to videotape police carrying out their duties in public?" Id. at 82.

The First Circuit answered affirmatively. Id. It held that the First Amendment's protection "encompasses a range of conduct related to the gathering and dissemination of information." Id. The First Amendment prohibits the government "from limiting the stock of information from which members of the public may draw." Id. (quoting First Nat'l Bank v. Bellotti, 435 U.S. 765, 783 (1978)).

> The filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within these principles. Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting "the free discussion of governmental affairs."

Id. (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966)). This freedom of expression has particular significance with respect to law enforcement officials, "who are granted substantial discretion that may be misused to deprive individuals of their liberties." Id.

Although the First Circuit did not define "filming," Glik involved a cell phone used to record both audio and video. At least two of the cases cited in Glik involved both audio and video recording. See Fordyce v. City of Seattle, 55 F.3d 436,

439 (9th Cir. 1995) (recognizing a "First Amendment right to
film matters of public interest" where plaintiff's videotaping
of people on the streets of Seattle simultaneously captured
audio); Demarest v. Athol/Orange Cty. Television, Inc., 188 F.
Supp. 2d 82, 94-95 (D. Mass. 2002) (recognizing
"constitutionally protected right to record matters of public
interest" where a reporter was punished for broadcasting video
and audio recordings of communication with government
officials).

The First Circuit acknowledged that the right to record
"may be subject to reasonable time, place, and manner
restrictions." Id. at 84. But it did not explore those
limitations because the plaintiff's conduct -- openly recording
both audio and video of police arresting someone on the Boston
Common -- "fell well within the bounds of the Constitution's
protections." Id. It also held that the right was "clearly
established," concluding that "a citizen's right to film
government officials, including law enforcement officers, in the
discharge of their duties in a public space is a basic, vital,
and well-established liberty safeguarded by the First
Amendment." Id. at 85.

More recently, in Gericke, a case involving an attempted
open audiovisual recording of a late-night traffic stop, the
First Circuit reiterated an individual's First Amendment right

to film police officers performing their duties carried out in public, subject to reasonable restrictions. 753 F.3d at 7. Therefore, "a police order that is specifically directed at the First Amendment right to film police performing their duties in public may be constitutionally imposed only if the officer can reasonably conclude that the filming itself is interfering or about to interfere with his duties." Id. The First Circuit repeated the admonition from Glik that police officers "are expected to endure significant burdens caused by citizens' exercise of their First Amendment rights." Id. at 8 (quotation omitted).

Like Glik, Gericke did not directly address audio recording. However, it did rely on American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583, 607 (7th Cir. 2012), for the proposition that the First Amendment right to record may be subject to reasonable orders to maintain safety and control. Gericke, 753 F.3d at 7-8. Alvarez itself resonates with this case because it held that "[t]he act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." 679 F.3d at 595. This was due, in part, to the Seventh Circuit's observation "that audio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating

14

news and information about events that occur in public. Their self-authenticating character makes it highly unlikely that other methods could be considered reasonably adequate substitutes." Id. at 607.

All of which is to say that the Court interprets Glik as standing for the proposition that the First Amendment protects the right to record audio and video of government officials, including law enforcement officers, performing their duties in public, subject only to reasonable time, place, and manner restrictions.

**DISCUSSION**

**I.   Preliminary Issues in *Martin v. Gross***

Before the paths of these two cases converge again, the Court must first address three preliminary issues that arise only in Martin.

**A.   Standing**

In Martin, the police commissioner first argues that the plaintiffs lack standing to bring this case because their claims are speculative, the scope of the right they assert is amorphous, and their fear of arrest and prosecution is not caused by Section 99. The commissioner's line of argument is essentially identical to the one that the Court addressed, and rejected, in its prior opinion in this case. See Martin, 241 F. Supp. 3d at 281-83. There, the Court "easily conclude[d]" that

the plaintiffs intended to secretly record police if not for Section 99. Id. at 282. The Court found a credible threat of prosecution because "Section 99 is alive and well." Id. at 283. And the Court found causation and redressability satisfied because the alleged injury arose from the potential arrest and/or prosecution of the plaintiffs by BPD or the SCDAO. Id.

The current record only solidifies those conclusions because now, instead of allegations, the plaintiffs have provided facts that are not subject to genuine dispute. The commissioner points to nothing that would change the Court's analysis. The plaintiffs still have standing to bring this case.

