```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                      )
      PROJECT VERITAS ACTION FUND,      )
 4                                      )
                      Plaintiff         )
 5                                      )  CA No. 16-10462-PBS
                  -VS-                  )  Pages 1 - 78
 6                                      )
      DANIEL F. CONLEY, in His          )
 7    Official Capacity as Suffolk      )
      County District Attorney,         )
 8                                      )
                      Defendant         )
 9                                      )
                  -and-                 )
10                                      )
      K. ERIC MARTIN, et al,            )
11                                      )
                      Plaintiffs        )
12                                      )  Civil No. 16-11362-PBS
                  -VS-                  )
13                                      )
      WILLIAM B. EVANS in his Official  )
14    Capacity as Police Commissioner   )
      for the City of Boston, et al,    )
15                                      )
                      Defendants        )
16

17
                        MOTION HEARING
18
            BEFORE THE HONORABLE PATTI B. SARIS
19           UNITED STATES CHIEF DISTRICT JUDGE

20
                          United States District Court
21                        1 Courthouse Way, Courtroom 19
                          Boston, Massachusetts  02210
22                        July 19, 2018, 9:20 a.m.

23                   LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
24             United States District Court
               1 Courthouse Way, Room 7200
25                 Boston, MA  02210
                    (617)345-6787
```

1  A P P E A R A N C E S:

2       JESSIE J. ROSSMAN, ESQ. American Civil Liberties Union
   of Massachusetts, 211 Congress Street, 3rd Floor, Boston,
3  Massachusetts, 02110, for the Plaintiffs.

4       WILLIAM D. DALSEN, ESQ., Proskauer Rose LLP,
   One International Place, Boston, Massachusetts, 02210-2600,
5  for the Plaintiffs.

6       MATTHEW M. McGARRY, ESQ., Assistant Corporation Counsel,
   City of Boston Law Department, City Hall, Room 615, Boston,
7  Massachusetts, 02201, for the Defendant, William B. Evans.

8       ERIC A. HASKELL, ESQ. and MATTHEW P. LANDRY, ESQ.,
   Assistant Attorneys General, Office of the Attorney General
9  Criminal Bureau, One Ashburton Place, 19th Floor, Boston,
   Massachusetts, 02108, appearing for the Defendant,
10 Daniel F. Conley.

11      BENJAMIN T. BARR, ESQ., Attorney at Law,
   12519 Carrington Hill Drive, Gaithersburg, Maryland, 20878,
12 appearing for Project Veritas Action Fund.

13      GREGORY D. COTE, ESQ., McCarter & English, LLP,
   265 Franklin Street, Boston, Massachusetts, 02110, appearing
14 for Project Veritas Action Fund.

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE CLERK:  Court calls Civil Action 16-10462, Project Veritas v. Dan Conley and Martin v. Evans.  Could counsel please identify themselves.

MS. ROSSMAN:  Good morning, your Honor.  Jesse Rossman at the ACLU on behalf of Mr. Martin and Mr. Perez.

MR. DALSEN:  Good morning, your Honor.  William Dalsen, Proskauer Rose, also on behalf of Mr. Martin and Mr. Perez.

MR. McGARRY:  Good morning, your Honor.  Matthew McGarry on behalf of Commissioner Evans.

MR. HASKELL:  Good morning.  AAG Eric Haskell representing District Attorney Dan Conley in both matters.

MR. LANDRY:  Good morning.  Assistant Attorney General Matthew Landry representing DA Conley.

MR. BARR:  Good morning, your Honor.  Benjamin Barr representing Project Veritas Action Fund, along with me Greg Cote.

THE COURT:  Okay.  All right, there we go.

THE CLERK:  You can all be seated.

THE COURT:  So we're here today on both sets of motions.  I don't know if you've worked out between you who should go first, which case.

MS. ROSSMAN:  We have not, your Honor.  At the Court's pleasure, we're happy to do whatever order.

1          THE COURT:  Let's start with Martin then.

2          MS. ROSSMAN:  All right.  Good morning, your Honor.

3          THE COURT:  Now, there's a little bit of a problem.

4    Because you're so tall, I may not see the attorneys behind you,

5    so I'm trying to -- maybe just in case you -- all right, are

6    you okay now?  All right, there we go.  I can see now

7    everybody.  I can see everybody.  Okay, go ahead.

8          MS. ROSSMAN:  This Court already held, your Honor,

9    that if discovery bore out the allegations in the complaint,

10   plaintiffs should win; and the undisputed record now confirms

11   that these are the right defendants, these are the right

12   plaintiffs, and the plaintiffs should win on the merits of

13   their claim.  Unless the Court has any specific questions to

14   ask at the start, I would like to walk through each of those

15   elements in turn.

16         THE COURT:  Sure, go ahead.

17         MS. ROSSMAN:  With respect to the defendants, your

18   Honor, there is no dispute that District Attorney Conley is

19   properly before the Court on this matter.  The question is

20   whether or not Defendant Evans is properly here under *Monell*.

21   Again, he's being sued in his official capacity, so it is as

22   though it is a municipal claim against the City of Boston.

23         And the key question, of course, in municipal

24   liability is whether or not the municipality has made a

25   conscious choice that has caused a constitutional violation;

1  and this Court already held in its decision denying the motion

2  to dismiss that it would join the weight of appellate authority

3  on this issue to find that there is such a conscious choice --

4       THE COURT:  No.  I think what I said is, I'd let it go

5  to the next stage to see, you know, what the evidence was on

6  this point.  So fair enough, the majority of the cases allow

7  that conscious-choice approach.  That said, you know, I was

8  just letting it go to Stage B, which is, you know, motion for

9  summary judgment.

10      MS. ROSSMAN:  Absolutely, your Honor, and during

11  discovery we ended up determining, and the undisputed record

12  puts forth, that there is record evidence, undisputed record

13  evidence that supports the two things that are important with

14  respect to finding a conscious choice in cases like these.  It

15  is undisputed that Section 99 is an authorizing and not a

16  mandatory statute.  The Boston Police Department is not

17  mandated to have to enforce Section 99 in this manner.  So the

18  question really turns --

19      THE COURT:  Are there any statutes that are mandatory?

20  Aren't they all worded that way?

21      MS. ROSSMAN:  Not exactly, your Honor, in fact.  So if

22  we look to other circuits, *Vives*, for example, in setting forth

23  this test, it cited to the New York State Agricultural and

24  Markets Law, and there it said a constable or a police officer

25  must issue an appearance ticket or arrest.  And similarly the

1   Seventh Circuit in *Snyder* was dealing with a statute that had

2   to do with voter registration, and it held that -- the statute

3   at issue was, "The county voter registration officer shall

4   remove the individual off of the official list," and that's not

5   the language that we have here in Section 99, which certainly

6   sets forth what violates the statute and what the punishment

7   for the statute will be; but it doesn't say that a police

8   officer shall arrest someone or shall seek a criminal complaint

9   for that particular violation.

10          THE COURT:  I do think it's true -- we did some

11   research on this -- that *Monell* would apply when only

12   injunctive relief is requested.

13          MS. ROSSMAN:  That is correct, your Honor.

14          THE COURT:  So it's not just a damages issue.  I think

15   that garnered all members of the Supreme Court, so --

16          MS. ROSSMAN:  It did.  Initially the Ninth Circuit was

17   going the other way, but the Supreme Court, as it sometimes

18   does, overturned the Ninth Circuit.

19          THE COURT:  So would a remedy against the District

20   Attorney provide you full relief?

21          MS. ROSSMAN:  Not exactly, your Honor, because, of

22   course, here the plaintiffs are seeking both declaratory relief

23   and injunctive relief against both the prosecution and arrest

24   under the unconstitutional application of Section 99 to the

25   secret recording of police officers performing their duties in

1   public.

2            THE COURT:  So what have other courts done if --

3   Justice Breyer asked in his majority opinion -- in fact, not

4   majority, his unanimous opinion, and no one has shown me a

5   situation where you need to find -- get injunctive relief

6   against a city where you involve a statewide policy or

7   something like that.  So what would be another avenue for

8   relief if your clients wanted a declaratory judgment or

9   injunctive relief and I found there was no conscious choice?

10  Is there another avenue for relief from arrest?

11           MS. ROSSMAN:  Not that I'm aware of, your Honor.  Of

12  course, from the declaratory judgment piece, we're seeking

13  relief both with Defendant Conley and Defendant Evans.

14           THE COURT:  Would *Monell* stop a declaratory judgment?

15           MS. ROSSMAN:  No, your Honor.

16           THE COURT:  How do we know that?

17           MS. ROSSMAN:  There's been no -- first of all, it

18  would be the affirmative burden of the District Attorney to

19  raise a *Monell* defense, and also *Monell* defense --

20           THE COURT:  No, not *Monell*.  I meant if -- I

21  understand your point, Conley is one piece of it.  But you're

22  saying, well, that's not enough because someone could still be

23  arrested, which is an unpleasant experience, to say the least.

24  So could I do a declaratory judgment against Commissioner Evans

25  under *Monell* if I found there was no conscious choice?

1           MS. ROSSMAN:  Well, the declaratory judgment that the

2    plaintiffs are seeking here, your Honor, is a statement that

3    the application of Section 99 to the secret recording of police

4    officers performing their duties in public is unconstitutional,

5    and that would apply, period.  So the declaratory judgment

6    would certainly be in place regardless of whether or not Evans

7    was a defendant in this case.

8           THE COURT:  So, I mean, at least I have no reason to

9    believe he wouldn't follow the law.  So would that be

10   appropriate relief?

11          MS. ROSSMAN:  It is certainly a form of relief, your

12   Honor, and it's something that the plaintiffs -- you know, the

13   declaratory relief in stating or confirming that the

14   application of Section 99 is unconstitutional as applied to

15   secret recording of police officers obviously is a big piece of

16   what the plaintiffs are seeking here.  I think the reason why

17   it's an important --

18          THE COURT:  Does he stay in technically as a defendant

19   if it's just a declaratory judgment?

20          MS. ROSSMAN:  I believe it turns, your Honor, on this

21   Court's determination of the *Monell* issue.  I don't think --

22          THE COURT:  So there's no way essentially around that

23   issue?

24          MS. ROSSMAN:  My understanding, your Honor, especially

25   given what the Supreme Court has now said with respect to

1     *Monell* liability, is it applies to all forms of relief, whether

2     it is equitable or damages, and so Defendant Evans is either in

3     or out with respect to all of the relief.  But of course, as

4     your Honor just mentioned, the declaratory judgment would apply

5     throughout the state.  It wouldn't simply be limited to Boston,

6     let alone just to Defendant Conley, so, of course, that would

7     apply regardless of whether Defendant Evans was named as a

8     defendant.

9         THE COURT:  And then of course I'm assuming this case

10     will go up on appeal one way or another so the First Circuit

11     can take a look at these very complicated and difficult issues.

12     So, anyway, I'm sorry, I interrupted.

13         MS. ROSSMAN:  No problem, your Honor.

14         Perhaps I'd like to, if it's useful, to at least

15     describe some of this evidence that was produced during

16     discovery that we believe confirms that that conscious choice

17     was made by Defendant Evans to satisfy that standard for *Monell*

18     liability.

19         THE COURT:  All right.

20         MS. ROSSMAN:  There's really a double choice that

21     we're talking about here.  It's not simply the choice to train

22     officers on Section 99, although that is apparent.  It is also

23     the choice to train officers exclusively on the application of

24     Section 99 to secret recording of police officers who are

25     performing their duties in public.

1          Now, we know from the undisputed record that resources

2     in terms of training and timing are limited.  I would imagine

3     that's always true with respect to academies, but we know with

4     respect to the Boston Police Academy, there have only been 22

5     training bulletins over the past three years, 28 videos that

6     were produced since 2009.  And with respect to the criminal

7     instruction for recruits, they only get about 50 to 60 hours,

8     and their book only focuses on approximately 150 sections out

9     of the thousands of crimes that there exist in Massachusetts.