**B.   Municipal Policy**

1.   Parties' Arguments

The police commissioner next argues that merely training police officers on how to enforce Section 99 is not a municipal policy for purposes of a § 1983 claim. More pointedly, he argues that even under the framework of Vives v. City of New York, 524 F.3d 346 (2d Cir. 2008), the record does not demonstrate a municipal "choice" to enforce Section 99. He also argues that the plaintiffs' fear of making secret recordings is caused by Section 99 itself, not by any municipal policy to enforce Section 99, and therefore the plaintiffs have failed to show a causal connection between any municipal policy and their alleged harm.

The plaintiffs argue that nothing requires BPD to enforce Section 99 against individuals who secretly record police. Therefore, enforcement of the law must be the result of a conscious policy choice by the city, as evidenced by repeated efforts to train officers on Section 99. The plaintiffs further argue that answering the question on the existence of a municipal policy simultaneously resolves the causation question.

### 2.   Legal Standard

Local governments (and local officials sued in their official capacities) can be sued under § 1983 "for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978). "[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." City of Okla. City v. Tuttle, 471 U.S. 808, 823 (1985).

### 3.   Analysis

The parties first dispute the appropriate legal standard for evaluating the existence of a "policy" for purposes of a Monell claim -- an issue on which courts have diverged. The plaintiffs argue that the Court should apply the Second Circuit's framework from Vives, as it did at the motion to

dismiss. Under Vives, the existence of a municipal "policy"
depends on "(1) whether the City had a meaningful choice as to
whether it would enforce [the statute in question]; and (2) if
so, whether the City adopted a discrete policy to enforce [the
statute in question] that represented a conscious choice by a
municipal policymaker." 524 F.3d at 353. The police commissioner
urges the Court to adopt the Seventh Circuit's decision in
Surplus Store & Exchange, Inc. v. City of Delphi, which stated:

> It is difficult to imagine a municipal policy more
> innocuous and constitutionally permissible, and whose
> causal connection to the alleged violation is more
> attenuated, than the "policy" of enforcing state law.
> If the language and standards from Monell are not to
> become a dead letter, such a "policy" simply cannot be
> sufficient to ground liability against a municipality.

928 F.2d 788, 791-92 (7th Cir. 1991). The First Circuit has not
weighed in on this question, aside from brief dicta in a
concurrence that positively cited Surplus Store. See Yeo v. Town
of Lexington, 131 F.3d 241, 257 (1st Cir. 1997) (Stahl, J.,
concurring).

Surplus Store does not govern here because the record
demonstrates that BPD has done more than merely "enforc[e] state
law." Rather, BPD has highlighted what it believes Section 99
allows (open recording of police officers) and does not allow
(secret recording of police officers).

To show the existence of a municipal policy, the plaintiffs
rely on an array of BPD training materials that discuss Section

99, including a video and a training bulletin. The roughly seven-minute video begins with a summary of the statute. It then reenacts two scenarios. In the first, a bystander holds up a cell phone and records police officers interacting with a couple arguing in the street. The video instructs that this does not constitute an "interception" under Section 99 because the bystander is openly, not secretly, recording the interaction. The second scenario parallels the facts of Commonwealth v. Hyde, 750 N.E.2d 963 (Mass. 2001), in which the SJC affirmed the Section 99 conviction of a defendant who surreptitiously recorded his conversation with police during a traffic stop. The video instructs officers that charges are appropriate in this scenario, although it emphasizes that, in order to violate Section 99, the recording "Must be SECRET!"

The bulletin, issued in November 2010, provides Section 99's definitions of "interception" and "oral communication," and breaks down the crime into elements. It also summarizes Hyde and Commonwealth v. Manzelli, 864 N.E.2d 566 (Mass. App. Ct. 2007), two Massachusetts appellate cases interpreting Section 99. The bulletin describes Section 99 as "designed to prohibit secret recordings of oral communications." It twice states, "Public and open recordings are allowed under the Wiretap statute. There is no right of arrest for public and open recordings under this statute."

The bulletin has been recirculated twice. In October 2011, the bulletin was accompanied by a memo from the Commissioner citing the Glik decision. The memo instructs officers that "public and open recording of police officers by a civilian is not a violation" of Section 99. The cover memo for the May 2015 recirculation "remind[s] all officers that civilians have a First Amendment right to publicly and openly record officers while in the course of their duties."

Section 99 is discussed in other training materials as well. For instance, the Municipal Police Training Committee, a state agency that sets minimum training standards for police academies in Massachusetts, discusses Section 99 in at least two training manuals used by the BPD. The record includes four additional manuals or texts that appear to discuss the statute as well.