10         And what Defendant Evans suggests, your Honor, is that

11    this training is focused on training officers that they cannot

12    arrest someone for openly recording a police officer; and this

13    might be a different case if that were true, but that's not

14    what the contents of the record bear out.  You'd anticipate

15    that if the training was focused on training officers not to

16    arrest someone for openly recording, it would state exactly

17    that.  It would perhaps provide an example of where it would be

18    improper to arrest someone, and it would perhaps provide case

19    law to that effect, citing and describing *Glik* and *Gericke,* and

20    in fact that's exactly what the MPTC training documents do.

21    But the Boston Police Department uses all of the tools at its

22    disposal to go one step further, and that is to continuously

23    tell its police officers that they can, they do have a right of

24    arrest under Section 99 when someone secretly records, and then

25    they provide explicit examples that exclusively focus on the

1    secret recording of police officers performing their duties in

2    public.  So, for example, that wiretap video that's discussed

3    in the record, the first example is someone who's openly

4    recording a police officer.  The second example goes on to

5    describe someone who secretly recorded a police officer, and

6    the wiretap video informs officers they have a right to seek

7    charges against this individual, and in fact this behavior is

8    exactly the behavior that Section 99 was meant to prohibit.

9    There's no discussion of *Glik* in the video, there's no

10   discussion of *Gericke* in the video, and there's no example

11   provided of any other kind of violation of Section 99 except

12   for secretly recording of police officers, even though the

13   record shows that the department can, and in the past has,

14   changed and updated its videos when it wanted to provide

15   additional information.  And that pattern, your Honor, is

16   reflected both in the training bulletin as well as the criminal

17   law book.  Again, there is a statement that you can't arrest

18   someone for openly recording.  That is undisputed.  But both

19   the training bulletin and that chapter in the criminal law book

20   go on to provide examples of what violates Section 99, and the

21   only examples they provide are of secretly recording a police

22   officer performing their duties in public.  Again, there's no

23   discussion of *Glik.*  There's no discussion of *Gericke*.  There's

24   no example provided of how else someone could violate

25   Section 99; for example, by recording a civilian either in a

1   private conversation or even in a conversation with a police

2   officer.  It's that sole focus of the application of Section 99

3   that we see repeated in all of these tools that the department

4   has at its disposal, and that's exactly the kind of choice that

5   *Vives* explains is meant to trigger a *Monell* liability.  *Vives*

6   actually directly speaks to training materials, and says that

7   when you provide examples of what violates a statute, that's

8   putting meat on the bones of the statute, and that is

9   sufficient to establish a policy that triggers *Monell*

10  liability.  And *Vives* held that wasn't conclusive in that case

11  at the motion to dismiss phase because there hadn't been

12  discovery about whether there were other kinds of training

13  documents or how those training documents were used.  But here

14  we now know from discovery that every single recruit used the

15  video and reads the criminal law statute on Section 99 to learn

16  what violates that statute.  And we know that there are not

17  other documents that the Boston Police Department is creating

18  that provides an alternative application of Section 99.  So for

19  those reasons, it's now undisputed on the record that under

20  *Vives*, there is that conscious choice.

21       THE COURT:  All right.  It does occur to me, though,

22  that we should probably get moving on to the -- are you

23  planning on doing all the issues?

24       MS. ROSSMAN:  I'm happy to, if it makes more sense to

25  break things up, your Honor, I'm happy to do that.

1          THE COURT:  Maybe you should just do your whole
2     argument, and then we'll turn to opposing counsel.  And then
3     what I'll have to do is -- I have till 11:00, but my guess is
4     we'll have a lot of discussion, so why don't you -- how long do
5     you think you'll need all together?
6          MS. ROSSMAN:  I would like to make sure that I save
7     time for rebuttal, so I can tailor to that, your Honor.  How
8     long, I'm sorry, to --
9          THE COURT:  To present?
10         MS. ROSSMAN:  I think it would probably be ten more
11    minutes, your Honor.
12         THE COURT:  Fine.  Oh, perfect, okay.
13         MS. ROSSMAN:  All right, so turning to the defendants'
14    justiciability, your Honor, and I'd like to address those in
15    turn because the First Circuit has made clear that when you're
16    looking at pre-enforcement cases, both ripeness and standing
17    turn on similar issues.  The defendants' arguments both boil
18    down to an assertion that the plaintiffs would need to subject
19    themselves to arrest in order to have a justiciable claim here;
20    and, of course, as *Babbitt* and *Steffel* and numerous other
21    Supreme Court and First Circuit cases make clear, that's simply
22    not the case.  And instead, when you're talking about
23    pre-enforcement standing, the cases turn on whether there's a
24    credible threat of enforcement and there is an intent to engage
25    in that kind of conduct.  And while that standard is not

```
 1    nonexistent, it is also, as this Court already noted, not high,

 2    and the undisputed record now confirms that the plaintiffs have

 3    satisfied that standard.

 4          The most on point case, your Honor, for this is of

 5    course the Seventh Circuit's Alvarez decision, and there the

 6    court pointed to three things which it said satisfied

 7    justiciability and said that nothing further was required for

 8    pre-enforcement standing.  So there was an attempt to engage in

 9    the prohibited conduct, which there was a recording of police

10    officers; that that conduct was prohibited by the statute; and

11    the plaintiffs faced a credible threat of prosecution if they

12    engaged in that conduct.

13          And plaintiffs here have provided that and more.  It

14    is undisputed that they want to secretly record police officers

15    performing their duties in public without fear of arrest and

16    prosecution, and that's at the Statement of Undisputed Material

17    Facts 9 and 26.  The plaintiffs are not required to state that

18    they have a present intent to engage in this conduct right now

19    while it's illegal.  That would, of course, undercut the entire

20    grounds of the chilling --

21          THE COURT:  That's what you want in this injunction,

22    police officers performing their duties in public?  Is that the

23    injunction you want?

24          MS. ROSSMAN:  That is correct, your Honor, and I'm

25    happy to take a moment either if it makes sense now to talk
```

1   about the remedies because, I want to make sure I'm clear about

2   what that means, and I can do that now or I can do that at a

3   later point if that --

4          THE COURT:  So it's protests or car stops but not home

5   searches?

6          MS. ROSSMAN:  That's correct, your Honor.  The

7   definition of "public" that we're asserting here is streets and

8   sidewalks and public parks and other places that are generally

9   accessible to the public without permission or a key or other

10  some kind of --

11         THE COURT:  Restaurants?

12         MS. ROSSMAN:  Yes, your Honor.  And that is what the

13  plaintiffs are requesting here, and I believe that that is in

14  line with what the First Circuit -- I'm sorry.

15         THE COURT:  So it's not just public forums.  It's also

16  publicly accessible?

17         MS. ROSSMAN:  To the general public, your Honor.  And

18  that is the scope of what the plaintiffs are requesting here,

19  and we think that that's supported by both *Glik* and *Yacobucci*.

20  Of course, the *Glik* case, that did occur in the park, but the

21  court continued to use words like "public spaces, public

22  places," and also cited and relied heavily on the *Yacobucci*

23  case from the First Circuit.

24         THE COURT:  That was in a town hall.

25         MS. ROSSMAN:  It was, but it wasn't a public hall.  It

```
 1   was within a building.
 2           THE COURT:  Right, a public building.  That was my
 3   case, so --
 4           MS. ROSSMAN:  Yes.  No, I am aware of that, your
 5   Honor.  So I do think that that supports at least a broader
 6   understanding than simply traditional public forums.  Of
 7   course, if this Court feels like the scope of that needs to be
 8   narrowed in terms of the definition, that would be the proper
 9   approach rather than denying relief outright; but in terms of
10   the full form of relief that the plaintiffs are speaking to in
11   terms of the place, it is those public spaces.
12           I'd also, it might make sense to speak briefly about
13   remedy right now, your Honor, unless you prefer that I
14   address --
15           THE COURT:  Well, I actually find one of the hardest
16   parts about this case is not necessarily the facts; it's
17   doctrinally.  Are we talking -- you've even switched.  Is this
18   as applied, or it's now morphed into a hybrid between as
19   applied and facial?  It's difficult to figure out which this
20   is.  And the Supreme Court has asked us not to rely on labels,
21   so that's a little helpful here, so maybe I don't have to
22   actually find out what the label is; but doctrinally it's
23   actually fairly difficult because we're this a pre-enforcement
24   situation.
25           MS. ROSSMAN:  So, your Honor, we do believe that the
```

1    Court appropriately addressed this simply as applied in the

2    earlier order, but I think --

3         THE COURT:  I'm having second thoughts about whether

4    it's facial or not.

5         MS. ROSSMAN:  I think for the purposes of this case,

6    the important piece is looking at *Reed* and *Showtime*.  It

7    doesn't actually matter with respect to the analysis of these

8    issues, and that is because even if it's in that quasi-facial,

9    quasi-as-applied realm -- and, as you noted, the Supreme Court

10   both says that labels don't matter and also are not consistent

11   necessarily in how they apply the labels -- but what they are

12   consistent on is that when you have this quasi area, you still

13   need to apply the relevant constitutional test for the question

14   that's been placed before the court to the conduct that we're

15   speaking about.  And *Showtime* is very clear on this and I think

16   is the reason why it's particularly relevant is, this doesn't

17   transform the case automatically into an overbreadth claim.

18   *Showtime*, similar to here, applied intermediate scrutiny to a

19   quasi-facial, quasi-as-applied claim, and twice, at Footnotes 7

20   and 15, stated that even though it was this quasi-facial,

21   quasi-as-applied claim, that was a separate claim than

22   overbreadth, which there it chose not to address because it

23   said it had been waived.  So regardless of the label that this

24   Court chooses to apply, or even if a label isn't actually

25   applied to this claim, what is clear is that the level of

1    scrutiny that needs to be applied is that intermediate scrutiny

2    test.

3              THE COURT:  So I deliberately wanted Martin and

4    Project Veritas to move on a similar track.  So you're asking

5    me to essentially rewrite the statute and to narrow it to only

6    apply to police officers in public spaces.  Let's leave for a

7    second how you define that.  So why just police officers?  In

8    other words, one could imagine similar arguments being raised

9    for housing specialists or firefighters, city councillors,

10   which is what it was in *Yacobucci*, I forget exactly --

11             MS. ROSSMAN:  It was the Historic Commission.

12             THE COURT:  It was the Historic Commission.

13             MS. ROSSMAN:  A very contentious hearing.

14             THE COURT:  I remember at the time thinking there's

15   nothing as nasty as local politics, and this I think was over a

16   stone wall, so --

17             MS. ROSSMAN:  It's very important in Massachusetts --

18             THE COURT:  But, you know, it involves all sorts of

19   public officers.  So what would your position be on making it

20   broader than just police officers performing -- I forget how

21   you said -- in public spaces?

22             MS. ROSSMAN:  First, your Honor, just to be clear,

23   we're asking -- I think this was what you said, but I want to

24   make sure I'm hearing correctly -- we're asking that it not be

25   applied to police officers performing their duties in public,

1  yes.

2          THE COURT:  Yes, I may have misspoken.  That's fine.

3          MS. ROSSMAN:  The plaintiffs claim is focused

4  exclusively on police officers, and the reason for that is, it

5  has support both in the case law and in practical applications

6  that police officers are treated differently as opposed to any

7  other government official, let alone a private citizen.  They

8  alone are in our public streets and in our public spaces as

9  arms of the state who are authorized to use force against

10  civilians under certain circumstances --

11          THE COURT:  Justice Marshall's analysis in the dissent

12  in *Hyde* basically.

13          MS. ROSSMAN:  Exactly, your Honor, and that was

14  written in the early 2000s.  I think that bears out even more

15  several years later in terms of why it is important, when

16  police officers have the right to detain individuals and arrest

17  them, why they can and should be treated differently.

18          THE COURT:  So you would be opposed to spreading it

19  out beyond police officers?

20          MS. ROSSMAN:  The plaintiffs are not taking a position

21  on that, your Honor, but the reason why they have focused

22  exclusively on police officers is because of that unique power

23  and unique role that they have in the state; and the fact that

24  the government, it's in everybody's interest, both the

25  government and civilians, to insure that police officers in

1   particular are held accountable.  They have their unique

2   powers, and along with that comes unique responsibilities.  We

3   already know, of course, that they need to be willing to sort

4   of accept significant burdens with respect to individuals

5   exercising their First Amendment rights as a result of the role

6   that they play in society, and one of those burdens is knowing

7   that they can be secretly recorded when they're performing

8   their duties in those public spaces.