These materials -- particularly the video and bulletin -- demonstrate why Surplus Store is inapt here. They instruct officers that Section 99 permits open, but not secret, recording of police officers' actions. But Glik did not clearly restrict itself to open recording. Rather, it held that the First Amendment provides a "right to film government officials or matters of public interest in public space." Glik, 655 F.3d at 84-85. The right is "fundamental and virtually self-evident," subject only to reasonable time, place, and manner restrictions.

Id. The BPD training materials narrowly read this holding, which amounts to more than mere enforcement of state law.

The same considerations demonstrate the existence of a policy under the two-prong Vives test. The parties do not dispute the first prong. That is, they seem to agree -- correctly -- that local police have discretion about whether and when to enforce Section 99. The second prong asks whether BPD has adopted a "discrete policy" to enforce Section 99 that "represent[s] a conscious choice by a municipal policymaker." Vives, 524 F.3d at 353. The police commissioner does not dispute that these training materials exist and have been disseminated to BPD personnel. Because there is no genuine dispute as to this factual basis for the alleged municipal policy, the only remaining question is one of law, appropriate for resolution on summary judgment: Do these training materials evince a "conscious choice" by BPD to enforce Section 99?

The answer is yes. Although an individual police officer retains discretion about whether to arrest someone for violating Section 99, the training materials cited above make clear that BPD "put flesh on the bones" of Section 99 and "apparently instructed officers that they could make arrests" for what the plaintiffs now claim was constitutionally protected conduct. Vives, 524 F.3d at 356. The video, bulletin, and manuals all speak with one voice regarding when Section 99 is and is not

violated. The Court concludes, as a matter of law, that this evidence demonstrates a "conscious choice" and amounts to a municipal policy for purposes of a Monell claim.

The police commissioner protests that BPD's guidance was in accordance with, and pursuant to, cases interpreting Section 99, and it is unfair to subject BPD to liability for trying to ensure that its officers comply with the law. He also argues that finding a municipal policy here will create "a perverse incentive not to train police officers." But the training materials go beyond telling officers when it is impermissible to arrest; taking a narrow construction of Glik, they also communicate that it is permissible to arrest for secretly audio-recording the police under all circumstances. In other words, it gives the green light to arrests that, as the Court holds below, are barred by Glik.

As the plaintiffs predicted, this analysis also resolves the causation question. "Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997). Here, the commissioner acknowledges that BPD's training materials were intended to ensure that officers complied with Glik. But Glik did not distinguish between First Amendment protection applicable to

audio and video recording. BPD's policymakers interpreted (in the Court's view, misinterpreted) the case as permitting arrest for secret audio recording in all circumstances without regard for the First Amendment interest at stake of police performing their duties in public. BPD's policies narrowly interpreting Glik caused the injury complained of in this case.

Accordingly, the Court concludes that the plaintiffs have proven the existence of a municipal policy and causation for purposes of their Monell claim against the police commissioner.

### C.   Adverse Inferences

#### 1.   Parties' Arguments

The district attorney argues that, for purposes of summary judgment, the Court should draw adverse inferences against Martin based on his refusal to answer certain questions during his deposition by invoking his Fifth Amendment privilege. The motion concerns two sets of videos produced in discovery: one from the Boston Common and one from the Arizona BBQ restaurant in Roxbury. The district attorney argues that he is prejudiced by Martin's assertion of the privilege because it prevents him from learning details about these videos, such as whether Martin created them, whether the recorder was holding the recording device in plain view, and whether the recorder had the subjects' permission to record. As a consequence, the district attorney asks the Court to make certain inferences about the videos --

for instance, that Martin did create them, that the recording device was not held in plain view, and that Martin did not have permission to record from persons in the videos.

Martin opposes the motion only in two respects. First, he seeks to ensure that none of the adverse inferences can be used in any criminal proceeding. Second, he opposes one specific inference -- that the Arizona BBQ restaurant is a "public place" for purposes of the plaintiffs' requested relief on their constitutional claim. He argues that this inference is outside the scope of his assertion of the Fifth Amendment privilege.

> 2.   Legal Standard

In general, "'the Fifth Amendment does not forbid adverse inferences against parties in civil actions when they refuse to testify,' . . . nor does it mandate such inferences, especially as regards topics unrelated to the issues they refused to testify about." Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 678 (1st Cir. 1996) (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)). Moreover, the First Circuit has "expressed doubt as to whether a court can draw [such an adverse] inference at the summary judgment stage, where all reasonable inferences must be drawn for the non-movant." In re Marrama, 445 F.3d 518, 522–23 (1st Cir. 2006).