9        THE COURT:  Or perhaps it's just if you apply as

10  applied, that's all you have standing to challenge at this

11  point, if I went down that route.

12       MS. ROSSMAN:  It's certainly the only thing that the

13  plaintiffs are bringing here today, that's correct.

14       THE COURT:  And then you're taking no position on the

15  broader?

16       MS. ROSSMAN:  That's correct.  We're simply focusing

17  on this narrow band of officers because we believe that is

18  where it is especially clear that there are significant

19  interests in holding police officers accountable and allowing

20  individuals -- sometimes the only way to do that is to secretly

21  record, either because individuals do not feel safe to openly

22  record, or because, by its very nature, open recording can

23  change the nature of an interaction such that you don't know

24  how a police officer would react if they didn't know it was

25  being documented, so it's particularly important in this realm.

```
 1              THE COURT:  All right.
 2              MS. ROSSMAN:  Again, your Honor, I think, just to be
 3    very clear about the remedy that we're seeking, unless you
 4    prefer that I go back to the justiciability first and address
 5    remedy at the conclusion.
 6              THE COURT:  I leave that up to you.  I sort of have
 7    written on ripeness and standing.  I'm not so eager to rewrite
 8    a treatise on it unless there's something new that came up.
 9    But I am quite confused, maybe is the word -- maybe that's
10    because I'm getting it from the Supreme Court case law -- as to
11    whether I think about this as facial or as applied because,
12    frankly, your folks are only doing it in public spaces, like
13    parades and protests and car stops.  So when you tell me you
14    want it in a restaurant, that pushes it more broadly than your
15    folks have said they intended to go, your plaintiffs.  So what
16    would be the difference if I called it "as applied" versus
17    "facial"?  And what's the difference in the label in terms
18    of -- it's still intermediate scrutiny, but you're so worried
19    about overbreadth.  Why?
20              MS. ROSSMAN:  We're not worried about overbreadth.  It
21    just is a matter of the analysis, your Honor, and --
22              THE COURT:  So what would be the difference in the
23    analysis?
24              MS. ROSSMAN:  Well, in overbreadth, there typically is
25    a requirement you show there's absolutely no set of
```

1    circumstances, even under the First Amendment, which is a

2    slightly more flexible overbreadth --

3              THE COURT:  No set of circumstances that --

4              MS. ROSSMAN:  That it could be constitutionally

5    applied.

6              THE COURT:  To anyone or just to the police officers?

7              MS. ROSSMAN:  In an overbreadth challenge, your Honor,

8    that was in a quasi-as-applied situation, I think it would be

9    as applied to police officers.

10             THE COURT:  So it's overbreadth in the

11   quasi-as-applied?

12             MS. ROSSMAN:  Right, but, again, *Showtime* makes clear

13   that overbreadth applies when you're bringing an overbreadth

14   challenge.  If you're bringing --

15             THE COURT:  And you're distinctly not bringing an

16   overbreadth challenge?

17             MS. ROSSMAN:  We're not bringing an overbreadth

18   challenge, exactly.

19             THE COURT:  So you don't want me to go there?

20             MS. ROSSMAN:  No, and I think *Showtime* indicates that

21   it would not be appropriate to do so when the plaintiffs have

22   not brought that kind of challenge and instead to bring this

23   intermediate challenge.

24             With respect to ripeness and standing, your Honor, I

25   will just say that, as we've already set forth in our papers,

1   there's more than enough information that confirms that they do

2   have standing and justiciability based on the standards that

3   this Court already set forth.  In addition to what they have

4   already said that they want to do, they've also provided now in

5   depositions and interrogatories more than a dozen examples of

6   times when they've wanted to secretly record police officers

7   performing their duties in the past, as well as dozens more

8   where they have already openly recorded.  So under *Alvarez*,

9   they've gone above and beyond what would be required to

10  establish pre-enforcement standing.

11          To your point about the restaurants, your Honor,

12  plaintiffs actually did list in those examples of times when

13  they, in their interrogatories, when they have wanted to

14  secretly record police officers in the past, that one of the

15  examples were times when they were in public spaces like stores

16  and they saw police officers engaged in the public performance

17  of their duties, and if they didn't feel safe openly recording

18  there, that was a time they would want to secretly record.  So

19  I think with respect to putting forth those facts, they have

20  done so.  But, again, while that is the claim that the

21  plaintiffs are seeking, I think the approach, if the Court

22  wants to do anything with that and doesn't want to reach those

23  issues, it would be to narrow the scope of the definition of

24  "public places," obviously not to deny the declaratory relief

25  outright.

```
1              THE COURT:  Because there is a difference between a
2    traditional public forum -- I think Project Veritas' best
3    example is the government official standing on a soapbox in the
4    public common -- as opposed to a restaurant where people are
5    welcome, they're invitees, but they may not have the same set
6    of expectations as you would in the Public Gardens.  So I think
7    that's part of the hard thing here, and prudentially how far
8    does the relief go I'm struggling with.
9              MS. ROSSMAN:  Well, I think in terms of the relief,
10   your Honor, again, the public spaces, there are instances where
11   we know where police officers are engaged in restaurants or in
12   stores and are engaging in their official capacity there
13   performing their duties in public, and those are the instances
14   to which our plaintiffs speak, and why they would, you know, at
15   the utmost would want to make sure that the relief we're
16   granted would include those spaces.  But of course, even relief
17   which spoke to those traditional public spaces of streets and
18   parks and sidewalks would be a vast improvement over the
19   unconstitutional application that we have now, which is
20   prohibiting a wide range of interactions with police officers
21   who are performing their duties in public in an unconstitutional
22   way.  And so I --
23             THE COURT:  Or maybe a constitutional way, and this
24   would prove it up.
25             MS. ROSSMAN:  Oh, I'm sorry.  It's being applied in an
```

```
 1   unconstitutional way.  That was no judgment on how the police
 2   officers in any of those -- and I think that speaks to your
 3   Honor that the recordings could both hold police officers
 4   accountable or confirm that they are performing their duties
 5   lawfully.  The plaintiffs agree that it can serve both of those
 6   purposes.
 7           THE COURT:  Okay.  Well, thank you.
 8           So I think, as I read the briefings, Mr. Conley --
 9   well, let me just ask, do you want to make one set of arguments
10   with respect to Mr. Conley and Mr. Evans, or are you going to
11   do them separately?
12           MR. HASKELL:  Oh, with respect to the two defendants?
13           THE COURT:  Yes.
14           MR. HASKELL:  We probably ought to do them separately.
15           THE COURT:  Okay.
16           MR. HASKELL:  But what I was going to suggest, your
17   Honor --
18           THE COURT:  You're Mr. Haskell, right?
19           MR. HASKELL:  Yes, that's right.
20           THE COURT:  And you're doing Mr. Conley?
21           MR. HASKELL:  Yes.
22           THE COURT:  Okay.
23           MR. HASKELL:  And as I'm sure you saw from our
24   papers --
25           THE COURT:  Soon to be someone else.
```

```
 1              MR. HASKELL:  That's right, I suppose.

 2              THE COURT:  When is that election?

 3              MR. HASKELL:  The primary is in early September, and

 4    then the general is in November.

 5              THE COURT:  Okay.

 6              MR. HASKELL:  So what I was going to suggest is, I'm

 7    sure you saw from our papers that, you know, our arguments in

 8    the Martin case are probably 95 percent the same as they are in

 9    the Veritas case.  You know, I'm happy in the interest of

10    efficiency to address kind of everything all at once because

11    they're basically the same argument, or we can proceed case by

12    case if the Court prefers.

13              THE COURT:  Then maybe what we should just do is just

14    jump to Project -- other than the issue of whether or not

15    there's a Monell issue, the same is true for Mr. Evans?

16              MR. McGARRY:  Commissioner Evans is only in the Martin

17    case.

18              THE COURT:  Commissioner.  Oh, okay.  Okay, so maybe

19    what we should do is defer on you, go to Commissioner Evans,

20    that's right, and then we'll go to Project Veritas, and then

21    you can do a big presentation, all right?

22              MR. HASKELL:  I think that makes a lot of sense, your

23    Honor.  Thank you.

24              THE COURT:  Okay, thank you.

25              MR. McGARRY:  Thank you, your Honor.  So, your Honor,
```

1   it's probably no surprise that I'd like to use my time to focus

2   on the municipal liability issues in this case, and first and

3   foremost, based on a concern that the Court raised, I wanted to

4   put that to bed.  Commissioner Evans and the City will of

5   course abide by the law according to this Court's decisions,

6   and so a remedy as to DA Conley would be a complete remedy as

7   to plaintiffs in this case, in any case.

8        THE COURT:  You work for the Attorney -- do you work

9   for the AG?

10        MR. McGARRY:  The City Law Department, your Honor.

11        THE COURT:  The City Law Department.  So what is the

12   correct remedy?  As Justice Breyer said, "And no one has shown

13   me a situation where by denying injunctive relief, that would

14   actually hurt civil rights."  I'm paraphrasing.  So let's

15   suppose I agreed it wasn't *Monell* liability, dismissed you out,

16   but issued a declaratory judgment action and injunctive relief

17   with respect to Mr. Conley, does that mean you would stop

18   arresting people?

19        MR. McGARRY:  Yes.

20        THE COURT:  And if not, at that point you would say

21   there would be custom; is that right?  In other words, at that

22   point, if you chose to enforce a law that I've declared

23   unconstitutional -- of course, the First Circuit overrides me

24   and then the Supreme Court -- I'd love to see you all before

25   the Supremes -- but let's just say that you're making the

1    public representation that if I rule adversely to the District

2    Attorney, that Commissioner Evans would follow that ruling and

3    send out a circular on that?

4              MR. McGARRY:  I don't know whether he'd send out a

5    circular or not --

6              THE COURT:  I mean an announcement, nowadays maybe an

7    e-blast, but, in any event, he would notify people?

8              MR. McGARRY:  That's right, your Honor, and the City

9    would abide by the ruling.  So as I indicated and as the Court

10   suggested, relief as to DA Conley in this case would be a

11   complete relief as to plaintiffs.  And I agree with

12   Ms. Rossman's assessment that Commissioner Evans is either in

13   or out of this case.  If there's no *Monell* liability, there can

14   be no real relief as to Commissioner Evans specifically, apart

15   from a sort of more general injunction, which, as I indicated,

16   the City would obey.

17             THE COURT:  Yes, but what you'd hate to see is a --

18   for most people, even if the District Attorney didn't

19   prosecute, whoever the District Attorney is doesn't prosecute,

20   you'd hate to see the fear of being arrested.  You'd want the

21   police officers to understand that there's at least a

22   constitutional shadow over an arrest while in public.

23             MR. McGARRY:  That's exactly right, your Honor, and in

24   fact that sort of dovetails with some of the issues that I'm

25   going to talk about.

```
 1              THE COURT:  Okay, well, go ahead.

 2              MR. McGARRY:  Thank you, your Honor.

 3              So, first, I'd just like to revisit the City's

 4    argument regarding the issue of municipal liability for mere

 5    enforcement of state laws, but on top of that, I also want to

 6    talk about three reasons why even under the alternative

 7    standard of Vives, there is no liability for Commissioner Evans

 8    in this case.

 9              So as to sort of more broadly liability for

10    municipalities for enforcing state laws, it's still the City's

11    position that mere enforcement of the state law cannot be a

12    city policy; and this bright line is important to protect the

13    purpose of Section 1983, and that's that in the context of

14    municipalities, that they can be held liable only for their own

15    illegal acts and only where they're the moving force behind the

16    deprivation of rights.  And this case sort of highlights the

17    risks of imposing such liability for merely enforcing state

18    laws.

19              To accept plaintiff's argument is to radically expand

20    Monell.  The Supreme Court has warned about the dangers of

21    defining municipal policy too broadly.  The example that was in

22    the Tuttle case and in the Harris case that's provided is "the

23    policy of establishing a police force."  Now, that's a

24    conscious choice that the City makes, but to apply that would

25    swallow the rule, and it's sort of just so here.  Plaintiffs
```

explicitly are asking the Court to impose liability for the wiretap statute on the ground that the City doesn't train its officers on all possible state criminal statutes.  So, in other words, plaintiffs are arguing that the City is liable for all laws that it doesn't ignore, all criminal laws that it doesn't ignore.  And if the Court accepts this and finds the training materials effectively constitute municipal policies, I'm also concerned that it could provide a back door around the stringent sort of failure-to-train standard of reckless indifference.