3.   <u>Analysis</u>

Because Martin opposes the inferences only in part, the Court generally allows the district attorney's motion. This comes with two caveats. First, as both parties seem to agree, the Court draws these inferences solely for the purpose of summary judgment in this case. Second, the Court agrees with Martin that the requested inference about the Arizona BBQ restaurant is outside the scope of his invocation of the Fifth Amendment privilege. That is, whether the Arizona BBQ restaurant constitutes a "public place" is a legal determination that likely would turn on facts outside the scope of any testimony Martin would offer on the topic. The district attorney's motion, therefore, is allowed in part and denied in part.

**II.  <u>Ripeness</u>**

**A.   Parties' Arguments**

In both cases, the district attorney moves to dismiss for lack of jurisdiction on the grounds that the case is unripe for judicial review. He argues that the plaintiffs' claims turn upon a host of fact-dependent considerations, but the plaintiffs have yet to develop a sufficient record to enable the Court to evaluate them.

The plaintiffs in <u>Martin</u> contend primarily that their claims do not turn on the factual considerations that the district attorney identifies. Even if they did, the plaintiffs

25

argue that they have provided plenty of facts to decide their respective cases. The plaintiff in Project Veritas argues that its history of secret recording activity in other states amply supports its intent to engage in the same conduct in Massachusetts and that this satisfies ripeness.

**B.   Legal Standard**

Ripeness is an aspect of justiciability rooted in both the Article III case-or-controversy requirement and in prudential considerations. Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017). Its purpose is "to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Id. (quoting Texas v. United States, 523 U.S. 296, 300 (1998)). As such, "plaintiffs bear the burden of alleging facts sufficient to demonstrate ripeness." Id. at 501. "Even a facial challenge to a statute is constitutionally unripe until a plaintiff can show that federal court adjudication would redress some sort of imminent injury that he or she faces." Id.

In general, the ripeness analysis has two prongs: fitness and hardship. Id. The fitness prong has both jurisdictional and prudential components. Id. The jurisdictional component of fitness asks "whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." Id. (quoting Roman Catholic

Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89
(1st Cir. 2013)). The prudential component of fitness concerns
"whether resolution of the dispute should be postponed in the
name of judicial restraint from unnecessary decision of
constitutional issues." Id. (quoting Roman Catholic Bishop, 724
F.3d at 89). The hardship prong is not disputed here.

       In the context of a First Amendment challenge like this
one, Supreme Court and First Circuit precedent describes two
types of cognizable injury. The first is when the plaintiff has
alleged an intention to engage in a course of conduct arguably
affected with a constitutional interest, but proscribed by the
statute, and there exists a credible threat of prosecution.
Mangual v. Rotger-Sabat, 317 F.3d 45, 56–57 (1st Cir. 2003). The
second is when a plaintiff is chilled from exercising her right
to free expression or forgoes expression in order to avoid
enforcement consequences. Id. at 57.

       C.    **Analysis: Martin**

       The plaintiffs in Martin satisfy both aspects of fitness
(the only ingredients of ripeness at issue here). The First
Circuit has recognized that, "though not unqualified, a
citizen's right to film government officials, including law
enforcement officers, in the discharge of their duties in a
public space is a basic, vital, and well-established liberty
safeguarded by the First Amendment." Glik, 655 F.3d at 85. Both

plaintiffs have attested to their prior recordings of police officers. The plaintiffs aver that they desire to secretly record police officers but have refrained from doing so because of Section 99. And the defendants have sought criminal complaints or charged persons for violating Section 99 numerous times since 2011. In this case and its companion, the government has not disavowed enforcement of Section 99. See Project Veritas Action Fund, 270 F. Supp. 3d at 342; Martin, 241 F. Supp. 3d at 283.

These facts give rise to a live controversy over genuine First Amendment injuries. Therefore, both the jurisdictional and prudential components of fitness are satisfied. That is, the plaintiffs have shown "a sufficiently live case or controversy . . . to create jurisdiction in the federal courts," while also satisfying the Court that resolution of the case need not (indeed, ought not) be postponed. Reddy, 845 F.3d at 501 (quoting Roman Catholic Bishop, 724 F.3d at 89). This conclusion is bolstered by the principle that "courts sometimes exhibit a greater willingness to decide cases that turn on legal issues not likely to be significantly affected by further factual development." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995). Such is the case here.