So, for example, a plaintiff in an excessive force case could simply allege that some minor error in the training document constitutes a city policy, and therefore be held to a lower standard than the Supreme Court has held is necessary in a failure-to-train case.  It would result in respondeat superior liability, which is exactly what 1983 is designed to prevent in municipal liability context.

I'd also point the Court again to the *Surplus Store* case from the Seventh Circuit.  I know there was some talk at the motion to dismiss stage about whether or not this was still good law in the Seventh Circuit, and plaintiffs cited to another case, *Bethesda Lutheran*.  I don't think that that case holds the weight that plaintiffs ascribe to it, and in fact there's a later case -- *Frobe* is the name of the case -- it's cited in our briefing -- where a District Court in the Seventh

1    Circuit has applied the *Surplus Store* logic in almost identical

2    context to a wiretapping statute in Illinois that has since

3    been held unconstitutional.

4              THE COURT:  What's that case?

5              MR. McGARRY:  The case is called if *Frobe v. Village*

6    *of Lindenhurst*.

7              THE COURT:  And you're saying that is like our case

8    where the circuit said, "No, that's not enough to be custom and

9    practice"?

10             MR. McGARRY:  Yes.  It said that the mere

11   enforcement -- the problem that plaintiffs have with this is

12   the enforcement of the state law, not with any city policy, and

13   so therefore it dismissed a 1983 claim against the city.

14             THE COURT:  Whom did it uphold such a claim for?

15             MR. McGARRY:  I'm sorry?

16             THE COURT:  So who was the proper defendant?

17             MR. McGARRY:  I believe that there were county

18   defendants in there as well, and so I don't think that that

19   defense applied to the state or the county defendants in that

20   case.  And, again, that parallels what's going on in the

21   instant case.

22             So on top of all that, finally, and maybe most

23   importantly on this issue, to hold that the City is liable for

24   enforcing every law, every one of the 150 laws in its training

25   book, creates a perverse incentive, right?

1          THE COURT:  It's funny, though, I do admit I have a

2     Supreme Court case that supports you on this, but it's not

3     really liable in the sense of money.  It's just a question of

4     liable in the sense of "Don't do this anymore."

5          MR. McGARRY:  But that's true and it's not, your

6     Honor, in the context of attorneys' fees.

7          THE COURT:  Ah-huh.  All right, so that's why it

8     matters to you.  I see.  All right, I get it.

9          MR. McGARRY:  Perhaps I tip my hand.

10         (Laughter.)

11         THE COURT:  I understand, I understand.

12         MR. McGARRY:  Moving on from our argument that

13    municipalities can't be liable for merely enforcing a state

14    law, again, the policy concerns and the fact that that line of

15    logic would be extended to bring in respondeat superior

16    liability, moving on from that, even under the standard adopted

17    by the Court at the motion to dismiss stage, the *Vives*

18    standard, there's a number of reasons why it's inappropriate

19    here to find for Commissioner Evans that the City adopted a

20    municipal policy with regard to the wiretap statute, enforcing

21    the wiretap statute.  And the first and I think the most

22    important reason is that the wiretap training materials are not

23    evidence of any such policy.  They were intended to protect the

24    rights of people who were openly recording and to preserve the

25    First Amendment rights established by the First Circuit in

1    *Glik*.  And you can see this on the face of the documents

2    themselves.  So there's a Commissioner's memo that rereleased

3    this training bulletin in 2015, and it states that its purpose

4    is to remind all officers that civilians have a First Amendment

5    right "to publicly and openly record officers while in the

6    course of their duties."

7         There's a Commissioner's memo that rereleased this

8    same training bulletin in 2011, and it explicitly mentions the

9    *Glik* case.  There is the training bulletin itself which was

10   released the same year as the *Glik* case, and the wiretap video

11   as well was released that same year.

12        So this is a case where these particular materials are

13   not evidence of any intention to prosecute people for secretly

14   recording officers.  On the contrary, the purpose of these

15   materials is to prevent officers from going out and arresting

16   people who are openly recording.  It's to prevent the exact

17   situation that happened to Simon Glik in the *Glik* case.  So

18   that's a very different policy.

19        THE COURT:  The thing that I keep coming back to,

20   though, is, the First Circuit did state the right more broadly.

21   So you're right that the factual situation in *Glik* was an open

22   recording, but it did talk about a First Amendment right to

23   record.  And then, of course, you do intermediate scrutiny to

24   decide whether or not it was narrowly tailored to protect

25   important interests, which I agree; privacy of citizens is an

1    important interest.

2            So apart from the issue about whether the Police

3    Commissioner is properly named as a defendant, I'm just

4    struggling to find out what the privacy interest of a police

5    officer is in a public arrest or a public street stop or that

6    sort of thing, since the only purpose of the statute is

7    privacy.  That's the -- and I sort of believe in privacy, I get

8    that, but it's just, as weighed against the First Amendment, it

9    strikes me that in certain settings it just gets counterbalanced.

10           MR. McGARRY:  That's right, but there's a flavor to

11   it, and it's a particular type of privacy, your Honor.  It's

12   privacy against secret recording as opposed -- because the

13   statute conveys --

14           THE COURT:  But why should -- all right, fair enough,

15   privacy against -- why should a police officer have privacy

16   against secret recording of a public act?  I've been struggling

17   with that.  I mean, it's not like you're going into his home

18   and his family or even, you know, bantering in a private

19   cruiser.  It's what he's doing in public, or she.

20           MR. McGARRY:  In my opinion, your Honor, the

21   protection, it's the same interest that anyone else has against

22   clandestine recording, right.  So in a situation where an

23   officer is openly recorded, that may enhance accountability,

24   but in a situation --

25           THE COURT:  It would decrease accountability because

```
1    let's say, for example, he's swearing at someone, they'd stop
2    as soon as the cellphone came out, right?
3              MR. McGARRY:  That's right, and that's exactly the
4    point that I'm trying to make, is that open recording, which is
5    an alternative channel that's left open, is more appropriate
6    for enhancing accountability, where if an officer sees that
7    he's being recorded, he may bring his conduct into line if he
8    was theoretically going to do something wrong.  But with secret
9    recording, the goal seems to be a sort of "gotcha" goal, wait
10   until some violation happens.
11             THE COURT:  Sure, because most people -- that's fair,
12   but most people wouldn't feel comfort- -- wouldn't have that
13   cellphone going.  In fact, it would be almost dangerous to
14   stick your hand suddenly into your pocket to make it keep going
15   because they'd think it was a gun.  So let's say you have
16   somebody who's willing to do that.  Most people wouldn't, and
17   so you would perhaps, for the rogue police officer, not the
18   general police officer, might be able to expose the way
19   somebody treats someone.
20             MR. McGARRY:  But when you say most people wouldn't,
21   your Honor, I think that rests on an assumption that the
22   Supreme Judicial Court rejected in *Hyde*.  It's an assumption
23   that officers are going to act in some sort of unlawful manner
24   on a regular basis.
25             THE COURT:  Not most officers, of course not, but
```

1    some, right?  Some.

2            MR. McGARRY:  I don't think that that assumption -- I

3    still think that that's the underlying assumption there, and I

4    don't think that it's necessarily warranted.

5            THE COURT:  All right.

6            MR. McGARRY:  And I think that the privacy interest of

7    a police officer, as far as the wiretap statute goes, is the

8    same as the privacy interest of a particular citizen, which is

9    not to be --

10           THE COURT:  But you could also imagine a situation of

11   private recording where some police officer is a hero.

12           MR. McGARRY:  That's right.

13           THE COURT:  I've seen so many of those in my

14   courtroom; you know, running down the street after someone with

15   a gun, and, you know, you could imagine a positive story that

16   comes out of this too.

17           MR. McGARRY:  Absolutely, and I've had cases where I

18   certainly wish that there was video, but that's sort of a

19   policy rationale rather than -- and a scrutiny rationale.

20   That's --

21           THE COURT:  Well, at some level I've got to weigh.

22   I've got to weigh.

23           MR. McGARRY:  I understand, your Honor, but the

24   legislature has already weighed that, and the Supreme Judicial

25   Court has rejected that sort of assumption as not properly

1    underlying that statute.

2          THE COURT:  Yes, I understand.  All right, thank you.

3          MR. McGARRY:  You're welcome, your Honor.  And if I

4    could return to sort of the *Vives* standard --

5          THE COURT:  Oh, all right, and also not liability.

6    Just why don't you finish up on that and then --

7          MR. McGARRY:  Thank you, your Honor.  So because the

8    purpose of the training materials at issue was to protect open

9    recording, it's not a conscious choice under *Vives* to enforce

10   the statute against people secretly recording police officers.

11   And plaintiffs make much of the fact that the training

12   materials focus on police officers.  I think there's some truth

13   to that characterization, but that's exactly what you would

14   expect if the purpose of those materials was to stop officers

15   from arresting people for openly recording.

16         The second point under *Vives* is that these training

17   materials are part and parcel of a comprehensive training

18   regimen provided by the Boston Police Department, and *Vives*

19   explicitly makes a distinction between a sort of general policy

20   of enforcing all state laws versus a particular focus on one

21   state law, and these materials fall into the former camp.  You

22   know, plaintiffs characterize, well, they only produced 20

23   something videos and they only made 20 something Commissioner's

24   memos, but there's no basis for saying that those numbers are

25   insufficient.  On the contrary, the record shows that making

1    e-learning videos in particular takes quite a bit of resources.

2    It's been described as making like mini movies.  So there are

3    28 of those out there, and the wiretap video is just one of

4    them.

5            The third point I'd like to make under *Vives* is that

6    *Vives* distinguishes situations where it's not a conscious

7    choice because it's mandated.  Now, I'm not arguing that the

8    state law mandates Commissioner Evans to enforce it, but what I

9    am arguing is that in the wake of *Glik* --

10           THE COURT:  You know, what do you do?  Remember

11   back -- there are a bunch of statutes on the book from colonial

12   days, for example.  Aren't there all these quaint old statutes

13   they're trying to get rid of?  So there's the Commissioner

14   chooses not to enforce whether you can have what, a pigsty in

15   your backyard?  You know, some of those old, old cases.  So, I

16   mean, there is some choice involved on what statutes you

17   enforce and which ones you don't.

18           MR. McGARRY:  I agree, and, as I said, I'm not arguing

19   that the state statute compels Commissioner Evans to enforce

20   it.  That is not the argument I'm making.

21           THE COURT:  What you're saying is, when the state

22   statute empowers him to, the fact that he does does not make it

23   a municipal policy?

24           MR. McGARRY:  Yes, but I'm also saying that federal

25   law in the wake of *Glik* requires training of officers to not

1    arrest people for openly recording.  So the federal law or

2    federal liability comes in as its own sort of mandatory

3    situation here in the place of a state law requiring

4    Commissioner Evans to enforce.

5           THE COURT:  Okay, thank you.  I think I've got the

6    point of this, and I've got a lot of people to hear from, so

7    was there one final point you needed to make?

8           MR. McGARRY:  Not at all.

9           THE COURT:  Okay, thank you very much.

10          MR. McGARRY:  Thank you, your Honor.

11          THE COURT:  I think what makes the most sense for us

12   to do is to go to Project Veritas and let the District Attorney

13   sweep up, with an opportunity for rebuttal, if necessary, okay?

14   All right.  And, again, you're Mr. Barr, right?

15          MR. BARR:  Yes, your Honor.  I'm Benjamin Barr on

16   behalf of Veritas.  May it please the Court, thank you for

17   having us here this morning to discuss the matter.