Many of the district attorney's arguments about an underdeveloped factual record seem to relate to his concern that

secret recordings could somehow endanger police officers or the public. This concern is not directly relevant to the issue of fitness. Moreover, nothing in Glik or in the relief sought by these plaintiffs would prohibit an officer from taking reasonable steps to preserve public safety. See Glik, 655 F.3d at 84 (noting that right to record "may be subject to reasonable time, place, and manner restrictions"); cf. Gericke, 753 F.3d at 8 ("[A]n individual's exercise of her First Amendment right to film police activity carried out in public . . . necessarily remains unfettered unless and until a reasonable restriction is imposed or in place."); Alvarez, 679 F.3d at 607 (noting that First Amendment right to record does not prevent officers from "tak[ing] all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations").

### D.   Analysis: Project Veritas

The undisputed facts in Project Veritas show a live controversy over, at a minimum, whether the plaintiff has been "chilled from exercising [its] right to free expression or [has] forgo[ne] expression in order to avoid enforcement consequences." Mangual, 317 F.3d at 57. It is beyond dispute that PVA has used secret audiovisual recording in the past. This has included secret audiovisual recording of government officials, such as New Hampshire voting officials during the

29

2016 primaries, and of private citizens, such as those depicted
in PVA's recordings during the August 2017 protests in
Charlottesville, Virginia. Further, according to PVA, Glik
extends to secret recording, and therefore Section 99 chills
them from engaging in protected conduct. The district attorney
disagrees that the right recognized in Glik covers secret audio
recording. The Court needs no additional facts to resolve that
legal dispute. See Ernst & Young, 45 F.3d at 536 (describing how
courts often "exhibit a greater willingness to decide cases that
turn on legal issues not likely to be significantly affected by
further factual development").

The district attorney further emphasizes deposition
testimony where PVA's designated witness, when asked whether PVA
had any present intentions of secretly recording in
Massachusetts, stated:

> Not in Massachusetts, no, that would be against the
> law. We can't do that. I would love to probably
> secretly record a whole bunch of people because that's
> what I do. I think it is a very important and valuable
> kind of journalism. We don't have any plans to because
> we can't. It's against the law, and we don't break the
> law.

The district attorney is correct that this testimony undercuts a
specific threat-of-prosecution injury, since the witness
admitted not having a current "intention to engage in a course
of conduct arguably affected with a constitutional interest."
Mangual, 317 F.3d at 56. But by the same token, this testimony

is unmistakable evidence that Section 99 has "chilled [PVA] from exercising [its] right to free expression" and that PVA is "forgo[ing] expression in order to avoid enforcement consequences." Id. at 57.

The district attorney also asserts that ripeness requires additional details about PVA's foregone investigations. But for many of the same reasons just discussed with respect to Martin, the First Circuit has not indicated that the right to record is as fact-bound as the district attorney suggests. In addition, waiting for additional details to develop on a case-by-case basis could exacerbate the "pull toward self-censorship" that First Amendment pre-enforcement review is supposed to avoid. See N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13-14 (1st Cir. 1996).

That said, the four investigations that PVA proposes are described with such sparse detail that they could encompass a vast array of settings and subjects for secret recording. The breadth of potential conduct involved, none of which has actually occurred, creates serious ripeness concerns. See Texas v. United States, 523 U.S. at 300; Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). On this score, PVA has narrowed the scope of its summary judgment motion to only those applications of Section 99 that involve the recording

of government officials performing their duties in public.[5]

Significantly, PVA's challenge remains broader than the one in

Martin, which challenges the statute only with respect to the

secret recording of police officers. But with respect to Project

Veritas, the Court's ensuing analysis will focus solely on PVA's

"government officials" claim. That claim is ripe to the extent

just discussed, and the motion to dismiss is denied.

### III. **First Amendment Challenge**

On the core constitutional question, the parties contest

three issues: (1) whether to treat the plaintiffs' claims as

"facial" or "as applied" challenges; (2) whether Section 99 is

subject to strict scrutiny, intermediate scrutiny, or rational

basis review; and (3) whether Section 99 survives whatever level

of constitutional scrutiny governs. The Court addresses each of

those issues before turning to a few loose ends.