18          I'd like to take just a moment to discuss the specific

19   importance of this case and the gravity of it in First

20   Amendment jurisprudence before I address three specific areas

21   of our briefings today.  We have before the Court Section 99,

22   which is unlike any other recording law in the nation.  It is

23   the only law that completely bans secret audio recording.

24   Unlike 38 other states that allow freely to record and 11 other

25   states that have balanced privacy and free speech interests

1    with reasonable regulations and allow recordings so long as

2    there's no reasonable expectation of privacy, Massachusetts

3    took the radical step to entirely foreclose this important way

4    to be able to gather news and hold government accountable.

5    That creates real tension with the First Amendment, for the

6    underlying purpose of the First Amendment is that those who are

7    in power should be held accountable to those they have power

8    over; and any means that allow them to do so -- to be able to

9    take notes as a reporter, to be able to criticize those in

10   power -- are means that are protected at the highest rung of

11   the hierarchy of the First Amendment.

12          So if you imagine a reporter in the 1920s having a

13   notepad and listening to a discussion in a public place, it

14   would be implausible to think that it would be constitutional

15   to forbid him from taking notes and later reporting on that.

16   We're in the era today of Alexa and of Syrie and of devices

17   listening to us, and First Amendment jurisprudence has to keep

18   up with technology.  Today the reporter's notepad is the

19   ability to do secret recording and to be able to hold those in

20   power accountable, and so it's for that reason that we allege

21   not only as-applied remedies but also overbreadth in this

22   matter.

23          THE COURT:  All right, so you both take slightly

24   different approaches, and it's a difficult doctrinal area.  So

25   your claim is I thought facial.  I thought that's the way you

1   brought this.

2          MR. BARR:  We have alleged that it can be determined

3   to be unconstitutional either as applied, in accordance with

4   the facts that we laid out --

5          THE COURT:  As applied to what?

6          MR. BARR:  As applied to the actions that Project

7   Veritas laid out in its complaint and in the statement of

8   material facts, or in its entirety.  But I actually think

9   there's a somewhat simple solution to this.

10          THE COURT:  Good.  I love it.

11          MR. BARR:  Right, right, yes, I'm here to help, okay.

12   So in essence, it boils down to this:  We have the state

13   Supreme Court of Massachusetts already unequivocally declaring

14   that there is no allowance for recording here.  That's in plain

15   violation of what the First Circuit has held, the Seventh

16   Circuit, and most Federal District Courts with respect to the

17   right to record under the First Amendment.

18          In looking at a statute that is before a Federal Court

19   for review, there has to be a reasonable and readily apparent

20   means to construct this to mean something else, to apply a

21   gloss.  Now, the state did a great job in pulling up the

22   legislative history behind this.  It's unambiguous.  There is

23   no waffling about whether this applied all the time or in

24   limited instances or had exceptions or safeguards.  It's not a

25   state like Oregon that spells out specific areas where you can

```
 1    record, public meeting areas, government halls, but then
 2    excludes others.  It is unequivocal in that ban.
 3            It has had, you know, numerous judicial treatment.
 4    The state has not moved to amend it or cure any constitutional
 5    deficiencies since Glik.  There's been no statement from the
 6    Attorney General's office that they will not apply it in
 7    certain instances.  So we're faced with a problem that was
 8    created by the Commonwealth of Massachusetts.  And while it's
 9    an extraordinary remedy, whether you call it overbreadth or
10    whether you look at it as applied, in an as-applied format, I
11    just don't see that there is a way to provide a narrowing
12    construction or a gloss that's readily apparent based on that
13    material.  So whether you decide to call it overbreadth or as
14    applied, and scholars from Chemerinsky to numerous Supreme
15    Court Justices have problems with the overbreadth and
16    as-applied situation, it's not --
17            THE COURT:  I'm not the only one struggling with this.
18            MR. BARR:  No, and I do a lot of these pre-enforcement
19    First Amendment challenges, whether they're as applied or --
20            THE COURT:  Has Erwin Chemerinsky written on this?
21            MR. BARR:  I believe he has, if I'm remembering
22    correctly on this.  There's numerous scholars who have written
23    about the difficulty of when it's really an overbreadth claim
24    or when it's just --
25            THE COURT:  He's recently written on this?
```

1          MR. BARR:  I don't believe it's recent.  I'd be happy

2     to file some material supplementally afterward.

3          THE COURT:  I've got so much briefing on this.  I

4     don't want anymore.  I want people to enjoy their summer

5     weekends.

6          MR. BARR:  I understand.

7          THE COURT:  I think he's really smart and thoughtful,

8     and that might help me through this, yes.

9          MR. BARR:  It's my recollection that he wrote on this.

10    I'm hoping I'm remembering the correct author at this moment.

11         So that's sort of how I see it.  The free speech

12    rights of whether it's Black Lives Matter who want to go out

13    and be able to record their interactions with police and other

14    individuals, whether it's Project Veritas, whether it's the

15    ACLU or the like, that's where the paramount importance here

16    is.

17         THE COURT:  But why isn't it -- the way I've been

18    thinking about it is in two buckets.  One is individuals.  I

19    ruled against you already on that, and I'm not inclined to go

20    the other way.  So already I've said that the privacy interests

21    of an individual outweighs that of the press, and that to have

22    a reasonable expectation of privacy, that's in the eyes of the

23    beholder.  So you could sit, you know, on the next table over

24    in a restaurant recording and say, "Hey, tough, you didn't have

25    a reasonable expectation.  You spoke too loud, so tough."  So

```
 1    individuals I put in a different bucket.
 2            So when you say a facial invalidity, you're talking
 3    about government officials in public spaces, or you're talking
 4    about something all -- just invalidate the statute?
 5            MR. BARR:  Massachusetts chose to write the law so
 6    broadly.  If you believe there's a narrowing construction that
 7    can save it, so be it.  I don't see how it can be invalidated
 8    piecemeal or in part.
 9            THE COURT:  You think -- and I've struggled with
10    this -- it would be too close to rewriting the statute --
11            MR. BARR:  Yes.
12            THE COURT:  -- with something recently the Supreme
13    Court knocked down in an immigration context.  So, you know, I
14    worry about that, whether there's an easy narrowing as opposed
15    to me being a legislator.  But why wouldn't the easy one be
16    government officials?
17            MR. BARR:  Because Massachusetts had the ability to
18    limit it to private individuals, to protect just the recording
19    of private individuals.  There's no indication of that.  It's
20    never taken that stance in litigation, and that's not how the
21    state courts have interpreted the law.  So it would be a
22    complete reversal of both what --
23            THE COURT:  What about going along with what the ACLU
24    wants, which is just narrowing it to police officers where
25    there's -- you know, they've always been treated a little
```

1    differently because of their ability to wield public force.

2         MR. BARR:  Right.  Well, I think all agents of

3    government possess the ability to be corrupt or to abuse the

4    rights of individuals, whether they're a city council member

5    who wants to bribe, a tax auditor who's acting improperly.  I

6    think it's incredibly narrow to say that this should only apply

7    to police officers.  I understand it's the particular facts of

8    the program and respect that.  Veritas has alleged in its

9    complaint and its statement of material facts that it wants to

10   investigate a wide array of public officials.  And the

11   underlying test is whether the activity in question serves to

12   be able to hold government accountable and to be able to allow

13   individuals and a free people to criticize those in power, and

14   that is what this allows, so every public official imaginable.

15        Now, you know, we noted in our brief, one remedy might

16   be your formulation in *Martin* that the secret recording of

17   public officials performing their official duties in a public

18   place, something to that effect -- I'm paraphrasing -- might be

19   a reasonable construction, but I have a very difficult time

20   understanding how it would be reasonable and readily apparent

21   that given the legislative history that was a unanimous

22   decision to ban all secret recording and that the state Supreme

23   Court has interpreted as such, I just, I don't see how that --

24        THE COURT:  You think it's all or nothing?

25        MR. BARR:  I do.  Now, as a backdrop, we really would

```
1    like to be active in Massachusetts before November, four months
2    away.  We've got a small time window in which the electorate
3    listens to information about public officials, and it's usually
4    before an election.  So if the Court is inclined to, you know,
5    to not as wide a remedy, of course we'll accept that too,
6    but --
7              THE COURT:  You can appeal.
8              MR. BARR:  Yes, your Honor, but time is of the essence
9    here.
10             I wanted to jump into just briefly ripeness concerns
11   that were raised both by you in the previous dismissal order --
12             THE COURT:  Yes, and I've been worried about this
13   because I keep going back and forth on the as applied versus
14   facial.
15             MR. BARR:  Right.
16             THE COURT:  You're looking for a facial overbreadth
17   challenge, I understand that; but if I went to, as you said,
18   the alternative, as applied, and then I said, "As applied to
19   what?" and you said, "Well, as applied to what we want to do,"
20   that's where it gets complex.  I know exactly what Martin's
21   people want to do.
22             MR. BARR:  Correct, correct.
23             THE COURT:  And I don't really know exactly what you
24   want to do, and you're not going to tell me because that would
25   ruin the -- I thought I would see something more concrete on
```

```
1    your proposal --
2              MR. BARR:  We changed.
3              THE COURT:  -- the sanctuary cities, and it's shifted.
4              MR. BARR:  What we did was, when we filed our amended
5    complaint, we did provide one very factually rich set of
6    details for one of our projects.  We've also bolstered the
7    others --
8              THE COURT:  Sanctuary cities.
9              MR. BARR:  No, not on sanctuary cities.  In the
10   amended complaint --
11             THE COURT:  Was that the landlord one?
12             MR. BARR:  No, no.  So this is about Antifa and about
13   public protests and police treatment of protesters in free
14   speech rallies.
15             THE COURT:  Oh, I'm sorry, all right.
16             MR. BARR:  No.  We have four different main projects
17   that we've alleged.  This one, you know, I took care to take
18   your statement in the order of dismissal very seriously that we
19   had not alleged any plans, steps, or past activities that would
20   suggest a present intent to lodge a prohibited investigation.
21   So we're very careful to try to spell that out, both in the
22   complaint and in the materials supporting the statement of
23   material facts.  And just to call to the Court's attention
24   what's very different from the prior pleadings, in Paragraph 28
25   we describe the program in which Veritas has been active with
```

```
 1    Antifa organizations for more than a year; that we were

 2    present -- we had a past activity.  We went to the

 3    Charlottesville Unite the Right rally on August 12 where an

 4    individual was ran over by a car.  We caught that by secretly

 5    recording --

 6               THE COURT:  Was that you?

 7               MR. BARR:  Other journalists as well, but we caught

 8    that.  We also caught --

 9               THE COURT:  I forget, what exactly does Antifa --

10               MR. BARR:  Oh, antifascists.  And we caught

11    interactions of police with protesters taunting them, jesting

12    them.  We went then to Atlanta, Georgia, on August 13, the next

13    day.  We went to the next Antifa protest there.

14               Now, a week later, August 19 -- this is Paragraph 29

15    of the complaint -- Boston had the similar free speech alley

16    with Antifa present.  We were denied the ability to secretly

17    record.  It's not hypothetical.

18               THE COURT:  Did you publicly record?

19               MR. BARR:  No.  We sent no one there.

20               THE COURT:  You sent no one?

21               MR. BARR:  Right.  We believe there is an intrinsic

22    strength in being able to secretly record individuals in their

23    interactions with government.

24               THE COURT:  So if I did as applied, both of those very

25    concrete examples would be very much a traditional public
```

```
1    forum?
2            MR. BARR:  Yes.  So I wanted to address the complexity
3    in recording law.  I do all of the recording operations for
4    Veritas nationwide, and there's a difference between a public
5    forum and a public place.
6            THE COURT:  Yes.
7            MR. BARR:  So for purposes of recording analysis, what
8    happens is that, for example, while a restaurant wouldn't be a
9    public forum, it would be deemed a public place, say, in
10   California that has a two-party consent standard.  And the
11   reasonable expectation of privacy standard comes out of Katz
12   from Fourth Amendment jurisprudence.  It's not "eye of the
13   beholder" so much.  It's a well-developed line of
14   jurisprudence --
15           THE COURT:  Yes, but, you see, the problem I have with
16   that, relying on tort remedies, is the technology has changed.
17   And as soon as you, let's say, audiotape somebody in a
18   restaurant speaking, and some jury two years from now decides
19   that that person had a reasonable expectation of privacy,
20   that's now all over the Web forever.
21           MR. BARR:  Yes.
22           THE COURT:  So technology both helps and hurts you.
23   It's not like somebody scribbling on a notebook.
24           MR. BARR:  Well, it's the most effective means to be
25   able to record what government is doing, to be able to
```

1  publicize that to the public.