### A. **"Facial" or "As Applied" Challenge**

The parties dispute whether the plaintiffs' First Amendment

claims are "as applied" or "facial" in nature. As sometimes

---

[5]     In part, this was in recognition of the fact that the Court has
already dismissed PVA's claims insofar as they pertain to private
individuals. See Project Veritas Action Fund, 244 F. Supp. 3d at 265
(holding that Section 99 survives intermediate scrutiny insofar as it
permits only non-secret recording of private conversations). Although
PVA continues to advance some of those arguments (e.g., by now arguing
that Section 99 is unconstitutionally overbroad and is
unconstitutional whenever the subject of a recording lacks a
reasonable expectation of privacy), the Court has already rejected
them.

occurs, the claims in these cases "obviously [have]
characteristics of both." John Doe No. 1 v. Reed, 561 U.S. 186,
194 (2010). They are "as applied" in the sense that the
plaintiffs only challenge Section 99 insofar as it applies to
the secret recording of police officers (in Martin) or
government officials (in Project Veritas) performing their
duties in public. They are "facial" in the sense that the relief
sought in both cases would block the application of Section 99
to any situation involving the secret recording of police
officers or government officials performing their duties in
public, not just in a specific instance of the plaintiffs
engaging in such conduct.

The Supreme Court faced a similar situation in Reed and
instructed that "[t]he label is not what matters." 561 U.S. at
194. Rather, the point of inquiry is whether the claim and the
relief that would follow "reach beyond the particular
circumstances of [the] plaintiffs" in the case. Id. If so, the
plaintiffs must satisfy the "standards for a facial challenge to
the extent of that reach." Id.; see also Showtime Entm't, LLC v.
Town of Mendon, 769 F.3d 61, 70 (1st Cir. 2014) (applying Reed
to hold that a strip club's challenge to a town's zoning laws
was facial because the club sought to invalidate the zoning
laws, not merely to change the way those laws applied to the
club).

Here, there is no genuine dispute that the relief the plaintiffs seek in both cases "reach[es] beyond [their] particular circumstances." Reed, 561 U.S. at 194. Specifically, the plaintiffs all seek to partially invalidate Section 99. Thus, under Reed, their claim is facial to a certain extent. However, there are only two "set[s] of circumstances" at issue: the secret recording of police officers performing their duties in public, and the secret recording of government officials doing the same. That is the limited "extent" of the facial challenges in these cases. See id.

B.    Level of Constitutional Scrutiny

The parties also dispute the appropriate level of constitutional scrutiny. PVA argues that Section 99 is a content-based restriction on expression because it primarily injures undercover journalists, and therefore strict scrutiny should apply. This argument is easily dispatched. A content-based restriction is one that "applies to particular speech because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015) (emphasis added). Section 99 does not do this. Rather, in the scenarios at issue here -- the secret recording of police officers or other government officials performing their duties in public -- Section 99 acts as a content-neutral restriction on conduct that, under Glik, is protected by the First Amendment

34

(for citizens and journalists alike). See Jean v. Mass. State
Police, 492 F.3d 24, 29 (1st Cir. 2007) (noting that Section 99
"is a content-neutral law of general applicability" (internal
quotation marks omitted)). Thus, intermediate scrutiny applies.
See Rideout v. Gardner, 838 F.3d 65, 71-72 (1st Cir. 2016)
("Content-neutral restrictions are subject to intermediate
scrutiny . . . ."), cert. denied, 137 S. Ct. 1435 (2017). The
plaintiffs in Martin agree that this standard governs here.

     Finally, the district attorney suggests in a footnote that
a standard lower than intermediate scrutiny "might" apply. He
does not convincingly develop this argument, and neither Glik
nor Jean supports it. See 655 F.3d at 82-84; 492 F.3d at 29.

### C.   Intermediate Scrutiny

     Intermediate scrutiny requires that the law be "narrowly
tailored to serve a significant government interest." Rideout,
838 F.3d at 72 (quoting Ward v. Rock Against Racism, 491 U.S.
781, 791 (1989)). In this context, narrow tailoring does not
require that the law be the least restrictive or least intrusive
means of serving the government's interests. Id. However, it
requires a "close fit between ends and means" and dictates that
the government "may not regulate expression in such a manner
that a substantial portion of the burden on speech does not
serve to advance its goals." McCullen v. Coakley, 134 S. Ct.
2518, 2534-35 (2014). The law also must "leave open ample

alternative channels for communication of the information."
Ward, 491 U.S. at 791.