2        THE COURT:  But you've got to understand, it's a

3  bigger megaphone.

4        MR. BARR:  It's a bigger megaphone.

5        THE COURT:  And you can't ever, ever get it down.

6        MR. BARR:  Right, and I think your concerns that

7  you're speaking to now speak more to private individuals, which

8  we realize --

9        THE COURT:  Yes, yes, yes.

10        MR. BARR:  That claim is dropped.  We're saving that

11  for appeal.  But as to government officials, the larger the

12  megaphone, the better the recorder, the better our republic is.

13        THE COURT:  You're just saying that if you take -- so

14  that would be the "as applied" if I went that route --

15        MR. BARR:  Yes, yes, exactly.

16        THE COURT:  -- would be to the public spaces.

17  However, I choose -- and do I sound too much like a legislator?

18  I know that's your big point; like, well, "yes" to the Boston

19  Commons, "no" to the restaurant.

20        MR. BARR:  This is what I'm trying to articulate is, I

21  mean, I suppose you could fashion a test that says on Tuesdays

22  and Thursdays but not Sundays and here --

23        THE COURT:  Right, and that's why ripeness is also

24  both a jurisdictional and prudential concern.  Like, I'm

25  reluctant to say, "Yes, well, what about restaurants?"  Well,

1    what about the Historic Commission?  Well, what about this?  I

2    mean, I find my -- I was, you know, doing this with my law

3    clerks:  Well, what about this and what about that?  And I

4    found myself sounding like a legislator.  Like you say, most

5    legislators have drawn lines.  Well, I'm not that person.

6              MR. BARR:  Right.  Yes, if I may offer an example too.

7    The right to record in a public space versus a public forum is

8    important because, for example, a police officer could be

9    taking a bribe in a restaurant, in a hotel lobby, areas that

10   most states that have two-party consent law would ordinarily

11   say lack a reasonable expectation of privacy, and you'd be

12   getting good information that you'd be able to pass along to

13   the public.  So I think it's important to keep that distinction

14   separate between public fora analysis under the First Amendment

15   and public place.  If this Court finds, you know, a way to

16   sensibly narrow the law or limit it, that's terrific, and we'll

17   do the best we can with it.

18             THE COURT:  Or at least for now, and then let other

19   cases arise as issues arise.

20             MR. BARR:  Well, I cited *Citizens United* in my brief

21   to explain that when First Amendment rights are before the

22   court, that length of litigation and denying people that full

23   ability to be able to hold government accountable and speak

24   does great damage to them.  It causes financial burdens.  It

25   mutes them.

1          THE COURT:  Where they kept trying narrowing, and then

2     they finally threw up their --

3          MR. BARR:  Kept trying and trying, right.

4          THE COURT:  It's easier for them than for me.

5          MR. BARR:  Well, I mean, when you think about this,

6     this law has had several attempts at state court treatment to

7     narrow it or to provide some remedy there that hasn't occurred.

8     The state hasn't responded in any way to *Glik* or any other

9     judicial treatment there.  So really the burden has been on

10    Massachusetts to provide some narrowing construction, to

11    provide some remedy, or some notice to public that this is what

12    you're able to do.  It has taken no steps.  And the burden

13    can't be on us, the speakers.  The burden is on the state, not

14    even the Attorney General's office.

15         THE COURT:  But what I'm struggling with is, this is

16    pre-enforcement, how do you do as applied pre-enforcement?

17    Because, by definition, it's not as applied because it's

18    pre-enforcement.  So where I have very specific instances of

19    people actually recording with police officers, that's ripe,

20    and maybe your -- how do you pronounce it?

21         MR. BARR:  Antifa.

22         THE COURT:  -- Antifa or the public protests, maybe

23    that would be as applied where it's very concrete for me.  It's

24    otherwise more difficult.

25         All right, well, I think I understand your position,

```
1    and I understand -- I didn't know if you had a position one way
2    or another.  You're just going against the District Attorney,
3    is that right?
4         MR. BARR:  Yes, I believe declaratory relief is
5    sufficient for our purposes here.
6         THE COURT:  And it would regardless -- because right
7    now, of course, he's only the District Attorney of Suffolk
8    County, so you think that would be sufficient?
9         MR. BARR:  I do, yes.
10        THE COURT:  All right.
11        MR. BARR:  I would just note very briefly on the
12   ripeness that, you know, the statement of material facts,
13   Paragraph 5, and the affidavit of Russell Verney, who's the
14   Executive Director, and Joe Halderman, both Paragraphs 5 and 6
15   provide the concrete details about the Antifa.  We've provided
16   additional details on some of the other plans such as the
17   sanctuary cities, but they're really difficult to narrow down
18   because it's more of a spontaneous organization.  We want to be
19   able to deploy people into the state and to be able to start
20   talking to police officers, legislators, members of the
21   Massachusetts Immigration Board and the like, candid
22   conversations in public spaces, and see where that develops.
23   And that is through what we've shown through discovery, that's
24   the manner in which Veritas operates.  So if that's too
25   speculative, we did our very best on Antifa to give you a very
```

1    concrete plan to show you.  We did it before.  We show you

2    exactly what equipment we use, why we want to do this

3    particular type of recording, and why we think that's

4    important.  And I think that meets your ripeness standard that

5    was detailed in the previous order.

6            THE COURT:  Right, I'd like to think it was mine.  I

7    think I took it right out of the First Circuit case.  So I

8    think that's what they're going to ask for as well, so --

9            MR. BARR:  Yes.  And it also meets *Alvarez*.  You know,

10   *Alvarez* had a base and you had a plan to do a police

11   accountability project and to satisfy standing and ripeness

12   concerns there.  It was simply enough to develop a plan to

13   generally record police in public spaces.  They couldn't know

14   the exact people or the exact time, where, et cetera, but a

15   general plan, so that's why I think some of the others would

16   also satisfy.

17           But I want to just remind this Court in closing about

18   the radical and unprecedented nature of this.  As I noted, so

19   many states have taken careful measure to balance both the

20   First Amendment and privacy interests.  Only Massachusetts

21   decided to forgo that balancing, and it deeply injured the

22   First Amendment in doing so.  On top of that, and to support

23   overbreadth and the seriousness, the gravity of the situation,

24   it imposes a five-year criminal penalty.  So if you're a social

25   protester, if you're active with Black Lives Matter and you

1    step across that line because you're catching something that

2    the public needs to see, off to jail for five years.  In

3    Massachusetts, we're going to imprison journalists; we're going

4    to imprison the civic-minded.  America does better than that.

5            Thank you, your Honor.

6            THE COURT:  Thank you.

7            MR. HASKELL:  Good morning, your Honor.

8            THE COURT:  Now the last word.

9            MR. HASKELL:  Speaking for DA Conley on both cases, if

10   it's okay with the Court, what I'd like to do is make the

11   argument which I think I mentioned earlier.

12           THE COURT:  Penultimate word because I am going to

13   give the opportunity for response.

14           MR. HASKELL:  Second-to-last word, still batting

15   cleanup here.  What I'd like to do, if it works for the Court,

16   is make our argument and kind of note along the way where the

17   argument might be different with respect to the two cases, but,

18   as I mentioned, the argument is fundamentally similar for both

19   Martin and Project Veritas, if that works.

20           So, you know, I think the Court is starting in just

21   the right place speaking about the as-applied versus facial

22   distinction as well as the remedy, and I think those two are

23   inextricably linked to one another.  We know that from the

24   Supreme Court.  We know that from the John Doe No. 1 case,

25   which says that labels don't matter for an as-applied versus

1    facial distinction.  What does matter is the scope of the

2    relief that the plaintiff is seeking.  If you have a plaintiff

3    who's seeking relief with respect to their own circumstances,

4    that's an as-applied challenge.  If you have a plaintiff who's

5    seeking relief that goes beyond their own circumstances, that's

6    a facial challenge.  You know, sometimes we think about a

7    facial challenge as a challenge to the entire statute and every

8    possible application of it, but there's something in between,

9    and that's actually exactly what the Supreme Court faced in

10   John Doe No. 1.  You know, I've come to describe it as a

11   partial facial challenge; that is, a challenge to the statute

12   that goes beyond just its application to plaintiffs but doesn't

13   go all the way.

14        THE COURT:  Yes, that's maybe what Ms. Rossman has

15   been calling the quasi --

16        MR. HASKELL:  I think that's the same thing.

17        THE COURT:  Yes.

18        MR. HASKELL:  And what the Supreme Court says in John

19   Doe No. 1 is, if you're making one of these quasi facial

20   challenges or these partial facial --

21        THE COURT:  It goes beyond you but not to the full

22   statute.

23        MR. HASKELL:  That's right, that's right.  What the

24   plaintiff needs to do is meet the standards of a facial

25   challenge to the extent of the scope of the relief that they

1    seek, and that makes sense.  Where the plaintiff is looking to

2    invalidate a statute in circumstances beyond their own, it's up

3    to them to prove that the statute isn't validly applied in all

4    of those circumstances that they're seeking relief for.  And

5    that's why the takeaway from John Doe No. 1 that the First

6    Circuit picks up and applies cleanly in the *Showtime* case is,

7    when a plaintiff is making a facial challenge, including one of

8    these quasi or partial facial challenges, their burden is to

9    show that the statute lacks a plainly legitimate sweep within

10   the scope of the injunction they're looking for.  And that's

11   actually a little bit relaxed in the First Amendment context.

12   In other constitutional claims, you'd apply the *Salerno*

13   standard, that there's no set of circumstances.  What they need

14   to show here, and this goes for both the Martin plaintiffs and

15   Project Veritas, where the relief they're looking for is an

16   injunction this wide, they have to show that the Section 99

17   lacks a plainly legitimate sweep within that scope of the

18   injunction that they're looking for.  How do they do that?

19   They apply the appropriate level of constitutional scrutiny.

20   That's where intermediate or *Swift* or the *O'Brien* standard or

21   whatever the appropriate level of scrutiny is comes in, but

22   that's what they need to show, and it's their burden.

23           THE COURT:  I think I've pretty much put my blessing

24   on an intermediate scrutiny standard.

25           MR. HASKELL:  Well, here's the -- sure.

1          THE COURT:  I mean, I haven't really budged off of
2     that because it's content-neutral.
3          MR. HASKELL:  Well, that's right, but the thing about
4     intermediate scrutiny that the Supreme Court reinforced just
5     recently, just last month in the *Minnesota Voters v. Mansky*
6     case that they passed down about wearing political apparel
7     within poling places, what the Supreme Court reinforced is that
8     intermediate scrutiny is a creature of the Supreme Court's
9     forum doctrine when the government says, "We're going to put a
10    time, place, manner restriction on speech that happens here in
11    this particular forum."  And what's tricky about the claims in
12    this case is, they aren't limited to a particular forum.  They
13    extend to all public places.  Some of those public places are
14    going to be governmental forums where, yes, absolutely,
15    intermediate scrutiny applies.  Some of those are going to be
16    governmentally owned nonpublic forums where a time, place,
17    manner restriction passes constitutional scrutiny as long as
18    it's reasonable and not designed to suppress a particular
19    viewpoint.  Some of the places that we're looking to apply it
20    are private property where, you know, the government forum
21    analysis doesn't really apply and --
22         THE COURT:  A fair point.  So let's assume for the
23    moment that we're talking about traditional public fora.
24         MR. HASKELL:  Sure.
25         THE COURT:  So using intermediate scrutiny, what could

1    possibly be the privacy interests that would outweigh the First

2    Amendment interest?

3           MR. HASKELL:  Sure.  So the privacy interest is

4    actually exactly what Mr. McGarry spoke to earlier, and that is

5    a particular flavor of privacy; not privacy in the sense that

6    you can't record me, but rather privacy in the sense that you

7    have to let me know when you're recording me so I can make an

8    informed choice about --

9           THE COURT:  So I can keep quiet and stop swearing.

10          MR. HASKELL:  Or you can choose to speak, by the same

11   token.