The defendants state that the purpose of Section 99 is to
ensure that all citizens -- government officials and private
citizens alike -- receive "guaranteed notice of being recorded,
so that one can respond appropriately." The defendants describe
this as a privacy interest of both the government officials and
the private individuals with whom they interact.[6]

The argument that Section 99 protects privacy interests is
consistent with case law from the Massachusetts Supreme Judicial
Court, which has stated that Section 99 "was designed to
prohibit the use of electronic surveillance devices by private
individuals because of the serious threat they pose to the
'privacy of all citizens.'" Hyde, 750 N.E.2d at 967-68 (quoting
Mass. Gen. Laws ch. 272, § 99). Generally speaking, protection
of individual privacy is a legitimate and significant government
interest. See Bartnicki v. Vopper, 532 U.S. 514, 532 (2001)
("Privacy of communication is an important interest . . . .");

---

[6]   The district attorney also suggests that this interest falls
within the First Amendment's protection against compelled
participation in the expressive conduct of another. In other words, if
notice of recording permits a person to modulate her behavior to
account for the recording, a lack of notice forces the person to
unknowingly participate in the expressive conduct (here, recording) of
another. Conley cites no case that applies this "compelled
participation" line of First Amendment jurisprudence in a right-to-
record dispute, and the First Circuit has not done so in its recent
explorations of the topic (i.e., Gericke and Glik).

cf. Frisby v. Schultz, 487 U.S. 474, 484 (1988) (recognizing protection of residential privacy as a "significant government interest" for purposes of First Amendment claim).

The Martin plaintiffs contend that allowing police officers to "respond appropriately" to notice of recording will permit them to alter any inappropriate behavior. They point to the important First Amendment interest in monitoring the conduct of law enforcement officials. In Glik, the First Circuit recognized the First Amendment's protection for information-gathering has special force with respect to law enforcement officials who are granted so much discretion in depriving individuals of their liberties. See 655 F.3d at 83. But the same basic interest applies generally to government officials: "Ensuring the public's right to gather information about their officials not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally." Glik, 655 F.3d at 82-83 (citations omitted).

The Court holds that Section 99 is not narrowly tailored to protect a significant government interest when applied to law enforcement officials discharging their duties in a public place. See id. at 84 ("In our society, police officers are expected to endure significant burdens caused by citizens' exercise of their First Amendment rights."). The same goes for other government officials performing their duties in public.

Id. at 82-83, 85; see Gertz v. Robert Welch, Inc., 418 U.S. 323, 344 (1974) ("An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties.").

This is not to say that police and government officials have no privacy interests. However, the diminished privacy interests of government officials performing their duties in public must be balanced by the First Amendment interest in newsgathering and information-dissemination. The First Amendment prohibits the "government from limiting the stock of information from which members of the public may draw." Bellotti, 435 U.S. at 783. "An important corollary to this interest in protecting the stock of public information is that '[t]here is an undoubted right to gather news from any source by means within the law.'" Glik, 655 F.3d at 82 (quoting Houchins v. KQED, Inc., 438 U.S. 1, 11 (1978)) (internal quotation marks omitted).

The First Circuit has recognized that "[t]he filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within these principles." Id.; see also Alvarez, 679 F.3d at 595 (recognizing audio and audiovisual

recording as among forms of information-gathering protected by First Amendment). Based on this case law, the Court holds that the First Amendment protects both audio and video recording. Because "the public's right of access to information is coextensive with that of the press," this right inures to individual citizens and journalists alike. Glik, 655 F.3d at 83. The right "may be subject to reasonable time, place, and manner restrictions," although Glik does not discuss what those restrictions might entail. Id. at 84.

Here, the defendants counter with several hypotheticals that might implicate individual privacy or public safety issues -- for instance, when an officer meets with a confidential informant or encounters a crime victim on the street. But these examples miss the mark. When such situations arise, police are free to "take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations." Alvarez, 679 F.3d at 607; see also Glik, 655 F.3d at 84 ("[T]he right to film . . . may be subject to reasonable time, place, and manner restrictions."). Nothing in the relief these plaintiffs seek would require otherwise. If an officer needs to protect the safety of an informant or her fellow officers, or seeks to preserve conversational privacy with a victim, the officer may order the recording to stop or to conduct the conversation at a

safe remove from bystanders or in a private (i.e., non-public)
setting. See Alvarez, 679 F.3d at 607. ("Police discussions
about matters of national and local security do not take place
in public where bystanders are within earshot . . . ."). A
reasonable restriction would remove the conversation from the
scope of the relief sought (and ordered) in this case.