12          THE COURT:  Or -- or you could just be -- you know,

13   you just suddenly conform, and you wouldn't be able to record

14   somebody who -- or you wouldn't take a bribe or whatever.  You

15   would stop doing what you were now embarrassed about, which in

16   a way, you're right, it forces conformity to the law or to

17   civility, however you'd like to go, but you wouldn't change the

18   dialogue, the public dialogue.

19          MR. HASKELL:  Well, that's right.  It's an ecumenical

20   interest in this kind of privacy in the sense of you have to

21   let me know when you're recording me, but that's a policy

22   judgment that Massachusetts legislature was within its rights

23   and not acting contrary to the First Amendment.

24          THE COURT:  But that's in fact what I'm struggling

25   with.

1          MR. HASKELL:  Sure.  So, I mean, it is an ecumenical

2     interest in the sense that, you know, the legislature's

3     purpose -- it's clear from the language of the statute in the

4     preamble, it's clear from the William Holman's concurrence in

5     the 1968 legislative history report -- their interest applied

6     equally to everybody in all places.  You know, they weren't

7     drawing any lines there and saying that some people get --

8          THE COURT:  Do they talk about police officers?

9          MR. HASKELL:  They don't talk about police officers.

10          THE COURT:  Do they talk about government --

11          MR. HASKELL:  They don't talk about anybody

12     specifically.

13          THE COURT:  And when you read it, it talks about

14     citizens' privacy rights, like a Brandeis kind of concern

15     about -- that's great.  I'm just saying, what Justice Cordy and

16     Justice Marshall said in *Hyde*, and I respect them both

17     enormously, was, yes, but they weren't talking about police

18     officers.  And so I suppose the SJC said, yes, they were, and

19     that's the final word on it; but I'm the final word, or more

20     accurately the Supreme Court is the final word on whether or

21     not whatever the privacy interests are outweigh the First

22     Amendment issues.

23          MR. HASKELL:  Well, I think that's right, your Honor,

24     and I guess my point is, Massachusetts statute, Section 99,

25     is -- it is broad, and it's categorical and it's clean, and the

1    interest that the legislature has expressed there, that people

2    ought to know when they're being recorded, is within the realm

3    of legitimate policy judgments that the legislature can make

4    because maybe there are going to be some situations where it

5    causes bad activity to go undetected.  There are going to be

6    other situations where it helps good activity to go detected.

7    There are going to be other situations where it prevents bad

8    activity from happening in the first place, and that's a good

9    thing.  That's something that the legislature could legitimately

10   have wanted to do was use the possibility of open recording to

11   deter bad acts rather than using surreptitious recording to

12   catch them.

13        THE COURT:  Because one could imagine citizens

14   recording a police officer showing heroism in some of these

15   locations too, but it would involve speech.  That person could

16   go to jail for five years too, right?

17        MR. HASKELL:  It goes all ways.  It's an ecumenical

18   interest.

19        THE COURT:  When you say "ecumenical," you mean --

20        MR. HASKELL:  Broad.

21        THE COURT:  Broad.

22        MR. HASKELL:  Without special exceptions I guess is

23   what I mean.

24        THE COURT:  So it's just very hard for me to

25   understand a strong privacy interest.  And so for me the big

1    issue is, the one that I've been struggling with is, if you do

2    it just as applied, you could potentially just deal with police

3    officers, the narrowest would be in public fora.  If you did it

4    a little broader, it would be all public officials in public

5    fora.  If you did it a little more broadly, it could be in a

6    publicly accessible setting like a restaurant, and then I start

7    feeling like a legislator.  So I'm struggling with, do I just

8    take the strongest case, or do I keep expanding?

9           MR. HASKELL:  Well --

10          THE COURT:  And --

11          MR. HASKELL:  Go ahead.

12          THE COURT:  I'm struggling with that, where the

13   Supreme Court always is admonishing us, you know, if there's

14   something that's easily available to narrow it, take it, but

15   otherwise don't rewrite a statute.

16          MR. HASKELL:  Well, I think that's right, your Honor,

17   and where we come from on that is, we take those same concerns

18   and frame them in terms of ripeness.  You know, this application

19   of the First Amendment right to record in the context of

20   Section 99 and whether the two are going to conflict somewhere

21   is going to depend on the circumstances.  That's the lesson

22   that we get from all these right-to-record cases.

23          THE COURT:  I get you, and that's normally the case.

24   It's just, in the First Amendment area, you're allowed to do

25   pre-enforcement, and you've got to think about ripeness in

```
 1    terms of pre-enforcement.  That's the catch here.  That's why
 2    normally I'm totally with you on ripeness, but if I said, no,
 3    it's got to be ripe and you've actually got to have a case,
 4    then some guy is sitting in jail.
 5            MR. HASKELL:  Well, I think the key case on that, your
 6    Honor, is Babbitt, the Supreme Court case from the late 1970s,
 7    early 1980s.  It's cited in our brief.  It involved an Arizona
 8    statute that governed agricultural labor relations, and unions
 9    brought a number of First-Amendment-related challenges to that
10    statute, some of which the Supreme Court deemed justiciable,
11    some of which the Supreme Court deemed non-justiciable.  And
12    the way the Supreme Court made that distinction was, well, what
13    are the legal principles that are going to resolve these cases?
14            The claim in Babbitt that the Supreme Court found
15    justiciable, there are two of them actually.  One had to do
16    with the procedures for electing union representatives among
17    agricultural workers, and what the Supreme Court said there is,
18    you know, "We can decide this claim based on broad legal
19    principles, so the facts don't matter as much, and we're going
20    to decide it."  And they actually throw that claim out.  They
21    say, you know, "There is no First Amendment interest in the way
22    you elect your union representatives, so that claim is thrown
23    out."
24            In contrast, another aspect of that statute had to do
25    with agricultural employers giving union representatives access
```

```
 1    in their facilities.  You know, "Come onto our farm.  Come onto
 2    our workspace.  You can set up a table.  You can handbill,
 3    whatever, to try to recruit members."  And, you know, the
 4    unions in that case tried to get that thrown out as well, and
 5    the Supreme Court said, "Well, no, that is fact-dependent.
 6    Whether the union has a First Amendment right to seek to
 7    associate with workers there is going to depend on the specific
 8    site where they try to do it.  You know, some farms are going
 9    to be different from others, and it's really going to depend on
10    the facts.  We can't resolve it on a broad principle, and
11    therefore it's not ripe, it's not justiciable."
12            Our position is that a claim of this type, where does
13    somebody have a right to record under the First Amendment,
14    really depends on the circumstances.  It depends on who they're
15    recording.  It depends on where they're recording.
16            THE COURT:  Is it a jurisdictional matter or
17    prudential matter?
18            MR. HASKELL:  That is jurisdictional.  My position is
19    that it's jurisdictional.
20            THE COURT:  Because both considerations can come in on
21    a ripeness.
22            MR. HASKELL:  Well, that's right, and, you know --
23            THE COURT:  But, you know, what else -- I mean, in
24    fairness, let's just talk about the Martin plaintiffs -- what
25    else do they have to do at this point, actually get themselves
```

```
 1    arrested?  They say, "We record police officers in public
 2    settings, and we've done it twelve times, and we wanted to do
 3    it in twelve other times."  What else?
 4         MR. HASKELL:  Well, and it's that "We wanted to do it
 5    twelve other times" --
 6         THE COURT:  "And we didn't."  They've been chilled.
 7         MR. HASKELL:  I don't think that's something that
 8    we're disputing.  Our contention on jurisdiction isn't that
 9    they haven't been injured by a chill.  It's more that, you
10    know, give us some facts that the Court can apply the law to.
11    In a pre-enforcement context, of course you aren't going to
12    have a record of historical fact because it didn't happen yet,
13    but what the law says a plaintiff needs to do in a
14    pre-enforcement context is:  Tell us your intentions.  Tell us
15    your plans.  Give us that level of detail necessary --
16         THE COURT:  I completely agree, and that's what now
17    Project Veritas has done, because I threw it out at least once,
18    maybe twice -- I can't remember -- and then they finally came
19    back with something.  I thought, all right, it gets to at least
20    stage two.  So haven't they done that?
21         Can I just say -- you've seen their videos, right?
22    Everyone knows who they are, right?  Is there any doubt in your
23    mind that they're going to try and do this kind of "gotcha" in
24    Massachusetts if they can?
25         MR. HASKELL:  No.
```

1          THE COURT:  Okay, all right, so we know they want to

2     do this, right?  There's like a hundred percent beyond any

3     doubt, not even beyond a reasonable doubt, beyond any doubt

4     they want to do it here.

5          MR. HASKELL:  No doubt, but --

6          THE COURT:  All right, no doubt, okay, so --

7          MR. HASKELL:  But the details are where the devil

8     lives here.

9          THE COURT:  Yes, they are, and so that's why I think

10    they very cleverly just say "Just do it all."  I'm just having

11    trouble with the "do it all" because I feel so strongly about

12    individual rights, that the legislature had a right to say that

13    they counterbalance, or at least I wasn't going to override

14    that; but I'm just having a hard time with the privacy rights

15    of, say, police officers in the public setting.

16         MR. HASKELL:  And that's a big source of our concern

17    about Martin's claim as well.  They don't limit their claim

18    based on who the officer is talking to or what the nature of

19    that interaction is.

20         THE COURT:  They can't because it's pre-enforcement.

21    They can't.

22         MR. HASKELL:  And I guess where we're coming from on

23    ripeness is, that might make a difference.  You know, a

24    situation where a police officer is arresting somebody out in

25    public, that's one thing.  The parties' interests are what they

1   are there.  You know, a bystander is recording them --

2         THE COURT:  That's the only time I'll get the level of

3   detail is once they're behind bars.  That's the difficult thing

4   here, and I'm struggling here with this.  I think they're

5   fabulous cases.  I'm very honored to be allowed to preside over

6   cases like this because they're so interesting and important,

7   but I am -- this may be a case -- don't you get to argue your

8   own cases in the Supreme Court?

9         (Laughter.)

10        MR. HASKELL:  I'm afraid I'd have to talk to my boss

11  about that.

12        THE COURT:  In the Attorney General's Office, I think

13  that's one of the beauties of it, you get to take it up.  But

14  it's just a very interesting case and one that merits great

15  public attention.

16        I actually have an 11:00 clock, so I think I'm going

17  to need a few minutes, if you have one final comment, and I'll

18  allow a brief rebuttal from both the ACLU and Project Veritas,

19  if they want.  I certainly have enough briefing, so --

20        MR. HASKELL:  I mean, just to wrap up the jurisdictional

21  thing, what it comes down to for us is, is the risk that the

22  Court is going to find itself dealing in hypotheticals and

23  drawing these hypothetical lines without really a solid basis

24  in the record, without facts or even any plaintiff's plans or

25  intentions, "This is what we plan to do, how we plan to do it

1    and where we plan to do it."  And without that, we're just

2    dealing in hypotheticals, and we see that as an Article III

3    problem.

4              THE COURT:  Or maybe just a prudential issue.  I think

5    I'm allowed to think about that.

6              MR. HASKELL:  And so we have a separate line of

7    argument, if I could end with two things.