In short, Section 99 prohibits all secret audio recording
of any encounter with a law enforcement official or any other
government official. It applies regardless of whether the
official being recorded has a significant privacy interest and
regardless of whether there is any First Amendment interest in
gathering the information in question. "[B]y legislating this
broadly -- by making it a crime to audio record any
conversation, even those that are not in fact private -- the
State has severed the link between [Section 99's] means and its
end." Alvarez, 679 F.3d at 606. The lack of a "close fit"
between means and end is plain. See McCullen, 134 S. Ct. at
2534-35.

Further, "[b]ecause [Section 99] is not closely tailored to
the government's interest in protecting conversational privacy,
[the Court] need[s] not decide whether it leaves open adequate
alternative channels for this kind of speech." Alvarez, 679 F.3d
at 607. Even if it reached that issue, however, the "self-
authenticating character" of audio recording "makes it highly

40

unlikely that other methods could be considered reasonably adequate substitutes." Id.

###    D.    Loose Ends

Some difficult questions remain about what constitutes a "public space" and who is considered a "government official" for purposes of the right to record. The facts of Glik provide some guidance on the "public space" issue. There, the recording took place on the Boston Common, "the apotheosis of a public forum" in which "the rights of the state to limit the exercise of First Amendment activity are 'sharply circumscribed.'" Glik, 655 F.3d at 84 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)). Many of the police-involved scenarios that the plaintiffs desire to secretly record would occur in similar locations -- traditional public forums like parks, streets, and sidewalks. See Minn. Voters All. v. Mansky, 138 S. Ct. 1876, 1885 (2018) (describing framework for traditional public forums, designated public forums, and nonpublic forums); Gericke, 753 F.3d at 7 (extending the right to record to traffic stops). It seems clear enough from Glik and Gericke that the right to record a government official, including a law enforcement official, performing her duties generally applies in public forums.

But the holding of Glik uses the phrase "public space," not "public forum." 655 F.3d at 85. The plaintiffs in Martin believe

the right to secretly record the police extends to private property that is open to the general public, such as a restaurant. For example, one of Martin's recordings of police activity occurred at the Arizona BBQ restaurant from a vantage point on the sidewalk outside the restaurant. In general, though, the First Amendment does not guarantee a right to free expression on private property. See Hudgens v. NLRB, 424 U.S. 507, 520-21 (1976) (holding that federal constitution did not protect employees' right to picket inside shopping center).

Moreover, there is a definitional issue with Glik's use of the term "government official." Glik, Gericke, and cases cited therein teach that a police officer falls within the ambit of "government official." But who are these other government officials? The First Amendment doctrine surrounding "public officials" may provide some guidance. See, e.g., Mangual, 317 F.3d at 65-66 (describing how definition of "public official" has evolved to "include[] many government employees, including police officers").

The parties did not focus on defining "public space" or "government official," and it is not prudential, under the ripeness doctrine, to do so now. While Glik's use of the term "public space" seems to indicate something broader than "public forum," and its use of the term "government official" includes a broader scope of public official than "law enforcement officer,"

the Court leaves it to subsequent cases to define these terms on a better record.

## CONCLUSION

Consistent with the language of Glik, the Court holds that Section 99 may not constitutionally prohibit the secret audio recording of government officials, including law enforcement officials, performing their duties in public spaces, subject to reasonable time, manner, and place restrictions.

## ORDER

In Martin, the motion for adverse inferences (Dkt. No. 115) is **ALLOWED IN PART** and **DENIED IN PART**. The plaintiffs' motion for summary judgment (Dkt. No. 121) is **ALLOWED**. The defendants' motion to dismiss for lack of jurisdiction and motions for summary judgment (Dkt. Nos. 110, 111, and 116) are **DENIED**.

In Project Veritas, the motion to dismiss on ripeness grounds (Dkt. No. 112) is **DENIED**. The motions for summary judgment (Dkt. Nos. 101, 117, and 126) are **ALLOWED IN PART** and **DENIED IN PART**.

The Court declares Section 99 unconstitutional insofar as it prohibits audio recording of government officials, including law enforcement officers, performing their duties in public spaces, subject to reasonable time, place, and manner restrictions. The Court will issue a corresponding injunction

against the defendants in these actions. The parties shall

submit a proposed form of injunction by January 10, 2019.

                              /s/ PATTI B. SARIS
                              Patti B. Saris
                              Chief United States District Judge