8              THE COURT:  Yes.

9              MR. HASKELL:  First of all, Mr. Barr argued a moment

10   ago that Massachusetts is an outlier on this.  It's not.  I

11   think it's fair to characterize Massachusetts as, you know,

12   representing one end of the spectrum.  When it comes to

13   balancing recording versus individual privacy rights,

14   Massachusetts is very protective of privacy rights.  But we're

15   not the only one out there, and I'd point the Court to Oregon

16   Revised Statutes 165.540.  What Oregon has is a general

17   all-party consent requirement, unless the person doing the

18   recording specifically informs the people that they're being

19   recorded.  However, there's a statutory carve-out for police

20   officers in public meetings.  The catch to the statutory carve-

21   out --

22             THE COURT:  In public meetings?

23             MR. HASKELL:  Public meetings.

24             THE COURT:  Police officers in a public meeting?

25             MR. HASKELL:  And a public meeting.

```
 1              THE COURT:  And, and, and --

 2              MR. HASKELL:  Two separate statutes.

 3              THE COURT:  Oh, oh, I'm sorry.

 4              MR. HASKELL:  Police officers doing their duties in

 5     public, very similar to the scope of Martin's claim, and public

 6     meetings.  The catch to those two statutory carve-outs, though,

 7     is that they only permit open recording, not surreptitious

 8     recording.  Oregon says, generally you can't record without all

 9     parties' consent or without them being specifically informed,

10     but you can record police officers doing their stuff in public

11     as long as you do it openly.  It's the exact same policy.

12              THE COURT:  So you're saying it's the same thing in

13     Oregon?

14              MR. HASKELL:  Fundamentally when it comes to police

15     officers.

16              THE COURT:  Fundamentally.

17              MR. HASKELL:  And, you know, an interesting thing

18     about --

19              THE COURT:  So what's the bi-coastal approach.

20              MR. HASKELL:  That's right.  And the really remarkable

21     thing about Oregon is, their all-party-consent requirement has

22     been on the books for a long time.  This police "you can openly

23     record them in a public" carveout was just enacted by their

24     legislature a couple years ago, and, you know, it seems pretty

25     clear that it's in response to recent developments --
```

1          THE COURT:  Is there litigation in Oregon?  Do you
2    know?
3          MR. HASKELL:  There hasn't been, or at least as best I
4    can tell on Westlaw.  I haven't picked it up, so nothing has
5    been reported yet.  But, you know, it goes to show --
6          THE COURT:  They're getting on a plane as soon as they
7    leave this --
8          MR. HASKELL:  I bet they are, but that's not my case.
9    But, you know, it goes to show that this notion that a
10   policymaker can legitimately make a distinction between open
11   recording where the people know about it and surreptitious
12   recording where they have no idea that they're even being
13   recorded and can do anything about it, and, you know, they
14   become an unwilling object of this recording, that distinction
15   continues to hold some force in public policy-making, at least
16   among the legislature of Oregon.
17         THE COURT:  Okay.
18         MR. HASKELL:  So unless your Honor has any
19   questions --
20         THE COURT:  No, thank you, and I'm just going to
21   give -- it's ten of, and I'll need to give my Court Reporter a
22   break before the next hearing, so I thought if each of you took
23   five minutes, does that seem fair?
24         MS. ROSSMAN:  Absolutely, your Honor.  Thank you.
25         Three quick substantive points, your Honor, and I

1    actually have one procedural question.  I know for the purposes
2    of the Martin case, our replies are actually due on Monday, but
3    we have now heard the Court say multiple times, I know that you
4    have a lot of papers already at this point, so we would propose
5    modifying the order to eliminate those briefs unless this Court
6    has specific issues that you would like to hear further
7    about --
8           THE COURT:  You know, between the motions to dismiss
9    briefing and the fact that there are two sets of briefing, I'm
10   not going to prevent you from filing a reply, but I don't need
11   one.
12          MS. ROSSMAN:  Thank you, your Honor.
13          THE COURT:  Thank you.
14          MS. ROSSMAN:  So with respect to the three quick
15   substantive issues, the first two I think can both be addressed
16   by *Glik* already.  So to this point that you've already raised
17   several times about the interest of police privacy and are
18   there any, as this Court already had stated before, there are
19   not, and I think that's supported by the First Circuit.  The
20   First Circuit has spoken to this in *Glik* when it said that
21   there could be no reasonable regulation of a police officer
22   arresting someone in public.  I think that's acknowledging and
23   holding that there is a right to record police officers while
24   they're performing their duties in public.  The First Circuit
25   has already answered this, that there are not privacy interests

1    of the police officers involved.

2          And, similarly, I think a critical distinction, and

3    this arose in Defendant Conley's brief, and I know Mr. Haskell

4    just raised this here today about whether the right to record

5    exists if that turns on context; and I think there's a

6    distinction between the right to record police officers

7    performing their duties in public and whether a regulation of

8    that right can be reasonable.  And that first category, *Glik*

9    has already said quite clearly that the right to record police

10   officers performing their duties in public is covered by the

11   First Amendment, period, and there's no additional context

12   that's needed there.  Now, whether a regulation --

13          THE COURT:  I think they said it more broadly.  They

14   said "government officials," didn't they?

15          MS. ROSSMAN:  Yes, your Honor.

16          Now, with respect to the regulation of that right,

17   that might turn on circumstances depending on the particular

18   regulation, but, of course, here Section 99 does not take into

19   account any details.  So for that reason, the details are

20   unimportant with respect to the regulation, but the right

21   exists when you're recording a police officer performing their

22   duties in public, regardless of additional context.

23          The final point goes to remedy, and I just want to be

24   very clear.  The plaintiffs, as we noted, are seeking that

25   declaration that Section 99 is unconstitutional as applied to

1    the secret recording of police officers performing their duties

2    in public.  And with due respect to Mr. Barr, I don't think

3    that this needs to be an all-or-nothing question.  There

4    certainly is a doctrine of narrowing the construction when a

5    court is doing statutory interpretation and trying to avoid a

6    constitutional issue and interpreting a statute, but that's not

7    what the claims are here.  Here the plaintiffs are saying that

8    the statute says it's unlawful to secretly record police

9    officers performing their duties in public, no doubt about it,

10   but that application is unconstitutional, and this Court

11   certainly has the power to say that that particular application

12   fails the First Amendment.

13           And what we're asking for in this relief is, at the

14   very least, this means that Section 99 cannot be applied to

15   secretly recording a police officer's voice when they're

16   performing their duties in public.  So that means that it

17   couldn't be used to charge someone when they secretly record a

18   police officer in a one-on-one interaction, or when somebody

19   else was in -- anyone else was with him already knew about or

20   had consented to that recording.  And plaintiffs are certainly

21   asking for that relief here, but they're also asking for

22   something a bit broader, and that is, when someone secretly

23   records a police officer performing their duties in public,

24   they can't be charged under Section 99 for that recording, even

25   if that recording includes other individuals' voices.  And *Glik*

1    speaks to that, your Honor, where it already said that there's

2    no reasonable regulation of a peaceful recording of a police

3    officer performing an arrest in public.  So that is what the

4    plaintiffs are asking for here today.

5         THE COURT:  So would you view it as part of your

6    obligation to delete out the bystanders?

7         MS. ROSSMAN:  Your Honor, I believe that's the type

8    of -- as it's written right now, the government has not

9    established that there is any -- that the statute as it is

10   written is narrowly tailored to any significant government

11   interest, and for that --

12        THE COURT:  Let's say you were to record a government

13   interaction, a police interaction with civilians, there is a

14   question about the civilian's rights to privacy.

15        MS. ROSSMAN:  First of all --

16        THE COURT:  I don't know that I have to deal with that

17   specifically, but I would imagine that if you were audio

18   recording some civilian conversation that you happen to pick

19   up, the statute might fairly apply to that.  You're not even

20   asking me to say anything else, are you?

21        MS. ROSSMAN:  We're speaking to those interactions

22   with police officers, your Honor, and if there is some narrow

23   tailoring that needs to occur here to address additional

24   interests, it is appropriate for the legislature.  Of course,

25   as you mentioned multiple times yourself, is that the

1  legislature can do that narrow tailoring if there are any

2  significant government interests.  But the problem here is that

3  as applied to the secret recording of police officers

4  performing their duties in public, there is just no tailoring

5  for any particular circumstances that the government has been

6  able to put forward where there's significant government

7  interest, and that's the application that the plaintiffs are

8  asking the Court to strike down as unconstitutional.

9       THE COURT:  All right, thank you.

10      Mr. Barr?

11      MR. BARR:  Thank you, your Honor.  To address

12 Mr. Haskell's point, because I've done several proof-ins for

13 Oregon, there are numerous exceptions built into the law that

14 allow at least for the ability to record.  When notice has been

15 given that a recording is occurring at an educational activity,

16 for example, it's unclear whether it has to be open or

17 surreptitious, so there's questions about the exact reach of

18 Oregon law that haven't been settled in any meaningful

19 litigation, but at least seems to be more expansive than

20 Massachusetts.  Massachusetts is an outlier.  It is the only

21 state with a complete ban --

22      THE COURT:  What about police officers in Oregon?

23      MR. BARR:  What about police officers?

24      THE COURT:  I thought he said that it had to be --

25      MR. BARR:  Oh, I believe it's open for them as well.

1          THE COURT:  It has to be open.

2          MR. BARR:  Yes, yes.

3          THE COURT:  So he's right on that point?

4          MR. BARR:  On that point, yes, yes.  But my point is

5     to say there are other exceptions that, for example, allow the

6     recording of private individuals --

7          THE COURT:  You don't have to win that it's the worst

8     in the country either.

9          MR. BARR:  Yeah, okay.  All right, I got you.  In

10    addressing sort of the need to have a proper fit here and

11    address the exact circumstances, the when, where, how, why that

12    the Attorney General's office has cited, that would be fine if

13    we had a law that had difficult-to-interpret terms and we had a

14    factual situation that we had to plug into that and figure out;

15    but you have to measure the case before you against the law,

16    the actual law.  We don't have a hypothetical law such as one

17    that you find in California or in New Hampshire or the like.

18    We have a complete ban, so it is impossible to do that sort of

19    precise fit here, and it's unnecessary.

20          I'd like to thank the Attorney General's Office that

21    this is ripe, and there's no question beyond a reasonable doubt

22    that Veritas will film if relief is afforded here.

23          I wanted to speak quickly to the remedy aspect of

24    this.  You know, if entire invalidation seems appropriate, the

25    Massachusetts --

1          THE COURT:  When you say entire invalidation, you're

2    referring just to government officials?

3          MR. BARR:  Yes, just -- well --

4          THE COURT:  I know you're appealing the other piece of

5    it, but as you're standing here today with what's left --

6          MR. BARR:  Well, right, but to issue --

7          THE COURT:  -- you want me to revisit it?

8          MR. BARR:  To issue an order stating that Section 99

9    is unconstitutional but only as to the recording -- I'm

10   sorry -- only as to the recording of government officials doing

11   their duties in a public place, that that's a gloss, that's a

12   narrowing construction that you're applying to the statute; and

13   the controlling Supreme Court precedent asks, is that

14   reasonable and is it readily apparent?  And I appreciate that

15   you have concerns that if you invalidate it in its entirety and

16   in toto, that private individuals' privacy concerns will be

17   damaged; but the Massachusetts legislative branch can take

18   actions to quickly move and to put in place a law where you can

19   be creative in a remedy to give them time to do that on that

20   angle.  But in the meantime, November is four months away.

21   It's very important for Veritas to be able to come in, be able

22   to realize its projects, to be able to speak to people when

23   they want to hear about this news most.  They'd prefer not to

24   go to jail and be imprisoned for five years.

25          Thank you, your Honor.

1          THE COURT:  Thank you.  Thank you to everyone.  I have

2     two scheduling conferences at 11:00 o'clock.  Those aren't on

3     the record.  We can stand in recess briefly, and then we'll

4     call you right up here.  Okay, thank you.

5          MR. HASKELL:  Thank you, your Honor.

6          THE COURT:  Thank you very much.

7          MR. McGARRY:  Thank you, your Honor.

8          (Adjourned, 11:00 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 C E R T I F I C A T E

 2

 3
     UNITED STATES DISTRICT COURT )
 4   DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
 5

 6

 7          I, Lee A. Marzilli, Official Federal Court Reporter,

 8   do hereby certify that the foregoing transcript, Pages 1

 9   through 78 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Civil Action No. 16-10462-PBS,

11   Project Veritas Action Fund v. Daniel F. Conley, and Civil

12   Action No. 16-11362-PBS, K. Eric Martin v. William B. Evans, et

13   al, and thereafter by me reduced to typewriting and is a true

14   and accurate record of the proceedings.

15          Dated this 1st day of April, 2019.

16

17

18

19

20          /s/ Lee A. Marzilli
            _____
21          LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
22

23

24

25
```